The following is the PDF of an official transcript. Official transcripts may only be filed in CM/ECF by the Official Court Reporter and will be restricted in CM/ECF for a period of 90 days. You may cite to a portion of the attached transcript by the docket entry number, referencing page and line number, only after the Court Reporter has filed the official transcript; however, you are prohibited from attaching a full or partial transcript to any document filed with the Court.

UNITED STATES DISTRICT COURT
OFFICIAL CERTIFIED TRANSCRIPT

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA,          :
                                   :
vs.                                :   DOCKET NUMBER
                                   :   1:15-CR-0284-3
BRANDON REDMOND,                   :
                                   :   ATLANTA, GEORGIA
          DEFENDANT.               :   AUGUST 2, 2021


**TRANSCRIPT OF JURY TRIAL – VOLUME 2 OF 6 PROCEEDINGS**

**BEFORE THE HONORABLE AMY TOTENBERG**

**UNITED STATES DISTRICT JUDGE**


APPEARANCES OF COUNSEL:

**FOR THE GOVERNMENT:**

RYAN K. BUCHANAN
JESSICA C. MORRIS
UNITED STATES ATTORNEY'S OFFICE


**FOR THE DEFENDANT:**

DEREK H. JONES
THE JONES LAW FIRM LLP


*MECHANICAL STENOGRAPHY OF PROCEEDINGS AND COMPUTER–AIDED
TRANSCRIPT PRODUCED BY:*

*OFFICIAL COURT REPORTER:        SHANNON R. WELCH, RMR, CRR
                                 2394 UNITED STATES COURTHOUSE
                                 75 TED TURNER DRIVE, SOUTHWEST
                                 ATLANTA, GEORGIA  30303
                                 (404) 215-1383*

2

**I N D E X   T O   P R O C E E D I N G S**

**PAGE**

PRELIMINARY INSTRUCTIONS (CONTINUED)

    by The Court                       21

OPENING STATEMENT

    by Ms. Morris                    35
    by Mr. Jones                     45

**THE GOVERNMENT'S CASE**

**WITNESS**                                   **PAGE**

SCOTT WOLFE

    Direct Examination
      By Mr. Buchanan            56
    Cross-Examination
      By Mr. Jones               70
    Redirect Examination
      By Mr. Buchanan            81

WILLIAM ANDERSON

    Direct Examination
      By Ms. Morris             85
    Cross-Examination
      By Mr. Jones               90

BASIL JAKKAR VARNER

    Direct Examination
      By Mr. Buchanan       104
    Cross-Examination
      By Mr. Jones            119
    Redirect Examination
      By Mr. Buchanan       149

JOHN PORTER

    Direct Examination
      By Ms. Morris           152
    Cross-Examination
      By Mr. Jones            166

UNITED STATES DISTRICT COURT
OFFICIAL CERTIFIED TRANSCRIPT

3

(...cont'd...)

**WITNESS**                                                    **PAGE**

    Redirect Examination
      By Ms. Morris                                          171

CHRISTOPHER BEAN

    Direct Examination
      By Ms. Morris                                          173
    Cross-Examination
      By Mr. Jones                                           179

LEON SCOTT

    Direct Examination
      By Mr. Buchanan                                        186

* * *

CERTIFICATE                                                    218

4

**P R O C E E D I N G S**

**(Atlanta, Fulton County, Georgia; August 2, 2021.)**

THE COURT:  Good morning.  Have a seat.

MS. MORRIS:  Good morning, Your Honor.

Mr. Buchanan just stepped out to the restroom.  So he will be back any second.  He left his telephone, so I know he will be right back.

THE COURT:  Okay.  Very good.

MR. JONES:  Good morning, Judge.  Before we get started when Mr. Buchanan gets back, there are just a couple of matters I would like to take up.

THE COURT:  I have one also.

MR. JONES:  Yes, ma'am.

THE COURT:  Good morning.  All right.  What are the matters you want to take up?

MR. JONES:  The first issue is courtroom security and shackling.  My client is in leg irons.  I object to him being shackled in the courtroom.  I think it violates his rights to due process.

He has not indicated throughout any hearing that we've had or any proceeding that I've been involved in that he is any sort of danger to the Court, to me -- I'm not afraid of him -- or to anybody else in this courtroom.

That is my first question is shackling.  I think there is a fundamental problem with shackling a defendant in

the courtroom.

Now, I don't think it can be seen. But that is not the issue in my mind, Your Honor. The issue is that a gentleman with a presumption of innocence comes in this court shackled.

The second thing is that the deputy marshal is seated probably three -- about a yard, three feet behind my client. Again, there has been no indication that he's any sort of danger. The deputy marshal will be in a position to hear our communications. And I simply state that he is too close.

There is no reason that he couldn't be moved to another area where he could -- he could be of assistance, if needed.

And frankly, Your Honor, I haven't tried a case in this division in several years. But I can't remember the last -- trying a case where the marshal was sitting right behind us at counsel table.

So I would object to that, Your Honor. It interferes with my ability to represent my client and denies him effective assistance of counsel under the Sixth Amendment. That's my first issue, Judge.

THE COURT: All right. Do you wish to have a hearing on the shackling issue? I mean, normally I think the shackling -- my understanding and recollection is that it is not unusual to have the ankles potentially shackled.

I do want to make a record of the fact that there is a curtain on all counsel's tables. So it wouldn't, as you acknowledge, be evident. But if you want a hearing on that, I am willing to do so. I would rather start the proceeding first and then do it during a break.

I'm somewhat -- I'm more concerned about the proximity of the marshal as it is so close. And I can see that myself. And I know we're a little more squeezed than we normally would be because of COVID and where everyone is sitting so that the entire courtroom -- all the tables are a little more squeezed in.

But is there any reason why the marshal couldn't sit at the table behind you, or you don't have anyone else who is assisting you? Is that all right?

THE MARSHAL: Yes, Judge.

THE COURT: Would that address your concern?

MR. JONES: That concern, yes, Your Honor.

THE COURT: I meant that particular set of concerns as to the marshal's location.

MR. JONES: It would. Thank you, Judge.

THE COURT: We can move the -- yes. Let's move that over toward the exhibit cart so that he has free access to the --

All right. Now, if you look at where he is sitting now, it is still behind you but further behind.

Does that make you feel any more comfortable?

MR. JONES:  That is satisfactory.  Thank you, Judge.

To go back to the shackling issue, I did not think it would be an issue as I do not recall in previous trials that I've had in this division -- and it has been a little while, I must admit -- that my client would be shackled.  I understood it was the custom during hearings.

But my understanding coming in to today was -- based upon talking to people was that he -- the shackles would be removed at trial.  If I misunderstood, I apologize.

But I think that they have to -- if the Court recalls, there was a -- the Government filed a motion to shackle Mr. Jackson prior to trial but made no motion for Mr. Redmond.  So I did not think it was an issue until I came in and saw him in leg irons, Judge.

**(There was a brief pause in the proceedings.)**

THE COURT:  All right.  So let me ask the Marshals' Office.  Tell me what your standard procedure is for all defendants during trials so that I just --

COURTROOM DEPUTY CLERK:  Both these guys are here from out of town.  So I'm talking to Brooke Davis, the supervisor downstairs.

THE COURT:  Oh, I'm sorry.  All right.  So I think that Mr. Martin is talking to somebody down in the Marshals' Office on the computer just asking them what their standard

procedure is.

Is that your notebook or your briefcase, or is it somebody else's?

MR. JONES:  Yes.  That is my briefcase.

THE COURT:  Why don't you move it over so that he is not just having to --

MR. JONES:  Judge, I remember when the Jackson shackle issues came up and there was discussion I believe in the Government's motion that these problems could be alleviated by skirtings, which is the -- which is the custom when a defendant needs to be shackled.

But, quite frankly, I was a little surprised when I saw the skirtings on the table today.  But again, Judge, I would have brought this up before this morning if I had known.

THE COURT:  Well, I didn't know either.  But I do think -- my understanding is it is not atypical.  So that is why I wanted to know exactly what the protocol is.

And, Mr. Buchanan, do you want to address that to your knowledge?

MR. BUCHANAN:  Sure, Your Honor.  With the trial I had before Judge May, which was a post-COVID trial, I think that some of the Marshals' procedures changed given how the courtroom configuration changed.  So I would defer to what they are saying.

Mr. Jones is right we didn't file a motion to have

Mr. Redmond shackled.  He was not shackled during jury selection, I don't believe.  But we do note that -- I know when we set up the courtroom with Judge May there was some concern with respect to that door that is right near there.  Because I don't believe that -- I don't believe it locks.  So there was a little bit of concern about that.

But whatever the Marshals want to do is fine with the Government.

THE COURT:  Well, all right.  Let's deal with some other things in the meantime and also you think about whether you are willing to wait until we get the opening statements first to have a hearing, if necessary.

Go ahead.

MR. JONES:  Judge, the -- there were two PSRs -- I'm sorry, Your Honor.  I keep forgetting about the mask.

There were two PSRs provided.

THE COURT:  Right.  I ruled on that.

MR. JONES:  Yes, Judge.  I just may need -- I got them around 8:00 last night.  It was a long day.  I just may need a little time to go through them if those witnesses are going to be testifying anytime soon.

THE COURT:  All right.  Well, who is your first witness?

MR. BUCHANAN:  Our first witness is Scott Wolfe, who is a victim, Your Honor.

10

THE COURT:  And are any of the witnesses from the PSRs likely to testify this morning?

MR. BUCHANAN:  No, Your Honor.

THE COURT:  Well, why don't we see --

MR. JONES:  That will do it, Judge.

THE COURT:  All right.  I do want to say with respect to the Government -- I don't have a document number on this.  But -- well, I do.  I'm sorry.

The Government's motion in limine to exclude improper impeachment evidence and motion to seal for protective order where it has been sealed, this is Document 645 -- I'm going to deny the motion.

I think looking at the case authority cited in both parties' briefs, it seems to me plainly clear that the evidence contained in the report of Mr. -- alleged -- Mr. Scott's alleged activities while he was incarcerated are relevant here for impeachment and bias purposes.

And I do have a question.  The report was given on the 2nd of July of this year.

When did the U.S. Attorney's Office -- when was it notified of this?

MR. BUCHANAN:  When Mr. Scott came up for a prep session, Your Honor, which I believe would have been July 22nd.  And Mr. Scott's attorney, Mr. Morrison, is aware of this allegation because we made it known to him, like we did

Mr. Scott.

And so I don't know what his counsel will be to his client about that. But I'll just -- so the Court is aware.

THE COURT: All right. Well, here is my question. Did he notify you or did the -- I mean, clearly it seems like the prison authorities at minimum have notice of it on the 2nd or 3rd.

MR. BUCHANAN: The Marshal Service notified us of it when he came up.

THE COURT: I see.

MR. BUCHANAN: And then we then talked with him and his lawyer about it. And then we filed a motion after that.

THE COURT: All right. Then that is my ruling on that. I mean, I have read last night all the cases that were cited and others and the material, and I think that it is -- it falls squarely in the area of admissibility in order to explore bias.

All right. What else do you have, Counsel, that you want to address?

MR. JONES: None on my behalf, Your Honor.

THE COURT: All right. Are you prepared to proceed with opening statements and with the preliminary instructions and then we'll -- under the current circumstances? Because I'm afraid everything else might take some time.

COURTROOM DEPUTY CLERK: We have a supervisor on the

12

way up.

THE COURT:  All right.  We have a supervisor on the way up, so we'll wait.

MR. JONES:  Thank you, Judge.

Judge, is there a problem with giving him an ink pen?

THE MARSHAL:  That's fine.

COURTROOM DEPUTY CLERK:  Judge --

THE COURT:  Yes.

COURTROOM DEPUTY CLERK:  -- Mr. Lukowski is here.

THE COURT:  Good morning.

THE MARSHAL:  Hello, Your Honor.

THE COURT:  Would you just come over here before the microphone and introduce yourself for me for the record.

THE MARSHAL:  Thank you.  I'm Jonathan Lukowski.  I am a supervisor from the Marshal Service.

THE COURT:  Thank you.  Would you share with counsel and me the -- what the standard protocol is as to shackling the ankles of defendants currently in the courthouse is during trial.

THE MARSHAL:  Well, standard protocol is they go to every court hearing with ankles on -- ankle shackles.  It is a case-by-case situation when it comes to trials at least here in Southern Georgia -- I mean, Northern Georgia -- sorry -- Atlanta.

If it was my preference, I like them on everybody all

13

the time.  But -- so we asked for them on this defendant because Friday during jury selection I guess he got up and went to throw something away in the trash can right by the jurors and he was told to get up and to sit down.  And then they moved the trash can back to the second row, and he got up and did it again.  So --

THE COURT:  But didn't he do that after they were departing?

COURTROOM DEPUTY CLERK:  As they were departing, yes, ma'am.

THE MARSHAL:  And then the personnel at the Marshal Service can't make a big deal about it in front of the jury. So that is why we are asking -- if he would have listened to the instructions, then I probably wouldn't have asked for that.

THE COURT:  All right.  I understand your concern, and I know you are here to protect everyone in the courtroom, as well as the defendant.

I think that we should -- my observation of that was that they had -- they were on their way out and he may have -- and he -- it is obviously also a nerve-racking situation for him too.  I didn't think that he was trying to approach anyone. I did watch that.

I'm going to just -- I'm going to allow the shackles to be removed.  But I'm going to just advise Mr. Redmond of this.  Sit still.  I mean, when you need -- I'm sorry.  When

14

you -- if you need to be able to move --

THE DEFENDANT:  I will ask first, Your Honor.  I won't -- I'll ask first.

THE COURT:  All right.  Thank you very much.  Because if anything goes wrong, then I have to put you -- authorize them to do that.  And it is the same thing when you are -- I know there is a lot of discomfort and tension at this time and the same thing in transit.

But don't make trouble for yourself because this is a long -- I mean, this is a very full of tension anxiety situation for you.  And it is going to be -- some things may be maddening.  Some things will be heartbreaking.  But it will be self-defeating for you if you -- if you make it worse for yourself.

So I'm going to give you this chance.

THE DEFENDANT:  I totally comprehend, Judge Amy Totenberg -- Ms. Totenberg.

THE COURT:  Is somebody able to do that at this time?

THE MARSHAL:  Yes, ma'am.

THE COURT:  Thank you, Officer.  Thank you very much, Officer.

Thank you.  All right.  Are we ready to proceed, or is there anything else?

MR. BUCHANAN:  Two quick things, Your Honor.  First, the United States would invoke the rule of sequestration.  We

would, however, note the exception to that for crime victims. We believe we have at least one victim of the offense who is in court today. So we would invoke that exception for that witness.

Secondly --

THE COURT: Let's just deal with one thing at a time.

Is there an objection to that?

MR. JONES: Judge, yes. I would object to any witness other than the -- sorry, Judge. I keep forgetting.

I would object to any witness who is going to testify in this trial being in the courtroom except the case agent, which is -- which is traditional. But anybody who testifies should not -- should be sequestered.

We would also invoke the rule ourselves, Your Honor.

THE COURT: Is there a provision in the -- in one of the victim crime acts that allows this? I have never had anyone invoke it before. That is why I'm asking.

MR. BUCHANAN: We would have to take a look, Your Honor. I think it might be the same provision that allows a testifying case agent to be in the courtroom. But I'm not certain. So --

THE COURT: Do you have an objection to the -- to the victim who is present listening to opening statements?

MR. JONES: Yes.

THE COURT: All right. Well, until you can provide

16

me that, I can't allow her to -- he or she to sit in.  I'm sorry.  Once you provide it, I'm happy to review it anew.

MR. BUCHANAN:  Your Honor, it is 18 U.S.C. 3771(a)(3), and it provides the crime victim the right to not be excluded from any such public court proceeding unless the Court, after receiving clear and convincing evidence, determines that testimony by the victim would be materially altered if the victim heard other testimony at that proceeding.

MR. JONES:  Judge, I'm not familiar with the statute. My apologies.

But does that include -- I would just ask if that includes trial testimony as opposed to motion hearings and whatnot.

THE COURT:  Well, I'm looking at it now.

It doesn't limit it.  It starts off -- 3771 says a crime victim has the following rights and then, Number 1, the right to be reasonably protected from the accused; Number 2, the right to reasonable, accurate, and timely notice of any public court proceeding or any parole proceeding involving the crime or a release or escape of the accused.  And I think that is broad enough to include a trial.  And 3 was the right not to be excluded from any such public court proceeding unless the Court, after receiving clear and convincing evidence, determines that testimony by the victim would be materially altered if the victim heard other testimony at that proceeding.

I don't know what the witness' testimony would be and how it might be affected.  I don't know anything about the specific witness.  We haven't even mentioned on the transcript, I think, her or his name.  So that is something I think I have to sort of -- this is for me a little bit last minute.

So I would like to hear what the -- I can't make that determination of whether there is a possibility that clear and convincing evidence would show that the evidence might -- his or her testimony might be materially altered if she or he heard other testimony in the proceeding.

I mean, that's what I'm called on to do is to look at that question because he is objecting.  So I don't know that you are able to make that showing either, on the other hand.

Did you know which witness that was?

MR. JONES:  No, Your Honor.

MR. BUCHANAN:  Toni Moceri.

THE COURT:  Toni Moceri?

MR. BUCHANAN:  Yes.

THE COURT:  And which of the home invasions is that?

MR. BUCHANAN:  It is the one that is noted in the second superceding indictment.  Its victims are T.M. and M.M. It happened on June 12th at 105 Blackland.

Just so we're crystal clear, she is the witness who reported the sexual assault during the robbery, Count 12 and 13, Your Honor.

18

MR. JONES:  If we could just have a timeout.

THE COURT:  Yes.

**(A discussion ensued off the record between the defendant and defense counsel.)**

MR. JONES:  Thank you for allowing me to interlude with my client, Your Honor.  I sort of lost the thread of things.

My apologies, Mr. Buchanan.

Where were we, Judge?

THE COURT:  Well, what I was asking you is simply do you wish to -- I mean, do you want to put any evidence or argument as to why this might impact her testimony after hearing the testimony?

This is obviously a contested issue about who it was -- who was the individual responsible -- among many other things for this -- what she experienced.  So I don't -- you-all know what her statements were, I assume, at this juncture.  I don't have any of those.

MR. BUCHANAN:  Your Honor, to expedite the proceedings this morning, we'll have Ms. Moceri step out.  We have done so.

But we are -- we remain supportive that 18 U.S.C. 37 -- it clearly allows for crime victims to be present.

THE COURT:  It does.  And he has also the right to try to put on clear and convincing evidence that -- that her

UNITED STATES DISTRICT COURT
OFFICIAL CERTIFIED TRANSCRIPT

testimony would be impacted.

So I appreciate your waiting until we can sort this out because it is last moment that it is being raised. And I certainly think it is important that we observe her right to have this potentially -- to be sorted out in a fair way for her and for the defendant consistent with the provisions of the statute.

All right. So I'm assuming that when we get a lunch break -- at least by the time we have a lunch break that you can take a look at her statements.

You have a copy of her statements, I assume?

MR. JONES: The PSRs, yes, Judge. That would --

THE COURT: No. I meant Ms. Moceri's statements. I mean, if she is -- if your concern is will whatever she hears here today affect her statement --

MR. JONES: I'll state my concern right now. Unless I have missed it, Ms. Moceri is the last series of holdups. Correct?

Unless I have missed something, Ms. Moceri and the other victim in that case -- I haven't seen anything where they gave a height or weight of the perpetrators. So I'm concerned if the Government's theory in opening statement is that there is a big guy and a little guy and that somehow influences her testimony as to the size of the respective perpetrators, which is a crucial issue in the case.

THE COURT:  All right.  Well, let's deal with this one-by-one.  She is not going to attend opening statement, and I think that is a legitimate concern, and we don't know what is going to happen.

And then please refine it after that.  One way or the other, do you think that you've got an issue?  And tee it up factually for me.  Not now.

Basically let's get going.  And then you can go look at what she said in the past, and you can tee up whatever you think the evidence would be that might influence her if she was going to sit -- if she was going to sit through it.

All right?

MR. JONES:  Yes, Judge.

THE COURT:  And the Government itself can address this obviously also why you think it won't influence her.  But I think we should try to do this not on the jury's clock at this point.

All right?

MR. JONES:  And, Judge, my only point was that is all I have to say about it.

THE COURT:  At this moment?

MR. JONES:  Yes.

THE COURT:  All right.  Maybe you will have more after the opening statement.  So let's -- and maybe not.  That is great.  We'll revisit it when we have a break, whether it is

21

a -- at any time.

MR. BUCHANAN:  Thank you, Your Honor.

I have one other housekeeping matter.  The Court is aware that Mr. Jones filed a motion which the Court granted that allowed him to ask about gender identity with respect to the witnesses.  The United States objected to that.

One of our witnesses we expect later this morning is Ms. Basil Varner.  I believe that that is the witness that Mr. Jones was referencing.

We would ask that Mr. -- Ms. Varner -- I will address her as Ms. Varner.  Her plea agreement describes her pronouns as Ms. and feminine pronouns.  We would ask that Mr. Jones not refer to her as Mr. Varner.

MR. JONES:  I fully intend to address the witness as Ms. Varner.

THE COURT:  Thank you.

Are we ready to go?

MR. BUCHANAN:  Yes, Your Honor.

THE COURT:  Great.  Thank you.  You can bring the jury in.

**(The jury entered the courtroom at 10:15 A.M.)**

THE COURT:  Please have a seat.

Good morning, ladies and gentlemen.  We had a lot of pretrial matters that we were still sorting out trying to make things move a little bit hopefully faster.  But I'm sorry that

22

it took up some of your time as well.

Thank you again for your service, and I'm just going to move over a little bit here so I'm not completely blocked by the witness screen.

I want to just say again, you know, we've got some amount of burdens in doing this, of course, during this -- the continuing pandemic. If at any point somebody feels really uncomfortable because they need -- for any reason and you need to go outside because you've been wearing a mask all day and you're just sort of feeling faint in any way, I understand that.

Mr. Meadows -- Ricky Meadows here is your ticket to comfort and also addressing discomfort. And if you need to go to the restroom at any time, you can flag him or send a note that way. Because I might not notice. Sometimes I do. But Mr. Meadows doesn't usually work past 2:30. He is here early in the morning. So then he will do a relay though with what is going on with whoever is going to be subbing in the afternoon for him.

But we understand that this is an incredibly valuable, important service you are giving. And I wanted to thank you and know that some accommodations may be necessary at times.

Now, you've already been sworn in on Friday. So I need to explain now some basic principles about a criminal

23

trial and your duty as jurors.  Some of this I have gone over in less detail on Friday.

These are preliminary instructions.  And I will give you more detailed instructions about the law at the conclusion of the trial.  It will be your duty as the jury to decide what happened so you can determine whether the defendant is guilty or not guilty of the separate offenses charged in this indictment.

At the end of the trial, I will explain the law that you must follow to reach your verdict.  You must follow the law as I explain it to you, even if you do not agree with the law.

You must decide the case solely on the evidence presented here in the courtroom.  Evidence can come in many forms.  It can be testimony about what someone saw or heard or smelled.  It can be an exhibit admitted into evidence.  It can be someone's opinion.

Some evidence proves a fact indirectly, such as a witness who saw wet grass outside and people walking into the courthouse carrying wet umbrellas and then says I think it was raining.

Indirect evidence, sometimes called circumstantial evidence, is simply a chain of circumstances that proves a fact.

As far as the law is concerned, it makes no difference whether evidence is direct or indirect.  You may

24

choose to believe or disbelieve either kind and should give every piece of evidence whatever weight you think it deserves.

Now, certain things are not evidence and must not be considered. I will list them for you now. Statements and arguments of the lawyers are not evidence. In their opening statements and closing arguments, the lawyers will discuss the case. But their remarks are not evidence.

Questions and objections of the lawyers are not evidence. The lawyers -- only the witnesses' answers are evidence. And only the documentary evidence that I submit -- allow you to get into the record and review is evidence. You should not think that something is true just because a lawyer's question suggests that it is. For instance, if a lawyer asks a witness, you saw the defendant hit his sister, didn't you, that question is not evidence whatsoever of what the witness saw or what the defendant did unless the witness says, yes, I agree. I saw that.

There are rules of evidence that control what can be received into evidence. When a lawyer asks a question or offers an exhibit and a lawyer on the other side thinks that it is not permitted by the rules of evidence, that lawyer may object. And that is his legal responsibility.

If I overrule the objection, then the question may be answered or the exhibit received. If I sustain the objection, then the question cannot be answered and the exhibit cannot be

25

received or the testimony cannot be provided.  Whenever I sustain an objection to a question, you must ignore the question and not try to guess what the answer would have been.

Sometimes I may order that evidence be stricken and that you disregard or ignore the evidence.  That means that when you are deciding the case you must not consider the evidence.

Some evidence is admitted only for a limited purpose.  When I instruct you that an item of evidence has been admitted for a limited purpose, you must consider it only for that limited purpose that I identify for you.

Now, we're going to talk about the credibility of witnesses.  In reaching your verdict, you may have to decide what testimony to believe and what testimony not to believe.  You may believe everything a witness says or part of it or none of it.

In considering the testimony of any witness, you must take -- or you may take into account the opportunity and ability of the witness to see or hear or know the things testified to, the witnesses' memory, the witnesses' manner while testifying, the witnesses' interest in the outcome of the case and any bias or prejudice, whether other evidence contradicted the witnesses' testimony, the reasonableness of the witnesses' testimony in light of all of the evidence and any other factors that may bear on believability in your

assessment.

I will give you additional guidelines for determining credibility of witnesses at the end of the trial. As you know, this is a criminal case. And there are three basic rules about a criminal case that you must keep in mind. First, the defendant is presumed innocent until proven guilty. The indictment against the defendant brought by the Government is only an accusation. Nothing more. It is not proof of guilt or anything else. The defendant therefore starts out with a clean slate.

Second, the burden of proof is on the Government until the very end of the case. The defendant has no burden to prove his innocence or to present any evidence or to testify.

Since the defendant has the right to remain silent and may choose whether to testify, you cannot legally put any weight on a defendant's choice not to testify, if he so chooses. The defendant's choice of whether to testify is not evidence, and you may not consider that in any way against him.

Third, the Government must prove the defendant's guilt beyond a reasonable doubt. I will give you further instructions on this point later. But bear in mind that the level of proof required is very high.

Our law requires jurors to follow certain instructions regarding their personal conduct in order to help assure a just and fair trial. I will now give you those

instructions.

First of all -- and many of these we talked about generally and on Friday -- do not talk either among yourselves or with anyone else about anything related to the case.  You may tell the people with whom you live and your employer that you are a juror and give them information about when you will be required to be in court.  But you may not discuss with them or anyone else anything related to the case.  Now, all of that will end when the case is over.

Do not talk with the lawyers, their staff, or parties in this case.  This may seem rude at times, for instance, if you find yourself in the elevator or restrooms together.  Any conversation you have with someone involved in the case can end up being misconstrued by others.  So this is the simplest way to avoid any misunderstandings or potential misconduct.

Do not at any time during the trial request, accept, agree, or discuss with any person any type of payment or benefit in return for supplying any information about the trial.  Do not read, watch, or listen to any accounts or discussions related to the case which may have been in the past or may be now reported in the newspapers, television, radio, internet, or other news media.

You as jurors must decide the case based solely on the evidence presented here within the four walls of this courtroom.  You must not be influenced by any personal likes or

dislikes, opinions, prejudices, sympathy, or biases.  Because you must decide the case based solely on the evidence presented in this courtroom, you must not conduct any independent research about the case or any matter in the case and the individuals or corporations or entities involved in this case.  In other words, you should not consult dictionaries or reference materials, search the internet, websites, blogs, or use any other electronic tools or literary tools to obtain information about the case or to help you decide the case.

Please do not try to find out information from any source outside the confines of this courtroom.  And do not visit or view the premises related to the charged crime or place involved in the case.  And you must not use the internet for trying to obtain such information.

So in summary, do not attempt to research any fact, issue, or law related to this case, whether by discussion with others, through the library internet, or by any other means or source.  And the whole reason for this, as I have said to you before, is that the only thing that would be fair to the parties in this case is for you to make a decision based on the evidence presented and the law as I have instructed you.

If you go look up an issue or a fact -- set of facts and you make your judgment based on that or share that information with other jurors, what happens is that information hasn't been cross-examined by either of the parties here.  And

it is not fair to them.  And it may not very well be admissible.  It may not be true, or it may only be partially true.

And we're trying to make sure in this rare experiment of American democracy with a jury trial that you base your decision based solely on the evidence again within the four corners of this room and walls.

Until you retire to deliberate with your fellow jurors in terms of the verdict itself, not before all of the evidence is in and not before I have told you what the law will be that is applied here, don't discuss the case with your fellow jurors.

After you retire to deliberate on what your verdict will be, you may begin discussing the case with your fellow jurors.  But you cannot discuss the case with anyone else, including your fellow jurors, until you have returned a verdict and the case is at an end.  So obviously you'll be talking with your fellow jurors though about the verdict.  But you are waiting until then.

And as I said to you on Friday, some of this involves -- don't go back and say, I don't believe a word that guy said.  That is talking about the case.  That is sharing your impressions.  And it tends to basically freeze people's views of the case and affect them so that they cannot hear the other testimony in a fair and unbiased way.

You must promptly tell me about any incident you know of involving any attempt by any person to improperly influence you or any member of the jury who appears to have violated the rules I have reviewed with you. And this is a very uncomfortable reality that you have that obligation. And I have to tell you there are times when we've had to have all the jurors in and talk to them and we've had to dismiss jurors. Because they may have done this on an innocent basis, but they have violated the rules of conduct that I have described to you.

I have never had anyone take a bribe or anything like this. It is much more all these other rules about doing research, sharing -- and jumping to conclusions and sharing them with other jurors or people who provide information just to a faction of the jury, which is also very destructive in terms of the jurors functioning as a whole to fairly discuss the case at the conclusion of the trial.

Also be very careful not to be sharing information by telephone, text messages, email, or internet chat of any variety or on Facebook or Twitter about your experience. Because, again, that tends to just basically solidify your opinions in a way that is contrary to keeping an open mind and being able to fairly evaluate the evidence based on all of the evidence given and based on the presumption of innocence.

In summary, our law does not permit jurors to talk

with anyone else about the case or to permit anyone to talk -- to research independently.  Because only jurors themselves are authorized to render a verdict.  Only you have been found to be fair.  And only you have promised and sworn to be fair and open-minded and not biased.  And no one else is so qualified.

Premature discussions among the jury can lead to a premature final decision because one faction of people have come to a premature decision.  You must keep an open mind throughout the trial and not reach any conclusions until you have heard all of the evidence, all of the argument, and the law as I have given it to you.

And, once again, our law does not permit you to visit a place discussed in the testimony.  You can't be sure that the place is in the same condition as it was on the day in question.

Second, even if you were -- it was in the same condition, once you go to a place discussed in the testimony to evaluate the evidence in light of what you see, you become a witness, not a juror.  As a witness, you may have a mistaken view of the scene that neither party may have a chance to correct.  That is not fair.

Finally, as I have told you, our law requires that you not read or listen to any news account or attempt to research it.

The law often uses words and phrases in special ways.

32

So it is important that any definitions you hear legally come from me and not from any other source.  It wouldn't be fair to the parties for you to base your decision on some reporter's view or opinion or upon some other legal opinion that you have gotten even by looking at the dictionary.

These rules are designed to help guarantee a fair trial.  I know that the rules regarding internet research and communication in this day and age may seem counterintuitive to you and totally different from the way you find out information and make decisions in your normal life.

However, the integrity and fairness of this trial depends on you evaluating the evidence and reaching a verdict solely based on the evidence presented in this courtroom and the law that I instruct you upon.

I trust that you understand and appreciate the importance of following these rules.  Because of their importance, our law sets forth serious consequences if the rules are not followed.  In accord with your oath and promise, I know you will do so though.

Now, if you wish, you may take notes to help you during the trial.  If you do take notes, please keep them to yourself until you and your fellow jurors go to the jury room to decide the verdict at the conclusion of the trial.  Do not let the note-taking distract you so that you do not hear other answers by witnesses and that you just aren't able to assess

their demeanor as well.

The witnesses will speak without their masks on.  So you will get an opportunity to see them facially and to assess that.

When you leave the courtroom, your notes should be left in the jury room.  Don't take them home with you.  Whether or not you take notes, you should rely on your memory of what was said.  Notes are there to assist you with your memory only.  They are not entitled to any greater weight than your memory or impression about the evidence.

If you do take notes, I want to give you this one suggestion.  If there are particular exhibits that you want to review again when you go into jury deliberations -- and we send the exhibits back with you into the -- as you are looking for examination -- you may want to write down the exhibit numbers as announced in court.  This will help you later when you are reviewing the evidence.

And also, of course, if there is something in particular that grabs your attention that you think is important about a -- the testimony of a witness, obviously you can star that or something else.  But don't take things down verbatim and literally because you'll be chasing that.

And I know people have some various ways that courts work across the country.  In this court though -- and I think in the federal courts in our region -- we don't engage in the

practice of reading back the transcript of a witness' testimony.  And I want to make that clear.

So even though we have a formal transcript being provided, that is really in the event we need this for other legal review purposes but not for reading back to the jury later on.  So if there is something important to you, you note it down.  And you'll be discussing it with your fellow jurors, how did they hear that, what did they think about that.

The trial will now begin.  First, the Government will be making an opening statement of roughly 30 minutes.  And an opening statement is simply an outline to help you understand the evidence as it comes in and the theory of the case in some ways that may be presented by the Government.

Next, the defendant's attorney may but does not have to make an opening statement.  Opening statements are neither evidence nor argument.  The Government will then present its witnesses.  And counsel for the defendant may cross-examine them but not required to.

Following the Government's case, the defendant may, if she wishes or he wishes, present witnesses whom the Government may cross-examine.  After all the evidence is in, the attorneys will present the closing arguments to summarize and interpret the evidence for you and I will instruct you on the law.

After that, you will go into the jury room to decide

35

your verdict.  We will take a break later.  You know, we started late, so I would like to probably -- possibly to run until lunch because I know many of you started early today.  And we'll see how it goes.  And, remember, if you need a break though at any time or you are feeling really sleepy-eyed and you just don't think -- you need to throw some water on your face, I would rather you tell Mr. Meadows that you need a break than you be falling asleep.  Because I'll be watching you for that.

All right.  I think we're now ready to begin.

Is the Government ready?

MS. MORRIS:  We are, Your Honor.

THE COURT:  All right.

OPENING STATEMENT

MS. MORRIS:  Good morning, ladies and gentlemen.  My name is Jessica Morris.  We met very briefly yesterday during the -- Friday -- excuse me -- during the jury selection process.

As the Court just said, this is our time to give you a little bit of a roadmap of the case to orient you to what we anticipate the evidence will be, what the testimony will be from the witness stand, what evidence will come in for you.

Nothing I say is evidence, as the Court mentioned several times just now during her preliminary instructions.  The evidence will all come in through the witness stand.

It is our job to lay these things out for you, to move the evidence in.  It is the Court's job, as you have already deduced I'm sure, to call the shots and to tell you what the law is that governs these proceedings.  And it is Mr. Jones' job to vigorously represent his client, the defendant, Brandon Redmond.

We are here today because back in 2015 -- June of 2015 the defendant came down from Memphis and participated in three violent home invasion robberies.  They occurred on June 12th -- the nights of June 12th -- and each one, I believe the evidence will show, happened around the same time, that time of night when you are settled in but you are not yet asleep.  Maybe your kids are asleep.  But someone in the household was awake.  They happened on the evenings of June 12th, June 17th, and June 21st, 2015.

What is a home invasion?  Maybe you've heard that term before.  Here, the evidence will show that that term means in this case that the defendant, together with a co-defendant in the case, Mario Deandre Jackson, who went by the nickname Dre sometimes -- that the two of them forced their way into these three homes.  In two instances, I believe you will hear testimony that the back doors of the residence's glass doors were shattered.  In a third instance, I believe you will hear testimony that the male member of the household -- the adult male was actually encountered outside in the garage.  And his

fiancee was in bed.  And the defendant and Co-defendant Jackson forced their way into the home at gunpoint.

I believe you will hear testimony that during these home invasions the defendants were armed, that they held the victims at gunpoint.

Now, during these robberies, they demanded money, jewelry, firearms, anything of value that they could take from the victims.  There are certain patterns I believe you will hear in these three incidents.  In each incident, the adult members of the household were separated from one another.  And that way, the defendant and Jackson, Dre, worked together to conduct these robberies.  They each had a role in the robberies.

You'll hear references in more than one instance to use of blankets or coverings.  More than one victim, I believe, will testify that they were covered up, rolled in a blanket or kept on the ground under cover with a gun at his or her head during this robbery.

Now, the defendant and his co-defendant, Mario Jackson, didn't just satisfy themselves with taking what they could from the house, jewelry, whatever cash was on hand, clothing that appeared to be valuable.  They also demanded that one of the victims drive them -- drive one of them to an ATM to withdraw cash.

Now, while that was happening, the other one -- we

38

believe the evidence will show it was Defendant Brandon Redmond -- stayed home with the -- with the remaining victim, the husband, the father, with his children while he kept them at gunpoint under a blanket.

Now, you'll hear mention of ATMs in other of these events as well. Only one of the three incidents that the defendant is charged with involved an actual trip to an ATM. But listen as the evidence comes in to the robbers' discussion and threats about ATMs in these other incidents.

Now, the indictment uses the phrase when it discusses the robbery the federal robbery statute that the defendants did commit and threaten physical violence. Now, you'll hear testimony from each of the victims, I anticipate, about threats to use physical violence, threats to kill them while pointing guns at their head, holding guns to their head, brandishing their firearms.

But it was more than just threats of physical violence. The defendants during these robberies -- Defendant Redmond and Mario Jackson, who conducted these three robberies with him, they used physical violence. You will hear testimony in one instance of the fact that a witness or a victim, when he heard the glass breaking in his home, when the break-in was happening, he grabbed a fire poker. You will hear evidence that one of the robbers who was masked grabbed the fire poker from him and bashed him in the head.

You will hear evidence from another victim of one of these robberies that she was awoken to one of these defendants actually from her bed and that he sexually assaulted her with his finger during the course of the robbery.

Now, I mentioned that the robbers were masked in one instance. In every instance, the victims will -- in every instance, each robbery, the defendant's face was covered in some manner. So this is not an instance where Mr. Buchanan or I will be asking the witnesses to identify the defendant.

It is our -- we anticipate that that will not be possible because the robbers, the defendant and Mr. Jackson -- the co-defendant, Mario Jackson, they were masked. So we don't anticipate that. But we ask you to listen over the course of the testimony and the evidence to indicators and evidence about the fact that the defendant was one of these two robbers.

That will come in the form of co-defendant cooperator testimony. We anticipate that you will hear from two witnesses who were actually involved in these robberies.

Now, with the three robberies that the defendant is charged with, it was him and Mario Jackson who were the robbers. They were the ones that went into the home with guns brandished, struck victims, in one instance took one to the ATM, but there were other individuals involved in the scheme.

You heard maybe during jury selection there was names mentioned of other people. We anticipate that you will hear

40

from two of these people.  One of them is Ms. Basil Varner.
She drove the defendant, Brandon Redmond, and Mario Jackson to
two of these robberies.  And she has accepted her
responsibility for her role in those crimes.  And she will
explain her role and how she knows intimately that the
defendant was one of the two men and robbers that she dropped
off or picked up from the scene of these two crimes.

We ask you to listen to her testimony and consider
how it fits in with the other identification evidence, the
other description of the robbers.  Some victims, based on their
perceptions, will be able to distinguish between the defendant
and Mario Jackson, which one was larger, which one was smaller.
Listen to that evidence and see how it compares with what
Ms. Varner tells you about her experiences and firsthand
knowledge of the defendant and Mario Jackson.

You will also hear from Leon Scott, another one of
the named co-defendants.  Now, Mr. Scott participated in a
robbery with Mario Jackson, the other robber, and has taken
responsibility for it and pled guilty.

Now, Mr. Scott is actually the defendant's cousin.
So he knows him quite well.  And Mr. Scott will explain that he
was actually introduced to Mario Jackson because he lived --
Mr. Scott lived in Memphis with the defendant at the time these
robberies were going on.  And it was Brandon Redmond, the
defendant, who was Leon Scott's introduction to this whole

41

scheme.  Were it not for Brandon Redmond, Leon Scott would never have had an introduction to Mario Jackson and had an opportunity, if you want to call it that, to participate in an armed home invasion.

Leon Scott will tell you that he -- in his robbery he did with Mario Jackson he was the one that played the defendant's role.  He was the one that held the family members at gunpoint while Mario Jackson walked around the house demanding jewelry, demanding items.

Leon Scott will explain that Mario arranged for him to come from Memphis to Atlanta for the purpose of conducting this robbery.  So you'll hear from him, and he will explain to you how Brandon is connected to this scheme and he knows it intimately because it is just how he is connected to the scheme.

Now, the Court will give you some instructions at the end, I anticipate, about how you should judge cooperators' testimony differently.  You should pay closer attention to their testimony.  And you should.  We invite you to pay close attention to their testimony.

We anticipate that Mr. Jones will rigorously cross-examine these particular witnesses because they are certainly differently situated than the victims.  They have something to lose, something to gain through their testimony.  They have pled guilty, and they have committed to cooperate

42

with the United States in these prosecutions.  We ask you to listen to their testimony and see how it matches up with all the other evidence.  We invite you to do that.

Now, in addition to these two individuals, Ms. Varner and Mr. Scott who know the defendant very well and his role in this scheme, you will also hear some testimony from an individual who has met the defendant much more recently, someone who was incarcerated with the defendant.  And this individual will explain that the defendant asked him some advice about the situation he was facing and made some admissions that were quite specific about these home invasions and the crimes that he participated in.

So although the defendant was masked during these robberies, you will hear a variety of evidence explaining why and how the defendant -- that point to the defendant's role in these particular robberies.  And we ask you to listen to it carefully and to see how it fits together, how it dovetails, how it intersects, how it works together.

Now, you will also hear some evidence towards the end of the case, we anticipate, about the fact that the defendant used his cell phone through the course of this scheme to keep in touch with his co-defendants.  And we anticipate you will hear evidence that his cell phone was, in fact, present at one of these particular robberies corroborating all of this other evidence regarding his participation.

43

Now, I just want to quickly orient you to the indictment in this case.  I'm not going to read it.  You'll have copies of it when it is time to deliberate.  It is nine pages.  The defendant is charged with three different federal crimes, three robberies that correspond with these three robbery dates on the 12th, the 17th, and the 21st.

He is charged with one federal kidnapping violation, which corresponds with one of those robbery incidents, the one when his co-defendant, we allege, Mario Jackson, took the victim to the ATM while he stayed home and held the family at gunpoint -- the husband and the children.

And he is charged with three counts of aiding and abetting and using a firearm, brandishing a firearm in furtherance of, during these robberies.

Now, in -- you'll see in the indictment when you get it and when you hear the jury instructions at the close of the case that there's references to commerce threaded throughout the statute, the charging language, and the jury instructions. For example, for the federal robbery charges, which there are three of, there's references to the robbery activity obstructing, delaying, or affecting commerce.  And with regards to the kidnapping, there is a reference to the fact that the defendant used a means, facility, or instrumentality of interstate commerce.

Now, those particular allegations and that

requirement goes to our elements, the elements of these federal offenses. And I tell you that only so you have some framework for understanding when we call certain witnesses to talk about how the robbery activity may have impacted or had some small effect on interstate commerce you have some understanding of why we are bringing this evidence before you.

And at the close of the case, you will hear more specific instructions about the fact that this impact on interstate commerce for this robbery activity is really only a minimal requirement. But I tell you this because that testimony will be very much in contrast to the more vivid testimony regarding the witnesses' experiences during these violent home invasions.

Finally, each of these counts charges the defendant with aiding and abetting his co-defendant, Mario Deandre Jackson or Dre. Under federal law, a defendant is equally responsible for the acts that he does in concert with another. I anticipate that the Judge will instruct you at the end that a defendant aids and abets a person if he intentionally joins with a person to commit that crime. So you are equally on the hook or culpable for those actions that happen over the course of an offense if you have gone into it knowingly and intentionally.

This applies, for example, to a kidnapping offense. If you believe, for example, that Mario Jackson was the one

that actually took the victim to the ATM, well, it will be -- our evidence will still show and the law permits you to consider that the defendant aided and abetted this action insofar as he kept the husband home at gunpoint to facilitate that kidnapping.  So you'll see those terms aiding and abetting in each of these particular violations.

So that is, in essence, a roadmap of the evidence that we expect to come in, a brief overview of these particular violations which you will receive much more clear instructions on and detailed instructions from the Court at the close of the evidence.

But we ask you to keep these things in mind as you hear the evidence.  And at the close of all of this, we'll have another chance to come back before you in much more detail. And rather than saying we anticipate that, we will be able to reflect back on what the evidence actually did show and connect these things specifically to the elements and to the law that is before you.

And at that time, we anticipate asking you to consider the verdict form and all of the evidence and returning a verdict of guilty on all of the counts before you.

Thank you.

THE COURT:  Go ahead.

OPENING STATEMENT

MR. JONES:  It is distracting looking at you through

this shield.  These are all new -- these procedures.

Again, ladies and gentlemen, my name is Derek Jones. I'm an attorney in Atlanta, Georgia.  And the gentleman over here who I represent --

And may Mr. Redmond stand up, Your Honor?

THE COURT:  Yes.  He can take off his mask so they can see his face as well.

MR. JONES:  The gentleman I represent over here is Brandon Redmond.  He is from Memphis, Tennessee.

Thank you, Mr. Redmond.

And as you can see, we are social distancing again, wearing masks, doing the hand sanitizer, and all that.

My job here is to ask questions.  I'm not trying to mislead anybody.  If I say something that is different from what you remember from the evidence, so be it.  But, again, I'm not trying to mislead anybody.

This is a difficult, emotional case.  And I may have to ask some people some hard questions.  I take no pleasure in that.  But that is my job as an attorney trying cases.

As the Judge told you, Mr. Redmond comes in here with a presumption of innocence, which means the law presumes that he's innocent until the Government, which has the burden of proof, must show their case beyond a reasonable doubt.  And as the Judge indicated, that is a pretty high standard.  And you will be instructed on that at the end of the trial.

This case involves a series of home invasions over a period of time in 2015. There were several of them. My client is charged with three. You will learn of at least one other one when Mr. Scott testifies. These occurred at night. People were at home, minding their own business, being with their family and their loved ones. And unknown perpetrators broke in, brutalized them, stole their stuff, and generally terrorized them. This is not a -- this is not a pleasant matter that we're going to be talking about.

Now, be that as it may, your job is to judge this case on the facts presented and not the emotion in the case. Because I can assure you that there is a lot of emotion for those folks that evening -- those evenings.

I will say that no victim in this case will sit on that stand and point to Mr. Redmond and say that is the man who came in my home and stole my stuff and brutalized my family and I. There are going to be -- the descriptions that were given after the crimes are basically nonexistent.

There is one particular case in which one of the victims in one household said that one perpetrator was six-foot -- six-foot tall, 230 pounds, and the other was five-foot nine and 180 pounds.

The other person in that -- this is the Wolfes -- will say that one perpetrator was six-foot and 180. The other was six-foot and 180. You saw Mr. Redmond stand next to me.

I'm six-foot five inches tall.  Mr. Redmond is 5-6 on a good day.

Now, the perpetrators were after, as home invaders often are, cash, jewelry, high-end items, things of value that they could use for their own purposes.  And a number of high-end items were taken and cash was taken.  None of those items have been linked to Mr. Redmond.

You will hear from Mr. Scott that he actually -- that is one of the reasons Mr. Scott got caught -- is he pawned a ring, used his ID, and the ring was quite distinctive.  And the police, doing their job, looked at pawn records and found out Mr. Scott had pawned a ring, which was identified by the victim in the case.  I don't believe you are going to hear that regarding Mr. Redmond.

I don't believe that there is going to be any physical evidence that ties Mr. Redmond to the case.  And, ladies and gentlemen, you have to understand that I don't know to what extent the Government is going to go into it.  But the police did their job in terms of looking for evidence, looking for video cameras.  There were like surveillance cameras in a neighboring house or something like that.

You know, they looked at stuff.  They did examinations and stuff.  But you will not -- I believe that you will not hear any evidence about any DNA that links Mr. Redmond to the scene, any fiber evidence, any fingerprints.  And the

49

perpetrators wore gloves.  And there are no fingerprints. There is no video footage.  And I don't believe there is anything on social media showing him, you know, like wearing the watch that was taken or, you know, flashing a bunch of cash.

So given that, why are we here?  Well, there is evidence.  In the three home invasions, the police worked with cell phone records and cell phone towers.  And I expect the Government is going to present a witness that will talk about, you know, you get the records, you examine the records, you look at the cell towers, and you figure out where the phone is in relation to the cell towers.  Okay?

Well, in two of the cases, the cell phone that they were looking at that they believe is Mr. Redmond's, which is listed in his name -- in two of these home invasions, his phone wasn't near those home invasions.

He will testify that Mr. Redmond's phone was near one of them.  I believe that is the last one on June 21st.  But the gentleman, with all of his skill and expertise, can only tell you that he believes based upon his analysis that the phone was there.  He can't tell you who had the phone.

Now, so what else is there?  Well, there is two, what we call in the business, cooperators.  One is Ms. Basil Varner. Ms. Varner is cooperating with the Government.  And she has gotten a reasonable plea deal with the Government.  And she got

some benefit in the fact that she wasn't charged with things that she could have been charged with under the concept that the Government has just told you, aiding and abetting.  She was involved in one of the kidnappings cases where there was a kidnapping.  But she wasn't charged with that.  And Ms. Varner has a reason to fear going to prison.

Now, the second person is Leon Scott, who my client has the misfortune of being his first cousin.  Mr. Scott is receiving benefit from cooperating with the Government in regards to these charges.  He pled guilty to the three cases -- to the three counts in the case in which he was charged with.  And he has got what is known as a cooperation agreement, which basically if the Government -- the technical way it is put is if he testifies truthfully the Government will make that cooperation known to the Court.  And one of the charges is a firearms charge, which is a mandatory minimum seven years.

Now, Mr. Scott understands that what -- there is the truth and what the Government wants to hear.  And I mean no dispersions on these folks here.  Okay?  They are doing their job.  I'm doing my job.  I'm focusing on Mr. Scott and his personal bias as to, okay, well, this is what I need to say to get my best deal.

And he is going to come in, and he is going to say that my client was involved in it.  My client was the one who introduced him to Mario Jackson.  But yet during his first

interviews with the FBI, he said that Mr. Jackson's cousin introduced him to Mr. Jackson. Not his cousin, Brandon Redmond. He also twice said that Mr. Redmond was not involved. That was shortly before he went to court. He met with the agents, even one of the prosecutors who used to be on the case, Ms. Kim Dammers. And, you know, he was made aware of, okay, this is some serious stuff that you are looking at.

At that time, he said that Brandon Redmond wasn't involved. He went to court, got a lawyer. And then after that, his story changed. And, oh, it was -- it was Brandon Redmond who introduced me to him -- Mr. Jackson. It wasn't Mr. Jackson's cousin. It was Brandon Redmond who introduced him. And, oh, yeah, Brandon is involved.

So he has a -- he has a basis to please the Government, a reason. It is called bias, looking out for yourself. And, you know, there is the expression of blood is thicker than water. Well, doing time in federal prison is thicker than blood.

Now, also in the time this case has been going on -- you know, this case has been going on for a while. I mean, this happened in 2015. This is August. This stuff occurred six years ago.

But in the meantime while waiting for trial, Mr. Scott has another legal problem in the system in which he is being investigated by the FBI for sexually assaulting

repeatedly his roommate in a county jail.  Sodomized the man.  Sexually assaulted him.  Now, those are the two witnesses.

The third witness is a man by the name of Ricky Stanley.  Now, Ricky Stanley is a career criminal.  He has an armed robbery conviction.  I think it is a sale of cocaine conviction.  And this is back, like, late '90s.  Then he got himself involved in federal court in a case and ended up getting just a massive amount of time for some big crack cocaine conspiracy.  He got like 292 months.  He did his time.  He was able to get the sentence reduced.  He got out.

And a year later, he was back -- back looking at getting his supervised release, which is like -- what basically like federal probation.  He was looking at getting his supervised release revoked because he got in an incident in Newton County and got himself locked up for aggravated assault for shooting a police officer, domestic violence --

MS. MORRIS:  Objection, Your Honor.  I believe this goes beyond the scope -- I believe this goes beyond the scope of permissible cross-examination of Mr. Stanley.

MR. JONES:  Judge, if I can respond.  I'm saying what I expect the evidence to show.

THE COURT:  All right.  But move on.  And either it will -- I think you are getting the point across as it is.

MR. JONES:  Mr. Stanley also is terrified to go back to -- back to prison.  Okay.  He's just terrified based upon

his experiences that he says he has in prison.  He also suffers from schizophrenia, which some of you may know if you have family members who suffer from that --

MS. MORRIS:  Objection, Your Honor.  This is going beyond the scope of anything we have cited together regarding permissible impeachment.

THE COURT:  All right.  Well, you will be able to raise all of this properly with the evidence.  So I think you flagged that this is from your perspective an unreliable witness.

MR. JONES:  Thank you.  Thank you, Judge.  I'll move on.  I don't mean to belabor it.

THE COURT:  All right.

MR. JONES:  And so suffice it to say that we expect this evidence to show that Mr. Stanley has a reason to cooperate.

Now, mind you, he got put in the jail with Mr. Redmond -- he got locked up in March of this year.  He got put in jail with Mr. Redmond in his dorm by June.  And then all of a sudden, here is Mr. Redmond not only discussing his case with him but confessing to him that he did things.  I don't believe there are going to be any witnesses that corroborate those alleged conversations.

Now, Judge, how much time -- more time do I have?  I'm sorry.

THE COURT:  You have about ten minutes.

MR. JONES:  Okay.  I don't need ten minutes.  Thank you.  Folks, we have got these clocks up here, but sometimes they confuse me.

Now, Mr. Redmond was at the time in question in Memphis, Tennessee.  And I expect that we'll have a couple of people testifying to that regard.  One is his mother, who works regularly, has a decent job, goes to work, pays her bills.  And she -- they will say that he was in Memphis on the time in question.

She's -- Ms. Redmond is certain on the last two, the 17th and 21st.  She's not 100 percent sure about the one on the 12th, but she thinks he was in town.

The other alibi witness is his sister, Ms. Brandi Beasley.  Ms. Beasley at this point is living with her mother in Tennessee.  She's a college graduate, played college ball, all conference.  She's about the same height as Mr. Redmond.  I think she's about 5-6, 5-5.  And she's waiting to go play basketball professionally in Europe hopefully September 1st.

So these are our alibi witnesses, and they will explain to you, I expect, why they believe that Mr. Redmond was in Memphis rather than Atlanta, Georgia.

Now, one other thing:  The Government closed by mentioning commerce -- commerce.  And that is going to be one of the things that they have to prove in their case, that this

affected commerce. What happened is that rather than these cases being prosecuted in local jurisdictions, Dekalb and Fulton County, which I'm sure have adequate court systems and prosecutors, it was taken into federal court. And so by doing that, that is one of the burdens they have to show is that -- that it somehow affected commerce. So -- but that is just a sideline in the case.

Thank you for your time. And I hope to speak to you when this is all over and give my final remarks.

Thank you.

THE COURT: Thank you, Counsel.

I just want to remind the jury that both counsel referred to a variety of things in their remarks that really were anticipated evidence. And, again, their statements are not evidence by themselves. They are describing to you what they anticipate the evidence to show.

All right. Are you ready with your first witness?

**THE GOVERNMENT'S CASE.**

MR. BUCHANAN: Yes, Your Honor. The United States calls Mr. Scott Wolfe.

COURTROOM DEPUTY CLERK: Please raise your right hand.

**(Witness sworn)**

COURTROOM DEPUTY CLERK: Please have a seat. Loudly and clearly state your name. And spell your last name for the

record, please.

THE COURT:  You can take off the mask while you are testifying.

THE WITNESS:  Morning.  Scott Wolfe is my name.

Whereupon,

SCOTT WOLFE,

after having been first duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. BUCHANAN:

Q.   Thank you, Mr. Wolfe.  If you will, if you scoot closer to that mic, it helps our court reporter and everyone else hear you carefully during your testimony.

Mr. Wolfe, back in 2015, did you -- you and your family live in Roswell, Georgia?

A.   Yes.

Q.   And, specifically, did y'all live at 125 Annie Cook Way in Roswell?

A.   Yes.

Q.   And who lived there with you at that address?

A.   My wife, Tina, and our kids.

Q.   And back in 2015, how old were your kids?

A.   Four and six.

Q.   And your wife, Tina, does she have a different first name?

A.   Nazgol Wolfe.

Q.   And is her last name Wolfe?

**A.**    Yes.

**Q.**    And so her initials are N.W.?

**A.**    Yes.

**Q.**    Were y'all home on the evening of June 17th, 2015?

**A.**    Yes.

**Q.**    Mr. Wolfe, do you remember that night?

**A.**    Yes.

**Q.**    And particularly let's -- we can sort of fast forward to that date at roughly 9:00, 10:00 that evening.

What were you doing?

**A.**    Yeah.  So I had gone to bed.  My wife was up working late. She was sitting on the couch out in the living room.  I had gone to bed.  And I fell asleep.

And then you want me to tell you the rest of the story?

**Q.**    Yes.

**A.**    So my wife comes running in our bedroom.  I heard a loud crash.  It woke me up.  And then she was trying to hit the alarm because we didn't have the alarm set and the -- and super calm.  She was trying to hit the alarm.  Couldn't get it alarmed.

I was kind of in a daze just waking up and went running in the -- started to run towards the living room to see what the crash was and then got hit -- got hit in the face.  And the guy knocked me on the ground.  And then I had the gun in the back of my head.  And he was on my back with his knee.

And, you know, I was trying to look around to see, trying to get loose a little bit. And then he kept pushing that gun right in the back of my head.

Q. Mr. Wolfe, could you tell how many people had come into your house?

A. Yeah. There were two people.

When he was on top of me, the other guy had got my wife. And then they went upstairs and got our kids while the one guy stayed downstairs. Got them out of bed. They were asleep as well.

Q. Brought your four- and six-year-old -- got them out of bed and brought them to you?

A. Yes.

Q. And once the kids were brought to you, what happened?

A. So they put the kids with me. I was on the ground. Then they put a blanket or our comforter off our bed on top of us.

Q. And while this was going on, were these two robbers -- were they saying anything or asking for anything?

A. Yeah. So they -- so while we were under the blanket, they were -- the first thing they asked for was our guns, which we don't have any. So -- and then they wanted my wife to show them where all the jewelry was. They asked if we had a safe, cameras.

So my wife walked them around the house and showed them where everything was: Shoes, clothes, jewelry, you know, all

59

the cash we had in the house.  Everything.

Q.    Did they threaten to kill you, Mr. Wolfe?

A.    Yes.

Q.    Did they threaten to kill your kids?

A.    Yes.

Q.    So after they brought the children down to you and you are all under the blanket, at that point was your wife going around the house with one of the robbers?

A.    Yes.

Q.    And at some point while they are talking, was there discussion of an ATM?

A.    Yes.  After they had kind of gotten everything they wanted from the house, they -- they asked me where the nearest ATM was.  I was a little confused.  You know, it is just down the street.  But then they decided to take my wife to the ATM and leave me with the kids.

Q.    Did you volunteer to go to the ATM?

A.    I insisted.  They refused.  They wanted to take her.  And then --

Q.    At this point, were you able to tell whether or not both of them had guns?

A.    Yes.

Q.    They both did?

A.    Yes.

Q.    And were those guns aimed at you, your wife, and your

children while this was going on?

**A.**   Yeah.  I was under the blanket, and the guy had -- I could tell he had the gun.

**Q.**   You could feel it?

**A.**   Yeah.

**Q.**   Pressed against your head?

**A.**   Right.  And then they took my wife.  Before they did, they called each other using our phones.

**Q.**   Let's talk a little bit about that.  And so we are in your bedroom; is that right?

**A.**   Right.

**Q.**   So they had your phone and your wife's cell phone?

**A.**   Yes.

**Q.**   And did they talk about what the numbers were for those phones?

**A.**   Yeah.  I'm not exactly sure how they -- how they called each other.  They maybe had my wife call my phone or my phone call hers.

**Q.**   But you are certain there was a call made by the robbers utilizing your phone and your wife's phone?

**A.**   Right.

**Q.**   And once this happened, were you able to hear what was going on with your wife?

**A.**   Yes.

**Q.**   And did they essentially do this to utilize those phones

as a listening device to make sure you behaved?

A.   That is right.

MR. JONES:  Your Honor, I'm going to object.  Counsel has been leading a bit.

THE COURT:  Sustained.  Be careful.

MR. BUCHANAN:  Yes, Your Honor.

Q.   (BY MR. BUCHANAN)  What did you hear as your wife -- as your phones were on?

A.   Yeah.  So I could hear -- the phones were connected.  I could hear them open the garage door, open the car door.  I could hear the dinging of the car.  You know like when you start the car up, you hear the chime.

And then I could hear the blinker as she was driving the car.  I could just kind of hear road noise generally.  And then when they got to the ATM, you know, I could hear Tina hitting the buttons on the ATM.  You can kind of hear the sound of what is happening.

So I could -- generally could hear the -- just her presence on the phone and just, you know, the sounds of the car.

Q.   So while that is going on with your wife and the car, what is happening with you and the children?

A.   We're under the blanket and just not -- just listening and doing everything we are told to do so we didn't get hurt.

Q.   How were your children behaving at this time?

**A.**    They were really good.  They were scared.  At one point, my daughter had to use the restroom.  And I wouldn't let her. I told her just -- just to go.  But she wouldn't.

They were -- we were just sitting under the blanket.  It was hot.  It was just awkward.

**Q.**    You mean -- to go, you mean you told your daughter to go ahead and urinate on herself?

**A.**    Yes.

**Q.**    Mr. Wolfe, at some point, did the robber who was gone with your wife return to your residence?

**A.**    Yes.  They came back, which was fantastic.  And then --

**Q.**    You mean that sarcastically.  We have got a court reporter.

You didn't expect them to come back?

**A.**    No, I did not.

THE COURT:  All right.  Don't -- that is leading.  So please don't feed the witness answers.

**Q.**    **(BY MR. BUCHANAN)**  Did you expect the robbers to come back?

**A.**    No, I certainly didn't.  I thought they were going to kill her and, you know, take off with the money.

**Q.**    And what happened?

**A.**    They had her car.  They had her.  You know, they had every means to get away.  And I just -- go ahead.

**Q.**    And what happened when they returned with your wife?

**A.**    They put us in the closet and put the blanket on top of us.  I think one of them left.  And then one of them told us to count to 100, which we did.  He left.  And then we called the police.

**Q.**    Mr. Wolfe, I have handed you two documents that I've marked as Government's Exhibits 1 and 2.

What are Government's Exhibits 1 and 2?

**A.**    One is a picture from our deck back door of our house.  And two is from the inside of the same door.  And you can see the stone had come through the window and broke the glass table.

**Q.**    And do these Government's Exhibits 1 and 2 fairly and accurately depict what that portion of your home looked like just after the robbery?

**A.**    Yes.

MR. BUCHANAN:  Your Honor, we would move for the admission of Government's Exhibits 1 and 2 into evidence.

MR. JONES:  No objection.

THE COURT:  They are admitted.

MR. BUCHANAN:  If I could publish those to the jury, please.

THE COURT:  Yes, you may.

**Q.    (BY MR. BUCHANAN)**  Mr. Wolfe, what is in Government's Exhibit 1?

**A.**    Government's Exhibit 1 -- this is a picture of the back of

our house or the back of our house from the deck.

Q.    And that door that is in the center of that picture has been busted out?

A.    Yes.

MR. BUCHANAN:  And, Ms. Toussaint, if I could have Government's Exhibit 2.

Q.    **(BY MR. BUCHANAN)**  Mr. Wolfe, what is in Government's Exhibit 2?

A.    So this is a picture of our living room where my wife was sitting on the couch where the stone had come through the back door and busted the table.

Q.    Mr. Wolfe, to the left, is that a laptop computer?

A.    Yes.

Q.    Whose laptop was that?

A.    That was my wife's.

Q.    Back in 2015, what did your wife do for a living?

A.    She's an accountant for NCR.

Q.    What is NCR?

A.    It is the company she works for.

Q.    NCR is a national company?

A.    Yes.

Q.    And your wife back in 2015, what did she do for them?

A.    She was an accountant.

Q.    Was she working when you went to bed before the robbery occurred?

65

**A.**    Yeah.  Yes.

**Q.**    I'll hand you what I have previously marked as Government's Exhibit 3.

Mr. Wolfe, what is Government's Exhibit 3?

**A.**    That is a picture of a stone -- a stepping stone paver from our yard.

**Q.**    And this is what came -- I guess it is also depicted in Government's Exhibit 2 -- in front of the couch?

**A.**    Yes.

**Q.**    Mr. Wolfe, I'll hand you what I have previously marked as Government's Exhibits 5, 6, 7, and 8.

MR. JONES:  Judge, if I could just see them for a moment.  Counsel gave me exhibits, Judge, earlier this week.  But they weren't marked.  So I'm not sure -- and I don't have them in the same order that they were given to me.  I'm sure they were given to me in order.

THE COURT:  I understand.  Well, go ahead and take the time to look at them.

MR. JONES:  Judge, the Government has given me a marked set, which is much easier to work with.

THE COURT:  For ease, do you have any objections to any of them.

MR. JONES:  No, ma'am?

THE COURT:  Okay.  This is 5, 6, 7 -- 5, 6, 7, 8?

MR. BUCHANAN:  Yes, Your Honor.  We would move for

66

those to be admitted into evidence since Mr. Jones --

THE COURT:  Once he identifies them.  I need him to still identify them.  But they are -- assuming they are, in fact --

Q.   (BY MR. BUCHANAN)  Mr. Wolfe, who is depicted in -- what is in Government's Exhibits 5, 6, 7, and 8?

A.   They are pictures of my wife at the ATM.

Q.   Do you recognize your wife in those pictures?

A.   Yes.

Q.   Do you recognize the vehicle that she is driving?

A.   Yes.

MR. BUCHANAN:  Your Honor, we move for the admission of Government's Exhibits 5, 6, 7, and 8 into evidence.

THE COURT:  Admitted.

MR. JONES:  No objections, Judge.

MR. BUCHANAN:  Ms. Toussaint, if I could have Government's Exhibit 5, please.

Q.   (BY MR. BUCHANAN)  Mr. Wolfe, this is a picture of Nazgol Wolfe?

A.   Yes.

Q.   If you look in the corner, there is a time stamp that says 6/17/2015.  Is that the date that this happened to you and your family?

A.   Yes.

Q.   The time stamp is in military time.  It is roughly 1147.

Is that roughly the time of night when that happened to your family?

A.    Yes.

MR. BUCHANAN:  Government's Exhibit 6, please, Ms. Toussaint.

Q.    (BY MR. BUCHANAN)  Is that a picture of your wife, Mr. Wolfe?

A.    Yes.

MR. BUCHANAN:  Government's Exhibit 7, please.

Q.    (BY MR. BUCHANAN)  And Government's Exhibit 7, Mr. Wolfe, is there anything in your wife's hand?

A.    Yeah.  It looks like our ATM card.  She's holding a card.

MR. BUCHANAN:  And Government's Exhibit 8, please.

Q.    (BY MR. BUCHANAN)  Is there anything in her hand in Government's Exhibit 8?

A.    Yes.

Q.    What does it appear to be?

A.    It looks like a debit card.

Q.    Mr. Wolfe, are you familiar with the accounts that you and your wife operated back in 2015?

A.    Yes.

Q.    And do you know how much money was withdrawn during these two transactions?

A.    Yes.

Q.    And how much was that?

**A.**    500 the first time and 200 the second.

**Q.**    And so two transactions during this period of time for which we have seen these pictures?

**A.**    Yes.

**Q.**    And do you know -- where did y'all bank at the time, Mr. Wolfe?

**A.**    Bank of America.

**Q.**    And do you know where these transactions occurred?

**A.**    Yes.  It is the bank about a mile from our house.

**Q.**    What type of bank?

**A.**    It is a Bank of America.

**Q.**    And were these -- you mentioned that you were familiar with these accounts.  Were these accounts where your wife's paychecks were deposited?

**A.**    Yes.

**Q.**    Mr. Wolfe, I'm going to hand you what I have marked as Government's Exhibit 9.  Take a look at Government's Exhibit 9 and let me know whether or not you recognize that item.

**A.**    Yes.

**Q.**    And what is Government's Exhibit 9?

**A.**    Tory Burch slippers.  My wife had a pair of these.  They were taken.

        MR. BUCHANAN:  Your Honor, we move for the admission of Government's Exhibit 9 into evidence.

        THE COURT:  Any objection?

MR. JONES:  No objection.

THE COURT:  I'm sorry.  Is there any objection?

MR. JONES:  I'm sorry, Judge.  The mask again.  No objections.

THE COURT:  They are admitted.

Q.   (BY MR. BUCHANAN)  Mr. Wolfe, I'm going to hand you what I have previously marked as Government's Exhibit 10.

MR. BUCHANAN:  Your Honor, may I show this exhibit to the jury?

THE COURT:  Yes.

Q.   (BY MR. BUCHANAN)  Mr. Wolfe, what is Government's Exhibit 10?

A.   It is a diamond necklace.  This is a necklace I bought my wife from Tiffany's.

MR. BUCHANAN:  Your Honor, we move for the admission of Government's Exhibit 10 into evidence.

MR. JONES:  No objections.

Q.   (BY MR. BUCHANAN)  Mr. Wolfe, do you recall anything happening with that necklace during the robbery?

A.   Yeah.  It was ripped off her neck.  She never took it off.

Q.   And that is a necklace that you had previously bought for her?

A.   Yes.

Q.   Mr. Wolfe, do you know approximately how long this ordeal took?

70

A.    I think it took about two hours.

MR. BUCHANAN:  One moment, Your Honor.

**(There was a brief pause in the proceedings.)**

Q.    **(BY MR. BUCHANAN)**  Mr. Wolfe, did you get a good look at the faces of the robbers who came in your house?

A.    No.

Q.    Did you have an opportunity to sort of size them up to measure their height and weight?

A.    I know one was a pretty big guy.  But the other I didn't really get a good feel for.  My wife did.  She said he was --

Q.    Don't tell us what your wife said.

A.    Okay.  Sorry.

Q.    Was your concern more on your children?

A.    Yeah.

MR. BUCHANAN:  Nothing else, Your Honor.

MR. JONES:  Give me a moment here.  It is a little close with Mr. Ryan and I both being big men trying to maneuver -- Mr. Buchanan.

THE COURT:  Okay.

CROSS-EXAMINATION

BY MR. JONES:

Q.    Good morning, sir.

A.    Good morning.

Q.    In your direct testimony, you said that one of the -- that they both had -- both men had handguns?

**A.**   Yes.

**Q.**   Okay.  Did you ever make the statement -- did you ever -- was it not a question of that they both had handguns but there was one handgun and they passed it back and forth?

**A.**   It is hard to say.  I think they had two guns.  But I know that the guy that stayed with me had a gun.  And I assumed that the other guy had a gun because he is the guy that had the gun to begin with.

So whether they had two or passed them back and forth, I'm not exactly sure.  But I think -- I think they had two.

**Q.**   Well, did you ever make the statement to the police who arrived that there was -- there was only one handgun and the two subjects passed it back and forth to each other?

**A.**   It has been a while.

**Q.**   I quite understand.  It has been six years.

**A.**   I don't know.

**Q.**   If I could show you something that might refresh your memory.

MR. JONES:  If I may, Judge, approach?

THE COURT:  Yes.

**Q.**   **(BY MR. JONES)**  So I don't have to approach the witness too many times, this was June 17th; correct?

**A.**   Yes.

**Q.**   First of all, I'm going to show you a calendar for June 2015.  And I would ask you to take a look at it and see if

that appears to be an accurate calendar for you.  And if so, you can tell -- could you tell me what day of the week this was.

Also, I'm going to show you a document that in terms of trying to -- that may or may not refresh your memory in regards to the handgun issue.  So --

**A.**   It is a Wednesday.

**Q.**   Okay.  Is that -- does that appear to be a true and accurate calendar for the month of June 2015?

**A.**   I assume so.

**Q.**   Okay.

MR. JONES:  Judge, I would move to introduce Defendant's Number 2.

MR. BUCHANAN:  No objection, Your Honor.

THE COURT:  All right.  It is admitted.

**Q.   (BY MR. JONES)**  And, Mr. Wolfe, again, I'm trying to be social here and all this.  If you can just sort of take a look at that and see if that refreshes your memory in regards to the handgun matter.

THE COURT:  Is it a police report?

MR. JONES:  It is a police report, yes.

MR. BUCHANAN:  Your Honor, if I may, is he looking at his statement or is he looking at an officer's statement?

MR. JONES:  I'm showing him the police report to see if he can refresh his memory from the document of the police

report.

MR. BUCHANAN:  We would object to him refreshing his memory with someone else's statement.

MR. JONES:  Judge, it is under 612, I believe it is. Any document can be used to attempt to refresh the witness' recollection.

THE COURT:  All right.  I'll allow it.

Q.   **(BY MR. JONES)**  Okay.  Mr. Wolfe, looking at that, at this point, are you certain that there is one gun or two or maybe it was one gun that the two holdup men were passing back and forth?

A.   I think it was one that they had handed back and forth.

Q.   Now --

A.   I say that.  Again, I was under the impression that they had two because I didn't think he would take my wife without having some way to hurt her, you know.

Q.   Fair statement.

A.   I just assumed that it was certain that that would happen.

Q.   Fair statement.  One gun or two.  But bottom line:  Y'all were held up; correct?

A.   Right.

Q.   And I think we agreed or you stated that Wednesday the 17th was -- June 17th was a Wednesday; correct?

A.   Yes.

THE COURT:  Just relative to your clarification of

74

your testimony, you've described what you assumed.  But I guess I just want to be clear what you actually observed rather than what you assumed.  So I just at this juncture having considered -- having had this evidence from the police report and thinking about it, just the bottom line as to what you actually observed rather than what you assumed.

THE WITNESS:  Yeah.  So I was under the blanket.  I didn't see both people have a gun.  I had a gun on me the whole time.  And, you know, they kidnapped my wife.  I assumed that they had a gun with him.

THE COURT:  Right.  But that is not what you observed itself?

THE WITNESS:  Correct.  I'm under a blanket.  No way to really -- okay.

THE COURT:  Now I have got clarity.  Thank you.

Q.   **(BY MR. JONES)**  Mr. Wolfe, is it a fair -- so y'all were held up.  The police came.  And the police took photographs; correct?

A.   Yes.

Q.   They examined the scene?  They looked for evidence; correct?

A.   Yes.

Q.   They did what you would expect the police to do in this situation?

A.   Yes.

Q.     Okay.  Did they -- and they questioned you about the height and weight of the perpetrators; correct?

A.     Yes.  They were asking for a description.

Q.     And a description.  And the purpose, no doubt, was so they could try to get an idea of who these folks were and see if they could find them that night or another time; correct?

A.     Yes, I assume so.

Q.     And the police were thorough, were they not?

A.     Yes.

Q.     Now, you told them that -- as far as the two perpetrators, you say that one was between the age of 25 and 30; correct?

A.     Yes.

Q.     And that person was six-foot tall and weighed 180 pounds?

A.     Okay.

          THE COURT:  Well, is that what you told them approximately?

          THE WITNESS:  Yes.

          MR. JONES:  If I may approach and actually show you what has been marked as Defendant's 5.

Q.     (BY MR. JONES)  If you could take a look at Defendant's 5. And can you identify what that is?

A.     This is a suspect description form.

Q.     Okay.  And is it for one or two suspects?

A.     One.

Q.     If you would look at the next page.

A.    Same thing.

Q.    Okay.  So those are -- those are -- Defendant's 5 are descriptions -- the description that you gave to the police as to the two different suspects; correct?

A.    Yes.

MR. JONES:  Okay.  I move to introduce Defendant's Number 5, Your Honor.

MR. BUCHANAN:  No objection.

THE COURT:  Any objection?

They are admitted.

Q.    (BY MR. JONES)  Now, Mr. Wolfe, when was -- let me back up.  I take it that on the night in question when the police came they got some information from you quickly to try to do what they needed to do at the time; correct?

A.    Yes.

Q.    Okay.  Now, did you do this, which is Defendant's Exhibit Number 5, the suspect identification forms -- did you do that at the scene that night or did you do that at a later time?

A.    It was that night.

Q.    Okay.  And I would take it that you carefully read the form because you wanted to give the police the most accurate information you could at that time about the people who had broken into your home?

A.    Yes.

**Q.**   Okay.

THE COURT:  So both of the individuals are six feet -- about six feet tall?

THE WITNESS:  Yes.  Again, my view of them was the initial view.  You know, when I came out of my bedroom, that is where they hit me or the one guy hit me and put me on the ground.

So, you know, the description of them -- I just don't have a great description of them.  I didn't really get to see their faces or anything beyond that.

Just their clothes.  I could see that they were wearing black clothes.  Other than that, that was it.

**Q.**   **(BY MR. JONES)**  But you -- and, again -- and a lot of the form is blank; correct?

**A.**   Yes.

**Q.**   Okay.  But you did fill out the height and weight for both individuals?

**A.**   Yes.

**Q.**   And, Mr. Wolfe, not trying to be personal, but you look to me that you are not a small man.

Could you tell me how tall you are, sir.

**A.**   Six-foot.

**Q.**   Six-foot.  Okay.  So your impression at the time was that each of these subjects were your height?

**A.**   Yes.

78

**Q.** Okay. Now, the sandals -- I'm not sure if they are 9 or 10.

Were these your -- were these Ms. Wolfe's sandals?

**A.** Yes.

**Q.** Okay. Were these actually taken from the -- by the perpetrators from your home?

**A.** Yes.

**Q.** And, now, there were other items taken from the home; correct?

**A.** Yes.

**Q.** Okay. I believe there was -- was it miscellaneous jewelry that was taken?

**A.** My wife's wedding ring --

**Q.** Yes, sir.

**A.** -- and other jewelry. Yes.

**Q.** I mean, how many different items of jewelry?

**A.** I don't know. I don't know. Maybe ten.

**Q.** Okay. And I assume at some point you itemized a list of the jewelry that was taken?

**A.** Yes.

**Q.** Okay. Was --

**A.** My wife did that.

**Q.** Ms. Wolfe did that?

**A.** Yes.

**Q.** Was -- aside from Ms. Wolfe's necklace, was any of that

jewelry recovered?

**A.**   Not to my knowledge.

**Q.**   Okay.  Now, there was shoes and clothes taken as well.  If you could just -- I mean, how many pair of shoes and how many items of clothing?

**A.**   I don't -- I really don't know.

**Q.**   Okay.  Were they -- again, I don't want to belabor the point.  I'm not trying to put you on the spot.

Was it a large number of shoes and clothing, and were they valuable?

**A.**   I mean, it was probably five pairs of shoes, and they are just average shoes, dress shoes, sandals.  You know, not really, no.

**Q.**   Were they ever recovered?

**A.**   I don't know.

**Q.**   You haven't seen them since?

**A.**   No.

**Q.**   And how much money was taken?

**A.**   $700 at the ATM.

**Q.**   Was there any other money that was in the car or elsewhere?

**A.**   I had cash in my wallet, but I can't remember how much.

**Q.**   Do you typically carry a lot of cash or a little cash?

**A.**   Not really, no.

**Q.**   So your wallet was rifled, and your cash was taken?

80

**A.**    Yes.

**Q.**    Any credit cards taken?

**A.**    The credit cards were there.  But I was suspicious that they had gotten my credit card numbers.  And we had some suspicious activity on our account.  You know, we were tracking the transactions.  And so we changed the credit cards.

**Q.**    Did the perpetrators say anything in regards to they had been watching you for a period of time?

**A.**    Yes.

**Q.**    And for what?  Three weeks they told you they had been watching you?

**A.**    I think so.  They didn't really say how long.  They said for a while.  We've been watching you for a while sort of -- yeah.

**Q.**    And did they indicate that they were with the Black Panthers and they were from Chicago?

**A.**    Yes.

**Q.**    Did they tell you that -- instruct you that when the police came tell them that Birdman did this?

**A.**    Yes.

**Q.**    And did they talk to you about white officers killing innocent black people?

**A.**    Yes.

**Q.**    So they made some political statements to you --

**A.**    Yeah.

81

Q.    -- of a racially divisive nature?

A.    Right.

        MR. JONES:  Judge, give me a moment.  I think I have everything.

                **(There was a brief pause in the proceedings.)**

        MR. JONES:  Thank you for your time and patience, Mr. Wolfe.  Sorry to have to ask you all these questions. Thank you.

        THE COURT:  Do you have any follow-up, Counsel?

        MR. BUCHANAN:  Yes, Your Honor.

                        REDIRECT EXAMINATION

BY MR. BUCHANAN:

Q.    Mr. Wolfe, if you can flip over on Defendant's Exhibit 5. The suspect identification form that you talked with Mr. Jones about, do you see it?

A.    Yes.

Q.    In addition to the height and weight description, did you also write a description of what the suspects had done?

A.    Yes.

Q.    And please read for the jury -- this is your handwriting, sir?

A.    Yes.

Q.    Read for the jury what you wrote for that first robber.

A.    Took my wife to the ATM while the other guy stayed.  It is kind of hard to read.  That is my writing.  I think it says

82

told me they were going to kill me if anything happened while they were -- while they were there.

Q.    He told you -- what is that -- if you can help me with your handwriting.  It says told -- and what happens after that?

A.    It says -- sorry.  Told the guy to kill me if anything happened while they were there.

Q.    And so for this descriptor, this is the person who went with Ms. Wolfe to the ATM?

A.    Right.

Q.    And the second page, how did you describe what that person had done?

A.    Told me not to move or he would kill me.

Q.    And is that the person who had the firearm?

A.    Yes.

Q.    Mr. Wolfe, I'm going to hand you what I have previously marked as Government's Exhibit 56.

      Mr. Wolfe, what is Government's Exhibit 56?

A.    This is the voluntary statement that I wrote for the Roswell Police Department.

Q.    And I believe Mr. -- this is a statement that you wrote right after this happened?

A.    Yes.

      MR. BUCHANAN:  Your Honor, we would move for the admission of Government's Exhibit 56 into evidence.

      MR. JONES:  I have no objections, Your Honor.

THE COURT: All right. Then it is admitted.

Q. (BY MR. BUCHANAN) This is how you remember the events of that night as they happened as you wrote them shortly thereafter the robbery?

A. Yes.

Q. On the second page, you note -- is there a reference to Birdland or Birdman?

A. Yes.

MR. BUCHANAN: Nothing else, Your Honor.

MR. JONES: No recross, Your Honor.

THE COURT: May this witness be excused?

MR. BUCHANAN: Yes, Your Honor.

THE COURT: Is there any possibility he is going to be recalled?

MR. BUCHANAN: Not for the United States, Your Honor.

THE COURT: Sir, you can be excused -- and what about for -- any chance you are going to recall this witness?

MR. JONES: I don't intend to call Mr. Wolfe in my case, Your Honor.

THE COURT: All right. You are excused. I would urge you not to share your testimony with any other of the witnesses.

But can this witness observe if he wishes to or not?

MR. JONES: If he has been excused, Your Honor, and won't testify again, I have no objections to Mr. Wolfe

84

attending the court and observing.

THE COURT:  All right.  You feel comfortable releasing -- excusing him and you won't need him for recall?

MR. BUCHANAN:  I'm comfortable releasing him, Your Honor.

THE COURT:  Okay.  So -- but please be sure not to share your recollection of the testimony here with any other witnesses whatsoever.  All right?

THE WITNESS:  Okay.

THE COURT:  Thank you.

Shall we start -- take a lunch break now?

MS. MORRIS:  We have a very short witness from Bank of America next.

THE COURT:  All right.  That is fine.

MS. MORRIS:  I think we would like to be able to release them.

THE COURT:  That is fine.  Go ahead.

MS. MORRIS:  Thank you.  Mr. Anderson.  The United States calls Bill Anderson.

COURTROOM DEPUTY CLERK:  Please raise your right hand.

**(Witness sworn)**

COURTROOM DEPUTY CLERK:  Please have a seat.  Loudly and clearly state your name, and please spell your last name for the record.

THE WITNESS:  William Anderson, A-N-D-E-R-S-O-N.

Whereupon,

WILLIAM ANDERSON,

after having been first duly sworn, testified as follows:

DIRECT EXAMINATION

BY MS. MORRIS:

Q.   Good morning, Mr. Anderson.  Could you tell the jury how you are currently employed, sir.

A.   I'm the vice president of global corporate security for Bank of America, and I have protection responsibility for Georgia and South Carolina.

Q.   As a part of your duties for covering global corporate security for Georgia and South Carolina, did you become involved assisting a law enforcement investigation back in 2015 involving a forced ATM withdrawal from an ATM in Roswell, Georgia, in June 2015?

A.   Yes, I did.

MS. MORRIS:  I'm going to ask you to take a quick look or I'm going to ask Ms. Toussaint to actually publish Government's Exhibit 5, please --

THE COURT:  All right.

MS. MORRIS:  -- which has been admitted.

Q.   (BY MS. MORRIS)  Could you take a look at the screen, Mr. Anderson, and tell me -- tell the jury if you recognize -- the screen to your right if you recognize this screenshot or --

and I'm sorry.  The font is small.  There are some fonts on the bottom left of the screen and the bottom right of the screen.

If you could explain to the jury the meaning of those words.

MS. MORRIS:  Thank you, Ms. Toussaint.  She is just pulling up the bottom right.

Q.   (BY MS. MORRIS)  What does this indicate?

A.   That is indicating a time stamp as well as the date stamp on this photograph.

Q.   And what is the time stamp and date stamp indicated there?

A.   June 17, 2015, and the time is showing military time 2347.

Q.   And what is --

MS. MORRIS:  And going back, Ms. Toussaint, to the picture.

Q.   (BY MS. MORRIS)  What is this a time -- what is this an image of?

A.   It is an image of an ATM user at the Roswell, Georgia, financial center.  And it is showing that it is at a drive-up ATM.

Q.   Thank you.  Do you know that because of some words on the screen?

A.   Correct.  I do.

Q.   Is that in the bottom left of the screen where it says D-U-A-T-A?

A.   Yes, ma'am, it is.

Q.    Thank you, sir.

I'm going to show you what has been marked as Government's Exhibit 4.  Please let me know if you recognize this disc and, if you do, what do you know it to be?

A.    This disc is the video footage from where those photographs were captured.

Q.    Okay.  So this contains the actual video from which those screen captures were taken; is that correct?

A.    That is correct.

MS. MORRIS:  The Government moves to admit Government's Exhibit 4.

MR. JONES:  No objections, Your Honor.

THE COURT:  Admitted.

Q.    **(BY MR. BUCHANAN)**  Let's talk, Mr. Anderson, about Bank of America's global and national operations.

First, where is the company headquartered?

A.    Charlotte, North Carolina.

Q.    And does the presence -- the banking services of Bank of America extend to the entire United States?

A.    It does, including the District of Columbia.

Q.    And what about internationally?  It is called Bank of America.  But is there a presence outside the United States?

A.    We operate in 40 countries.

Q.    And approximately how many banking centers and ATMs does the bank have?

88

A.    Approximately 4600 financial centers and just shy of 16,000 ATMs.

Q.    And are those numbers for today for 2021?

A.    Yes, they are.

Q.    So back in June of 2015, can you give the jury a sense of whether the scope of your operations was comparable back then?

A.    It was comparable.

Q.    Now, this particular ATM in Roswell, was it located at 10750 Alpharetta Highway in Roswell, Georgia?

A.    Correct.

Q.    And you mentioned that you recall from pulling the video and seeing this and I think also seeing the screenshot that this was a drive-thru ATM; is that correct?

A.    Correct.

Q.    And what are the hours of accessibility or operation for a drive-thru ATM?

A.    It is 24/7 access.

Q.    So in terms of the setup of a drive-thru ATM such as this, are more than one customer able to use a single ATM machine at a time?

A.    No.

Q.    And so at the time when this particular withdrawal was happening or withdrawals that were depicted on the screenshot that we viewed, could another Bank of America customer utilize the ATM at that time?

**A.**    No.

**Q.**    And you mentioned that your role is specific to security and protective services; is that correct?

**A.**    That's correct.

**Q.**    Is the security of ATMs in the banking centers critical to the operations of Bank of America's business?

**A.**    It is.

**Q.**    Now, at the time a withdrawal is made from this particular ATM or was made, did the withdrawal of cash from that particular ATM in Roswell on Alpharetta Highway -- did the withdrawal deplete the amount of funds available in that particular machine available to any other Bank of America customer that night?

**A.**    Yes, it would have.

**Q.**    And are banking customers from other banks able to use your Bank of America ATMs as well?

**A.**    They are.

**Q.**    So is it accurate to say that on the night of the withdrawals depicted in the video that you pulled -- the forced withdrawal and seeing the screenshot that Bank of America's operations, which are national and international in scope, were impacted in some way by that forced withdrawal?

            MR. JONES:  Object to leading, Your Honor.

            THE COURT:  Sustained.  Rephrase the question.

            MS. MORRIS:  Certainly.

Q.    **(BY MS. MORRIS)**  When a withdrawal is made at any time, are your operations impacted?

A.    Yes.

MS. MORRIS:  I think that is all I have on direct examination, Your Honor.  Thank you.

CROSS-EXAMINATION

BY MR. JONES:

Q.    So if I understand what you are saying, Mr. Anderson, is that any time anybody goes to the ATM and takes out any sum of cash that that somehow impacts the international and national company known as Bank of America?

A.    I mean, it impacts transactions obviously across our enterprise.

Q.    Well, so if I go to the ATM and put in my card for Bank of America, get my PIN number right, then -- and I get, let's say, $100, I have impacted the global company known as Bank of America?

A.    Yes.  It does impact our transaction volume.

Q.    Okay. And you have -- I believe now you said you have -- what? -- 16,000 ATMs, or was it 1600?

A.    16,000.  Just shy of 16,000.

Q.    Now.  Okay.  You now have 4600 financial centers; correct?

A.    Yes.

Q.    Okay.  And I bet you back in 2006 you had more financial centers because you're closing financial centers; correct?

**A.**    We have closed some.  Yes, we have.

**Q.**    Quite a few; correct?

**A.**    Correct.

**Q.**    Okay.  Now, so this -- and going back to June 17, 2015, these two transactions of $500 and $200 depleted the funds of Bank of America; correct?

**A.**    Depleted the customer's funds but --

**Q.**    Customer's funds.  Well, did the ATM run out of money that night -- the ATM in question?

**A.**    Not that I'm aware of.

**Q.**    Did you check?

**A.**    No, I did not.

**Q.**    What is the -- you have been with Bank of America how many years, sir?

**A.**    13 years.

**Q.**    13 years.  What is Bank of America worth?

**A.**    We did 85 billion last year.

        MS. MORRIS:  Objection, Your Honor.

**Q.**    **(BY MR. JONES)**  85 billion?

        THE COURT:  Yes.  Go ahead.

        MS. MORRIS:  Your Honor, the legal standard -- the element does not reach the quantitative comparison.  The standard is a minimal impact on commerce.  The inquiry of the withdrawal depletion versus the bottom line of Bank of America is simply not relevant.

92

THE COURT:  Are you contending that there was a minimal -- that you don't meet that minimal impact?

MR. JONES:  I won't concede that all they have to prove is a minimal impact, Your Honor.

THE COURT:  All right.  Go ahead.

MR. JONES:  They brought this case to federal court and are relying on the commerce clause or commerce -- effect on commerce.

Q.   **(BY MR. JONES)**  So what is Bank of America worth?  What was Bank of America worth conservatively speaking in June of 2015?

A.   50 billion.  Probably 50 billion.

Q.   What is your share price now?  About $23 a share, and you've got millions and millions of shares?  Is that not a fair estimate -- fair statement?

A.   That is fair.

MR. JONES:  No further questions.

THE COURT:  Thank you.

MS. MORRIS:  Nothing further, Your Honor.

THE COURT:  May this witness be excused?

MS. MORRIS:  He certainly may.

THE COURT:  Thank you very much, sir.

Just so I know when to let the jury back, is there -- are there any follow-up items that we need to do from our earlier session before?

93

MR. BUCHANAN:  Not on behalf of the United States, Your Honor.

THE COURT:  Okay.  All right.  Why don't we see you here at 1:15.

And thank you very much for your attention.  Remember not to talk about the case between yourselves or do any research in between.

Thank you.  See you then.

**(The jury exited the courtroom at 12:19 P.M.)**

THE COURT:  All right.

MR. BUCHANAN:  1:15, Your Honor?

THE COURT:  That is fine.

**(A lunch break was taken.)**

THE COURT:  Mr. Jones, you -- I gather you have something you would like to chat about first?

MR. JONES:  Yes, Judge.  And I felt in fairness to the Government and particularly to the Court I didn't want to appear that I misrepresented something.

I was asked do I intend to refer to Basil Varner as Mr. Varner or Ms. Varner.  And I said I will refer to the person as Ms. Varner.

And I guess maybe -- anyhow -- however, I think the fact that he's a transgender male is relevant -- highly relevant in this case on several levels.

Number 1, it goes to his bias or his -- excuse me --

94

it goes to Ms. Varner's fear about possibly ending up in a male institution.  And I believe when she was sent to Lovejoy, she was put in the men's wing.  So -- and that has got to be a terrifying thought to a transgender person.

And, you know, Judge, this is not a line of cross-examination, quite frankly, that I personally enjoy.  But I'm here doing a job.  That is the first thing.

Secondly, the Government's theory of this case for all this time has been that there has been basically two thugs and a driver, who is either a transgender person or women.  So here you've got the thugs and the -- and then the sort of ladylike drivers.

Well, I don't really know what happened, and the jury doesn't either.  This is the Government's theory.

In one of the holdups, the first one, one of the perpetrators is described as 5-6 and 120 pounds.  Ms. Varner in her rap sheet is -- her height is 5-6, 175 pounds.  Now, she's much heavier, but I'm not sure when that height and weight was.

THE COURT:  Well, awhile longer.

MR. JONES:  And who is to say -- and, again, descriptions vary.  Who is to say it wasn't just her and Mr. Jackson who went in and did this?

You know, I saw her guilty plea.  You know, I'm sure she can come across as very, very ladylike.  But she does have a history of violence in terms of in 2020 they issued a warrant

to revoke her supervised release because she got involved in a domestic violence down in Clayton County it was where I think she put a belt around the person's neck, assaulted them, hit them, left marks.  And she's now on probation for domestic violence.  So I think I have -- for two reasons have a good faith basis to go into this and make this inquiry.

And as I say, Your Honor, it is nothing that I take any pleasure in.

THE COURT:  So you would -- am I understanding you want to continue to call -- to refer to the witness as -- with the --

MR. JONES:  Ms. Varner.

THE COURT:  Ms. Varner?

MR. JONES:  If that is what she chooses to go by.

THE COURT:  But you want to -- in terms of exploring her experience, you want to be able to -- and her potential bias or what she would get from this, you want to refer to the fact that she -- this peril in front of her?

MR. JONES:  She's a transgender.

THE COURT:  All right.  I just want to summarize --

MR. JONES:  Yes.  Yes.

THE COURT:  -- that is what you want to do.  All right.

MR. JONES:  And then, of course, the physical description could be her.  And she's not -- though she presents

very well, she is not necessarily always all that ladylike.

THE COURT: All right.

Mr. Buchanan?

MR. BUCHANAN: First of all, Your Honor, Mr. Jones describes or called Ms. Varner a transgender man. That is incorrect. She's a woman. She says she's a woman. That is what she is. Her gender identity is not at issue in this case.

If Mr. Jones wants to compare her physical stature to the description of the people who committed the robbery, he is free to do so without harassing the witness and asking how long have you been a woman.

THE COURT: Well, I didn't hear him saying that. I think what he wants to do, if I understand it correctly, is discuss her -- this business about the prison, which is -- and the peril and incentive to avoid that. Because that is a well-known issue. I don't mean about her individually but as a whole. It is a realistic concern.

MR. BUCHANAN: That is a concern for every cooperator. No cooperator who wants to -- who testifies -- they understand the peril that they put themselves into, notwithstanding their gender identity, when they cooperate against their co-defendants.

THE COURT: Right. That is a peril. But I don't think I'm referring to that. I mean, I don't know what -- I think what he's discussing is something different and that he

wants to be able to address that, as I understand.

MR. BUCHANAN:  That is his speculation of what her fear is.  And I don't believe that that is -- it is proper to even assume that she has that particular -- that particular fear, especially absent some evidence to the contrary.  All we have is Mr. Jones surmising that a woman would not want to be sent to a male prison.

And we don't know how the Bureau of Prisons would address this issue either.  So I think it is speculative to think that she has some additional bias or some additional incentive to testify favorably on behalf of the Government because she doesn't want to go to a particular prison.

In addition, we do believe that there is a potential -- potentially it is highly likely that she would come into this public forum and be embarrassed greatly by this inquiry into her -- the history of her sexual identity and how that history may bear upon her testimony.

MR. JONES:  Judge, it is not something -- it is not something I'm going to dwell on.  In her criminal history that was given to me by the Government, she's listed as a male.  I respect that she identifies as a female.  God bless her.

But the real is that she's -- for law enforcement purposes, she's a man.  You know, my understanding was she was in the male wing at Lovejoy.  Mistakes happen.  And transgender people in the prison system -- it has just got to be just

absolutely brutal.

And I don't intend to dwell on this, Judge.  I just intend to bring it up and move on.  Because, again, it goes to what is her subjective fear and bias.  I'm not going to ask when you did this or when you did that or whatever.  It is going to be hopefully as short and to the point as I can possibly make it.

THE COURT:  And she is your next witness?

MR. BUCHANAN:  Yes, Your Honor.

THE COURT:  Well, I have to say following enough about issues of treatment in prisons that this is a well-known concern, generally speaking.  I think that if, Mr. Jones, you can address it, as you said, quick and in as noninvasive a way as possible and then move on.

Because to the extent that it does, in fact -- and that is all -- she can deny it.  But we'll go in and out of it.

But, generally speaking, prisons are -- throughout the country are still -- other than selective ones in California and even those are still classifying people in this position as -- and that is the State of California, not -- I mean, the state prisons, not the federal prisons, are classifying individuals by their original identity.

But I don't want this to be anything more than that.

MR. BUCHANAN:  Your Honor, would it be acceptable to the Court to voir dire Ms. Varner about whether or not she

bears this fear of a potential custodial sentence, which is not necessarily guaranteed to her, but it makes sense to bring her in and ask her whether or not -- and, I mean, if she doesn't have that fear, then I would persist in my argument that her gender identity bears nothing on this matter.

MR. JONES: Judge, I would object to that. What she says and what she feels could be very likely two different things. I think the Court's indication about that I touch upon it in a limited manner and then move on is the appropriate way to handle it.

Whatever Ms. Varner says at this point, I just don't think that that could be determinative on whether or not this issue can be brought up. I just don't think it is reliable.

THE COURT: I think that the jury should have the opportunity to see her demeanor in responding to it. We're going to go in and out, and I don't want -- I'm not the one who has to judge her demeanor in the end. All right?

MR. BUCHANAN: Could I have a moment with her before?

THE COURT: Yes.

MR. JONES: Judge, there is a video that I finally looked at from the Scott phone dump.

THE COURT: Ladies and gentlemen in the back, if you wouldn't be talking. Thank you. If you need to talk, just go ahead back out and then come back in. Thank you.

MR. JONES: There was a video from the phone dump

100

from Mr. Scott, which I objected to earlier.  I finally got it working this weekend.  And I found a 30-second video of Mr. Scott and other people in the hotel -- in a hotel.  And one of them appears to be Ms. Varner.

I propose that I can just play the video and ask her if that is her.  Because, otherwise, you know, I'm going to have to try to get it through Mr. Scott.

THE COURT:  What is the problem with that?

MR. BUCHANAN:  I told him there is no problem with that.  I just asked it not be played for the jury before it is played for the witness.  That is my only issue.

THE COURT:  You want to have her see it first?

MR. BUCHANAN:  Yes.

THE COURT:  What is the problem with that?

MR. JONES:  I don't have any problem with that, Judge, if she could just come in and look at it at the monitor.

THE COURT:  That is fine.

MR. JONES:  Because Mr. Martin has got me all hooked up here and, you know --

THE COURT:  I mean, she can come in now and do it, if you want.

MR. JONES:  Yes.

Judge, I apologize for this.  I'm not trying to dump it back on the Government.  But if I had this earlier, I actually could have taken it out to Mr. Redmond and asked him.

So I think this is the best way to do it.

THE COURT: Are you loaded up so you can play it?

MR. JONES: I believe I have the right one. I believe I have the right one, yes.

THE COURT: Do you want to go ahead and call your witness? We'll have her sworn in twice.

MR. BUCHANAN: Your Honor, the United States calls Ms. Basil Varner.

COURTROOM DEPUTY CLERK: If you would, please stand and raise your right hand.

**(Witness sworn)**

COURTROOM DEPUTY CLERK: Thank you.

MR. JONES: Should I just --

THE COURT: Just go ahead.

Have you advised Ms. Varner that this is what we're doing or not?

MR. BUCHANAN: No. I had no idea until I came back in.

THE COURT: All right. Ms. Varner, there is a short 30-second video. We're going to then start your testimony with the Government asking you questions thereafter and with the jury coming in, of course.

But just as a preview, we wanted to -- I'm allowing the defense counsel to have you verify whether this is a -- this captures an image of you or not -- this video. And that

102

is all you have to do is say yes or no or I'm not sure.

And then we'll deal with it during the course of testimony.  We just don't want to have it being shown to the jury if it is not you.

THE WITNESS:  Okay.

**(Playing of the videotape.)**

THE WITNESS:  I'm not in that video.

THE COURT:  Was there a particular image you thought was Ms. Varner?

I'm just asking the counsel so we can --

**(Playing of the videotape.)**

MR. JONES:  That person right there.

THE WITNESS:  No, that is not me.  I don't have tattoos on my chest.

MR. JONES:  If I may have one moment.

THE COURT:  Thank you very much.  Just stay put.

COURTROOM DEPUTY CLERK:  We're going to swear her in again once the jury gets here?

THE COURT:  Yes.  Right.

Are you ready to begin?

MR. JONES:  Yes.  Thank you, Judge.

THE COURT:  Can we have the jury in?

When you are testifying, you can take your mask off. If you would grab a plastic bag and place it over the microphone.

COURTROOM SECURITY OFFICER:  All rise for the jury, please.

**(The jury entered the courtroom at 1:50 P.M.)**

THE COURT:  All right.  Ladies and gentlemen, please have a seat.

Is this your next witness?

MR. BUCHANAN:  The United States has called Ms. Basil Varner.

COURTROOM DEPUTY CLERK:  Please stand and raise your right hand.

**(Witness sworn)**

COURTROOM DEPUTY CLERK:  Please have a seat.  Loudly and clearly state your name, and spell your last name for the record.

THE WITNESS:  Basil Varner, V-A-R-N-E-R.

MR. BUCHANAN:  Your Honor, one clerical matter.  I believe earlier I introduced Government's Exhibit 3 but failed to introduce it into evidence.

THE COURT:  Was there any objection to it?

MR. JONES:  Number 3 was --

THE COURT:  Those photos.

MR. JONES:  No.  No objections, Judge.

THE COURT:  Go ahead.  It is admitted.

MR. BUCHANAN:  Thank you, Your Honor.

Whereupon,

BASIL JAKKAR VARNER,

after having been first duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. BUCHANAN:

Q.   Good afternoon, Ms. Varner.  Are you familiar with Mr. Brandon Redmond?

A.   Yes, I am.

Q.   You have -- prior to today in years past, have you had a relationship with Mr. Varner?

A.   We had relations.

Q.   You were physically intimate with Mr. Redmond?

A.   Yes.

Q.   Was that approximately back in 2015?

A.   Yes.

Q.   Ms. Varner, do you see Mr. Redmond here in court today?

A.   Yes.

Q.   And please describe what he is wearing.

A.   Well, he's just right there with the green shirt.

Q.   You said with the print shirt?

A.   Yes.

        MR. BUCHANAN:  Your Honor, could we have Mr. Redmond remove his mask so that the witness can see him?

        THE COURT:  Certainly.

Q.   **(BY MR. BUCHANAN)**  And what color shirt is Mr. Redmond wearing?

**A.**   Green.  I'm color blind by the way.

**Q.**   Is he seated at the table to my right?

**A.**   So it looks green to me.  I'm sorry.

**Q.**   Seated at the counsel table on the other side of the partition?

**A.**   Yes.

MR. BUCHANAN:  Your Honor, I would like the record to reflect that the witness has identified the defendant.

THE COURT:  All right.

But you are color blind?

THE WITNESS:  I'm red-green color blind.

THE COURT:  Thank you.

**Q.**   **(BY MR. BUCHANAN)**  I'm going to show you, Ms. Varner, what has previously been marked as Government's Exhibit 12.

Ms. Varner, what is Government's Exhibit 12?

**A.**   It is Mr. Redmond.

**Q.**   Is that Mr. Redmond that we just talked about with whom you had relations back in 2015?

**A.**   Yes.

MR. BUCHANAN:  Your Honor, we move for the admission of Government's Exhibit 12 into evidence.

MR. JONES:  No objections, Your Honor.

THE COURT:  It is admitted.

**Q.**   **(BY MR. BUCHANAN)**  Ms. Varner, what did you call Mr. Redmond?  Did you call him Brandon?

106

**A.**   No.

**Q.**   What did you call him?

**A.**   Shawty Love.

**Q.**   Shawty Love, L-O-V-E?

**A.**   Yes.

**Q.**   In your knowing Mr. Redmond, did he tell you where he was from?

**A.**   Yes.

**Q.**   Where did he say he was from?

**A.**   Memphis, Tennessee.

**Q.**   I'll show you what I have marked as Government's Exhibit 14.

   Ms. Varner, what is Government's Exhibit 14?

**A.**   This is his phone number that was stored in my phone.

**Q.**   So back in 2000 -- is that a fair and accurate screenshot of your phone and his number in your phone?

**A.**   Yes.

   MR. BUCHANAN:   Your Honor, we move for the admission of Government's Exhibit 14 into evidence.

   MR. JONES:   No objections, Your Honor.

   THE COURT:   It is admitted.

**Q.**   **(BY MR. BUCHANAN)**   And, Ms. Varner, back in 2015, did you have the occasion to speak with Mr. Redmond from time to time on the phone?

**A.**   Yes.

**Q.**    And to reach Mr. Redmond on the phone, did you dial him at this number that ends in 3291?

**A.**    Yes.

**Q.**    Is that why the screenshot notes the Facebook name Brandon Redmond?

**A.**    Yes.

**Q.**    Ms. Varner, I'm bringing up what I have marked as Government's Exhibits 11 and 13.

            MR. JONES:  11 and what?

            MR. BUCHANAN:  13.  1-3.

**Q.    (BY MR. BUCHANAN)**  Ms. Varner, take a look at Government's Exhibit 11.

        Do you recognize the person in Government's Exhibit 11?

**A.**    Yes.

**Q.**    And who is that?

**A.**    That is Dre.

**Q.**    Do you know his full name?

**A.**    Mario is his first name.  Jackson is his last name.

**Q.**    You called him Dre?

**A.**    Yes.

            MR. BUCHANAN:  Your Honor, we move for the admission of Government's Exhibit 11 into evidence.

            MR. JONES:  No objections.

            THE COURT:  It is admitted.

**Q.    (BY MR. BUCHANAN)**  And likewise, Ms. Varner, did

108

Mr. Jackson tell you where he was from?

A.   Yes.

Q.   And where was he from?

A.   From Memphis, Tennessee.

Q.   Just so we are clear, you are a defendant in this case; right?

A.   Yes.

Q.   And so is Mr. Jackson?

A.   Yes.

Q.   Take a look, Ms. Varner, at Government's Exhibit 13.

     Ms. Varner, what is Government's Exhibit 13?

A.   This is Dre's phone number stored in my phone.

Q.   That is a screenshot from your phone?

A.   Yes.

Q.   Is that a fair and accurate depiction of that screenshot from your phone?

A.   Yes.

        MR. BUCHANAN:  Your Honor, we move for the admission of Government's Exhibit 13 into evidence.

        MR. JONES:  No objections, Judge.

        THE COURT:  It is admitted.

Q.   (BY MR. BUCHANAN)  And, Ms. Varner, back in 2015, did you have the occasion to speak with Mr. Jackson by telephone?

A.   Yes.

Q.   And did you do so by dialing the two numbers that are

written on Government's Exhibit 13?

**A.**   Yes.

**Q.**   It is the number ending in 1788?

**A.**   Yes.

**Q.**   And the number ending in 9328?

**A.**   Yes.

**Q.**   Back in 2015, what was the phone number that you utilized?

**A.**   (256) 200-7532.

**Q.**   Is that the number that you used to dial both Mr. Jackson and Mr. Redmond?

**A.**   Yes.

**Q.**   Now, Ms. Varner, have you also spent time back in 2015 with Mr. Jackson?

**A.**   Yes.  I was in a relationship with him.

**Q.**   We talked about the relations you had with Mr. Redmond; correct?

**A.**   Uh-huh (affirmative).

**Q.**   You have to say yes or no so she can write it down.

**A.**   Yes.

**Q.**   And so given that, you have had the opportunity to see them both up close; is that right?

**A.**   Yes.

**Q.**   Which of the two of them is taller, Ms. Varner?

**A.**   Mario.

**Q.**   Is he taller by a lot or by a little bit?

110

**A.**   By a lot.

**Q.**   Now, Ms. Varner, I mentioned that -- and you've testified that you were a defendant in this case and you entered into a plea agreement after you were charged; is that right?

**A.**   Yes.

**Q.**   I'll show you what I have marked as Government's Exhibit 15.

         MR. JONES:  Thank you, Mr. Buchanan.

**Q.**   **(BY MR. BUCHANAN)**  What is Government's Exhibit 15, Ms. Varner?

**A.**   This is my plea agreement.

**Q.**   And is that a fair and accurate copy of your plea agreement with the United States?

**A.**   Yes, I believe so.

         MR. BUCHANAN:  Your Honor, the United States moves into -- moves for admission into evidence Government's Exhibit 15.

         MR. JONES:  No objections, Judge.

         THE COURT:  Admitted.

**Q.**   **(BY MR. BUCHANAN)**  And let's get through that.

         MR. BUCHANAN:  Ms. Toussaint, if I could have a picture of Government's Exhibit 12.

**Q.**   **(BY MR. BUCHANAN)**  Ms. Varner, what is this in Government's Exhibit 12?

**A.**   Brandon Redmond.

Q.    Is that how Mr. Redmond looked back in 2015?

A.    Yes.

        MR. BUCHANAN:  Ms. Toussaint, Government's Exhibit 14, please.

Q.    **(BY MR. BUCHANAN)**  And this is a screenshot -- is this a screenshot from your phone?

A.    Yes.

Q.    And whose number is that 3291 number?

A.    That is Brandon Redmond's.

Q.    Government's Exhibit 11, please.

      Ms. Varner, who is in Government's Exhibit 11?

A.    That is Mario Jackson.

Q.    13, please.

      And so Mario Jackson -- you called him Dre?

A.    Yes.

Q.    Does that explain why you saved his name as Memphis Dre in your phone?

A.    Yes.

Q.    Are those the numbers that you used to contact him?

A.    Yes.

Q.    Now Government's Exhibit 15, please.

      Ms. Varner, this is Page 17 of your plea agreement.  Do you see your signature here?

A.    Yes.

Q.    And with respect to this plea agreement, Ms. Varner, does

112

it help you to lie?

**A.** No.

MR. JONES: Your Honor, I'm going to object to counsel leading the witness through this.

THE COURT: I'm going to allow the question, but please be careful about it.

MR. BUCHANAN: Yes, Your Honor.

**Q.** **(BY MR. BUCHANAN)** Ms. Varner, in your words, what did you plead guilty to doing?

**A.** To picking them up from a robbery.

**Q.** How many robberies?

**A.** Two.

**Q.** I want to talk about each of them separately. First, I want to talk about the robbery that occurred on June 12th.

You acknowledge in your plea your involvement in that; is that right?

**A.** Yes.

**Q.** Do you recall, Ms. Varner, driving Mr. Jackson around in Stone Mountain?

**A.** Yes, I do.

**Q.** Do you recall any particular streets or cross streets that you traveled upon in driving him around Stone Mountain?

**A.** I remember driving and reading the sign Silver Hill Manor.

**Q.** Silver Hill Manor?

**A.** Yes.

Q.   And after doing that with Mr. Jackson, do you recall ever going back to that vicinity?

A.   Yes.  I picked him up from -- when I went to pick them up, I passed Silver Hill Manor.

Q.   And do you -- you testified you passed Silver Hill Manor, and you picked them up.

Who did you pick up?

A.   I picked up Dre and Brandon Redmond.

Q.   And how did you know where to pick them up?

A.   Because they told me -- Dre told me where to pick them up.

Q.   What time of day was it when you went to pick them up?

A.   This was late night.

Q.   After -- after sundown?

A.   Yes.

Q.   And when -- the place where you picked them up, was it a long way from the Silver Hill sign that you saw earlier?

A.   No.

Q.   And when you went to pick them up, how did they get to the car?

A.   They ran out to the car.

Q.   Both of them?

A.   Yes.

Q.   And what happened after they got to the car?

A.   They got in the car, and they didn't discuss anything.

Q.   And what did you do when they got in the car?

114

**A.**    Took them back to Lithonia.

**Q.**    Now, did you notice anything about how they looked or smelled or anything like that?

**A.**    They smelled like pepper.

**Q.**    Excuse me?

**A.**    They smelled like pepper.

**Q.**    Like seasoning pepper?

**A.**    Yes.

**Q.**    Did you see them with any pepper?

**A.**    I can't recall it.  I don't remember.

**Q.**    But you do recall the smell?

**A.**    But I don't think so.

**Q.**    I'm sorry?

**A.**    I don't think so.  But I don't recall.

**Q.**    Now, you testified that as you drove away they didn't discuss anything; is that right?

**A.**    That's correct.

**Q.**    Did you later discuss with Mr. Redmond what happened?

**A.**    Kind of.  The conversation was treaded lightly.

**Q.**    Okay.  Please tell us about that conversation.

**A.**    We were just having conversation.  We were both pissed off at Dre.  And I just remember him saying that -- that he done got him -- that he done got involved in some stuff and done beat the man with a fireplace poker.

**Q.**    Now, explain when you say he and him, who did you mean?

115

**A.**   Brandon.  Brandon beat someone with a fireplace poker.

**Q.**   Mr. Redmond told you that?

**A.**   Yes, he did.

**Q.**   Ms. Varner, in connection with your plea agreement, did you also acknowledge your involvement in the robbery that happened June 17th, 2015?

**A.**   Yes.

**Q.**   That robbery took place in Roswell.  Do you remember that?

**A.**   Yes.

**Q.**   And please tell the jury what happened with respect to that trip up to Roswell.

**A.**   They told me where to park.  And that was -- they got out -- they did the -- well, they didn't get out from where I was parked.  But I was told where to park, and they came back to that location where I was parked.

**Q.**   And who told you where to park?

**A.**   Mario.

**Q.**   Mario, Mr. Jackson?

**A.**   Yes.

**Q.**   And who was with Mr. Jackson?

**A.**   Brandon Redmond.

**Q.**   Mr. Redmond?  And did you drive them to that location or just pick them up at the location?

**A.**   I think I just picked them up from that location.

**Q.**   Now, when you went to that Roswell -- when you drove to

Roswell, did you have to wait a long time for Mr. Jackson and Mr. Redmond?

A.    Yes.

Q.    And what did you do while you waited?

A.    Just sat in the car, played music, and waited.

Q.    Now, while they were gone from your car, did you communicate with them?

A.    Dre -- I don't know.  I don't remember just because it has been so long.  But I'm not sure.

Q.    Do you recall approximately roughly how long you waited on them?

A.    I'm going to say about 30 or 45 minutes.

Q.    When they came back or when they got to the car, did they have anything with them?

A.    Had a black bag.

Q.    And did you get an opportunity to see what was in the bag?

A.    No.

Q.    Ms. Varner, I'm going to hand you what has been admitted into evidence as Government's Exhibit 9.

      Ms. Varner, have you seen those sandals before, Government's Exhibit 9?

A.    Yes.

Q.    And please tell the jury when you saw them.

A.    Dre gave them to me shortly after going to Roswell.

Q.    After the Roswell robbery -- after you drove them to

Roswell, Mr. Jackson gave you those?

**A.** Yes.

**Q.** Did you wear them after that, Ms. Varner?

**A.** Yes. I was arrested in them.

**Q.** Ms. Varner, I placed on the table what has been admitted into evidence as Government's Exhibit 10.

Have you seen this item before?

**A.** Yes.

**Q.** When did you see it?

**A.** Dre gave me that shortly after picking them up from Roswell.

**Q.** And when you say picking them up from Roswell, who did you pick up?

**A.** Which would be him and Brandon Redmond. That would be Mario and Brandon Redmond.

**Q.** And after Mr. Jackson gave you that necklace, did you wear it?

**A.** Yes. I was arrested wearing that as well.

**Q.** Ms. Varner, do you ever recall doing any shopping with Mr. Jackson?

**A.** Yes.

**Q.** And when you did some shopping with Mr. Jackson, what types of items did y'all shop for?

**A.** Just clothes and things.

**Q.** Did you ever shop for any ski masks with Mr. Jackson?

**A.**    Yes.

**Q.**    Did you ever shop for bandanas with Mr. Jackson?

**A.**    Yes.

**Q.**    Did you ever see Mr. Jackson with black pants?

**A.**    Yes.

**Q.**    I want to ask you a couple of questions about the plea agreement.

Has the Government made you any promises about what any type of potential sentence will be for your conduct?

**A.**    No.

**Q.**    Obviously do you want the Government to recommend that you get a very light sentence?

MR. JONES:  I'm going to object to this leading -- these leading questions.

THE COURT:  Rephrase your question.  Thank you.

**Q.    (BY MR. BUCHANAN)**    What do you hope with respect to your sentence, Ms. Varner?

**A.**    I hope with cooperating and telling the truth that that would be taken in account when I am sentenced.

**Q.**    And who decides what your sentence will be?

**A.**    Judge Totenberg.

MR. BUCHANAN:  No more questions, Your Honor.

MR. JONES:  Judge, just give me a moment.  I thought that they were going to go much longer.

If I may approach, Your Honor?

119

THE COURT:  Yes.

CROSS-EXAMINATION

BY MR. JONES:

Q.   Ms. Varner, my name is Derek Jones.  I have a few questions for you, ma'am.

You know my client, Mr. Redmond, as Little Shawty or Shawty Love?

A.   I know him as Shawty Love.

Q.   Shawty Love.  And you and he are about the same height, aren't you?

A.   Well, I'm 5-6.  So I don't know.

Q.   Well, you stood next to him.  So was he about the same height as you?

A.   I never tried to like equal it out to see if he was or wasn't.  But I would assume so, yeah.

Q.   Well, you had relations with him, but you don't know if he's the same height as you?

A.   It was just sex.  It wasn't trying to know what his height was.

Q.   Well, have you stood next to him?

A.   I have laid with him.

Q.   I beg your pardon?

A.   I have laid with him.

Q.   Okay.  When you walked to the car, as you said, before you drove him, as you say, to the holdup, did you walk next to him?

120

**A.**    No.  Me and him -- we were only having sex sneaking around.  I was dating Dre.

**Q.**    So you can't tell me if he is the same height as you?

**A.**    No, I can't.

**Q.**    Okay.  But he is not six-foot tall, is he?

**A.**    No, he is not.

**Q.**    You wouldn't call him Shawty Love if he was six-foot tall, would you?

**A.**    No.

**Q.**    You were having relations with Mr. Jackson, who you knew as Dre?

**A.**    As Dre.

**Q.**    Dre.  And Mr. Jackson or Dre lavished gifts upon you, did he not?

**A.**    Yes.

**Q.**    What did he give you?

**A.**    He gave me shoes.  He gave me a necklace.

**Q.**    What else?

**A.**    Money.

**Q.**    What else?

**A.**    That was about it.

**Q.**    So he is just -- all the time with you, he just gave you this pair of shoes and this necklace and some money?

**A.**    He gave me a bag.  I want to say it was a Louis bag.  But he did take it back.

UNITED STATES DISTRICT COURT
OFFICIAL CERTIFIED TRANSCRIPT

121

**Q.** What else did he give you that he -- is it a fair statement, Ms. Varner, that he gave you a bunch of stuff but he took it back?

**A.** No. Because he just didn't take everything back. But he did take that Louis bag back because that was the most valuable thing that he gave me.

**Q.** Okay. So he gave you a Louis bag. By that, you mean a Louis Vuitton bag, which is from France, and is an expensive designer purse? Is that what you mean?

**A.** That's correct.

**Q.** So, again, what else did he give you?

**A.** I think that is about it.

**Q.** The bag that -- you say that in one of the holdups there was a bag that was brought out.

Did you ever see what was in the bag?

**A.** No.

**Q.** Did you ever get what was in the bag?

**A.** I don't know because I didn't see what was in the bag. It was given to me after seeing the bag.

**Q.** Okay. Well, did not Mr. Jackson give you perfumes?

**A.** Yes, he did.

**Q.** Tom Ford?

**A.** No.

**Q.** Ms. Dior?

**A.** Yes.

122

**Q.** Coco Chanel?

**A.** Yes.

**Q.** Okay. How about shoes? Black Tory Burch sandals?

**A.** Brown Tory Burch shoes.

**Q.** Excuse me?

**A.** Brown Tory Burch sandals.

**Q.** Apart from whatever brand these are? I mean, these weren't the only sandals he gave you?

**A.** I'm not sure.

**Q.** How about a maroon Gionni purse?

**A.** Yes, maybe.

**Q.** Okay. How about a Marni purple and black polka dot tote bag?

**A.** I don't know, and I don't think so.

**Q.** What sort of vehicles did Mr. Jackson drive?

**A.** Mr. Jackson had a gray Infiniti truck. He had a black Impala. He had a black Cadillac.

**Q.** Mr. Redmond didn't have a vehicle, did he --

**A.** No.

**Q.** -- that you knew of?

**A.** No.

**Q.** And you know Mr. Redmond -- you knew Mr. Redmond for -- what? -- a couple of weeks, a week?

**A.** Yeah.

**Q.** Now, when Mr. Redmond told you -- you say that he told you

that he hit somebody with a poker, was there anybody else around?

A.    No.  It was just me and him.

Q.    So there was nobody else who could corroborate what you are telling us today?

A.    That's correct.

Q.    Now, on the June 17 holdup, you said you were parked and you waited a long time and played music?

A.    Uh-huh (affirmative).

Q.    If you could answer yes or no for the court reporter.

A.    Yes.  I'm sorry.

Q.    So were you acting as a lookout?

A.    No.  I was just waiting for him to tell me to pick them up.

Q.    So you didn't understand that there was anything going wrong?  You just were out there in the middle of the night playing music in a neighborhood that you weren't familiar with and you weren't acting as a lookout; is that correct?

A.    I really wanted to be blind about what was going on because I didn't want to know what was happening.

Q.    But yet in one of these two robberies at least, did you not drive around with Mr. Jackson, I believe you said, and looked around and then came back later?

A.    To pick him up when he called me and told me to pick him up.

124

Q.    Well, did you not go around earlier and with Mr. Jackson, to use the expression, case joints, scout out locations?

A.    It was never for me to be scouting anything.  So that wasn't what I thought we were doing.  I thought we were just simply looking at houses, which is what he said.

Q.    Looking at houses.  Was Mr. Jackson in the real estate business?

A.    I guess not.

Q.    Was he looking to buy a house?

A.    I don't know what his intentions -- I did not know what his intentions was at that time.

Q.    Now, as far as the plea agreement, which I believe that you have in front of you --

A.    Yes.

Q.    Is it in front of you --

A.    Yes.

Q.    -- Ms. Varner?

      Okay.  Now, you are -- you were charged in Count 10; correct?  You were charged in several counts; correct?

A.    Yes.  I was charged.  But for what count or what, I don't know.

      THE COURT:  Do you need a copy of the indictment?

Q.    (BY MR. JONES)  You were charged in regards to two incidents; correct?

A.    Yes.

125

Q.   And one of them was on June 12th; correct?

A.   Yes.

Q.   Okay.  And that was a situation -- well, first of all, were you charged with kidnapping in regard to the June 12th incident -- excuse me.  I'm sorry.

Were you -- you were charged in the June 12th incident for robbery; correct?

A.   Yes.

Q.   Okay.  And then there was another incident that you were involved in, which was June 17th, and you were charged with basically robbery as well; correct?

A.   Yes.

Q.   Okay.  Now, were you charged in June 17th with kidnapping?

A.   No.  I never kidnapped nobody.

Q.   Do you understand that somebody was kidnapped on June 17th?

A.   I did not know what took place.

Q.   You did not know what took place?

A.   No.

Q.   You have been a defendant in this case for six years.

I am assuming you are represented by good lawyers?

A.   Yes.

Q.   And you don't know what happened on June 17th?

A.   I did not know the events that took place until I became a part of this case and got brought in.  So to -- prior to this

126

even being brought to the court, I did not know anything about a kidnapping.

Q.    Okay.  Well, you were debriefed by the Government on a couple of occasions, were you not?

A.    Yes.

Q.    Okay.  And that was shortly after you were arrested?

A.    Yes.

Q.    Okay.  And so you have no knowledge that somebody was kidnapped on June 17th?

A.    I had no knowledge that anybody was kidnapped.

Q.    Okay.  And you weren't charged with it; correct?

A.    No.

Q.    Now, do you understand the legal concept of aiding and abetting, party to a crime?

A.    Kind of, yeah.

Q.    Kind of.  Which means that if you assist somebody, like for being the getaway driver, which you say you were, you can be charged for other conduct; correct?

        MR. BUCHANAN:  Your Honor, I'll object to the leading here.

        MR. JONES:  Leading?

        THE COURT:  I think he has the right to lead during the cross-examination.

Q.    (BY MR. JONES)  I mean, you understand, you know, aiding and abetting, party to a crime, that a person can be charged

127

for something that they are involved in?

A.   I have never studied law.  So I don't know how that works.

Q.   Okay.  And -- okay.  But you have been represented by a good attorney these past six years; correct?

A.   Yes.

Q.   Okay.  I'm not going to get into what you discussed with your attorney.

     Okay.  Now, you were charged -- you didn't plead guilty to anything involving the first count; correct?  The June 12th holdup, you weren't -- that was -- you didn't plead guilty to that, did you?

A.   No, sir.

Q.   Okay.  So you just pled guilty to the June 17th count; correct?

A.   I think that is correct.

Q.   June 10th count -- Count 10, June 17th.

     Okay.  And how much -- what is the maximum penalty for a Hobbs Act robbery that you pled to in Count 10?

A.   Again, I never studied law.  So I wouldn't know that.

Q.   Did you have a plea agreement?

A.   We never did a plea agreement where I was told a certain amount of time that I would get.

Q.   No.  No, ma'am.  I understand that you haven't been sentenced yet; right?

A.   Correct.

128

Q.   And you are going to -- you are going to go to court.
Have you got a sentencing date yet, or has that been set?

A.   No, it hasn't.

Q.   Okay.  And you are concerned about your sentencing date;
right?

A.   Of course.

Q.   You don't want to go to prison?

A.   Who would?

Q.   No one.  Right?

A.   Right.

Q.   You don't want to go to prison?

A.   No.

Q.   Now -- but you do know, do you not, what is the potential
maximum penalty for you?

A.   No.

Q.   Now, Mr. Buchanan showed you this plea agreement, which I
believe is in evidence, Number 14; right?

A.   Yes.

Q.   Okay.  Now -- and you read through this?

        THE COURT:  If she has it, why don't you just -- you
don't need to -- just tell her what page you want her to look
at.  Then you can step back and --

        MR. JONES:  Yes, ma'am.

        THE COURT:  Then the jury will hear you better.

        MR. JONES:  I'm more comfortable with that.  I don't

want to crowd Ms. Varner.

THE COURT:  All right.

Q.  **(BY MR. JONES)**  Page 3.  Okay.  Acknowledgment of penalties.

THE COURT:  Do you see that, Ms. Varner?

THE WITNESS:  Yes.

Q.  **(BY MR. JONES)**  So you are looking at a maximum of 20 years; correct?

A.  Yes.

Q.  Okay.  Now -- so how old are you going to be in 20 years?

A.  I'll be 50 -- 51.

Q.  And you certainly don't want to be in prison when you are 51, do you?

A.  I don't want to be in prison when I'm 31.

Q.  Yes, ma'am.  Now, you also know that you entered into a cooperation agreement with the Government; correct?

A.  Yes.

Q.  Okay.  And if the Government feels that you have sufficiently cooperated, they are going to make a recommendation in your favor to Judge Totenberg?

A.  Yes.

Q.  Okay.  Now, you understand Judge Totenberg is going to do what Judge Totenberg thinks is right; correct?

A.  Correct.

Q.  But it would be helpful would you not concede to have a

130

good recommendation from these folks?

A.    Regardless of if I got a recommendation from them or not, I would still do it.  I would still get up here and testify.

Q.    Well, I appreciate that, ma'am.  But that wasn't my question.

My question was:  A good recommendation from them will be helpful to you?  Do you not believe that a good recommendation from the Government will be helpful to you?

A.    I think so.  This is my first time ever dealing with something this extreme.  So maybe so.

Q.    Okay.  You are not saying this is the first time you have been in a court proceeding?

A.    No.  This is the first time I'm facing a felony though.

Q.    Okay.  Now, you also know that in your plea agreement you have given up -- basically given up your right to appeal?

A.    Yes.

Q.    Okay.  So more or less what you get, you are stuck with?

A.    Correct.

Q.    Okay.  Now, when you were driving the car to and from the incidents, were you ever stopped by the police?

A.    No.

Q.    Now, and when you got arrested, you were wearing some lady's sandals and some lady's jewelry; correct?

A.    From what I'm told, yes.

Q.    Well, at the time you were wearing them and you were

arrested, did you think they came -- that that necklace came from somebody's neck?

**A.**   I didn't know.

**Q.**   You didn't know.  Okay.

Now, how long were you in jail before you got out on bond?

**A.**   Less than a week.

**Q.**   Okay.  And you were in the Robert A. Deyton detention facility?

**A.**   I think so.  Lovejoy.

**Q.**   Lovejoy. Yes.  Exactly.  Exactly.

And you were -- the Government was trying to keep you in -- in there pending trial, were they not?

**A.**   Not to my knowledge.  I'm not sure.

**Q.**   Okay.  Well, was it not -- you went to court the first time, and then it was put off for a detention hearing, was it not?

**A.**   I'm not sure.  It happened so long ago I don't remember.

**Q.**   Okay.  Well, when you were sitting in jail that week, were you wondering when you went back to court were they going to keep you there or were they going to let you out on bond?

**A.**   I had no clue of what was going to go on.

**Q.**   Well, do you recall that when you went to court that the Government decided not to try to keep you in jail and you actually got a bond?  Do you recall that?

**A.**   I really don't remember.

132

**Q.** You don't remember?

Now, since you have been out on bond, you've had a couple of problems; correct?

**A.** Yeah.

**Q.** Okay. And at one point, because you got into some trouble, you had to wear an ankle bracelet for a while?

**A.** Yes.

**Q.** Monitor?

**A.** (Witness nods head affirmatively.)

**Q.** And another time you have had some trouble down in Clayton County, an arrest down there, and there was a warrant out for -- to revoke your bond?

**A.** Yes.

**Q.** Okay. But your bond wasn't revoked?

**A.** No.

**Q.** At any of these times when you had these, shall we say, trouble with your probation, was the Government there saying to the judge -- by the Government, I don't necessarily mean these prosecutors but other prosecutors.

Was the Government there saying, you know, Judge, we need to revoke this person's bond because, you know, they committed -- for the Clayton County troubles saying, well, you committed a new offense while on bond?

**A.** I don't remember them saying revoke my bond, but I do remember them requesting for me not to be released until my

133

residence was approved.

Q.   Let me show you what has been marked Defendant's Exhibit Number 5.

Is that your picture on it?

A.   Yes.

Q.   Okay.  It has your height and weight and that sort of thing?

A.   Yes.

Q.   And so that is a document to revoke your bond, is it not? Asking to revoke your bond?

A.   I'm guessing.  I don't know.

Q.   You don't know what it is?

A.   No.

Q.   You have no idea?

A.   No.

Q.   But that is you?  That is a document that pertains to you, does it not?

A.   Yes.

Q.   Okay.

MR. JONES:  Your Honor, we move -- thank you.  We move to introduce Defendant's Exhibit Number 8.

MR. BUCHANAN:  We object.  The witness just testified twice that she didn't know what that document was.

THE COURT:  Let me see the document.

Why don't we take a five-minute break right now so I

can address that.

MR. JONES:  I beg your pardon?

THE COURT:  I want to take a five-minute break so I can address this with y'all and also take a pit stop for anyone who wants to take a pit stop.

And if you would just step down and from the witness stand for now.  I want to excuse the jury during this first -- once the witness has passed.  Thank you.

All right.  We're going to -- if you need to use the restroom, this is a good time.  Thank you.

**(The jury exited the courtroom at 2:40 P.M.)**

THE COURT:  So my question is:  It doesn't look like you need the first page.  And to the extent you need either the warrant or the petition for action on conditions of pretrial release, aren't those public documents that you can all just agree on to be admitted without the defendant having to --

MR. JONES:  I would think so, Judge.

MR. BUCHANAN:  Your Honor, I don't believe that the factual assertions contained in the petition are public documents.  Petitions aren't typically -- petitions don't necessarily show up on the docket.

And I would also point out that it is my understanding this matter has been adjudicated in Clayton County and also here in the district court.

THE COURT:  I don't think the question is the

135

adjudication.  I think he's just trying to get across that there was a petition.  And, you know, I recall this, but I don't recall it a great deal.

But we don't need -- are you trying to get the allegations in the petition in?

MR. JONES:  Yes, Judge.  I think it is appropriate.  Again, this person's cooperation seems to benefit them.  I have seen many another case when a person commits a new offense while on bond they get -- they get put in jail.  They get their bond revoked.  That is the norm from my experience and particularly when it is a fairly serious domestic violence as alleged there.

But somehow this lady, it doesn't seem -- doesn't seem to phase her.  She is still on bond.

THE COURT:  Let me just hear from the Government's representatives.  Thank you.

MR. BUCHANAN:  Yes, Your Honor.  I believe the witness testified that she did not know what position the Government took at that petition.  Counsel -- I don't recall what position we took with respect to that petition.

It sounds like there was some type of amendment that was made.  The witness testified that she was instructed or held and told not to go back to a particular residence.  But I don't see the connection in what happened then with her cooperation.

And I certainly don't see it absent knowing exactly what happened at that revocation proceeding.

MR. JONES: Ms. Varner has been vague at best, Your Honor, about much of this. I don't know if what she says can be taken at face value. Or minimalization comes to mind. And that is why I think it is relevant.

THE COURT: All right. Well, let me take a look at it. I need to go to the restroom. We'll chat before we get the jury back in.

All right?

MR. JONES: Yes, Judge. How much time do we have?

THE COURT: A few minutes. Enough for everyone to get to take a restroom break.

MR. JONES: You are a hard task master, Judge. Hard task master.

THE COURT: Not really. I'm slow compared to my colleagues. I know that. All right.

**(A brief break was taken at 2:45 P.M.)**

THE COURT: So I asked -- I shared this with you, the order modifying conditions of release and the minute order. So you can see counsel present.

Here is the thing: I think it is relevant to know that she -- that Ms. Varner had a charge. I don't think -- she is clearly not at this point able to testify -- at least doesn't recognize that she was given a copy of this.

I think the charge -- if you want to basically say were you charged with an assault in a family violence context in a domestic dispute, you can do that.  But I think it is sort of getting it more complicated than it is worth.

If she says she doesn't remember that, then you -- basically did you get an order modifying conditions of release and you want -- you can go through that.  But she doesn't recognize these documents, the ones that you have been showing, Defendant's Exhibit 8.

And that is kind of understandable, though it may have been shown to her.

MR. JONES:  So what would be admitted?  Would any or all?

THE COURT:  Well, let me -- the problem -- you could -- the problem with -- you could do the petition.  But the thing about Page 2 is it also refers to Ms. Varner as Mr. Varner.

And so I just -- it would be simpler to see whether she will acknowledge that she was charged with an assault in the family violence domestic dispute context and that as a result she went to a hearing.  That is the way I understand the sequence here.

And, Ms. Morris, do you recall the hearing?

MS. MORRIS:  I do not, Your Honor.  I am embarrassed to say I remember covering something for Mr. Buchanan.  I

thought it was for Mr. Richardson.  I don't know if he also had a revocation proceeding.  So I am conflating the two.  I don't remember.

This is before -- this may have been how I got myself involved in this case, frankly, was some -- covering one of these.

THE COURT:  Well, anything -- do you agree that it reflects that -- you may not remember it.  It does reflect you were present.

MS. MORRIS:  The docket entry certainly does.

THE COURT:  And would reflect that she -- that there was a hearing -- some sort of hearing.

MS. MORRIS:  It would.  And I mean, I can -- her status as a cooperator may not have been even known to me because I didn't have any real familiarity with the case.

THE COURT:  I'm not trying to put you on trial about this.  I think the easiest thing is the order modifying conditions of release would be a public document clearly.  And that is what I think you could rely on.  And it doesn't go through all of the nitty-gritty details.  And it tells you what it is.  And if she --

MR. JONES:  And the minute sheet.

THE COURT:  You can provide it to her and see if she recalls this.

MR. JONES:  The minute sheet could come in as well.

139

THE COURT:  You can put the minute sheet in too.

MR. JONES:  I should call that 8A and 8B?

THE COURT:  Yes.

MR. BUCHANAN:  I will simply note we don't object to those documents that the Court is going to let Mr. Jones cross about.  But I do believe the impeachment is complete.  She acknowledged from the witness stand that she remembers being back here and told to stay away from that residence and the person who was reflected in those documents.

THE COURT:  Yeah.  I just didn't hear anything very clear from her, frankly.  It was confusing.  And that is why I wanted to stop.  Because she didn't recognize the document. But -- so everything sounded very messy.

Before I forget, though, would everyone be sure to send us their jury charges in Word?  So that if you could send it -- Ms. Boring the -- Mr. Jones, did you hear me also?  I want to be sure you heard me.

I want to make sure we get the jury charges in Word so we can -- from everybody so we can work with them beginning tonight.

MR. JONES:  Yes.  I hope that I have them at my office computer.  But I'll do my best, Judge.

THE COURT:  Okay.

MR. JONES:  So in terms of what needs to come out on 8?

THE COURT:  I don't think 8 can go in.  She doesn't recognize it.  I don't know why you need 8.  I mean, this is telling you what the story is.

MR. JONES:  Okay.

THE COURT:  It is a public document.  But she doesn't -- can't identify it.

And since I'm trying to get a public document that is self-certifying, the Court's order is clear and doesn't get into all this other trouble.

MR. JONES:  I can ask her about, hey, you were in court looking to get your bond revoked because you had this assault in play.

THE COURT:  Yeah.  It summarizes what the charge was without going through all the nitty-gritty.

MR. JONES:  And I don't need to show this to her?  I can just introduce it?

THE COURT:  You can.  But you can show it to her too.

MR. JONES:  Thank you.

THE COURT:  I think it is -- there are words on both sides, isn't it?

MR. JONES:  Yes.

THE COURT:  All right.  All right.

Anything else before we get the jury back?

MR. JONES:  I don't think so, Judge.

THE COURT:  Okay.  Thank you.

141

**(The jury entered the courtroom at 3:08 P.M.)**

THE COURT:  Can we bring our witness back?

Everyone have a seat.  Thank you.

All right.  I just wanted to remind you that you are still under oath.

THE WITNESS:  Okay.

THE COURT:  Thank you.

Do you want to take your mask off to examine the witness?

MR. JONES:  Yeah.  But I'm going to bring it to Ms. Varner first and then --

**Q.   (BY MR. JONES)**  Ms. Varner, I'm showing you -- we're going with a couple of other documents -- Defendant's 8A and 8B in regard to a proceeding you were involved in in court awhile back.

Do you recognize those documents?  In looking at them, do you recognize what you were doing at that time or what you were going through in court?

**A.**   What was I doing and what was I going through in court?

**Q.**   Yeah.  What was going on in court at that time, if you remember?

**A.**   This is when I -- I went to jail in Clayton County for this first document.  The second document is I don't know.  I'm guessing dealing with my bond probation.

**Q.**   Okay.  Thank you.  Thank you, Ms. Varner.

142

Ms. Varner, is it not a fair statement that what was going on then is that you had a problem with probation because you got locked up for domestic violence and assault in Clayton County; correct?

A.    That's true.

Q.    Okay.  You had to go to court because one of the conditions of your bond is that you don't get arrested for anything else; correct?

A.    That's true.

Q.    Okay.  And, in fact, you've -- so you went to court because they were going to -- they were talking about revoking your bond and putting you back in jail, correct, potentially?

A.    I don't know the process.  I just know I went to jail. And when I got out, I went to court.

Q.    How long were you in jail that time?

A.    A couple of days.

Q.    Okay.  And so when you got to court --

THE COURT:  Which court?  Are we talking about this court, or are we talking about --

MR. JONES:  Well, I wasn't going to go into the Clayton County resolution.

THE COURT:  Okay.  That's what I was trying to figure out.

MR. JONES:  I didn't think it was appropriate.

THE COURT:  No, it is not.  I wasn't clear when you

said when you go back to court.

Q.   (BY MR. JONES)   When you got back to court here in this building in front of Judge Larkins, your bond was not revoked but it was modified; correct?

A.   Correct.

Q.   Okay.  So you caught a break?

A.   Yes.

Q.   Okay.  And who was the Government attorney present when this hearing took place?

A.   Ms. -- I don't know her name, but she's behind you.

Q.   Ms. Morris, the brunette behind me at the Government's table?  The lady lawyer?

A.   Yes.

Q.   Okay.  So Ms. -- okay.

        MR. JONES:  I move to introduce Defendant's 8A and 8B.

        MR. BUCHANAN:  No objection to A.  I believe she didn't recognize B.

        THE COURT:  Well, I think they are both public documents that are on the docket so -- the United States District Court docket here.  So I think they are self-certifying.

Q.   (BY MR. JONES)   And to be clear, in the domestic abuse or violence battery case that you had to have this bond hearing on, you were the aggressor; correct?

144

**A.**    That's correct.

**Q.**    And somebody got hurt?

**A.**    No.

**Q.**    No.

Well, that is not what the probation office --

MR. JONES:  If I may approach, Your Honor, and try to refresh the witness' recollection by the previous document that we were talking about.

THE COURT:  All right.  But try to wrap this up.

MR. JONES:  I beg your pardon?

THE COURT:  I'm going to let you go a little bit more.  But then let's move on past this incident.

MR. JONES:  If you would just read that paragraph and -- please and see if it refreshes your memory as to whether or not when you were the aggressor somebody else got hurt.

THE WITNESS:  I guess.

**Q.    (BY MR. JONES)**  You guess somebody got hurt?

**A.**    The way this is written up, it is, like, yeah.

MR. BUCHANAN:  Your Honor, may I --

MR. JONES:  Don't go into whatever.

**Q.    (BY MR. JONES)**  Just does that refresh your recollection as to whether or not somebody got hurt?  That is all I'm asking, ma'am.  If it doesn't --

THE COURT:  There is an objection behind you --

MR. BUCHANAN:  My objection is I think we should

UNITED STATES DISTRICT COURT
OFFICIAL CERTIFIED TRANSCRIPT

inquire as to who wrote that document.

MR. JONES:  It was in my original 8, Judge.

THE COURT:  It was the probation officer's charge essentially.

MR. JONES:  Right.  I didn't want to say that in front of the jury.

THE COURT:  All right.

Q.    (BY MR. JONES)  Now, Ms. Varner, after reading that, does that refresh your memory as to whether or not in the assault in which you were the aggressor the other party got hurt?  Does it refresh -- by that, it means:  Does it jog your memory?  Bring it back to you?

A.    To ask if they were hurt?

Q.    Yeah.

A.    I don't think they were hurt.

Q.    You don't think they were hurt.  Thank you.

Now, Ms. Varner, these particular exhibits -- let's see.  Government's 13, Memphis Dre, that is from your phone?

A.    Yes.

Q.    And Shawty Love 2, that is from your phone?

A.    Yes.

Q.    And how did the Government get this from your phone?

A.    I sent it to my lawyer.

Q.    Okay.  So you provided this information?

A.    Yes.

146

Q.   Okay.  Did you provide anything else to them from your phone?

A.   I provided a lot of things to my lawyer.

Q.   To your lawyer.  I'm talking about to the Government.

A.   I mean, if she gave it to them, she gave it to them.

Q.   If you know, fine.  If you don't, ma'am --

A.   I don't know.

Q.   -- I'm not trying to -- okay.

Now, in regards to the first incident that you were involved in, do you have any idea of the height and weight of the perpetrators -- do you know what the victims think about was the height and weight of the perpetrators?

A.   No.

Q.   You have no knowledge of that?  Okay.

MR. BUCHANAN:  I object to that.  It calls for hearsay.

THE COURT:  I agree.

Q.   (BY MR. JONES)  Now, Ms. Varner, I'm not trying to be funny.  I'm really not here.

But you are dressed very nicely.  You are very ladylike-looking.  But how about if you were to tie back your hair, take the heels off?  Could you have been assisting Mr. Jackson in one of these holdups as opposed to the person you say Mr. Redmond?

A.   I don't think so.

147

**Q.** You don't think so.

**A.** We weigh two totally different weights.

**Q.** Okay. But you are the same height?

**A.** I mean, same height but different weights.

**Q.** Sure. Sure. Now, you can handle yourself physically in a situation, can you not?

**A.** I have been on hormones for about four or five years. So I would not have --

**Q.** I don't want to get into any of your personal business.

**A.** No. I'm just saying, as you asked would I be able to, physically I would not have the strength of the average man because of hormones breaking my body down.

**Q.** How about in 2015 would you have had the strength?

**A.** I was still on hormones.

**Q.** I've asked you questions about your concern about going to prison for up to possibly 20 years.

And you don't want to go to prison? Nobody would? We agree on that; correct?

**A.** Right.

**Q.** But you have another, much more personal reason to fear going to prison, do you not?

**A.** Come again.

**Q.** You have a much more personal reason to fear going to prison, do you not?

**A.** I don't want to go to prison, period. Just off the bat,

148

whatever reason that is supposed to be, I don't want to go to prison.

Q.   Nobody would.  But my -- let me be direct and blunt.  And my apologies to you, ma'am.

But you are a transgender woman.  You are now a woman, but you were a man, and you don't know if you go to prison if you would end up in a male facility?

A.   I'm pretty sure that I would end up in a male facility.  But what scares me about going to prison is much more than just my gender identity that scares me about prison.  I have never been to prison.  So I don't know what to expect from prison.  So that is what scares me.

Q.   But you could expect that special people like you can be victimized terribly in prison?

A.   I can make assumptions about a lot of things that would go on with prison.  I just don't know what goes on in prison.

MR. JONES:  I don't think I had anything else, Judge.  Let me just gather my belongings.

Ms. Varner, if I don't have any more questions afterwards, thank you for your time, ma'am.

THE WITNESS:  Thank you.

THE COURT:  Are you turning over the witness, or are you looking over --

MR. JONES:  I'm sorry, Judge.  No further questions at this time.  I wasn't clear.

149

THE COURT:  Okay.

MR. BUCHANAN:  May I, Your Honor?

THE COURT:  Yes.

                    REDIRECT EXAMINATION

BY MR. BUCHANAN:

Q.   Ms. Varner, when you were arrested back in 2020 and you were in court with my colleague, Ms. Morris, did she make you any promises about what would happen with your arrest in Clayton County?

A.   No.

Q.   Did she -- did you ask her to let you remain on bond because you were cooperating with the Government?

A.   No.  I actually didn't even speak to her before receiving my bond, I guess.

Q.   Now, you testified earlier that Mr. Jackson told you where to pick him up in Stone Mountain?

A.   Yes.

Q.   How did he tell you where to pick him up?

A.   Through cell phone.  He called me or text me.

MR. JONES:  Your Honor, I am going to object to this line of questioning.  I don't think it was raised on my cross-examination.  And counsel is going back into direct or things he could have raised on direct.

THE COURT:  What is it following up on in the cross-examination?

MR. BUCHANAN:  How she communicated with the two -- there was some questions about his cell phone, about the cell phone numbers that we talked about earlier.

THE COURT:  All right.

Q.    (BY MR. BUCHANAN)  Would that have been utilizing the numbers that were in the Memphis Dre screenshot that Mr. Jones showed you?

A.    Yes.

Q.    And how did Mr. Jackson communicate with you about where to pick him up in Roswell?

A.    Through cell phone.

MR. JONES:  Your Honor, again, same objection.  This is -- this is not anything that I raised in cross.  I merely asked some questions about did these -- did 13 and 14 come from the cell phone.  And counsel is going back into his direct examination.

THE COURT:  All right.

MR. BUCHANAN:  Same one question follow-up related to that particular exhibit that he showed the witness.

THE COURT:  Then you will be through?  Then are you going to close off that?  Because I do think you are sort of going back into your direct.

MR. BUCHANAN:  Yes.  Then I'll move on quickly.

THE COURT:  All right.  Thank you.

Q.    (BY MR. BUCHANAN)  With respect to Roswell, was that

utilizing that same number in that Memphis Dre screenshot?

**A.** Yes.

**Q.** Mr. Jones asked you questions about whether or not you assisted Mr. Jackson in these two robberies.

Do you remember that?

**A.** Yes.

**Q.** Let's be very clear here, Ms. Varner. The two robberies that you acknowledge your responsibilities for, in either of those, did you go into someone's house?

**A.** No.

**Q.** In either of those, did you hold people at gunpoint?

**A.** No.

MR. JONES: Objection. Leading.

THE COURT: Overruled.

**Q.** **(BY MR. BUCHANAN)** Did you hold anyone at gunpoint?

**A.** No.

**Q.** In either of those, did you put a gun to anyone -- I mean, did you take anything from anyone?

**A.** No.

**Q.** Ms. Varner, after that robbery with -- at Roswell, did you remain in touch with Mr. Redmond?

**A.** Yes.

MR. BUCHANAN: Nothing else, Your Honor.

MR. JONES: No recross, Judge.

THE COURT: All right. May this witness be excused?

152

MR. BUCHANAN:  Yes, Your Honor.

THE COURT:  Please don't discuss your testimony with anyone until the conclusion of this trial.

Thank you very much.

THE WITNESS:  Thank you.

THE COURT:  You can dispose of it once you are --

MS. MORRIS:  The Government calls as its next witness John Porter -- excuse me -- yes.  John Porter.

COURTROOM DEPUTY CLERK:  Please raise your right hand.

**(Witness sworn)**

COURTROOM DEPUTY CLERK:  Thank you.  Please have a seat.  If you would take the plastic bag and place it over the microphone.  Then if you would state your name, and spell your last name for the record, please.

THE WITNESS:  John Porter, J-O-H-N P-O-R-T-E-R.

Whereupon,

JOHN PORTER,

after having been first duly sworn, testified as follows:

DIRECT EXAMINATION

BY MS. MORRIS:

Q.  Good morning, sir.  Excuse me.  Good afternoon, sir.  I lost track a little.  That is what happens.

I'm going to take you back in time to June 12th, 2015. Where were you living, Mr. Porter, on that date?

153

A.    1822 Chartwell Trace, Stone Mountain, Georgia.  1822 Chartwell Trace, Stone Mountain.

Q.    Thank you.  1822 Chartwell Trace in Stone Mountain; is that right?

A.    Yes.

Q.    And do you have specific memories of that date, June 12th, 2015?

A.    Yes.

Q.    Tell the jury about what happened that evening.

A.    It was a little before 11:00 P.M., and I was watching television in my basement.  My partner came down and was sitting on the sofa watching television.  And I hear a loud thud and thought something fell, a picture off the wall or something.  Not really that concerned.  But suddenly I heard a large crash.  And I knew something was happening, most likely a break-in.

So I stood up, walked across the room really fast, and hit a panic button on our security system.  It was not on at the time.  But the panic button triggered, and it is a silent alarm basically.  It just does a low beep.

Q.    Let me stop there just so I can get some names so the jury can understand who all was home.

You mentioned you were watching TV with your partner at the time?

A.    Correct.

154

Q.    What is his name?

A.    Jim.

Q.    Jim.  Okay.  So you and Jim were watching TV a little bit before 11:00 P.M.; is that right?

A.    Yes.

Q.    Now, you mentioned that you hit a panic button, and you clarified that it wasn't -- the system wasn't on but the panic button was on.

      Can you explain that a little bit more?

A.    I don't -- I usually arm my system when I go to bed because it activates everything, the entire perimeter of the house.  So at that time it was not on.  But there is a panic button that will cause instantaneous.  But it is a silent alarm.

Q.    So after you heard this loud noise and hit the panic button, what did you and Jim do?

A.    Well, I knew something bad was happening.  I grabbed the fire poker prepared to possibly see teenagers, something, someone breaking in and started up the stairwell to the main level of the house.

      And I'm confronted with two men both carrying large caliber pistols pointed directly at me and wearing a mask.  And the smaller of the two said give me the fire poker.  So I did.  And turned me around so we were going back downstairs.

      And so as we were going back downstairs, we turned left to

155

go into the TV room.  I was struck from behind by the fire poker.  I didn't know what it was at the time.  But it knocked me to the ground.

And then someone was on my back holding me down with a gun on my head saying I'm going to kill you.

Q.    Mr. Porter, where was -- where was Jim at this time?

A.    The other person had taken him over to the left and put him in -- wrapped him up in a blanket.  But I was face down with someone's hand on the back of my neck and a gun against my head saying I'm going to kill you and also saying I want to know where all your cash is.  I was like there is no cash.

He says you better tell me where all your cash is or I'm going to kill you.  Just constantly he was like, sir -- he kept saying, sir, I'm going to kill you if you don't tell me where your cash is.  This was the larger of the two.  There were two different guys.

Q.    And were both of these individuals masked?  You mentioned a mask.

A.    Yes.

Q.    And do you recall what their faces were covered with more specifically?  Whether it was -- what type of covering?

A.    Basically some type of blue mask that you see people wearing today.

Q.    So you mentioned -- several times you mentioned the larger and the shorter.  Could you compare -- explain to the jury how

you recall them.

**A.**   One man was -- appeared older, more mature.  Probably 40 -- 40s.  He was very methodical, calm.  Kept referring to me as, sir, tell me where this, or, I'm going to kill you; sir, do this, or I'm going to kill you, over and over.

He said we're going to go upstairs and you are going to show me where the money is.  So I'm bleeding.  And it is -- I don't know how bad it was.  But there was a lot of blood coming off my face and dripping on the floor in front of me.  So I knew something -- it was pretty bad.

So we went upstairs.  He says where is the master bedroom.  So we go to the main level.  Then we go up to the second level.  He says where is the money.  The only thing I could think of is there was a Ziploc bag that had some old silver dollars in it.  I thought that is all I have.  So I showed him where it was.

He took it.  He says what else do you have.  I was like what do you want.  He says where is your closet.  He walked me into the closet.

So I'm looking around.  He said grab a towel, put it on your head.  Because there was pretty much blood everywhere.  And he said where -- do you have any -- do you have a safe.  I was like yes.  He is like where is your safe.  I was like it is in the basement.  He is like do you have any more cash, sir; if you do not give me more cash, I'm going to kill you.

I said I think I have some money in my truck on the main

157

level.  So he took me to my truck.  I gave him probably 200 -- around $240, $250 in cash that was in my console.  He then asked me -- he is like where is the safe.  Back down to the basement.

And that is on the opposite end of the house.  So we went over there.  I opened the safe.  There was nothing in it.  He said, okay, we're going to go back into the other room where it all started.

Q.   Let me stop you there.  In your journey through the house with the taller man who said sir, did he -- did he ask for any other items?  Any jewelry, guns?  Anything else?

A.   Jewelry.  He did.  He asked for jewelry, guns, or cash.  I said I don't have anything.  Just please take the cars and leave.  He said I only want cash, jewelry.  He did get a diamond ring.

Q.   How did he get the diamond ring?

A.   It was in the Ziploc bag, unbeknownst to me.  But I wasn't really thinking about it at the time.

Q.   You said he asked you for firearms, but you told him you didn't have any?

A.   Correct.

Q.   And you just explained to the jury that you after looking for the safe -- after looking through the safe you were back down in the basement; is that right?

A.   Yes.

158

Q.    And what happened next?

A.    He walked me back into the other room where my partner was.  He put me face down on the floor.  And the younger, smaller guy got on my back with the blanket and held his hand down on my neck, gun against my head.  And he began basically berating me.  And the other gentleman took my partner upstairs.

Q.    What type of things did the younger, smaller robber say to you when he had the gun on you when you were down on the floor?

A.    I'm going to kill you.  I'm going to get you for what you did to Trayvon.  I'm going to get you for what you have done to my ancestors.  You don't know who you are messing with.  I'm new -- we're the new Black Panthers.  You better tell us where all your money is.  We're going to kill you.  And just a constant beratement.

Q.    And how did all of this end?

A.    Well, I'm face down with the gun on my head with the hand on my neck.  And suddenly he was just gone.  I was just like -- I just didn't move for a second.  I didn't hear anything.  I turned around and looked, and there was no one there.

I didn't know if they had fled or if they were looking for something.  So I went through the basement.  There is only one sort of door that goes into that level.  I opened those doors and thought about going outside and then became concerned that they would be outside and went back inside and waited a moment to try and gather my thoughts.

My phone was on the main level on the charger.  So I went to my phone and called 911.  The operator answered, and I described what was happening.  She is like, sir, the police are on the premises.  And I said, do I come out?  She is like stay in place.  Where are you?  I said I'm on the main level in the bathroom.  She said stay in place.  Officers are on the premises.

Q.   So at that time, did you know where Jim was?

A.   The operator said he is outside with the police.  So I knew he was okay at that point.

Q.   At any point in time when you were walking with the taller robber through the house, was there any discussion about getting more money?  You said that he demanded more money.

A.   He did mention that we would either go to an ATM.  Do you have an ATM card?  I think that was his next plan.  I asked him, again, please just take the cars and go.

Q.   Was he interested in taking your car?

A.   No.

Q.   Now, I take it from your account that the -- you never -- neither you nor Jim were taken to the ATM; is that correct?

A.   Correct.

Q.   I'm going to bring you, Mr. Porter, a series of things and ask you to just look through them.  I'm handing you what has been premarked as Government's Exhibit 25 through 31.

Just page through them and please let me know once you

160

finish looking through them.

Have you looked through them?

A.   Yes.

Q.   What do you recognize 25 to 31 as?  Let's start with the first few, 25, 30, and 31.  What are those three?

Excuse me.  25, 26, 27.

A.   25 is the back door to my house.

Q.   Okay.

A.   26 is the room just inside that door.  And 27 is the stairwell going to the basement.

Q.   And do these appear to be accurate representations of your home following the robbery that you just described on June 12th, 2015?

A.   Yes.

MS. MORRIS:  I move to admit 25, 26, and 27.

THE COURT:  Any objection?

MR. JONES:  No objection, Judge.

THE COURT:  They are admitted.

MS. MORRIS:  Ms. Toussaint, if you could publish Government's Exhibit 25, please.

Q.   (BY MS. MORRIS)  So looking now at the scene to your right, you can see or -- Mr. Porter, what does this Government's Exhibit 25 show?

A.   That is the back door into my house.

Q.   Is that how it looked after the entryway was --

161

A.    Yes.

Q.    -- breached?

        MS. MORRIS:  And could you now publish 26,
Ms. Toussaint.

Q.    (BY MS. MORRIS)  And what does 26 show, sir?

A.    That shows the glass from the window.  It shattered all
the way across the room.  The loud noise I assumed that is what
I heard upstairs.

Q.    And based on your understanding of what happened this
evening, how do these pictures relate to how the robbers got
into your house?

A.    It appears they busted the window, reached in, and
unlocked the door.

        MS. MORRIS:  And, Ms. Toussaint, if you could show us
Government's Exhibit 27.

Q.    (BY MS. MORRIS)  What does this picture show us?

A.    It shows us the stairwell to my basement.

Q.    And is there anything in this picture that is not there
usually?

A.    The blood.

Q.    Okay.  And where is the blood?

A.    Some of it is on the kitchen, and it trails down.

Q.    Ms. Toussaint has just blown up the middle.

        Are these red dots in the middle of the screen on the
flooring -- is that your blood?

A.   Yes.

Q.   Using this picture, can you again just describe to the jury where you encountered the robbers?

A.   Basically at that landing.  The stairs go down about five steps.  There is a landing.  And then it turns left to go on down to the rest of it -- to the basement.

Q.   And, sir -- and where on these stairs did -- you testified, I believe, that the smaller of the two robbers took the fire poker from you; is that right?

A.   The landing.

Q.   So at the bottom of these stairs?

A.   That is the midpoint.  It is the bottom of these stairs, but it is not the bottom of the stairwell.

Q.   So the landing is where that happened?

A.   Correct.

Q.   And what does Government's Exhibit 28 depict, Mr. Porter?

          MS. MORRIS:  That hasn't been admitted yet.

A.   28 is a picture of the basement where I was held face down and the fire poker along with the fire ash holder.

Q.   (BY MS. MORRIS)  Is this an accurate representation of where it was following the robbery that night?

A.   Yes.

          MS. MORRIS:  I move to admit Government's Exhibit 28.

          MR. JONES:  No objections, Your Honor.

          THE COURT:  Admitted.

MS. MORRIS:  If we could publish that, Ms. Toussaint.

Q.   (BY MS. MORRIS)  And I'm also going to show you now what is a physical item, which has been marked as Government's Exhibit 16.

If you could just take this and tell me if you recognize it.

A.   Yes.  That is the fire poker.

Q.   When you say the fire poker, is it the fire poker that was taken from you by the shorter robber and that you were struck with?

A.   It is.

MS. MORRIS:  The Government moves to admit Government's Exhibit 19.

MR. JONES:  No objection, Judge.

MS. MORRIS:  Excuse me.  15.

MR. JONES:  No objection to 15.

MS. TOUSSAINT:  16.

MS. MORRIS:  Oh, my goodness.  What is it marked as?

MS. TOUSSAINT:  Fire poker?  16.

MR. JONES:  No objections to the fire poker.

MS. MORRIS:  No objections to the fire poker from the defense.  I apologize for that.

THE COURT:  It is admitted.

MS. MORRIS:  The fire poker is admitted.

Q.   (BY MS. MORRIS)  And is this the same fire poker that is

164

depicted in the picture?

A.    Yes.

Q.    Government's Exhibit 29, 30, and 31, what are those?

A.    That is me -- pictures of myself with the detectives after the incident.

Q.    And to the best of your recollection, do these accurately depict your injury following the incident you just described?

A.    They do.

        MS. MORRIS:  I move to admit 29, 30, and 31.

        MR. JONES:  Let me just get to those.  Just let me get to those, Judge.

        THE COURT:  All right.

        MR. JONES:  No objections, Judge.

        THE COURT:  Admitted.

        MS. MORRIS:  Ms. Toussaint, if you could publish 29.

Q.    (BY MS. MORRIS)  And where was this photograph taken, Mr. Porter?

A.    That is in my kitchen.

        MS. MORRIS:  And then if you could then publish 30, ma'am.

Q.    (BY MS. MORRIS)  What does this depict?

A.    That is just a side view.

Q.    Okay.  Where were you struck, if you could explain to the jury?

A.    Basically up in the crown of my head.

165

MS. MORRIS:  And, ma'am, if you could show now 31.

Q.   (BY MS. MORRIS)  What is this a picture of?

A.   Where I was struck.

Q.   And did you receive medical attention that evening from the responders?

A.   We did.

Q.   Now, you mentioned that you hit your alarm -- your panic button, rather, as soon as this incident began.

What security company did you use at that time?

A.   Ackerman.

Q.   And what kind of business were you in back in 2015?

A.   I'm in real estate.  I was then and still am.

Q.   And is it residential real estate?

A.   Yes.

Q.   And did -- does some of your business include servicing customers who are moving to Atlanta from other places or Stone Mountain or leaving the area?

A.   Yes.  Frequently.

Q.   So after this incident happened, did you have to take any time off work for medical appointments or to deal with the damages -- the damage in your home to have things replaced?

A.   I did have to have the house repaired.  I did stay in a hotel for a couple of nights.  It was scary.  I looked a little rough.

Q.   So you spent nights in a hotel because your home was --

166

**A.**    A little fearful.  Just unknown.

**Q.**    And was that here in the Atlanta area?

**A.**    Yes.

MS. MORRIS:  Thank you, sir.  I think the defense may have some questions for you.

MR. JONES:  If I may approach, Your Honor.

CROSS-EXAMINATION

BY MR. JONES:

**Q.**    Mr. Porter, I'm going to show you what is marked Defendant's Exhibit Number 2.  It is simply a calendar of June 2015.

Can you tell me what day of the week this occurred?

**A.**    A Saturday.

**Q.**    Is it June 12th, or is it June 13th?

**A.**    It may have been Friday.  Friday or Saturday.

**Q.**    So it happened in the evening hours?

**A.**    Yes.  Just before 11:00 P.M.

**Q.**    And then I imagine you were -- excuse me.  Let me take my mask off.

I imagine you were then dealing with it during the aftermath, if it occurred on the evening of the 12th, and you would have been dealing with it during the early morning hours of the 13th; is that right?

**A.**    Yes, sir.

**Q.**    Now, when did the -- the police arrived while this was

167

going on?

A.   Yes, sir.

Q.   Okay.  And so at some point, this was going on and the perpetrators fled and then the police arrived?

A.   Yes, sir.

Q.   Okay.  I take it you didn't see a vehicle exiting?

A.   No.

Q.   Okay.  And the police came and took your statements?

A.   Yes, sir.

Q.   And looked for physical evidence; correct?

A.   Yes, sir.

Q.   And at some point, did they actually bring in a police dog to try to track people?

A.   They did.

Q.   Okay.  And found -- I think they found a 20-dollar bill somewhere outside the home?

A.   Yes, sir.

Q.   Okay.  And do you know if the police looked for video footage, let's say, neighbor's surveillance cameras, that sort of thing?

A.   I don't know.

Q.   But they were -- the police were in your home for a long time looking for potential physical evidence that could help them catch the perpetrators?

A.   Yes, sir.

168

Q.    Okay.  Now, you described one of -- one of the men -- the older one was in his 40s, late 40s, early 40s?

A.    Probably.

Q.    Late 40s?

A.    I would say probably mid to late 40s.

Q.    Mid to late 40s.  Mature man and he referred to you as sir?

A.    Constantly.

Q.    Now, I believe you said that there was a -- a platinum ring was taken?

A.    Yes, sir.

Q.    And just what was the approximate value of that ring?

A.    Replacement is 5900.

Q.    Okay.  Have you ever seen the ring again?

A.    No, sir.

Q.    Okay.  And then there was a bag of silver dollars?

A.    Yes, sir.

Q.    Okay.  So these are about how many silver dollars was there?

A.    I would say 12 to 15 Morgan dollars and Liberty dollars from the late 1800s, early 1900s.

Q.    Okay.  In other words, those are silver dollars that are collector's items?

A.    Yes, sir.

Q.    So -- so not to appear dense or obvious, if there were

12 -- I think you said 10 to 15?

A.   12 to 15.

Q.   So those silver dollars weren't worth a dollar a piece for a total value of $12 to $15?  They were worth quite a bit more, were they not?

A.   Yes.

Q.   And I believe -- in looking at the police report, I believe it was an estimated value of $4500?

A.   Probably.

Q.   So they were -- they were --

A.   They were rare.

Q.   And quite valuable?

A.   Yes, sir.

Q.   Now, was there also -- is it my understanding some currency was taken?  Was it 250 or 500?

A.   Between 240 and 250, I believe.

Q.   And where was that taken from?

A.   It was taken from the console of my truck.

Q.   So the retail value of the possessions that were taken from your partner and you were over $10,000 plus some cash money?

A.   Yes, sir.

Q.   Okay.  Now, I believe you said that one of the other -- one of the perpetrators was berating you?

A.   Yes, sir.

**Q.**    Okay.  And he was talking about -- was it Trayvon Martin?

**A.**    Yes, sir.

**Q.**    And everybody has a pretty good idea about that.  It was a controversial killing situation, and there was a great deal of tension in the country over that incident; correct?

**A.**    Yes.

**Q.**    And the perpetrator appeared to be upset about that?

**A.**    Yes, he did.

**Q.**    Berating you as a white man for what happened to this black man basically?

**A.**    Correct.

**Q.**    Okay.  So there were some racial animosity going on?

**A.**    Yes, sir.

**Q.**    And then also talked about -- about the wrongs done to his ancestors?

**A.**    Yes, sir.

**Q.**    Okay.  Again, more racial animus?

**A.**    (Witness nods head affirmatively.)

**Q.**    Did they tell you that they were -- they said they were new Black Panthers?

**A.**    Yes, they did.

**Q.**    Did they indicate or did they indicate that they were from Chicago or anything like that, if you recall, or just was new Black Panthers?

**A.**    That was all.

Q.    New Black Panthers?

A.    New Black Panthers.

Q.    Did you see -- as far as the smaller man, did you notice that he had a small hump in his back?

A.    They asked me not to look at them and they kept the gun on the back of my head.

Q.    Do you know whether or not Mr. Terry noticed a small hump on the man's back?

A.    I never heard anything about it.

Q.    But -- okay.

        MR. JONES:  Judge, I don't believe I have any more questions of the gentleman.  Thank you, sir.

        MS. MORRIS:  Very brief redirect, Your Honor.

                    REDIRECT EXAMINATION

BY MS. MORRIS:

Q.    Mr. Porter, defense counsel asked you if you could see a vehicle exiting after the robbery.

      Will you explain to the jury what kind of street Chartwell Trace is and what the closest cross street is.

A.    Chartwell is a one cul-de-sac neighborhood, one way in, one way out, 20 homes.  And my yard is gated.  So you can't enter from the front.  The alarm will trigger on the gates. And it appears that they came from behind the house back through the backyard from the street behind my house rather than from the front.  So I would not have been able to see the

car leave.

Q.   And what street is Chartwell Trace off of?

A.   Silver Hill.

Q.   Silver Hill.  Counsel also showed you a calendar and referenced the fact that this incident would have happened on a Friday evening; is that correct?

A.   Yes.

Q.   Okay.  Now, as a real estate -- a residential real estate agent, was it the case at that time that the weekends were quite busy times for work?

A.   Yes.

Q.   So being out of commission physically and out of your home on the weekend likely did interfere with your work that weekend?

A.   The entire episode affected work, everything.

           MS. MORRIS:  Thank you.

           THE COURT:  Are you complete?

           MS. MORRIS:  The Government --

           THE COURT:  Is there anything else you have?

           MR. JONES:  No, Your Honor.

           THE COURT:  May this witness be excused?

           MS. MORRIS:  He may, Your Honor.

           THE COURT:  Sir, you may be excused at this time. Please don't discuss your testimony with anyone else, your partner.  Unless -- if he is not going to testify, you can talk

173

about it with him.  But don't otherwise until the whole case is concluded.

THE WITNESS:  Yes, ma'am.

THE COURT:  Okay.  Thank you.

COURTROOM DEPUTY CLERK:  If you would, please take your bag with you.

MS. MORRIS:  The Government calls as its next witness Christopher Bean.

COURTROOM DEPUTY CLERK:  Step up.  Face me and raise your right hand.

**(Witness sworn)**

COURTROOM DEPUTY CLERK:  Please have a seat.  Take a plastic bag from the box there and put it over the microphone. And then please state your name, and spell your last name for the record.

THE WITNESS:  Can I take my mask off?

COURTROOM DEPUTY CLERK:  Yes.

THE WITNESS:  My name is Christopher Bean.  Last name is spelled B-E-A-N.

Whereupon,

CHRISTOPHER BEAN,

after having been first duly sworn, testified as follows:

DIRECT EXAMINATION

BY MS. MORRIS:

Q.   Sir, how are you currently employed?

174

**A.**   I'm employed by Ackerman Security Systems.

**Q.**   And how long have you worked for Ackerman?

**A.**   14 years.

**Q.**   14 years.  So what is your current title with Ackerman?

**A.**   I am the president of integrated solutions, which essentially serves all of our business services, the customers' experience, sales, installation service, inventory control, all that stuff.

**Q.**   Okay.  Where is Ackerman headquartered?

**A.**   Norcross, Georgia.

**Q.**   Now, I'm going to ask you questions mostly about 2015 because that is what is relevant to the jury and our purposes here today.

So taking you back to 2015, although you are a Georgia-based company headquartered here in the greater Atlanta area in Norcross, do you have customers in other states?

**A.**   Yes.  We have customers in Georgia, Virginia, Maryland, Washington, D.C., Pennsylvania, New Jersey, Delaware, Texas, California, Arizona, Nevada.  Those are our residential market footprints.

**Q.**   That is just your residential security customer base; is that correct?

**A.**   Correct.  And we service all 50 states and many shared U.S. territories or protected U.S. territories from our commercial division.

Q.    Okay.  So let's talk first about this commercial division.

Okay.  So what size of the accounts are those or what size of properties are managed under that umbrella?

A.    The commercial division manages properties above 5000 square feet.  And the sky is the limit.  Anything under that designation in light commercial would be under my team's purview.

Q.    And those -- the commercial division for these large properties, where is the nerve center of those operations?

A.    Its also headquarters is in Norcross.  It is on the same campus as my team and our monitoring facility and accounting operations.

Q.    Okay.  Let's talk more specifically about the residential security operations because that is what will be relevant to our case here.

You mentioned that you have -- you have customers in many states.  Can you just -- now that we're narrowing our focus on the residential customers, what states do you serve?

A.    All the states that I just mentioned a few moments ago.

Q.    Including Texas?

A.    Yes.

Q.    Okay.  Now, talking more specifically about the security systems and the residential environment, if a customer back in 2015 had a panic button as a part of their alarm system, what happens from an operational perspective at Ackerman when that

customer pushes that duress or panic button?

**A.**   Okay.  The way that we would respond to that alarm signal is the same today as it was then.  And much of that is controlled or regulated by local laws.

Okay.  So in the State of Georgia, when a panic button signal is received by the alarm center which is in Norcross, Georgia, we first have to screen that through an emergency call list.  So we would call the residence -- all the phone numbers. And if no one answers, then we would request alarm dispatch.

However, if a panic device is designated or programmed as a panic silent alarm, which means that is not something that could accidentally occur -- theoretically if it did accidentally occur, the user would know and they would contact the call center to request false alarm, don't dispatch.

But if a panic button comes through and we don't receive an immediate, you know, cancel request, we treat that as a silent alarm, a burglary in progress.  And we would immediately call local law enforcement and request dispatch without even making a call to the premise to try to contact the homeowner.

**Q.**   And you mentioned that your monitoring facility is in Norcross; is that correct?

**A.**   Yes, ma'am.

**Q.**   And does that Norcross facility service residential security accounts and customers outside the State of Georgia?

**A.**   Yes, ma'am.

177

**Q.**    And are the agents who are manning this call center or the monitoring facility -- do they have designated geographical duties?

**A.**    No.

**Q.**    Okay.

**A.**    Not for alarm signaling.

**Q.**    Not for alarm signaling.

So is it the case that an agent who responds to a call for a Georgia-based customer is also responsible for responding to calls for customers in Virginia, Washington, D.C., Pennsylvania, Maryland?

**A.**    That is correct.  And they have to be cross-trained for all market-specific treatment, such as false alarm registration.  Some municipalities require the homeowner to have a false alarm registration number.  And they have to be trained to provide that to the dispatch police department if it is requested.

So all agents go through that training to make sure that they can touch and interact with the account in any territory.

**Q.**    So when an agent in your call center in 2015 was responding to a panic button alert, could that agent simultaneously be taking those same steps, going through those same protocols for another panic button alert that came from another state?

**A.**    They can, and it is very likely.  Our call center

environments are quite the beehive.  They are very busy.

Q.    So it is possible that someone would be -- an agent would be having to manage more than one call, including a Georgia call, a Pennsylvania call at the same time?

A.    Yes.  They do drop through in sequence, and we have to respond to all of our alarm signals within a required time frame.

Q.    So the sequence is determined by whichever panic button's signal is communicating first; is that correct?

A.    The signals drop through to the agent on the call line based upon prioritization level, which might be, you know, a silent alarm panic holdup duress-type signaling.  Thereafter it would fall to fire, medical, emergency-type responses.

And thereafter if we receive cancellation signals, we would still provide a courtesy call.  And we would respond in that prioritization sequence.

Q.    So when a Georgia-based customer presses their alarm button, they are activating resources within Ackerman that are used and shared by the rest of your customers throughout the country; is that correct?

A.    Correct.

Q.    Okay.  When I asked you about this -- the specific question about can -- let me clarify my question.

Can an individual agent, not your call center, not the capacity of your call center -- but can an individual agent, a

person, agent A -- can agent A answer two calls -- two panic button alerts at the same time?  Can those be given the same priority by agent A?

**A.**    There could be signals sitting in sequence for response. But an agent would not simultaneously be responding to two alarm signals at the same time.

They certainly need to have designated focus to the situation at hand and to close that alarm response and note the account before they would proceed to the next signal in their queue.

**Q.**    So every -- so when a signal is pressed in Stone Mountain, Georgia, by an Ackerman customer that is going to utilize your resources in your call center?

**A.**    Correct.

**Q.**    And if that agent responding -- if a call had come in three seconds later from out of state, the agent would be occupied with the Stone Mountain panic button?

**A.**    Correct.

MS. MORRIS:  No further questions on direct.

CROSS-EXAMINATION

BY MR. JONES:

**Q.**    Good afternoon, Mr. Brown -- excuse me -- Mr. Bean.

**A.**    Good afternoon.

**Q.**    So you work with Ackerman Security?

**A.**    Yes, sir.

180

Q.    And you are a large corporation?

A.    Yes.

Q.    Okay.  You have a commercial division and a residential security division?

A.    Correct.

Q.    Okay.  And you are a publicly held company?

A.    We are not.

Q.    So you are -- so you don't -- you are a private company, so you don't trade on a stock exchange?

A.    We have no SEC filings, no, sir.

Q.    Now, your security -- your commercial division, how many accounts do you have?

A.    In the commercial division?

Q.    Yes, sir.

A.    We have approximately 12- to 15,000.

Q.    Beg your pardon?

A.    12- to 15,000 accounts.

Q.    Okay.  And these run from what type of -- if you could just give me an estimate of the range of commercial -- these commercial accounts.  Is it like from a mom-and-pop store to a major supermarket?

A.    Sure.  Small mom-and-pop-type operations, burglary only signals, standard alarm security systems, that would fall within my division's control and purview.

      The core commercial division, which you've just inquired

about, they are 5000 square feet and above.  Not always fire related but fire marshal ordinances will require certain sprinkler suppression systems, fire escape systems, strobe lights, pull stations like you have seen on the wall for fire alarm systems.

So that is not entirely uniform but very consistent throughout all of our core commercial accounts.  And many of these accounts also have access control systems with card readers to get access into doors that are controlled with magnetic locks and push-to-exit systems as you see those in a lot of hospital doors where you can only proceed one way unless you have the secured access control card.

We have video surveillance and cloud video recording and video analytics out the wazoo in recent years.  Now we have got the thermal reading is becoming more popular in the age of COVID.  And a real spectrum -- just a bouquet of different technologies a la carte at need to the individual sites that we service in the commercial base.

Q.   Okay.  And, again, how many -- how many of those 5000-square-foot and above bill accounts do you have?

A.   Right.  12- to 15,000.  And I should note that those accounts were acquired by ADT during a transaction just a few months ago.  They also acquired the core commercial business entity itself.  So the employees have now become ADT employees.  And the commercial accounts will soon be converted over to

signaling to ADT's enterprise call centers.

But the residential division and the light commercial division, our in-house call center, all that remains intact as Ackerman assets.

Q.    Okay.  And when did this commercial division change hands or have a consolidation?

A.    I believe that was beginning March of 2021.

Q.    Okay.  And in 2015, who was running things and what was the business entity then?

A.    It was all Ackerman at that time and had always been Ackerman since 1967.

Q.    So your residential security systems -- which I believe you said you act as a call center if somebody has an alarm that goes off, y'all deal with it; correct?

A.    Yes, sir.

Q.    And there is also a panic button; correct?

A.    Correct.

Q.    There is also that -- there is a facility -- there is a thing that if you call somebody's house, if there is an alarm that goes off, you can call the house and they will -- there is like a panic signal number or name and then something that tells you that it is a false alarm, it is okay?

A.    That is correct.

Q.    Okay.  Now, how many residential security accounts do you have now?

A.    About 115- to 120,000, in that range.

Q.    Is that the division that you are primarily involved in?
The residential side?

A.    Correct.

Q.    Okay.  What was your title again, sir?

A.    President.

Q.    President?

A.    Uh-huh (affirmative).

Q.    So that is your show?

A.    Yes, sir.

Q.    Okay.  Back in -- were you the president back in 2015?

A.    No, sir.

Q.    Okay.  But you were with the company then, I assume?

A.    Correct.

Q.    How many accounts did you have back in 2015 -- residential
accounts?

A.    I would say maybe 90- to 100,000 at that time.  We've
steadily grown year over year.  And in any recurring revenue
subscriber-based model, whether it is cell phones or cable
television or what have you, there will always be some
attrition where some customer accounts cancel or they move to
different sites and you acquire new customers.

      But we did have year over year growth to the current level
that we have.  So we were smaller then but larger now.

Q.    And I may not have made this clear.  But in 20 -- in

184

regard to the commercial division back in 2015, was it 12,000 to 15,000 accounts or was it less?

A.    Less.

Q.    Approximately how many?

A.    It would be proportionally less.  Probably 8000 to 11,000 accounts at that time.

Q.    And --

A.    When I say accounts, I mean site locations.

Q.    Right.  So --

A.    With commercial, we had many key accounts that might have hundreds of accounts throughout the country.

Q.    And, sir, if I'm not intruding on any sort of business trade secrets or whatever, just let me know with my next question.

But basically back in 2015, what was the value of the residential security business?

A.    So I don't feel that that would be infringing on trade secrets or private information.  So at that time, private equity was valuing us at that time in the mid forties.  So we would be privately valued at probably $80- to $90 million.

Q.    Okay.  And can you tell me also what your -- in 2015 what would have been the gross revenue for the residential security side of the business?

A.    We were a recurring monthly revenue model of approximately $2 million per month at that time, plus annual revenue sales of

UNITED STATES DISTRICT COURT
OFFICIAL CERTIFIED TRANSCRIPT

185

another 4 to 5 million.

**Q.**   So the total gross earnings for the residential side of it for 2015 would be what?  Best ball park figure that you can give me?

**A.**   Approximately $25- to $30 million.

And annual revenues?  That was your question; right?

**Q.**   Yes.  Annual revenues.  Not your net.  But just the revenues.

**A.**   Yeah.

THE COURT:  Are you almost through?  Are you about through on this?

MR. JONES:  Yes, ma'am.

THE COURT:  Okay.

MR. JONES:  Thank you, sir.

THE WITNESS:  You're welcome.

THE COURT:  Is there any follow-up?

MS. MORRIS:  No further questions for the United States.

THE COURT:  All right.  You can be excused at this time.

THE WITNESS:  Thank you.

THE COURT:  Thank you.

It is 4:20.  I'm just going to stand up, if anyone else wants to stand up.  I know that they have a witness here. But it is -- you can get very sleepy after you have heard all

that.

So if you want to stand up, go ahead and do so. If you don't, that is fine.

MR. JONES: May I step out for a moment, Judge?

THE COURT: Yes. If anyone needs to use the restroom, maybe we could get -- that is fine. Let's take just a few minutes to wake ourselves up from all the numbers. And we'll get the next witness. And then we're going to -- I don't expect we're going to conclude this witness today.

So we'll get a little head-start on him and then continue until tomorrow. So I'm going to follow my own advice and go to the restroom.

**(A brief break was taken at 4:19 P.M.)**

THE COURT: Your next witness -- you want to formally call them? Though he is obviously on the stand.

MR. BUCHANAN: The United States calls Leon Scott.

COURTROOM DEPUTY CLERK: Please stand.

**(Witness sworn)**

COURTROOM DEPUTY CLERK: Please have a seat. State your last name, and spell your last name for the record.

THE WITNESS: Scott, S-C-O-T-T.

Whereupon,

LEON SCOTT,

after having been first duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. BUCHANAN:

Q.   Mr. Scott, what is your first name?

A.   Leon, L-E-O-N.

Q.   You can take your mask off.  And you can either scoot your chair up or pull that microphone close just so that we can hear you and so the court reporter can type down what you are saying.

     Mr. Scott, it is clear from your attire that you are currently in custody; is that right?

A.   Yes, sir.

Q.   And is that because you have entered a guilty plea?

A.   Yes, sir.

Q.   And what did you enter a guilty plea to?

A.   Hobbs Act robbery, 924(c), and kidnapping.

Q.   924(c), is that the action as you brandished a firearm during a crime of violence?

A.   Yes, sir.

Q.   Mr. Scott, you entered a guilty plea in front of Judge Totenberg; is that right?

A.   Yes, sir.

Q.   And as of right now, Judge Totenberg has not sentenced you; is that correct?

A.   No, sir.

Q.   It is correct that she has not sentenced you?

A.   Yeah.  That's correct.

188

Q.   And your actions to which you entered a guilty plea occurred in this particular case; is that right?

A.   Yes, sir.

Q.   Mr. Scott, where are you from?

A.   Memphis, Tennessee.

Q.   And where particularly before you were arrested did you live in Memphis, Tennessee?

A.   5700 Fenway.

Q.   And who lived with you at 5700 Fenway?

A.   Me, my mom, my grandfather, my grandmother, an uncle, and my cousin Brandon.

Q.   Mr. Redmond is your cousin?

A.   Yes, sir.

Q.   And how were y'all cousins?

A.   His mother is my aunt.  And my mom is his aunt.

Q.   Your mothers are sisters?

A.   Yes.

Q.   And do you see Mr. Redmond here in court today?

A.   Yes.  My cousin right there.

Q.   What is he wearing?

A.   A burgundy shirt and a mask.

         MR. BUCHANAN:  Your Honor, we would like the record to reflect that the witness has identified the defendant.

Q.   **(BY MR. BUCHANAN)**  So Mr. Redmond is your first cousin?

A.   Yes, sir.

Q.    And how long have you known Mr. Redmond?

A.    All my life.

Q.    And your entire life or the time you have known Mr. Redmond, has he always lived in Memphis?

A.    Yes, sir.

Q.    A second ago, you testified that you pled guilty in this case; is that correct?

A.    Yes, sir.

Q.    And you signed a plea agreement; is that right?

A.    Yes, sir.

Q.    I'm handing you what I will mark as Government's Exhibit 22.

      Take a look, Mr. Scott, and tell me whether or not you recognize Government's Exhibit 22.

A.    Yes, sir.

Q.    Is that your plea agreement?

A.    Yes, sir.

          MR. BUCHANAN:  Your Honor, we would move for the admission of Government's Exhibit 22 into evidence.

          MR. JONES:  No objections, Your Honor.

          THE COURT:  It is admitted.

          MR. BUCHANAN:  Ms. Toussaint, if I could have Page 19 of that.

Q.    **(BY MR. BUCHANAN)**  And, Mr. Scott, above your name, a signature has been placed there.  Is that your signature?

A.    Yes, sir.

Q.    Mr. Scott, I want to ask you a couple of questions about your understanding about that plea agreement and this process.

Does the plea agreement promise you what your sentence will be?

A.    No, sir.

Q.    Who decides what your sentence will be?

A.    The judge.

Q.    Particularly Judge Totenberg?

A.    Yes, sir.

Q.    Does this plea agreement -- in this plea agreement, do you acknowledge or agree to make -- to cooperate with the Government?

A.    Yes, sir.

Q.    And you have been doing so for a couple of years now; is that right?

A.    Yes, sir.  Six years.

Q.    You mentioned that you entered a guilty plea to kidnapping, robbery, brandishing a firearm during a violent crime.

Did all of that happen here in Atlanta?

A.    Yes, sir.

MR. BUCHANAN:  Ms. Toussaint, if I could have Government's Exhibit 11.

Q.    **(BY MR. BUCHANAN)**  Mr. Scott, who is in Government's

Exhibit 11?

A.    That is Mario Jackson.

Q.    You are familiar with Mr. Jackson?

A.    Yes, sir.

Q.    The robbery that you committed, did you do so with Mr. Jackson?

A.    Yes, sir.

Q.    So you know what Mr. Jackson physically looks like; is that right?

A.    Yes, sir.

Q.    You have been in close proximity to him; is that right?

A.    Yes, sir.

Q.    Have you also been in close proximity to your cousin, Mr. Redmond?

A.    Yes, sir.

Q.    Mr. Scott, who is the taller person?  Mr. Jackson or Mr. Redmond?

A.    Jackson.

Q.    Is it close?

A.    No, sir.  He is a lot taller.

Q.    A lot taller than your cousin?

A.    Yes, sir.

Q.    Mr. Scott, you talked about that you've cooperated for quite some time; is that correct?

A.    Yes, sir.

**Q.** But you have known Mr. Redmond for even longer; is that right?

**A.** Yes, sir.

**Q.** Do you understand that your cooperation agreement requires you to tell the truth?

**A.** Yes, sir.

**Q.** Now, at times over the course of your cooperation, have you been a little less than forthcoming with information?

**A.** No, sir.

**Q.** You've put out the information as fully as possible?

**A.** Yes, sir.

**Q.** Do you recall talking about Brandon's involvement early on in this case?

**A.** Yes, sir.

**Q.** And was there a time when you minimized Brandon's involvement in this case?

**A.** No, sir.  Of course not.

**Q.** Mr. Scott, how did you meet Mr. Jackson?

**A.** He arrived at our residence looking for my cousin Brandon.

**Q.** By he, you mean Mr. Jackson?

**A.** Yes, sir.

**Q.** And you said at your residence.  Is that the Fenway residence in Memphis?

**A.** Yes, sir.

**Q.** Please tell the jury what happened when Mr. Jackson came

to the residence looking for your cousin.

**A.** He drove a new model Cadillac. And me and a few friends were outside of the residence. And he got out of the car, asked all of us where was my cousin. And I explained that he wasn't there. And that is when I introduced myself to him.

**Q.** Later on, did you talk with your cousin -- with Mr. Redmond about Mr. Jackson?

**A.** Not immediately.

**Q.** At some point, did y'all --

**A.** Yes.

**Q.** -- talk about Mr. Jackson?

**A.** Yes.

**Q.** And did y'all talk about Mr. Jackson before you came to Atlanta?

**A.** Yes, sir.

**Q.** Do you recall what your cousin said about Mr. Jackson?

**A.** He told me that he really didn't want me to go with Mr. Jackson because he was supposed to go with him but he was fine with me introducing myself to him.

**Q.** Well, let me sort of get us correct on dates. The date of the robbery to which you pled guilty was May 25th, 2015; is that correct?

**A.** Yes, sir.

**Q.** And so this conversation that you had with Mr. Redmond about Mr. Jackson, was that before or after you came here to

194

Atlanta?

A.   Before.

Q.   Now, when you were saying that Mr. Redmond said he didn't want you to come with Mr. Jackson, do you have any idea of what they were doing?

A.   Yes, sir.

Q.   And what did Mr. Redmond tell you they were doing?

A.   That they were breaking into expensive houses while people were inside of the houses.

Q.   And eventually did you decide you wanted to participate in this?

A.   Yes, sir.

Q.   And when you decided that you wanted to participate, who did you talk to about it?

A.   Mr. Jackson.

Q.   And eventually did you leave Memphis and come to Atlanta to commit a robbery?

A.   Yes, sir.

Q.   Now, Mr. Scott, how did you get from Memphis to Atlanta?

A.   I traveled on a Megabus.

Q.   And how did -- did you arrange your own ticket on the Megabus?

A.   No.  Mr. Jackson arranged my ticket, and I just showed up to the bus station.

Q.   Now, the bus station in Memphis?

**A.**   Yes, sir.

**Q.**   And before you went to the bus station in Memphis, did you do anything else?

**A.**   No, sir.

**Q.**   Did you bring anything with you from Memphis to Atlanta?

**A.**   Yes, sir.  I was instructed to go and meet a guy I didn't know and retrieve a backpack from him and bring it to Atlanta with me.

**Q.**   Who instructed you to meet this person and get the backpack?

**A.**   Mr. Jackson.

**Q.**   And did you go meet the person to get the backpack?

**A.**   Yes, sir.

**Q.**   And this was in Memphis?

**A.**   Yes, sir.

**Q.**   And when you went and picked up the backpack, did you look inside it?

**A.**   Yes, sir, I did.

**Q.**   What was inside of it?

**A.**   Black cooking pepper and a gun.

**Q.**   You said cooking pepper?

**A.**   Yes, sir.

**Q.**   And a gun?

**A.**   Yes, sir.

**Q.**   I'm going to show you what I have marked as Government's

Exhibit 41.

MR. BUCHANAN:  Your Honor, I would note that Government's Exhibit 41 is a firearm.  It has been checked by the Marshal Service.  It has been rendered safe with a zip-tie on.

THE COURT:  All right.

Q.  **(BY MR. BUCHANAN)**  Mr. Scott, take a look at Government's Exhibit 41.

Do you recognize that item?

A.  Yes, sir.

Q.  When have you seen that before?

A.  This is the gun that I was instructed to retrieve from the guy in Memphis before I came to Atlanta.

Q.  Is that the gun that you brought from Memphis to Atlanta?

A.  Yes, sir.

MR. BUCHANAN:  Your Honor, the United States moves for the admission of Government's Exhibit 41 into evidence.

MR. JONES:  No objections to 41, Judge.

THE COURT:  It is admitted.

MR. BUCHANAN:  May I show it to the jury, Your Honor?

THE COURT:  Yes.

Q.  **(BY MR. BUCHANAN)**  Mr. Scott, Mr. Jackson -- what did you call him?

A.  Dre.

Q.  And just so we're clear, the Government's Exhibit 41, this

pistol with the brown handle, is that the pistol that you used in the robbery that you committed?

**A.**   Yes, sir.

**Q.**   In very plain English, you pointed that pistol at a family; correct?

**A.**   Yes, sir.

**Q.**   I'm going to show you, Mr. Scott, an item that I have marked as Government's Exhibit 17.

Mr. Scott, do you recognize Government's Exhibit 17?

**A.**   Yes, sir.  This is my cell phone.

**Q.**   Is this the cell phone that you used back in 2015?

**A.**   Yes, sir.

MR. BUCHANAN:  Your Honor, the United States moves for the admission of Government's Exhibit 17 into evidence.

THE COURT:  Any objection?

MR. JONES:  That is the actual physical cell phone, not a photo?

MR. BUCHANAN:  Yes.

THE COURT:  Thank you, Mr. Buchanan.

MR. JONES:  No objections, Your Honor.

THE COURT:  It is admitted.

**Q.**   **(BY MR. BUCHANAN)**  Mr. Scott, your cell phone, Government's Exhibit 17, in that cell phone, did you -- were you able to take pictures with it?

**A.**   Yes, sir.

198

Q.    Smart phone?

A.    I'm not sure if it is a smart phone.  But I was able to take pictures with it.

Q.    And were you also able to keep and maintain a list of contacts?

A.    Yes, sir.

Q.    I'm going to bring up what I have marked as Government's Exhibits 18, 54.

        MR. JONES:  18 and --

        MR. BUCHANAN:  54.

        MR. JONES:  18 and 54.  Thank you.

Q.    (BY MR. BUCHANAN)  Mr. Scott, take a look at Government's Exhibit 18, please.

    Mr. Scott, what is Government's Exhibit 18?

A.    My contact list.

Q.    These are contacts from the L portion of your list?

A.    Yes, sir.

        MR. BUCHANAN:  Your Honor, we move for the admission of Government's Exhibit 18 into evidence.

        MR. JONES:  No objection to 18, Your Honor.

        THE COURT:  Admitted.

Q.    (BY MR. BUCHANAN)  Mr. Scott, I want you to look partway down or I guess the second entry, Mr. Scott, is a person -- a name called Lil B?

A.    Yes, sir.

199

Q.   Is the name Lil B familiar to you?

A.   Yes, sir.

Q.   Who is Lil B?

A.   That is my cousin's number that is saved in my phone.

Q.   Which cousin?

A.   Brandon.

Q.   So this number that ends in 3291, that is Brandon's number?

A.   Yes.

Q.   Back in 2015, did you utilize this 3291 number to call Brandon?

A.   Yes, sir.

Q.   Mr. Scott, take a look at Government's Exhibit 54.

     And what is Government's Exhibit 54?

A.   A contact name in my phone.

Q.   And this contact -- this photo of this contact came from your phone?

A.   Yes, sir.

     MR. BUCHANAN:  Your Honor, the United States moves for the admission of Government's Exhibit 54 into evidence.

     MR. JONES:  No objections, Judge.

     THE COURT:  It is admitted.

     MR. BUCHANAN:  Ms. Toussaint, if we can have 54.

Q.   (BY MR. BUCHANAN)  Mr. Scott, what is the name associated with this contact?

200

A.   Dre Yo.

Q.   And who would you have referred to as Dre Yo?

A.   Jackson.  Mr. Jackson.

Q.   Mr. Mario Jackson?

A.   Yes.

Q.   And would you have contacted Mr. Jackson by dialing this number ending in 3921?

A.   Yes, sir.

Q.   Back in 2015?

A.   Yes, sir.

Q.   Mr. Scott, I will walk up what has been previously marked as Government's Exhibits 19 and 20.  Take a look at Government's Exhibit-- take a look at Government's Exhibit 19, please.

     What is Government's Exhibit 19?

A.   A picture of the gun.

Q.   Do you recall who took that picture?

A.   Yes, sir.  I did.

Q.   Is that a gun in your lap?

A.   Yes, sir.

     MR. BUCHANAN:  Your Honor, we move for the admission of Government's Exhibit 19 into evidence.

     MR. JONES:  No objections, Judge.

     THE COURT:  Admitted.

Q.   (BY MR. BUCHANAN)  Now, Mr. Scott, just so we're clear,

201

this is the gun that you picked up in Memphis?

A.    Yes, sir.

Q.    You brought it to Atlanta?

A.    Yes, sir.

Q.    And you committed a robbery with it?

A.    Yes, sir.

Q.    Now, the magazine that is to the right, did it have bullets in it?

A.    Yes, sir.

Q.    Now, take a look at Government's Exhibit 20.

      What is Government's Exhibit 20, Mr. Scott?

A.    Me taking the picture of me holding the gun.

Q.    And you took this picture?

A.    Yes, sir.

        MR. BUCHANAN:  Your Honor, we move for the admission of Government's Exhibit 20 into evidence.

        MR. JONES:  No objections, Your Honor.

        THE COURT:  Admitted.

        MR. BUCHANAN:  Ms. Toussaint, thank you.

Q.    (BY MR. BUCHANAN)  And so you put the pistol in your left hand and snapped a picture of it with your right hand?

A.    Yes, sir.

Q.    And, Mr. Scott, do you recall whether or not you took these pictures before or after you committed that robbery with Mr. Jackson?

A.    Before.

Q.    I'm going to walk up with Government's Exhibit 21, Mr. Scott.  Take a look, please, at Government's Exhibit 21, Mr. Scott.

What is in Government's Exhibit 21?

A.    A picture of a train in Atlanta.

Q.    It is a picture that you took?

A.    Yes, sir.

Q.    After you showed up here to commit the robbery?

A.    Yes, sir.

MR. BUCHANAN:  Your Honor, the United States moves for the admission of Government's Exhibit 21 into evidence.

MR. JONES:  No objections, Your Honor.

THE COURT:  Admitted.

Q.    (BY MR. BUCHANAN)  Mr. Scott, when you got here to Atlanta, was Mr. Jackson already here?

A.    Yes, sir.

Q.    Let me ask you this:  How did Mr. Jackson arrange your Megabus ticket?

A.    He sent me a picture of the receipt to my phone, and that gave me access to get on the bus.

Q.    And you used that receipt to travel from Memphis to Atlanta?

A.    Yes, sir.

Q.    And after you got here to Atlanta, did you meet up with

Mr. Jackson?

A.   Yes, sir.

Q.   And what happened after you met up with Mr. Jackson?

A.   He took me to a hotel room.  I met him at Lenox Mall.  But he then drove me to a hotel.

Q.   And then did you meet anyone else after you got to the hotel?

A.   He already had somebody with him.  He had a female with him.

Q.   And at some point -- I want to talk about the robbery.

At some point, did you and Mr. Jackson travel to a residence here in Atlanta?

A.   Yes, sir.

Q.   And at this residence, ultimately you committed a robbery; is that right?

A.   Yes, sir.

Q.   Now, how did y'all get to the residence?

A.   The lady that was with him drove us to the residence.

Q.   Did she drop you off right in front of the house, or where did she drop you off?

A.   A little bit down the street from the house.

Q.   And prior to getting to the house and conducting the robbery, did you have a plan as to what your role would be with respect to the robbery?

A.   Yes, sir.

204

**Q.** And what was that plan?

**A.** To basically just let him do the talking and to watch his back, make sure nothing really got out of hand.

**Q.** And what do you mean got out of hand?

**A.** Make sure nobody, like, tried to run or tried to hurt him.

**Q.** So you would be responsible for securing the people who were in the residence?

**A.** Yes, sir.

**Q.** And eventually you got to a house; is that right?

**A.** Yes, sir.

**Q.** Had you been to this house before?

**A.** No, sir.

**Q.** Had you -- prior to going there, had you cased this house or anything like that?

**A.** No, sir.

**Q.** And so this other person drove you there. What happened next?

**A.** We got out of the car, and it was like a truck. But we got out of the truck. And we went to the front gate of the house. And you could push your way through the bushes instead of going through the gate. So we pushed our way through the bushes and made our way to the back of the house. And we looked for a way inside of the house, but the back door was open.

**Q.** Let me ask you this: When you got out of that car, did

you have that brown-handled pistol with you?

**A.**   Yes, sir.

**Q.**   And were you planning when you got in there to use that pistol to keep people under control?

**A.**   Yes, sir.

**Q.**   And so you pushed through the door and then got to the -- pushed through the gate and actually got to the door.

What happened next?

**A.**   When we got inside, we went up the stairs.  And that is where the husband and wife were.

**Q.**   What were you wearing, Mr. Scott?

**A.**   Kind of a hoodie and dark pants and white Nikes.

**Q.**   Had you and Mr. Jackson had any conversation about what you should wear?

**A.**   Yes, sir.

**Q.**   And what did y'all discuss?

**A.**   All black clothing.

**Q.**   But you didn't wear all black; is that right?

**A.**   No, sir.

**Q.**   So what happened after you got into the house and encountered who you believed to be the husband and wife?

**A.**   Basically I let Jackson do all the talking.  But he asked was anybody else inside of the house.  And they said there were kids in the house.  And he went with the husband to go and retrieve the kids and bring them back to the space where I was.

206

Q.   And you remained there with the wife?

A.   Yes, sir.

Q.   Did you and Mr. Jackson both have guns?

A.   Yes, sir.

Q.   You had the brown one?

A.   Yes, sir.

Q.   Did Mr. Jackson have a gun as well?

A.   Yes, sir, he did.

Q.   Did y'all point those guns at the people who were in the house?

A.   Yes, sir.

Q.   And what, if anything, did Mr. Jackson say to the husband and wife once y'all got to them?

A.   Was there any valuables in the house?  And basically that was it.  He was looking for valuables around the house.

Q.   You testified a second ago that the victims told you that there were children in the house?

A.   Yes, sir.

Q.   Did you see any children?

A.   Yes, sir.  Two or -- two or three kids.

Q.   And what happened with the children?

A.   He put them in the closet.

Q.   Do you recall roughly how old these children were?

A.   They were young.  Probably like six and nine or something like that.

Q.   And when Mr. Jackson put the children in the closet, what did you do with the wife?

A.   Made sure that she didn't run or anything like that.

Q.   And what did she do?

A.   Stood there.

Q.   Eventually did you put her on the ground?

A.   Yeah.  Put her on the ground and put the clothes over her head to cover her up and make sure she didn't see anybody's face.

Q.   By clothes, tell the jury what you mean by putting clothes over her.

A.   Like towels and T-shirts and stuff like that.  Just told her to get on the floor and put it over her head.

Q.   It seemed like someone was doing laundry when y'all went in the house?

A.   Yes, sir.

Q.   After you had the laundry on the wife and the children in the closet, what happened next?

A.   Mr. Jackson took the husband to an ATM.

Q.   Now, Mr. Scott, I believe you mentioned a second ago that -- let me ask you this:  Did you go to any other parts of the house after you got in and encountered the husband and the wife?

A.   After Jackson came back from the ATM, I asked was it okay for me to go through the house and see if I could find anything

valuable.

**Q.** And did you?

**A.** No, sir.

**Q.** Now, while you were there and while you could see Mr. Jackson, did he go through any other parts of the house before he left with the male?

**A.** Yes, sir.

**Q.** And did he take anybody with him throughout the house?

**A.** Yes, sir.  The husband.

**Q.** And you stayed with the wife while Mr. Jackson did that?

**A.** Yes, sir.

**Q.** And just so we're clear, you had a gun the entire time?

**A.** Yes, sir, I did.

**Q.** And do you know whether or not Mr. Jackson forced this male victim to make a withdrawal at the ATM?

**A.** Yes, sir.

**Q.** And eventually did they come back to the house?

**A.** Yes, sir.

**Q.** And when they came back to the house, were you still there?

**A.** Yes, sir, I was.

**Q.** And the entire time that they were gone, did you hold the wife and the children at gunpoint?

**A.** Yes, sir.

**Q.** Mr. Scott, what types of things did y'all take from this

residence?

**A.**    Designer handbags and shoes and jewelry.

**Q.**    Did you take a wedding ring?

**A.**    Yes, sir.

**Q.**    Now, how did y'all get away from the house, Mr. Scott?

**A.**    The same young lady that dropped us off picked us up.

**Q.**    Do you know whether or not Mr. Jackson called this young lady to come pick you up?

**A.**    I didn't see him make the call.  But I'm sure that he did.

**Q.**    And after this young woman came and picked him up, what did you -- picked the two of y'all up, what did y'all do next?

**A.**    We went back to the same hotel.

**Q.**    And at some point, was there a discussion about how to divvy up all of the things that you had taken?

**A.**    Yes, sir.

**Q.**    And what particular items did you take, Mr. Scott?

**A.**    Handbags and shoes and the one wedding ring.

**Q.**    And did you take those items back with you to Memphis?

**A.**    Yes, sir.

**Q.**    And when you got back to Memphis, what did you do with them?

**A.**    I sold them for whatever money I could get for them.

**Q.**    What did you do with the wedding ring?

**A.**    I pawned it.

**Q.**    So you took it to a pawn shop?

A.    Yes, sir.

Q.    Did you complete a ticket for it?

A.    Yes, sir.

Q.    And did you put your name on that ticket?

A.    Yes, sir.

Q.    How soon after this robbery did you go back to Memphis?

A.    About two days after.

Q.    Now, after this robbery, did you have any discussion with Mr. Redmond about what happened?

A.    Yes, sir.

Q.    Please tell the jury about that conversation.

A.    I told him about everything that happened while I was in Atlanta, how -- like the details of what happened in the robbery.

Q.    Like what details did y'all discuss?

A.    Basically that I was okay and where the robbery was in Atlanta and the items that were taken in the robbery.

Q.    Now, had you and Mr. Redmond ever talked -- I think you testified earlier that y'all had talked about robberies with Mr. Jackson before you committed one?

A.    Yes, sir.

Q.    And what did you understand or what did you discuss with Mr. Redmond about what he had done in those robberies?

A.    The same thing.

        MR. JONES:  Your Honor, I'm going to object to this

line of testimony.  I'm going to move for a mistrial.  They are bringing up uncharged conduct.  I move for a mistrial.

THE COURT:  Well, first of all, I don't -- I think we've gone astray.  So I think -- I think we've gone astray here.  I mean, you are just asking about in a -- I think you just need to move on.

MR. BUCHANAN:  Okay.

THE COURT:  We'll deal with your motion separately.

MR. JONES:  I beg your pardon?

THE COURT:  We'll deal with your motion after the jury leaves.  All right?

Q.    **(BY MR. BUCHANAN)**  Mr. Scott, where were you arrested?

A.    Birmingham, Alabama.

Q.    Mr. Scott, you testified that you picked up a backpack before you came to Atlanta.

Do you remember that?

A.    Yes, sir.

Q.    And what all was in that backpack?

A.    A gun and pepper.

Q.    And, Mr. Scott, after you left Atlanta, what did you do with that brown-handled pistol?

A.    I left it in Atlanta with Mr. Jackson.

Q.    Mr. Redmond -- I mean, Mr. Scott, what was your understanding of what the pepper was for?

A.    In case the police came and dogs were to chase us, the

212

pepper was to throw off their scent.

THE COURT:  Ladies and gentlemen, we're going to take a break for the day now.  Defense counsel will get an opportunity to cross-examine Mr. Scott when we resume tomorrow.

Thank you very much for your attention and your patience in dealing with our ups and downs here.  And we will see you -- we'll start again at 9:30 tomorrow.  Thank you.  We'll endeavor to again.

Just stay put.  And the jury can be excused.

**(The jury exited the courtroom at 5:05 P.M.)**

THE COURT:  I don't see any reason for Mr. Scott not to be excused at this point.  We're going to bring him back -- the Marshals' Office will bring him back tomorrow morning for the 9:30 hearing.  All right?

Thank you.

THE DEFENDANT:  God bless you.

THE WITNESS:  Thank you.

**(The witness exited the courtroom.)**

THE COURT:  All right.  So I'm sorry.  You moved for a mistrial.  And what was the basis of the motion?

MR. JONES:  Mr. Redmond is on trial for three counts June 12th, 17th, and 21st.  Mr. Scott has made it perfectly clear that Mr. Redmond has told him that he was involved in home invasions prior to those dates, prior to the time that Mr. Scott was recruited by Mr. Jackson and came down by bus to

213

participate in a robbery on May 25th.

I think all that -- all that is crystal clear that Mr. Scott has let the jury know that Mr. Redmond has told him about other cases that he is involved in home invasions. There has been no 404(b) information given to us. And given that this is uncharged conduct for which he is not on trial, we move for a mistrial.

THE COURT: What does the Government have to say?

MR. BUCHANAN: Your Honor, we believe that this conversation that Mr. Redmond and Mr. Scott had that Mr. Scott has testified about is inextricably intertwined with the activity, particularly the activity to which Mr. Scott has entered a guilty plea.

He said that based on his understanding as to what had happened with Mr. Redmond that is what prompted him, he said, to going and introducing and volunteering to participate in one of these robberies.

There has been no testimony about the specifics or individual other robberies. Just that before conversation that got Mr. Scott involved in this activity and then a subsequent sort of post-robbery conversation in which they talked about what had happened.

So we don't believe that that is 404(b) uncharged conduct. It is inextricably intertwined with the conduct to which Mr. Scott has entered a guilty plea. And it explains in

fullness his testimony.

MR. JONES:  And the response to that, Judge, is it could have simply been left as:  My cousin Brandon introduced me to Mr. Jackson.  I talked to Mr. Jackson.  I decided to come down here and help him in a robbery.  And that is what I did.

I don't see why there was anything needed about Mr. Jackson -- Mr. Redmond allegedly being involved in other holdups.  And I quite frankly don't know which ones those are supposed to be.  I may have missed something in discovery or whatever.

But -- so we stand on our motion, Judge.

THE COURT:  Well, the question is -- and I understand the argument about it is inextricably connected in terms of the original conversation arguably.  I don't know why counsel returned to it later on because that sort of seemed like icing on the cake.

I mean, it is not inextricably interconnected when you ask, and what did you understand and what did you discuss with Mr. Redmond about what he had done in those robberies?  This was at the concluding part of Mr. Scott's testimony.  He says the same thing.  And that is when Mr. Jones jumped up.

But that said, I don't know that is enough by itself for a mistrial.  I am perfectly willing to give an instruction to the jury at this time if you want me to -- if you are asking that alternatively.

I mean, I know you are going to stand on your motion for a mistrial.  But alternatively would you -- I mean, this is always the question about an instruction.

Do you want me to bring it to their attention or not?

MR. JONES:  Well -- and I have been in this dilemma before.  It is a Hobson's choice, Your Honor.

If I don't ask the Court to give instructions, I probably will have been deemed to have waived it if it goes up to the Eleventh Circuit.  And if I do ask for curative instructions, then it rubs it in -- just rubs it in more to the jury.

THE COURT:  Well, you can sleep on it.  I'll write one, and you can sleep on it.  I mean, if I -- we'll try to send you something about what we're thinking about -- what I'm thinking about --

MR. JONES:  Yes, Your Honor.

THE COURT:  -- this evening in the next hour or so so you can think about it.  And --

MR. JONES:  Yes.  Thank you, Judge.

THE DEFENDANT:  Excuse me, Judge Totenberg.

MR. JONES:  No, please.

THE COURT:  If you want something to be brought to my attention, you are very welcome -- I'm willing to have you chat with your counsel and he will -- and you have every right to do that.

But I can't let you just talk on your own behalf or else you are -- at that point. And I don't want anything that might be used against you in a way that you don't foresee.

So let me give you a minute or two to talk together about whatever it is that Mr. Redmond wanted to bring to my attention.

**(A discussion ensued off the record between the defendant and defense counsel.)**

THE COURT: Was there anything else that you want to bring to my mention that Mr. Redmond has shared with you or his concern?

MR. JONES: No, Judge. I'm going to ask the graces of the Marshal for me to be able to speak to Mr. Redmond before he is brought down.

THE COURT: All right. That is fine. Do you want us to stay around in case there is something after you chat with him, or do you want to just bring that back to us tomorrow morning?

MR. JONES: Well --

THE COURT: Because I think he ought to be here if you are talking since there seems to be some communication concerns.

MR. JONES: Judge, at some point, I may ask to address the Court ex parte on attorney-client issues and what is going on and that sort of thing. I don't know if we've

gotten that far to involve the Court.  But we may.  And I'm going to --

THE COURT:  Then you-all seriously talk about it before we go much further.  Okay?

MR. JONES:  Yes, ma'am.

THE COURT:  You can talk again tomorrow morning before we begin.

MR. JONES:  Thank you, Judge.

THE COURT:  Thank you.

All right.  Everyone remember to send us, if you haven't already, the Word version of the jury charges.  And I'll send out a possible instruction for the jury.  Thank you.

All right.  We're all excused.  And I'm just sitting here for a second finishing something up.

MR. BUCHANAN:  Your Honor, we'll keep the firearm in our custody and not leave it with the others.

COURTROOM DEPUTY CLERK:  Yes.  Please do.

THE COURT:  Thank you.

**(The proceedings were thereby adjourned at 5:15 P.M.)**

218

C E R T I F I C A T E


UNITED STATES OF AMERICA

NORTHERN DISTRICT OF GEORGIA


     I, SHANNON R. WELCH, RMR, CRR, Official Court Reporter of the United States District Court, for the Northern District of Georgia, Atlanta Division, do hereby certify that the foregoing 217 pages constitute a true transcript of proceedings had before the said Court, held in the City of Atlanta, Georgia, in the matter therein stated.

     In testimony whereof, I hereunto set my hand on this, the 23rd day of September, 2021.




                    _____
                    SHANNON R. WELCH, RMR, CRR
                    OFFICIAL COURT REPORTER
                    UNITED STATES DISTRICT COURT