The following is the PDF of an official transcript. Official transcripts may only be filed in CM/ECF by the Official Court Reporter and will be restricted in CM/ECF for a period of 90 days. You may cite to a portion of the attached transcript by the docket entry number, referencing page and line number, only after the Court Reporter has filed the official transcript; however, you are prohibited from attaching a full or partial transcript to any document filed with the Court.

UNITED STATES DISTRICT COURT
OFFICIAL CERTIFIED TRANSCRIPT

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA,              :
                                       :
vs.                                    :    DOCKET NUMBER
                                       :    1:15-CR-0284-3
BRANDON REDMOND,                       :
                                       :    ATLANTA, GEORGIA
            DEFENDANT.                  :    AUGUST 3, 2021


**TRANSCRIPT OF JURY TRIAL – VOLUME 3 OF 6 PROCEEDINGS**

**BEFORE THE HONORABLE AMY TOTENBERG**

**UNITED STATES DISTRICT JUDGE**


APPEARANCES OF COUNSEL:

**FOR THE GOVERNMENT:**

RYAN K. BUCHANAN
JESSICA C. MORRIS
UNITED STATES ATTORNEY'S OFFICE


**FOR THE DEFENDANT:**

DEREK H. JONES
THE JONES LAW FIRM LLP


*MECHANICAL STENOGRAPHY OF PROCEEDINGS AND COMPUTER-AIDED
TRANSCRIPT PRODUCED BY:*

*OFFICIAL COURT REPORTER:*        *SHANNON R. WELCH, RMR, CRR*
                                  *2394 UNITED STATES COURTHOUSE*
                                  *75 TED TURNER DRIVE, SOUTHWEST*
                                  *ATLANTA, GEORGIA  30303*
                                  *(404) 215-1383*

UNITED STATES DISTRICT COURT
OFFICIAL CERTIFIED TRANSCRIPT

<u>**I N D E X   T O   P R O C E E D I N G S**</u>

<u>**WITNESS**</u>                                                    <u>**PAGE**</u>

LEON SCOTT

    Cross-Examination
      By Mr. Jones                                          30
    Redirect Examination
      By Mr. Buchanan                                       61

JIM TERRY

    Direct Examination
      By Ms. Morris                                         74
    Cross-Examination
      By Mr. Jones                                          82

MARK MANSFIELD

    Direct Examination
      By Mr. Buchanan                                       88
    Cross-Examination
      By Mr. Jones                                          93

TONI MOCERI

    Direct Examination
      By Mr. Buchanan                                       96
    Cross-Examination
      By Mr. Jones                                          100

RICKY LAMAR STANLEY

    Direct Examination
      By Ms. Morris                                         108
    Cross-Examination
      By Mr. Jones                                          124

DANIEL WORRELL

    Direct Examination
      By Ms. Morris                                         150
    Cross-Examination
      By Mr. Jones                                          181
    Redirect Examination
      By Ms. Morris                                         193

(...cont'd...)

**WITNESS**                                                    **PAGE**

LIEUTENANT TAURUS NOLEN

    Direct Examination
      By Mr. Buchanan                                        195
    Cross-Examination
      By Mr. Jones                                           197

                    * * *

CERTIFICATE                                                    206

4

**P R O C E E D I N G S**

**(Atlanta, Fulton County, Georgia; August 3, 2021.)**

THE COURT:  All right, Counsel.

Mr. Jones, if you want some type of instruction, I can give one.  But I think it is -- your concern about bringing it to -- giving you more problems than it is worth is a real one.

MR. JONES:  Yes, Your Honor.

THE COURT:  And I don't know how you want to proceed. And I looked over Mr. Stanley's statement, at least as it is identified by the Government.  I don't know that they are going to get exactly into that same problem or not from looking at that.  I hope not.

But I think that the -- 404(b) notice was not given. We're just in a delicate territory.  And I think it is very easy in any of these circumstances for the Government, if it is not very careful, to end up eliciting 404(b) notice -- 404(b) evidence without having provided notice.

And that is what my concern is.  I think that is what happened specifically with the question about, well, what did he tell you about other -- his -- when you were asking him about the -- him being Mr. Scott, about his conversation about -- with the defendant about what he had done in the past, what his experience was, when the record is clear at very minimum that Mr. Scott's incident was the first one.  It

preceded the charges or the events that are charged here against Mr. Redmond.

So I mean, it was bound to do exactly what it ended up doing by asking about that.  I don't think it was, you know, in any way worthy of -- and so grave at this juncture as to be worthy of a mistrial.  So I deny a motion for mistrial.

But the question is, A, what to do and also how not to repeat that.  And if you view it from the perspective of the defendant, this witness or others may have a strong interest in trying to paint the defendant in the worst light possible.  So it lends itself to this situation even.

But I'm certainly willing to consider any alternatives that either counsel proposes.

MR. JONES:  Judge, I think the remedy is a mistrial. And I understand the Court's -- I understand the Court's reluctance to grant a mistrial, Your Honor.  And the Court has so ruled.  And I'll stand -- I think that covers the matter from us, Judge.

THE COURT:  All right.  Well, just so that you can also perfect the record, the reason I'm not giving a curative instruction is at this juncture I think it, in fact, would damage your client's posture even more.  So there is no point in my doing so.

I don't think it is -- and I know that that is the standard way of fixing things.  But because it happened so

quickly, I'm concerned that what I would do would inflict greater damage.

MR. JONES: I share that concern, Judge.

THE COURT: And that is what you brought to my attention, and I thought about it some more. But I don't want to see anything like that happen again.

And I just caution the Government to be -- I don't think that you intentionally did that. But I think that -- but now we're on notice that this is a serious problem. And it probably was inherent in the searching for other evidence from other witnesses. But I think we have to be very careful going forward.

MS. MORRIS: Your Honor, on this point, because the Court specifically inquired about Ricky Stanley's testimony -- and the Court has reviewed the report of investigation or the summary of his anticipated testimony -- the context of what Mr. Redmond seemed to be telling Mr. Stanley, which is what Mr. Stanley will testify about, was, you know, the robberies that he was locked up for and that is what he was talking to him about.

Now, there were some facts that Mr. Redmond said to Mr. Stanley that will come out through Mr. Stanley about, you know, following some white victims from Lenox Mall to just the snippet -- and, admittedly, we don't have other testimony about that. But we have no reason to believe that that is outside

the scope of what he believes he is sitting here for.  And that is why he was talking to Mr. Stanley about that.

We certainly just wanted to raise that out of an abundance of caution.  We have no reason to believe that is in relation to some other uncharged conduct because we -- we take Mr. Stanley's -- Mr. Redmond's and Mr. Stanley's discussions to be about what he is facing here.  Because, in fact, everything else that he discusses, you know, does match up to other things we know.

So there is no way to, you know, parse that because we're just going to be discussing with Mr. Stanley about the things that Mr. Redmond told him.  But we wanted to raise it now.  Because as far as we know, this is part of, you know, the fabric of these robberies.

THE COURT:  Well, who -- who was living of these -- of your three identified family victims, who was living close to Lenox?

MS. MORRIS:  Well, one of the families lived in northwest Atlanta on Blackland.  But the reality is they all -- I mean, Lenox Mall is -- certainly, the Stone Mountain victims, Mr. Terry and Mr. Porter, could have been -- any of them could have been at Lenox Mall.  So --

THE COURT:  I don't think that Stone Mountain -- you would follow somebody home from Lenox to Stone Mountain.  That is a long following.

8

MS. MORRIS:  The Blackland victims are certainly the closest.  And in every instance, you know, the victims at least -- you know, the victims do discuss that there are statements about how they were watching them.

So I mean, that is consistent with the fabric of kind of these three charged robberies that they feel as if or there are statements made to them that they are being watched.

I just didn't -- because the Court is so sensitive to this, I certainly wanted to make sure that -- so that you could know about that.  And to the extent Mr. Jones has something to say about it, he could say it now rather than some kind of big to-do during Mr. Stanley's testimony.

MR. JONES:  And I appreciate counsel bringing it up. The problem with the following is that the cooperator, Ms. Varner, who was the driver on two occasions -- though her testimony wasn't the model of clarity -- I don't know if she said anything about following -- them following.  Her recollection was she just drove.

MS. MORRIS:  Your Honor, Ms. Varner also testified that Mr. Jackson had at least three different vehicles during this time.  So there is nothing to say that Mr. Jackson wasn't driving them around themselves.

THE COURT:  Well, why do you need that piece of testimony?  Why do you need to elicit that piece of testimony?

MS. MORRIS:  We don't need it, Your Honor.  But we're

not manufacturing his testimony.  I'm going to ask him what did he tell you.  I mean, I'm not going to lead him.  I'm planning to organically elicit their conversation because that is the most -- that is the way of eliciting the most powerful, truthful testimony.

I'm not putting words in Mr. Stanley's mouth.  We want to hear and the jury deserves to hear what Mr. Redmond said to Mr. Stanley, I mean, within reason.  And this is just kind of part of what he told him.

So it is not so much a matter of do we need it.  And we don't plan to emphasize it because it doesn't -- you know, it is just another -- it is another bullet point.  But it doesn't necessarily link up.  So it is not that we need it.  It is just that there is not a -- it is not overly prejudicial.

THE COURT:  Well, it is.  And I'm going to -- I think under the circumstances because it is really talking about potentially other incidents, I think that you should not elicit it.  And you should make clear to Mr. Stanley in advance that you are not eliciting it and don't -- and don't want it to be referred to.

MS. MORRIS:  All right.  So we'll need just a brief moment to meet with our witness before to caution him not to state that.

THE COURT:  Of course.

MS. MORRIS:  While we're speaking about Mr. Stanley,

10

Mr. Jones kindly gave us some copies of his intended exhibits that he plans to use with Mr. Stanley's testimony.  And we want to move to exclude in advance prior to him taking the stand Exhibits 9 and 10.  And this is kind of a parallel issue -- parallel to some issues we have already discussed.

THE COURT:  I just need to find these exhibits.

MS. MORRIS:  Certainly.  I can provide the Court a copy.  Defense Exhibits 9 and 10.

When you are ready, I'll explain the basis.

THE COURT:  Okay.  Okay.  Go ahead.

MS. MORRIS:  So Mr. Stanley is currently in custody on a supervised release violation.  The basis for the violation is underlying state conduct which occurred in Covington or is alleged to have occurred in Covington.  And that conduct is still pending in Covington.

It is described in the Government's motion for detention in Defense Exhibit 9.  And the alleged conduct is also described in the probation officer's -- excuse me -- Judge Vineyard's order of detention in Defense Exhibit 10.

So this -- the Court just dealt with a parallel issue with Ms. Varner.  But in Ms. Varner's case, she had actually already pled guilty and that underlying state offense had been adjudicated.  So the Clayton County incident, which was the subject of some discussion and cross-examination, had been already -- she pled guilty to it in state court in Clayton

County.

Here, we have some pending charges in Covington. Another piece of -- and probation provided to the defense indicates that according to Mr. Stanley's evaluation with Adriana Flores, in fact, we know that the witness is actually recanting right now.

So the state charges are -- it is uncertain what will happen with the state charges. So right now they are just allegations.

So I believe that all that is fair -- is fair game for impeachment purposes is the fact that, of course, Mr. Stanley is locked up. He is facing revocation of his federal supervised release. And he faces up to five years of revocation.

I mean, those are the facts. That is according to the probation officer's calculation. So even in opening, I believe Mr. Jones alluded to the fact that he was facing some enormous amount of time federally. But the reality is he is only facing -- not only -- it is substantial, of course. But he is facing five years' revocation on supervised release.

So the facts of the underlying state case are inflammatory. I mean, he's alleged to have shot a firearm in the direction of a police officer, a domestic incident. And the reality is that the witness has now recanted.

THE COURT: The police officer?

12

MS. MORRIS:  I don't know about the police officer.

THE COURT:  I mean, she can recant, and this is typical of domestic abuse.  But the police officer either was shot at or not.  And I can't perceive that the -- that the Government would proceed in the state charges unless there was evidence that, in fact, that occurred.

Why would we believe they would be alleging that otherwise?

MS. MORRIS:  Well, so these things are -- the petition for revocation was brought within weeks of the state -- of the arrest.  Mr. Stanley was obviously brought over very quickly after the incident, which makes sense.

My point is that, Your Honor, it is a pending case. And we know -- I think it is appropriate to allude to the fact that he was arrested on state charges.  He is now facing revocation of his supervised release, and those state charges are still pending.

So I mean, that allows the jury to understand that he faces not only the prospect of going back to federal prison but he has some state charges hanging out there.  But I mean, the nature of the -- the nature of the actual events, they don't go to his veracity.  I mean, they are allegations at this point.

So the fact that he has exposure is significant.  But the nature of these events don't go anything -- they are just inflammatory, and they are --

13

THE COURT:  Yeah.  But I have a finding here still of -- findings of Judge Vineyard on the other side of it, anyway.

Go ahead in your response.

MR. JONES:  Well, Judge, we handled this at length in the pretrial conference.  And the Court said I could bring up his priors for armed robbery and sale of cocaine.  I can go into the pending charges.  That was my understanding.

And, again, all of this, Judge, goes to his bias to try to please the Government.  He's -- one of the charges -- first of all, any sort of violence against the lady -- as we all know, women back off and try to protect people later on.

We also know that one of the charges was an aggravated assault on a police officer because he shot in his direction.  We also know that he's being charged with a convicted felon in possession of a firearm.  That -- we dealt with all of this at the pretrial conference on Wednesday.

Now, he's now in the federal system looking at not only getting his supervised release revoked, but he's no doubt hoping that the Government could maybe have a good word for him in Newton County about, hey, you know, he helped us out here.

Also, as we discussed in the pretrial conference, there is a very real possibility, given his record, that he would be brought over here and prosecuted on the federal gun count because he is an armed career criminal.  That happens all

14

the time.  I have handled several of them.  And I imagine this Court has.

So that all goes to his bias.  So -- and then the fact that he is suffering from mental illness and hallucinations when he was arrested and then brought over to here for his revocation issue goes to his mental state as to what Mr. Redmond did or did not tell him.  The man suffers from schizophrenia.

MS. MORRIS:  We agree, Your Honor, his mental state is relevant.  And we plan to address that with the witness.  And it is a fair basis for cross-examination.  I mean, certainly the evaluation from Adriana Flores is not admissible.  But the defense has that information.  And we agree that is perfectly admissible.

Just to clarify, the defense is alluding, I believe, to the armed robbery offense, which is Paragraph 41 of his PSR.  He was arrested for that offense at age 17 in 1990, and he was discharged from parole in 2002.  And, similarly, there is a 1996 arrest for sale of cocaine with an *Alford* plea also where he is discharged also in 2002.

So to the extent the defense is referring to those two convictions, Paragraphs 41 and 42 of the PSR, those are well beyond the look-back period for permissible impeachment by convictions.

MR. JONES:  Judge, we dealt with this at the pretrial

15

conference.  My understanding is that the Court ruled it is part, again, that he is a career criminal and what he is facing.  Yeah, he might have been discharged in 2002.  And then in 2002, he started serving a 292 sentence in federal court, which he got reduced.

MS. MORRIS:  We agree that the fact that he served almost 20 years in federal prison for a drug case that took him through kind of the middle decades of his adult life or the majority of his adult life is highly relevant.  And we expect him to explain that he was in the custody of the Bureau of Prisons for decades, and he is back in prison now and that he has a pending supervised release violation.

We agree there is a lot of impeachment fair game kind of material here.  But an armed robbery conviction when he was 17 when he was discharged in 2002 and similarly another cocaine charge that he was already also discharged from parole in 2002, I mean, that is just --

THE COURT:  Were those counted as part of -- in determining he was a career criminal?  Because I have had 17-year-old -- I have had people who were 17 years old when they committed the violations that are considered as part of the career offender.

It may not be what I think is great policy on the part of our sentencing system.  But 17-year-old violent crimes are considered.

16

MS. MORRIS:  Certainly.  I mean, Your Honor, the jury -- I mean, the -- he got a really long sentence for his prior --

THE COURT:  I understand.  All I'm saying is that they are considered as kind of the lifelong you are a career offender.  You don't get that wiped off.

MS. MORRIS:  Absolutely.  But something being considered by the sentencing guidelines and being able to talk to the jury about the fact he committed an armed robbery when he was 17, I mean, it is just -- it is just embarrassing the witness without any really -- and it is squarely beyond -- I'm not aware of any case law, if the defense has some, about -- that overrides the kind of rules about admissibility about prior convictions if those prior convictions were somehow taken into account as predicates or enhancing recidivist provisions.

I mean, that is an interesting legal issue.  I'm not aware of that.  But at the end of the day --

THE COURT:  But I wish you --

MS. MORRIS:  I feel this is risky because the defense has -- there are a lot of areas of impeachment here.

THE COURT:  I just wish you had raised -- been -- I don't believe you argued this at the --

MS. MORRIS:  Frankly, I thought it was just -- it was as a matter of law that those convictions were well outside the look-back period.  And the PSR just make it frankly very clear.

And this ACCA argument that the defendant is making -- I believe Your Honor said that that was too speculative so that he is not permitted to make this argument, oh, well, it involves a gun, so he could be facing 15 to life.

Frankly, I'm not aware of the fact that the firearm was even recovered, which is usually a requirement for a federal gun prosecution.  We don't typically charge people with ACCA that are this advanced in age.  I mean, there are just a whole lot of prosecutorial discretion involved in that decision.

THE COURT:  What I think you are right about is that I think he has a long criminal history and the defendant can basically say you have a significant criminal history, don't you, and, in fact, you would be concerned about significant consequences.

And, you know, I don't know that we have to go through all of the details.  And it doesn't go directly to his veracity.  But it does go to would he want -- motive and bias and what his motive for his testimony would be.

And that is why I'm -- because -- I'm concerned because of the gun involved here.  And I would like to see -- I know you weren't handling this but -- the revocation.  But obviously the probation officer wrote a recommendation, included a law enforcement record about this because that is what is standardly done, and I would like to see it so I would

be able to see the police officer's report about the weapon because I think that that is significant.

I mean, normally much of what you are saying would make sense. But this is not a normal situation.

MR. JONES: Well, Judge, first of all, the findings of Judge Vineyard in Defendant's 10 says the defendant is alleged to have discharged a firearm in the direction of a police officer. If he discharged a firearm in the direction of a police officer, he possessed a firearm. That can be a federal prosecution. It certainly apparently is a state prosecution.

In regard to the PSR of Mr. Stanley back in his 2001 case, Paragraph 47 says pursuant to U.S. Sentencing Guideline 4B1.1, the defendant is a career offender. The defendant's criminal history category is enhanced to Level VI because he is considered a career offender.

So he potentially is coming back to federal court again at this time as an armed career criminal.

THE COURT: All right. Can you get me -- I think that the -- unless there is something in the police -- that doesn't indicate this happened, then I am sure that Judge Vineyard who is meticulous had a basis for determining this.

So I mean, I think that this is -- this relates to his motive. It is not -- I mean, you're going to have to -- I think that the Government can make clear that this is not --

19

these are -- that this is only a charge and not a -- in terms of the state court proceedings and anything else.  And -- but it relates to motive.

Why would he be coming out at this juncture to say this?

MS. MORRIS:  Certainly.

Just two things.  So is the defense permitted to ask about the armed robbery conviction when he was 17 and the other -- and the drug conviction that preceded his federal conviction?

THE COURT:  When was the drug one?  Is that what he served all the time for?

MS. MORRIS:  Both cases were discharged at the same time in 2002.  So 19 years ago.

MR. JONES:  Judge, my understanding was that the Court -- my understanding of the pretrial conference was that the Court was going to allow me to go into, of course, obviously the conviction that he just finished serving, the armed robbery and the sale of cocaine priors.

The Court had some reservations with me going into -- the Court didn't have any reservations talking about how much supervised release he was looking at being revoked.  The Court didn't have a concern with me going into the fact that he potentially was facing additional federal charges.

What the Court didn't want me to do was start talking

about armed career criminal and waving my arms around saying, you are looking at 15 to life, aren't you?

THE COURT:  Right.  And that is still my concern.

MR. JONES:  And if the Court doesn't want me to do that, I can simply say to him, and, Mr. Stanley, in addition to this supervised release problem, you are concerned that you have other federal problems based upon the case in Covington that could expose you to additional prison time without going into making it an armed career -- that is what I understood the Court's instructions to be.

Just leave the armed career criminal alone but just say there is a possibility that, you know, you are concerned that the feds might go after you again and you are here to try to tell them what they want to hear to, you know, get Mr. Redmond.

MS. MORRIS:  The other just second point briefly --

MS. IVORY:  Your Honor, may I go meet with my client?

MS. MORRIS:  So this is -- sorry.  She doesn't know who you are.

MS. IVORY:  I wanted to go meet with my client.

MS. MORRIS:  She doesn't know who you are.

MS. IVORY:  I'm sorry.  Your Honor, I am Victoria Ivory.  I was appointed to represent Mr. Stanley as a witness in this case and on the supervised release revocation.

MS. MORRIS:  So I was just -- I didn't know Ms. Ivory

was in the courtroom.

THE COURT:  Well, I couldn't recognize her with the mask.

MS. MORRIS:  I was about to indicate.

THE COURT:  So I was starting to wonder if I had some security issue.

MS. IVORY:  I don't think I'm a security issue, Your Honor.  I was just wondering if I could step back and see my client.

COURTROOM DEPUTY CLERK:  Mr. Stanley is not back here.  This is Mr. Scott.  You'll need to go down to the 16th floor and check on Mr. Stanley.

MS. IVORY:  They told me he was up here.  So that is why I came up here.

MS. MORRIS:  Your Honor, my second point -- but I did not know Ms. Ivory was in the courtroom -- was just to indicate that Mr. Stanley is represented by counsel and that he may invoke the Fifth when asked about the pending charges.  I didn't realize that his counsel was here to speak on that issue.

THE COURT:  All right.

MS. IVORY:  And that is correct, Your Honor.

THE COURT:  Are you anticipating that?

MS. IVORY:  Am I anticipating that he will invoke the Fifth if asked about the supervised release underlying charges?

THE COURT:  Yes.

MS. IVORY:  Yes, Your Honor.

THE COURT:  I think the thing about it is the cocaine and the 17 -- and the event that was when he was 17, as I hear about it, is old.  But I think what you can do is that you can say you had serious prior charges -- criminal charges as well, didn't you?  And that is -- convictions.  I think that is as much as I think really -- I think there is so much ample territory in what you have in front of you.  And I will let you say you served previous time because I think it builds up to what you want to say as to so there are a lot of potential consequences for you here.

MR. JONES:  So, Judge, I'm assuming though that I can say, well, hey -- I won't go into the facts of the case.  I'm not going to say, hey, Mr. Stanley, isn't it true you shot at a police officer?  I'm going to say, Mr. Stanley, you were arrested for shooting at a police officer and being a convicted felon in possession of a firearm.  And I'm assuming he is going to say yes to that.  And if he doesn't, he is lying.  But I don't --

THE COURT:  Well, he may invoke the Fifth.

MR. JONES:  Well, the fact that he was arrested is --

THE COURT:  Right.  That is why I would like to see what other documentation there is also.  I'm sure Ms. Black has it or the probation department has it.

23

MR. JONES:  Again, Judge, if he doesn't want to answer the questions, again, I don't intend to go into the specific facts of the case in terms of did you do this, did you do that.  Simply were you arrested.  And that makes it all the more reason -- the paperwork here shows what allegedly happens, and I can just introduce the paperwork.

THE COURT:  Well, I think number -- Exhibit 10 is the finding of the Court.  I'm more concerned about your introducing 9.

MR. JONES:  Well, in 9, the Court had problems with stating that -- the Court -- as I understand the Court's concern now is that the Court would prefer me not to go into the armed robbery and sale of cocaine.

I think I'm entitled to do that.  But if the Court is not going to allow that, I would except.  But in terms of this document, then simply it could be redacted at a later time to take out the armed robbery and the sale of cocaine.

THE COURT:  You mean in terms of the Government's motion for detention?

MR. JONES:  Yes.

MS. MORRIS:  Your Honor, I disagree that that is our only issue.  So the way the Government's detention motion is written is obviously from a posture of advocacy.  And it states that -- it states that the defendant was involved in very serious new criminal conduct at the bottom of the first page of

24

the detention motion.

Even the judge's order for detention states it differently.  Judge Vineyard said he is alleged to have discharged a firearm.  We would prefer none of these facts to come in.

But I mean, at least the Court's order uses the word alleged, which is accurate.  I mean, that is -- at this point, he is alleged.  And the Government's detention motion includes additional facts about, you know, a 11-year-old child being involved in the alleged incident.

MR. JONES:  All the more reason that the Government alleged this against this man.  He knows it.  This has been filed.  He has got an attorney.  It goes to his bias.

THE COURT:  All right.  Well, I'm going to take it under advisement.  I think we're going to be plenty full with Mr. Scott for a while.  And I'll think about it.  But I'm going to let you, no matter what, get 10 in -- Exhibit 10 in.

MR. JONES:  Could we take a moment before the jury comes in, Judge?

THE COURT:  Absolutely.

I just want to be 100 percent clear though.  In the event of redirect here on Mr. Scott, I want the Government to be very careful about this -- about this issue about potentially eliciting 404(b) evidence that has -- and anything that smacks of it or smells of it.

25

MR. BUCHANAN:  Noted, Your Honor.  One -- I guess one final thing.  Mr. Jones mentioned yesterday just before we broke that he may want to take up some issues with the Court outside the presence of the Government.  I want to just sort of offer our absence for a few minutes if he still wanted to do that.

THE COURT:  Do you want to do that at this time?

MR. JONES:  No.  No, Judge.  I don't think we're at that posture.

THE COURT:  All right.  Would you just chat with your client?  Because he is facing the side wall at this point.  So I want to make sure that that is -- that we're okay.

All right?

MR. JONES:  Judge, if I could, perhaps I need to go back.

THE COURT:  All right.  If you would.  We'll just hold out here for a second -- hang out here for a second.

COURTROOM DEPUTY CLERK:  We can't take him back.

MR. JONES:  That is correct.

THE COURT:  All right.  Well, I tell you what.  Why don't the rest of us -- everyone in the room vacate other than obviously the Marshals' Office representatives.  And if the Marshals' Office representative would just step a little further behind so they can have a maximum amount of privacy. Thank you.

**(A brief break was taken at 10:09 A.M.)**

THE COURT:  Please have a seat.

All right.  I have also reflected on where we're at as to Mr. Stanley as to the discussion we just had.  And what I think -- my view is this:  Mr. Jones, I think you can pursue in a cogent and effective way this whole issue still.  And I'm not restricting you by basically saying you had a serious criminal record without going into -- and get him to admit that and there were potential consequences of this without going into the particulars of the two incidents that the two -- the one that happened when he was 17 and the one afterwards.

I don't think it -- they don't need to know about the specifics of what the event was.  He had a serious criminal record even before then.  And he can acknowledge that and therefore that there could be -- there could be long-term consequences like he was a career offender.

Then I think you can as to -- but I don't want to go through all the particulars of that.  Then as to Exhibits 9 and 10, I think that they can be admitted but for the purpose of showing that he understood -- he recognized at the point in March when this was filed both -- and when the hearing was held by Judge Vineyard that he was potentially facing serious consequences.

And the thing is that the Government's motion makes it 100 percent clear the seriousness of the -- of what he might

be facing.  It doesn't mean that he is going to be found guilty or not guilty.  And if the Government wants a charge that would clarify that, that is fine.  But I mean, I think the seriousness of the charge and that he could be facing consequences for that and might want to do something about that certainly goes to his motive and potential bias in his testimony.

MR. JONES:  And the consequences, Judge, would be problems with his supervised release and possible further federal charges, without me going into the further federal charges?

THE COURT:  Well, I mean, he is facing some potential state charges.  And there could be -- you understand that you are a career offender and so you could -- there could potentially be consequences there without going through what they are.  Because I mean, they may not happen.

But the point of allowing you simply to show the concern the Government had about this and the seriousness of this -- that is why I'm allowing you to -- only for that purpose.

And if the Government wants a limiting instruction as to the information contained in the motion for detention, then I'll certainly consider that.

MS. MORRIS:  Certainly we would request a limiting instruction that the -- reminding the jury that the information

concerning the underlying state charges referenced in the petition are merely allegations and should be considered as such. They are pending charges. They are not even indicted, as far as I know. They are merely pending.

THE COURT: All right. I would still like to see the police -- the record that provided the basis for the -- obviously the good faith filing of this motion.

Thank you. I would like to have it before I have to give such an instruction.

Okay. Are we ready for Mr. Scott?

MR. JONES: Yes, Judge.

THE COURT: And I understand you don't -- it is not necessary for the Court to have an ex parte meeting with you and your client at this point?

MR. JONES: No, Judge. If the Court at some point would think that is necessary, I would defer to the Court. But I'm not requesting it now.

THE COURT: All right. Well, I don't have any basis for knowing anything other than having my visual observation of what I reflected in the record before and you mentioning at the end of the last session. So I will continue to observe. But --

MR. JONES: I appreciate the Court's concern.

THE COURT: All right.

COURTROOM DEPUTY CLERK: Mr. Scott wants to speak to

29

his attorney prior to coming out.

THE COURT:  Okay.

**(A brief break was taken at 10:26 A.M.)**

THE COURT:  All right.  Are we ready to proceed?

MR. JONES:  Yes, Judge.

THE COURT:  Bring the jury in.

**(The jury entered the courtroom at 10:27 A.M.)**

THE COURT:  Morning.  Good morning.  Have a seat.

I know it seems like an endless delay.  We started early, but we didn't finish early here.  I think our problem is because of the configuration of the courtroom and the fact that we can't do any bench conferences we're trying to sort anything else out that is a dispute in advance so that we're not popping you up and down during the course of the trial.

So that is the way it is at the moment.  It is just a little more challenging to have -- run a smooth trial right now.

Are you ready to begin your cross-examination --

MR. JONES:  Yes, Your Honor.

THE COURT:  -- of Mr. Scott?

Whereupon,

LEON SCOTT,

after having been previously duly sworn, testified as follows:

CROSS-EXAMINATION

BY MR. JONES:

Q.   Morning, Mr. Scott.  My name is Derek Jones.  And I'm your cousin's lawyer.  I have a few questions for you, sir.

Now, you told the jury yesterday on your direct examination by Mr. Buchanan that you met Dre, Mario Jackson, through Mr. Redmond; correct?

You can take your mask off.

MR. JONES:  I believe, can't you?

THE COURT:  That's right.  Can you take the bag off of that?  No.  That's fine.  Keep the bag now.

Fine.  Go ahead.

A.   Yes, sir.

Q.   **(BY MR. JONES)**  That is not true, is it?

A.   He actually came to our house.

Q.   My question is, sir:  That is not true?  You did not meet him through your cousin; correct?  Is that true or not true?

A.   No, sir.  I guess you could say it is not true.  But --

Q.   Now, isn't it true that you met him, Mr. Jackson, through somebody else, his cousin, Mario, big guy with dreads, dark skin?

A.   No, sir.

Q.   Have you ever said that?  Have you ever told anybody that?

A.   Sir?

Q.   Have you ever told anybody that?

A.   That I have met Jackson --

**Q.**    That you met Mr. Jackson, who you know as Dre, through his cousin Mario.

**A.**    No, sir.

**Q.**    Okay.  Now, do you recall after you were arrested being brought over and questioned -- first of all, you were arrested in Birmingham; correct?

**A.**    Yes, sir.

**Q.**    And then you were brought here; correct?

**A.**    Yes, sir.

**Q.**    And you were questioned by FBI agents before you went to court?

**A.**    Yes, sir.

**Q.**    Okay.  Was this gentleman here one of those agents?

**A.**    I'm not sure.

**Q.**    Okay.  Was Ms. Kim Dammers?

**A.**    I'm not sure.

**Q.**    The prosecutor?  Was she there for a -- briefly at the beginning of the interview?

**A.**    I'm not sure, sir.  I'm not sure what their names were.

**Q.**    Okay.  Well, do you remember a sort of tall, white lady with blonde hair maybe in her 40s who --

**A.**    I'm not positive, sir.  It was a little over almost six years ago.

**Q.**    Okay.  Well, now, also you testified yesterday that Brandon Redmond made admissions to you about being involved?

**A.**    Yes, sir.

**Q.**    Okay.  Now, isn't it true that he never told you anything like that?

**A.**    No, sir.  We talked about --

**Q.**    Okay.  My question is:  So you are saying -- you deny that.

Now, my next question is:  Did you not when asked about your cousin's involvement tell the FBI agent during that same interview where you discussed how you met Mr. Jackson -- did you tell them that Mr. Redmond was not involved in this -- in this crime?

**A.**    Not the one that I was involved in.

**Q.**    Did you not tell them that he wasn't involved in the case?

**A.**    Not the robbery that I was involved in.  Not the one that I was being charged with.

**Q.**    Okay.  Did you not say words to the effect like he wouldn't do something like that?

**A.**    No, sir.  I cooperated immediately.

**Q.**    You cooperated immediately, and you fully implicated him in that first meeting.  Okay.

MR. JONES:  If I may have a moment, Your Honor.

**(There was a brief pause in the proceedings.)**

**Q.**    **(BY MR. JONES)**  Now, Mr. Scott, what I propose to do is play you excerpts of the -- of a tape recording that was made of that interview that was provided to me by the Government in

this case.

**A.**   Yes, sir.

**Q.**   Okay.  So I just want you to understand it is not my tape. It is a tape I got from the Government.

MR. BUCHANAN:  Your Honor, I believe the proper way is for the witness to hear it before the jury does.

THE COURT:  What do you say to that?

MR. JONES:  Your Honor, Mr. Buchanan in his direct testimony tried to get this man to admit that he hadn't been entirely candid in the beginning, and he categorically denied it.  I would like to just play the tape.

THE COURT:  Go ahead then.

**(The audio recording was played for the jury.)**

THE COURT:  Can you stop a second?  I know that there was a problem about the video being far from some of you.  Are you able to read it since -- in case you want to be able to read it?

MR. JONES:  This is audio, Judge.

THE COURT:  I know it is.  But sometimes audios are hard to understand.  So I know that the individuals in the jury box can -- are able to see.  So I don't want some of the jurors who are further away not to have that option.

Are the jurors able to see, if you need to see?

All right.  Very good.  That is all I wanted to confirm.

All right.  Go ahead.

MR. JONES:  Judge, this is a little awkward not having a mouse.  So I apologize if I don't get quite spot on.

**Q.    (BY MR. JONES)**  Now, Mr. Scott, you were advised by the agents who were questioning you during this time that you needed to tell them the truth on all occasions; correct?

**A.**    Yes, sir.

**(The audio recording was played for the jury.)**

**Q.    (BY MR. JONES)**  So the person who you are describing as flashy with materialistic things, that is Mr. --

**A.**    Jackson.

**Q.**    Mr. Jackson?  Okay.  Thank you, Mr. Scott.

**(The audio recording was played for the jury.)**

**Q.    (BY MR. JONES)**  Okay.  Now, Mr. Scott, didn't you just say that it was Mario who introduced you to Dre?  Weren't those just your words there?

**A.**    No, sir.  Mario?  No, sir.

**Q.**    But isn't that what you just heard on the tape?

**A.**    No, sir, it is not.

**Q.**    Okay.  Thank you.

**(The audio recording was played for the jury.)**

**Q.    (BY MR. JONES)**  Okay.  So, Mr. Scott, is it not true that in that statement you told the agents that you met Mr. Jackson, Dre, through his cousin who was a big guy with dreads?

**A.**    Sir, this was about six -- a little over six years ago.

35

And I'm still trying to remember everything -- you know, details and everything.  And I'm trying my best to give you exact -- because this recording was almost six years ago.  And I have been incarcerated since then.

But I'm not going to get up here and make myself look like a liar.  From what I remember, Mario Jackson came to our residence looking for my cousin Brandon.  And that is when I introduced myself to him.

I'm still trying to remember who this other guy is that, you know, I'm saying that introduced me to him.  But Brandon had -- Mario come to our house looking for him.  And that is when I introduced myself to him.

Q.   Well, that is what you are saying today.  But that is not what you told the agents back when you were interviewed in 2015 based upon what we just heard; correct?

A.   I mean, I'm here to tell the truth, and that was six years ago.

Q.   I understand you are here to tell the truth.  But is that not correct?  That that is -- you didn't tell them back in 2015 when this tape was being recorded what you told them -- what you told this jury yesterday?  Is that not true?

A.   Is it not true?  I'm hearing something different on here, but that was six years ago.

Q.   Yes, sir.

MR. JONES:  Let me try to move forward, Judge.

(The audio recording was played for the jury.)

Q.    (BY MR. JONES)  Now, Mr. Scott --

A.    Yes, sir.

Q.    -- did you just not then again say that Mario introduced you to Dre?

A.    No, sir.  I'm still trying to remember who this guy is that I'm saying introduced me to him.  But I remember directly that Mario came to our residence looking for Brandon.  And that is how I remember meeting him.

Q.    That is your voice on the tape, isn't it?

A.    Yes, sir.

Q.    Okay.

(The audio recording was played for the jury.)

MR. JONES:  Okay, Judge.  I'm going to move forward.

Q.    (BY MR. JONES)  And, again, Mr. Scott, I'm going to call your attention to a portion of the tape where the agents asked you about Brandon Redmond, and I invite your close attention.

MR. BUCHANAN:  I think he should ask the question before he attempts to impeach the witness with this particular --

MR. JONES:  I already did, Judge.  I already asked him about that he said that -- when he was first asked about Brandon Redmond, he said Brandon Redmond wasn't involved or words to that effect.  I have already laid that foundation, Judge.

THE COURT:  All right.  I gather there is no -- no verbiage that is going to be appearing on these screens?

MR. JONES:  I'm sorry, Judge?

THE COURT:  Well, since there is nothing to show here, try a -- I thought we were going to end up having some verbiage here.

MR. JONES:  No, Judge.  I did not have a transcript prepared.

THE COURT:  Okay.  I misunderstood.

MR. JONES:  I kind of wish I had.  But let me go forward.

Now, this may not be the exact spot, Judge.  But I think it is close.

**(The audio recording was played for the jury.)**

**Q.   (BY MR. JONES)**  Now, Mr. Scott, did you not tell them back then that you didn't see him having anything to do with this?

**A.**   Not with the robbery that I was being accused of.

**Q.**   Oh, so you were just -- oh, so that is the confusion.  You were just talking about the robbery that you were involved in and not -- okay.  So that is your explanation for that.

Did not the prosecutor and the agents tell you in that interview that they were looking to try to catch everybody involved in this case and it would be helpful if you could tell them who else was involved in the case?  Is that not true?

**A.**   Yes, sir.  But I was being --

Q.    Okay.

A.    I was being arrested for my robbery.

                  **(The audio recording was played for the jury.)**

            MR. JONES:  Judge, I think I can move on to the --

Q.    **(BY MR. JONES)**  Now, that was your first interview that day.  Did you have -- do you remember a second interview?

A.    Yes, sir.  I remember showing up twice.

Q.    Okay.  And this is before you got a lawyer; correct?

A.    Yes, sir.

Q.    Okay.

            THE COURT:  What was the date of the first interview?

            That is all right.  You can tell me later.

Q.    **(BY MR. JONES)**  Now, in the second interview, the agents started showing you pictures of people?

A.    Yes, sir.

Q.    Okay.

            MR. BUCHANAN:  Again, is this impeachment (inaudible) --

            COURT REPORTER:  I cannot hear you.

            THE COURT:  Can you stop for a second?

            COURT REPORTER:  I could not hear you.  Could you repeat what you said.

            MR. BUCHANAN:  The question was whether or not they showed him pictures.  And Mr. Scott's answer was yes.  So --

            THE COURT:  Are you impeaching that?

UNITED STATES DISTRICT COURT
OFFICIAL CERTIFIED TRANSCRIPT

MR. JONES:  No, Judge.  I'm leading up to the next statement that he said about Mr. Redmond's involvement or lack thereof.  That is all I'm doing.

THE COURT:  All right.  That is fine.

(The audio recording was played for the jury.)

Q.  (BY MR. JONES)  So prior to showing you the pictures, the agent reminded you that the U.S. Attorney had stressed that honesty was very important at this phase; correct?

A.  Yes, sir.

Q.  Okay.

(The audio recording was played for the jury.)

Q.  (BY MR. JONES)  Now, when you say bingo there, Mr. Scott, you have been shown a picture and you identify the person in the picture and that is why you say bingo; is that correct?

A.  Yes, sir.  But that was six years ago.  I'm not sure what picture I was looking at.

Q.  Okay.  But it is coming back to you now?

A.  I mean, I recognize my voice.  But I can't say what picture I was looking at because it was so long ago.

Q.  Okay.  Well, let me play some more.  We'll see if we can clear that up.

(The audio recording was played for the jury.)

Q.  (BY MR. JONES)  Now, Mr. Scott, did you not just then again in a second interview say that Brandon wasn't involved and that Brandon didn't introduce you to Mr. Jackson but rather

40

it was Mr. Jackson's cousin?  Is that not what you just said on that tape?

**A.**   I'm still trying to remember from all that time ago who introduced me to Jackson because I'm hearing my voice.  But from what I recall, I met Jackson from coming to look for my cousin Brandon at our residence.  And I was referring to Brandon not having anything to do with the robbery that I was involved with when I came to Atlanta.

When I first got locked up, I was -- I was still young and kind of shooken up about being arrested.  So I was still kind of afraid to kind of talk to anybody because I didn't know if I could trust any of these guys by telling them what was going on and if I was going to end up getting -- getting myself hurt.  So I was kind of -- kind of scared about talking to them.

But pretty much I was telling the truth.

**Q.**   But you told them about what you had done; correct?

**A.**   Yes, sir.

**Q.**   I mean, at first, you tried to tell them about that ring that you pawned up in -- somewhere up north from here that, oh, you just -- you just received that?  You didn't actually take that.  You just received that ring that you pawned.

Wasn't that your first story?

**A.**   I didn't really want to incriminate myself to the wrong people.

**Q.**   My question was:  Wasn't that your first story about the

ring?  Not that you took it --

A.    I am not sure --

Q.    Let me finish my question, sir.  It is a simple yes or no answer, I believe.

Your first story in regards to the ring that you took off somebody's finger and pawned in Memphis was, oh, well, I just received that from somebody?  You didn't admit that you stole it; correct?  Yes or no?

A.    I can't remember.  It was six years ago.

Q.    Okay.  Now, at the beginning of that interview where there was the prosecutor, the tall, white lady -- is she coming back to you now?

A.    No, sir.  I'm trying to remember.  But it was so long ago I can't remember who was all there.  I was still shooken up about being arrested.  It was my first time actually being arrested for anything.  So I was still kind of -- kind of scared to talk to anybody.

Q.    Are you sure it was the first time you had ever been arrested for anything?

A.    It was the first time I was actually facing time.  I have been arrested for driving on suspended license and things like that but never anything to this magnitude.

Q.    Okay.  So it was made clear to you what you were facing and that you needed to help yourself; correct?

A.    Yes, sir.  But it was still kind of hard to take in being

that I was scared and it was my first time actually facing this amount of time.

Q.   So -- but is it -- has it come back to you now what you told them then about Brandon not being involved and Brandon not introducing you to Dre?  After we have played this tape, is it coming back to you now, Mr. Scott, or you are still kind of hazy about all that, seeing how it is six years ago and you were and young and scared?

A.   I'm still trying to remember all the details.

        MR. BUCHANAN:  Your Honor, I would object.  We have asked and answered this about three times now.

        MR. JONES:  I'll move on, Judge.

        THE COURT:  Thank you.

Q.   **(BY MR. JONES)**  Now, how much money did you get from that holdup?

A.   I'm not really sure the exact amount.  But if I can remember correctly, I got about $500.

Q.   And a ring that you pawned?

A.   Yes.

Q.   And which ultimately was what got you in trouble?

A.   Yes, sir.

Q.   Okay.  Now, you have entered a guilty plea in this case; correct?

A.   Yes, sir.

Q.   And -- oh, before I get to that, you went to court,

correct?  After you had that interview, you went to court and the Government moved to detain you in this case; correct?

A.    I'm not sure exactly how it went.

MR. JONES:  Okay.  Your Honor, I would just like to submit Defendant's Exhibit Number 6, which is the copy from the docket sheet of the Government's motion for detention filed on July 24th.

MR. BUCHANAN:  I would object to that, Your Honor. It is not a document that this defendant authored.  I'm not sure he has ever even seen it.  And it is clear from the testimony that he has been in custody throughout this matter.

THE COURT:  Well, I mean, is there a reason you need it?  Can't the Government just stipulate as to when he was brought for detention?

MR. JONES:  Let me try it another way, Judge.

Q.    (BY MR. JONES)  Okay.  Mr. Jackson, do you -- excuse me. Mr. Scott, you were arrested in Birmingham; correct?

A.    Yes, sir.

Q.    Okay.  The agents then drove you down to Atlanta?

A.    Yes, sir.

Q.    You came to the -- either the FBI place or the federal building and talked to them; correct?

A.    I'm not sure what the name of the building was.  But yes, sir, they did talk to me.

Q.    Was it here?  Was it this building?

44

**A.**    I believe so.

**Q.**    Okay.  And from there, you went up and saw a judge; correct?

**A.**    I'm not sure exactly how it went.

**Q.**    Okay.  And after that, did you -- after you talked to the lawyer -- to the agents in that taped statement that we have heard, you went to court and then you got a lawyer; correct?

**A.**    I'm not sure exactly how it went.  But eventually I did talk to my lawyer.

**Q.**    Okay.  And after you talked to your lawyer, then you decided to cooperate more with the Government; correct?

**A.**    I'm not sure exactly how it went.  But I'm pretty sure I cooperated from the time I was arrested.

**Q.**    But at some point after you got the lawyer, after you knew that you weren't going to get out of jail on bond -- you knew that; right?  You weren't going to get out of jail on bond?

**A.**    No, sir, I had no idea.

MR. JONES:  Okay.  I would move to introduce Defendant's 6, Your Honor, which shows the date of the Government's motion for detention.

MR. BUCHANAN:  We'll stipulate to the date.  But I don't believe that the document is necessary.  I certainly don't believe it has been authenticated properly.

MR. JONES:  Judge, for the Court's -- for the Court's -- the Court had a question as to when these taped

45

statements were made.

THE COURT:  Right.

MR. JONES:  I believe based upon the information that is on the file, it is July 24th.  And let me see if I can see --

THE COURT:  Is that the second one or the first one?

MR. JONES:  Both of them are on July 24th.

THE COURT:  All right.

MR. JONES:  I believe that to be 2015 based upon the conversations that Ms. Dammers had with him about him going up to court.

THE COURT:  So the Government will stipulate that it moved for detention on July 24th also in 2015?

MR. BUCHANAN:  Yes, Your Honor.

THE COURT:  And when was the -- and the detention hearing itself was held on the 29th; is that right?

MR. BUCHANAN:  If that is what the docket reflects, Your Honor.  I have no reason to disagree with that.

MR. JONES:  Judge, I would state in my place based upon looking at the stamp on that tape that it was July 24th.

THE COURT:  What?  The detention hearing?

MR. JONES:  No.  The tape that I just played.

THE COURT:  That is fine.  That is fine.

MR. JONES:  And I submit that it was July 24th, 2015. And if the Government would like to stipulate to that, fine.

46

THE COURT: Will the Government stipulate that in terms of the taped proceeding?

MR. BUCHANAN: That is fine.

THE COURT: All right. And I just have the magistrate's criminal minutes, and they indicate that the preliminary hearing was the 29th of July, 2015, and that is when counsel was appointed also, and it says counsel is appointed -- this was filed -- the minutes of this indicating when the hearing would be on the 23rd of July and indicated that the arrest date was July 24th.

I don't understand quite why the 23rd is there. The arrest date was the 24th, and they were setting the detention hearing for the 29th of July, 2015.

Q.   (BY MR. JONES)   Yes. At some point during that whole process, you were appointed an attorney who has represented you throughout this entire time?

A.   Yes, sir.

Q.   And he is here in court today?

A.   Yes, sir.

Q.   Okay. And you entered a guilty plea in this case, as you said, to kidnapping, Hobbs Act robbery, and 924(c) gun count; correct?

A.   Yes, sir.

Q.   And you actually stated those in your direct examination as to that is what you were charged with and convicted of and

pled guilty to?

**A.**   Yes, sir.

**Q.**   Okay.  So you are clear on that?

**A.**   Yes, sir.

**Q.**   Okay.  Now, as far as the kidnapping, you are looking at a possible penalty of up to life in prison?

**A.**   I believe so.

**Q.**   You believe so?

**A.**   I'm not exactly sure what the charges exactly carry.  But from my understanding, yes, sir.

**Q.**   Mr. Jackson, is there -- Mr. Scott, is not your plea agreement in evidence?

          MR. JONES:  If I may approach, Your Honor?

          THE COURT:  Yes.

          MR. JONES:  Do we have his -- I believe the plea agreement was actually entered into evidence.

          Do we have that?

          COURTROOM DEPUTY CLERK:  If it is the Government's, it will be right there in that stack.

          MR. JONES:  Yes.  Okay.

**Q.**   **(BY MR. JONES)**  Mr. Scott, that is your plea agreement that was introduced into evidence yesterday; correct?

**A.**   I believe this is my plea agreement.  But I'm not sure if it was admitted yesterday.  I'm not quite sure.

**Q.**   You are not sure?

**A.**    Because I don't know what that means, sir.

**Q.**    Okay.  Well, if you look at Page 19, there is a signature line.

        THE COURT:  Don't put your back to the jury or else they might not hear you.

        MR. JONES:  I'm sorry.  Let me take my mask off.

**Q.    (BY MR. JONES)**  If you look at Page 19, there is a signature line; correct?

        THE COURT:  He just says he doesn't know when it was introduced in these proceedings.  You might not have heard him properly.

        MR. JONES:  I'm sorry, Judge?

        THE COURT:  The witness indicated that -- my recollection here is that he didn't know if it was introduced yesterday as opposed to that it was actually executed or when.

        MR. JONES:  Yes.

**Q.    (BY MR. JONES)**  Well, Mr. Scott, this is your plea agreement, and on Page 19 you signed it; correct?

**A.**    Yes, sir.

**Q.**    And you went to court with your lawyer, the same gentleman who is here today, and you entered the plea in front of the judge; correct?

**A.**    Yes, sir.

**Q.**    Correct?

**A.**    Yes, sir.

Q.    Okay.  And I don't want you to go over anything that you and your lawyer talked about.

But your lawyer explained everything thoroughly to you, did he not?

A.    I believe so.  Yes, sir.

Q.    Okay.  Now, if you look at Page -- and you weren't certain when I was asking you before as to what your maximum penalties were.  But if you look at Page 3, Count 4, that is the kidnapping count.

Did you not agree that the maximum term of imprisonment is life?

A.    Yes, sir.

Q.    Okay.  And in regards to Count 5, the maximum term of imprisonment, which is the Hobbs Act robbery, is 20 years; correct?

A.    Yes, sir.

Q.    And then as far as Count 6, which is on the fourth page, the maximum term of imprisonment is life, but there is a mandatory minimum imprisonment of 11 -- of 7 years; correct?

A.    Yes, sir.

Q.    And that 7 years has to run consecutive to any sentence -- other sentence in the case; correct?

A.    I believe so.

Q.    Well, that is what the document says; correct?  C, any term of incarceration imposed on this count must be served

consecutively to any other term of imprisonment; correct?

**A.**   Yes, sir.

**Q.**   So whatever you get on counts -- the two other counts, the gun count, at least seven years of it has to follow that; correct?

**A.**   Yes, sir.

**Q.**   So this would be your sentence on the other counts, and then the gun count wouldn't run along with it like that?  It would have to run after it; correct?

**A.**   Yes, sir.

**Q.**   Now, you had some proffers with the Government once you got your attorney; correct?

**A.**   I'm not sure what that is, sir.  What do you mean proffers?

**Q.**   You met with the Government agents with your attorney and you told them about the case; correct?

**A.**   Yes, sir.

**Q.**   Okay.  Now, did you not tell them in your interview on July 29, 2015, that during the incident you did not have a gun?

**A.**   I'm not sure, sir.  It was so long ago I can't remember my exact words.

**Q.**   Well, let me see if I can show you this and you can read it and it can refresh your memory as to what you did or did not tell the agents.

MR. JONES:  It is to refresh his recollection,

Mr. Buchanan.

Q.   **(BY MR. JONES)**  Now --

THE COURT:  Do you have an objection?

MR. BUCHANAN:  I do.  I would object to Mr. Jones attempting to refresh this witness' recollection with a document that this witness didn't write.

THE COURT:  Is this the one he signed?

MR. JONES:  No, Judge.  It is a -- it is a proffer -- it is an agent's notes of -- it is the agent's notes of his -- of their -- after they met with him.  And I'm attempting to refresh his memory by having him read it.

THE COURT:  All right.

MR. JONES:  Thank you, Judge.

THE COURT:  Then if he says it doesn't help him, that is fine.

MR. JONES:  Exactly, Judge.

MR. BUCHANAN:  We filed a motion about this, but I understand the Court's ruling.

THE COURT:  Okay.

MR. JONES:  Judge, we filed a motion on it, and, you know --

THE COURT:  All right.  We'll deal with that later.

Q.   **(BY MR. JONES)**  Mr. Scott, this is the date -- okay.  Mr. Scott, this is the date that I'm referring to, and this is the statement.  It is not the statement -- the notice.

Now, read just read this line here and there.  Okay?

A.   (The witness complies.)

THE COURT:  So just to be clear with Mr. Scott, Mr. Scott, these are the notes of the FBI agent who was interviewing you.  And just because he wrote it doesn't mean it is true or not true.  But it is just to help -- that is what he wrote as his official record and notes.  And it may help you, or it may not --

THE WITNESS:  Yes, ma'am.

Q.   (BY MR. JONES)  So --

THE COURT:  -- in refreshing your recollection of what happened.

Q.   (BY MR. JONES)  Again, Mr. Scott, just read those lines and just tell me if it refreshes your memory as to whether or not you ever said that you didn't have a weapon during that home invasion.

A.   I remember being asked, but I was so shooken up about being arrested on these charges that I was trying my best to be as honest as possible.

Q.   So on July 29, you were still shaken up and -- about -- because you had been arrested on these serious charges?

A.   Yes, sir.  It was my first time ever dealing with something this -- this big to this magnitude.

Q.   Yes, sir.  Thank you.

How tall are you?

**A.** I'm not sure. I think about 5-9 or something around there.

**Q.** Okay. Who is taller? Mr. Jackson or you?

**A.** Mr. Jackson.

**Q.** How much taller?

**A.** I'm not sure.

**Q.** Well, if I'm six-foot five and you have sort of -- I have been in your face a bit -- and I apologize for that.

But if you look at my size compared to your size, am I like Mr. Jackson's height or was he a little shorter than me or what?

**A.** I'm not quite sure, but I'm pretty sure you are probably around the same height, or he is a little bit taller. I haven't seen him in a long time. It has been six years.

**Q.** Okay. Now, also your plea agreement -- if you testify truthfully and the Government feels that you testified truthfully and substantially assisted them, they are going -- they can make a favorable recommendation to the judge; correct?

**A.** They can't promise me anything, sir.

**Q.** They can't promise you anything. But they can make a favorable recommendation for you if they feel it is appropriate?

**A.** I'm not sure if they can do it or not. I'm not sure, sir. But I haven't been promised anything. I'm in hopes of, but I can't -- I'm not promised anything.

54

**Q.** Well, you understand that the 924(c) count -- that their assistance would be very helpful in that in terms of getting below that mandatory seven years to run consecutive?

**A.** I mean, I believe so.  But --

**Q.** You believe so?

**A.** -- I was not promised anything, sir.

**Q.** You were just -- you just had this plea agreement, which sets it all out?

**A.** I'm not much of a reader, sir.  So I didn't actually go through all the paperwork thoroughly because --

**Q.** But your lawyer did with you?

**A.** I mean, I'm not even quite sure if my lawyer thoroughly went through it with me.  But he did show -- he did go through it with me.  There's things that I have to see for myself.

**Q.** So your attorney is an older man by the name of Bill Morrison.

**A.** Yes, sir.

**Q.** Do you know how many years Mr. Morrison has been practicing law -- criminal defense?

**A.** Not really.

**Q.** Never asked him?

**A.** I mean, he's mentioned it.  But --

**Q.** Excuse me.  I should -- time-out.  My fault.  I can't go into anything -- my apologies, Mr. Scott, for going through anything that your attorney might have told you.  My apologies.

Now, you also gave up your right to appeal in this; correct?

A.   I'm not sure.  I'm not really a lot familiar with the law.

Q.   Well, there is a section on Page 17 that talks about limited waiver of appeal?

A.   Yes, sir.

Q.   Okay.  And basically you give up your appeal, and the only thing you can appeal basically is if you want to come back later and say your lawyer messed up; isn't that true?

A.   I believe it to be true.  But I'm not sure, sir.

Q.   Now, let me show you what has been marked Defendant's 3.

Now, before I do that, Mr. Scott, you went over to talk to -- now, you talked to the FBI folks a number of times during the course of this case, have you not?

A.   I'm not sure who the FBI people are.  And I have talked to a few of the Marshal people.  But I'm not quite sure who all -- what their labels are.

Q.   Well, when you would meet with the -- with the folks that you talked to, was your attorney with you?

A.   Yes, sir, for the most part.  Yes, sir.

Q.   Okay.  Now, at one point -- and this was recently -- July 22nd, they showed you a gentleman -- actually it was Mr. Burke, wasn't it?  Didn't Mr. Burke show you your phone, the gentleman seated right here?

A.   Yes, sir.  I have saw my phone.  Yes, sir.

Q.    Okay.  Is this the gentleman who showed you the phone?

THE COURT:  Do you want him to take the mask off so you can see his face?

THE WITNESS:  Yes, sir.

Q.    **(BY MR. JONES)**  Had you spoke with Mr. Burke before?  Do you remember?

A.    I'm not sure.

Q.    Okay.  Now -- and you gave them the password, and they downloaded your -- your phone, correct, and got all of the stuff out of your phone?

A.    I gave them my password to my phone immediately when I was caught the very first day.

Q.    Did you give it to them again on the 22nd of July again this year?

A.    Yes, sir.

Q.    And that is where these pictures of the handguns come from; correct?

A.    Yes, sir.

Q.    This comes from your phone, and this comes from your phone; correct?

A.    Yes, sir.

THE COURT:  When you say this, do you want to just simply indicate the exhibit number?

MR. JONES:  I'm sorry, Judge.  I apologize, Your Honor.  I'm not being exact.  My apologies.

Q.    (BY MR. JONES)  Government's Exhibit 20 is a photograph that came from your phone; correct?

A.    Yes, sir.

Q.    Government's Exhibit 19 is a photograph that came from your phone?

A.    Yes, sir.

Q.    Government's Exhibit 21 --

A.    Yes, sir.

Q.    -- came from your phone; correct?

A.    Yes, sir.

Q.    Now, let me show you -- let me show you Defendant's Number 3.

Let me ask you:  Did these come from your phone?

A.    I believe so.  Yes, sir.

MR. JONES:  Okay.  Move to introduce Defendant's Number 3.

MR. BUCHANAN:  No objection.

THE COURT:  It is admitted.

Q.    (BY MR. JONES)  Page 1 -- both of these pages show you holding money?

A.    Yes, sir.

Q.    Okay.  Now, did you take that picture -- you described how you took the picture of your -- of this handgun?  That you basically held the handgun in your left hand and you took a picture of it?

**A.**    Yes, sir.

**Q.**    Is that sort of like a souvenir of the occasion?

**A.**    Sir?

**Q.**    Was it like a souvenir of the occasion, a momento, something to remember that you had this gun in your hand?

**A.**    No, sir.  It was just a being young thing, and I just took a picture.  It didn't really have a meaning behind it.

**Q.**    Did it have any meaning behind it when you took this picture of you holding the money?

**A.**    No, sir.  Just me posting pictures and taking pictures.

**Q.**    Well, the handgun was used when you held up that -- that -- those folks in their home; correct?

**A.**    Yes, sir.  But that picture was tooken way before.

**Q.**    And the money -- was that taken by you of the money that you had taken from these folks?

**A.**    No, sir.  That money could have came from a number of places.  I also worked and did other things for money.  So that could have been a picture from way before the robbery even took -- took place.

**Q.**    But it could have been money that you got from the robbery or from when you pawned the ring; correct?

**A.**    No, sir, I don't believe so.

**Q.**    Okay.  Fair enough.

        MR. JONES:  Judge, I'm -- I'm winding down here, if the Court could just give me a moment.

THE COURT:  Sure.

MR. JONES:  Let me just confer with Mr. Redmond.

**(There was a brief pause in the proceedings.)**

Q.  **(BY MR. JONES)**  Mr. Scott, I appreciate your time.  You have stated that you hope that your testimony in this case will benefit you when it comes time to be sentenced before Judge Totenberg; correct?

A.  That's the only thing I can do is hope.  But I haven't been promised anything, and I -- they explained to me that they cannot promise me anything.

Q.  Right.  Yes.  Okay.  But you also now have a new concern, do you not, about criminal charges that could come back to hurt you in the future either on the state level or the federal level?

A.  No, sir.

Q.  No?  Are you not under investigation by the FBI or are you not under federal investigation for an alleged sexual assault on your roommate when you were in the Butts County jail in Jackson, Georgia?

A.  I was questioned.  But from my knowledge, I have not been charged with anything.  There was not any video, audio, or DNA.  And from my concern, I haven't been given a court date, I haven't been served any papers, and I agreed to the -- the interview.  But I haven't been charged with anything.  I haven't heard anything else about it.

Q.    So you are very clear about that there is -- you have been questioned, that there is no video, there is no DNA?  You are clear on that?

A.    Because I agreed to the interview.

Q.    Okay.  But you are being investigated based upon allegations that you repeatedly raped and sodomized your roommate; correct?

A.    Not from my knowledge that I have been charged with anything.

Q.    I didn't say you were charged.  But you are under an investigation; correct?

A.    I'm not sure if I'm under investigation, but I was interviewed.

Q.    Okay.  Well, might not you be hoping that if you do a good job in your testimony here that the Government might -- might see a way to put in a good word for you down in Butts County or not prosecute you federally?  Has that ever come to your mind?

A.    I'm not sure I understand, sir.

Q.    I think you do.  But let me ask it again.

      Aren't you not -- with your testimony today, you know you've got trouble.  You've got more potential trouble.  And aren't you hoping that your testimony today could benefit you by somebody putting in a good word -- the Government -- for you in regard to this case?  Is that not true?

A.    Most definitely not, sir, because I'm not worried about

that.  I know I didn't do anything.  So I'm not worried about anybody putting in a good word for anything.

Q.    You're not worried about it?

A.    No, sir.

Should I be?

From my understanding, I haven't been charged with anything.  So I shouldn't be worried about anything.

Q.    I can't -- Mr. Scott, I can't answer that question about should you be worried.

But I suggest to you that you are worried and that is the truth of the matter.

MR. BUCHANAN:  Your Honor, is this a question?

MR. JONES:  It is a question.

Q.    **(BY MR. JONES)**  I suggest to you that you are worried, and that is the truth of the matter.

A.    I'm not sure I understand.

Are you suggesting that I should be worried or I should --

THE COURT:  All right.  That is enough.

THE WITNESS:  I'm not sure.

MR. JONES:  I'll move on, Judge.  No further questions.

MR. BUCHANAN:  May I, Your Honor?

THE COURT:  Yes.

REDIRECT EXAMINATION

BY MR. BUCHANAN:

Q. Mr. Scott, a few moments ago, Mr. Jones showed you, I believe, Defendant's Exhibit 3, which is a page of you holding money from your phone.

A. Yes, sir.

Q. Do you remember? Do you recall you used that blue phone to take that picture that was in the Government's exhibit yesterday?

A. I believe so.

Q. And do you recall what your phone number was?

A. It was six years ago. I'm not exactly sure what the number was. But if I seen it, I'm pretty sure I would recognize it.

Q. I'll show you this document and see if it refreshes your memory of what your phone number was.

THE COURT: What is the document?

MR. BUCHANAN: It is a Metro PCS phone record.

THE COURT: Okay.

Q. (BY MR. BUCHANAN) Does that refresh your memory about what your phone number was?

A. I believe so. I believe it was the 801-9832.

Q. What is the area code on it?

A. 901.

Q. Just state the number for me, again, please.

A. (901) 801-9832.

Q. Thank you. You believe that is the number that you were

using associated with that phone that took the picture that is in Defendant's Exhibit 3?

A.   Yes, sir.  I believe so.

Q.   Now, Mr. Scott, Mr. Jones asked you a couple of questions about your height, Mr. Jackson's height, and your cousin's height.

Are you taller than Mr. Redmond?

A.   Yes, sir.

Q.   And are you shorter than Mr. Jackson?

A.   Yes, sir.

Q.   I believe you said you are roughly 5-9?

A.   Yes, sir, I believe so.

Q.   Mr. Scott, how long did the -- if you recall, the Megabus from Memphis take to get to Atlanta?

A.   I can't remember exactly how long it was.  But --

MR. JONES:  Your Honor, I don't believe this was brought up in cross.  It sounds like more direct to me.  I would object.

MR. BUCHANAN:  I can move on.  He said he didn't know.

THE COURT:  All right.

Q.   (BY MR. BUCHANAN)  Mr. Scott, after you were arrested, you began talking with law enforcement almost immediately; is that correct?

A.   Yes, sir.

Q.   And Mr. Jones went through several interviews that you conducted with law enforcement members; is that right?

A.   Yes, sir.

Q.   And some of that was right after your arrest; is that correct?

A.   Yes, sir.

Q.   And then more of that continued after you got a lawyer; is that correct?

A.   Yes, sir.

Q.   Just so we're clear, your lawyer is Mr. Morrison who is seated back in the front row; is that correct?

A.   Yes, sir.

Q.   And Mr. Morrison has been present for a number of your interviews; is that correct?

A.   Yes, sir.

Q.   Now, Mr. Scott, you have known Brandon Redmond for quite a while; is that correct?

A.   All my life -- well, all his life.

Q.   Because you are older; is that right?

A.   Yes, sir.

Q.   And Mr. -- Mr. Jones on cross-examination asked you about the times when you were asked about Mr. Redmond.

     Do you recall that?

A.   I don't understand, sir.

Q.   I'm sorry.  I asked a bad question.

Mr. Jones on cross-examination, he asked you about those times back in 2015 when law enforcement asked you about your cousin Brandon?

A.    Yes, sir.

Q.    And was it difficult even back then to talk to law enforcement about your cousin Brandon?

MR. JONES:  Objection.  Leading.

THE COURT:  Sustained.  You can rephrase the question.

Q.    (BY MR. BUCHANAN)  How do you feel -- how did you feel back in 2015 about testifying or talking to law enforcement about your cousin Brandon?

A.    I mean, I'm a young man.  I did not want to snitch on my cousin or tell on my cousin at the time.  And I was still trying to take in how much time I was facing, how much trouble I was in.  But I decided to tell the truth.

Q.    And so you mentioned that when it was difficult.  Is it difficult for you now to testify in front of this jury --

MR. JONES:  Objection.  Leading, Judge.

MR. BUCHANAN:  The question was is it.

THE COURT:  I think that you are suggesting the answer.  So rephrase the question.

Q.    (BY MR. BUCHANAN)  How do you feel about testifying in front of this jury about your cousin Brandon?

A.    Terrible.

Q.   Has it caused issues for you with your family?

A.   Yes, sir.

Q.   Is it your intention to mislead this jury?

A.   No, sir.

Q.   Who and only who decides what your sentence will be?

A.   The judge.

Q.   Judge Totenberg?

A.   Yes, sir.

Q.   Now, Mr. Scott, Mr. Jones talked with you about the charges that you're facing.

     Do you remember that?

A.   Yes, sir.

Q.   And he -- the charges that you are facing -- Mr. Jones went through portions of your plea agreement related to those charges.

     Do you remember that?

A.   Yes, sir.

Q.   And you are charged in the same case as your cousin?

A.   Sir?

Q.   Are you charged in the same case as your cousin Mr. Redmond?

A.   Yes, sir.

Q.   The robbery to which you pled guilty, holding up the people with the brown gun, that occurred on May 25th, 2015; is that correct?

**A.**    I'm not sure of the exact date.  But it sounds about right.

**Q.**    And are you aware that the robberies that your cousin is charged with happened after that?

**A.**    Yes, sir, I believe so.

**Q.**    Now, Mr. Scott, have you had any conversations with Mr. Redmond about the robberies that he is charged with that allegedly occurred on June 12th, June 17th, and June 21st?

**A.**    I haven't talked to my cousin in six years.  I'm not allowed to.

**Q.**    Prior to your arrest?

**A.**    Yes, sir.

**Q.**    Did you talk with Mr. Redmond about the robberies that are in your indictment?

**A.**    Yes, sir.  Way before I was --

        MR. JONES:  Your Honor, I'm going to object.  And the Government is sailing very close to the issue that we've discussed before.  And I object.  And we renew that previous motion.

        THE COURT:  Counsel, would you come up here?

        **(A bench conference ensued, as follows:)**

        THE COURT:  What question are you thinking -- is Mr. Buchanan expecting to pose at this point?

        MR. BUCHANAN:  My question is:  Did you have any conversations with Mr. Redmond about the robberies that are

68

charged in this case?

THE COURT:  Well, you already asked that before.  So that is the problem.  You did ask it.  That is how we got into the problem.

MS. MORRIS:  These are the ones in the case.

MR. BUCHANAN:  If I may, Your Honor, I think that the question that was the subject of that discussion was about robberies outside of this indictment, which the Court likened to Rule 404(b).  That is not robberies outside the indictment.  I'm specifically only asking about --

THE COURT:  No.  Are you asking before was that like your experience.

MR. BUCHANAN:  That is the -- that is the old -- I'm not asking that question right now, Your Honor.

THE COURT:  So how does this -- how is this rebuttal testimony here at this point?  I mean, what has Mr. Jones raised that this is the rebuttal to?

Because it sounds like it is basically going back to establishing what their conversations were from the beginning.  I didn't think he touched that.

MR. BUCHANAN:  I think he touched a lot about Brandon's involvement.  His cross was a lot about things that Mr. Scott said that whether or not Brandon was involved -- Mr. Redmond was involved in these other robberies.

And so I believe that I'm entitled to be able to ask

him whether or not he had any specific conversations with Mr. Redmond about Mr. Redmond's involvement solely in the charged conduct.

THE COURT:  Well, I said -- what does counsel feel?

MR. JONES:  Judge, they made it crystal clear yesterday that he had discussed with Redmond robberies other than the ones in this case, which were before May 25th.

THE COURT:  Yes, I understand.

MR. JONES:  Now what he is doing is coming in and talking about did you specifically talk about the ones in this case.  Well, the jury already knows -- has heard them talking about others.  It is just highlighting it.

I don't know if I'm making myself clear.  Because that is what -- so now the jury is thinking, oh, well, he didn't talk to him about the ones that we're dealing with today.  But he talked to him about the other ones which occurred before he came, which you heard before May 25th and Mr. Scott came to Atlanta.

I just can't believe that the Government is taking this chance with a mistrial.

THE COURT:  I'm not going to allow it because I think it does highlight that, and we're trying -- I couldn't give an effective curative instruction.  So I don't want to get to this.

MR. JONES:  Judge, I'm renewing the mistrial motion.

MR. BUCHANAN:  As I understand the Court's instruction and the concern of defense counsel, it was for conversations about uncharged conduct.

THE COURT:  Right.

MR. BUCHANAN:  My question was specifically about charged conduct.

THE COURT:  And I understand that.  But what he argues is that now let me focus you on the conversations you had about robberies that happened after yours.  Well, what he said -- what counsel argues is now that you are basically highlighting the fact that the conversation before that you brought out was for about events preceding it, which shouldn't have been -- shouldn't have been introduced without a 404(b) notice.

So that is -- that is the argument.  If you want to ask, figure out a different question.

MR. BUCHANAN:  I want to preview my question.  So my question will be:  After his -- he came back from the robbery in May of 2020 -- May 25th, did you remain in communication with Mr. Redmond?  That will be my question.

MR. JONES:  He's already asked that, Judge.

MR. BUCHANAN:  I have not asked that.

MR. JONES:  He's answered, Judge.  He needs to leave it alone.  He really does.

THE COURT:  Because you -- because he was in

communication because that is when he testified -- when he testified about --

MR. JONES: He just needs to leave it alone.

THE COURT: Because anything here is going to sour this because that is what the last question is he came back from May 25th, he talked with him at that -- with his cousin at that time. So everyone knows that.

MR. BUCHANAN: Okay.

THE COURT: Let me just say one other thing. In bringing out that the Court is the ultimate decider, which is certainly true about the sentence, I think that it does misrepresent the fact that only the Government can recommend it. I can't give a sentence that goes underneath the mandatory minimums and give cooperation without your -- without the Government's recommendation.

MR. BUCHANAN: I'll happily -- be happy to clear that up.

MS. MORRIS: Well, I think that is a difficult thing to clear up for the witness because he doesn't know that. That is a legal issue. I would rather --

THE COURT: I just think it is in the plea agreement.

MR. BUCHANAN: I can go --

MS. MORRIS: Maybe the Court could explain, or you can ask him.

MR. JONES: Did the Court rule on my motion?

THE COURT:  Your mistrial motion?

MR. JONES:  Yes.

THE COURT:  I'm going to deny the mistrial motion.

MR. JONES:  Yes, ma'am.  Thank you.

**(The bench conference was thereby concluded.)**

MR. BUCHANAN:  May I, Your Honor?

THE COURT:  Yes.

Q.   **(BY MR. BUCHANAN)**  Mr. Scott, during your cross-examination, there was questions about your desire or you wanting to have the Government recommend to the Court that you receive a lighter sentence.

Do you recall that?

A.   Yes, sir.

Q.   And I believe your testimony -- well, do you want the Government to recommend a lighter sentence for you?

A.   I'm hoping for a lighter sentence for mercy.

Q.   All right.  Mr. Scott, let me ask you one last question. Mr. Redmond talked about -- I mean, Mr. Jones asked you about holding up that family with that brown gun.

Do you recall that?

A.   Yes, sir.

Q.   Are you sorry for what you did?

A.   Yes, sir.

THE COURT:  All right.  Ladies and gentlemen, I just want to explain one thing regarding the exchange between

counsel and the witness regarding the adjustment in the sentence and it ultimately being my decision as the judge.

And that is true but true in part. Because in terms of cooperation, a witness can only receive an adjustment under the mandatory sentences that would go underneath that if the Government, in the first place, recommends that cooperation credit be given. Then it is up to the judge to decide whether to give the credit and how much the credit is.

But a precondition for the Court's consideration of that downward adjustment is that there actually be a recommendation of cooperation from the Government.

And I don't normally go through this, but I think it could be confusing otherwise.

Is there anything else that you wish to follow up on, Counsel?

MR. JONES: In regards to Mr. Scott, no, Judge. I have no more questions -- I have no more questions for the gentleman, Your Honor.

THE COURT: Thank you.

May this witness be excused?

MR. BUCHANAN: Yes, Your Honor.

THE COURT: Mr. Scott, I would direct you not to discuss your testimony with anyone until the conclusion of the trial.

Thank you very much. Somebody will pick up that --

74

is that your exhibit?

Would you take -- would you take the bag, and you can dispose of it wherever there is a garbage -- yes.

Who is your next witness?

MS. MORRIS:  The Government calls Jim Terry.

MR. JONES:  I'm sorry.  I didn't hear the name.

MR. BUCHANAN:  Jim Terry.  Thank you.

COURTROOM DEPUTY CLERK:  Please raise your right hand.

**(Witness sworn)**

COURTROOM DEPUTY CLERK:  Please have a seat.  Loudly and clearly state your name, and please spell your last name for the record.

THE WITNESS:  Jim Terry.  T-, as in Tom, E-R-R-Y.

Whereupon,

                    JIM TERRY,

after having been first duly sworn, testified as follows:

                DIRECT EXAMINATION

BY MS. MORRIS:

Q.  Good morning, Mr. Terry.  I'm going to take you back to the day of June 12th, 2015.

Do you remember that day?

A.  Of course.

Q.  Back on that date, where were you living?

A.  Stone Mountain, Chartwell Trace, 1822.

75

Q.   And who did you live with at that time?

A.   John Porter.

Q.   And you said of course when I asked you why do you -- do you remember that day.

Why did you answer in that way?

A.   Because that was one of the most horrible days of my life.

Q.   Let's start with the events that made it such.

Please describe to the jury what happened, if anything, out of the ordinary on that day.

A.   Well, it was the evening.  It was getting dark.  I was coming home.  Unloaded my Sprinter.  Put everything away.  Went upstairs.  Changed my clothes because I had been at work all day.

Q.   Sir, what kind of work do you do?

A.   I work with the military.

Q.   And you were -- so you were unloading your Sprinter.  Is that a vehicle you use for work?

A.   It is.

Q.   And so what did you do after you changed clothes?

A.   Went downstairs.  John was downstairs watching TV.  So I went down to basically let him know I was home and that I was finished and we were going to watch TV downstairs.

I was down there for about maybe three minutes at the most.  I heard something fall.  We had a big painting on the wall upstairs, and I thought it was the painting.

But before -- as soon as it fell, then we heard a big loud sound, like the back of the house was coming in.  The back of our house is glass mostly.

And do you want me to go on from there?

Q.    So let me stop you quickly.

MS. MORRIS:  Ms. Toussaint, could you please put on the screen the admitted Exhibit 25.

Q.    **(BY MS. MORRIS)**  If you could, take a look and let us know if you recognize this, Mr. Terry.

Do you recognize that?

A.    I do.

Q.    What is that?

A.    That is the back door of our house.

MS. MORRIS:  And, Ms. Toussaint, if you could show 26.

Q.    **(BY MS. MORRIS)**  Do you recognize this?

A.    I do.

Q.    What does that show?

A.    That shows the glass all over in our sun room that went on into our kitchen area.

Q.    So you just -- you were just describing the fact you heard a very loud noise.  It sounded like a painting and that the back of your house was glass.

So what happened after you heard these noises?

A.    We at that point knew that someone was breaking in.  I

77

mean, we knew it at that point.  So we got up.  John went over to the fireplace and picked up the fire poker.  We started up the stairs.

And as we were starting up the stairs -- I think before that, he actually, which I did not know that he had done, pushed our panic button, which is at the bottom of the stairs.  And then we started up the stairs.  As soon as we started up the stairs, the two guys came around with the guns pointed at us.

Q.    And what did these two men -- two guys look like?

A.    One was taller.  One was short.

Q.    Could you see their faces?

A.    I could not see their faces.  I could see their eyes.

Q.    Okay.

A.    And their voices.

Q.    Why couldn't you see their faces?

A.    Because they had them covered with a covering.

Q.    And you say one was tall and one was short.

Do you have a recollection of how big of a difference there was between their heights?

A.    I would say several inches difference.

Q.    So what happened -- what else did you note about them -- their appearances or anything they may have been carrying?

A.    Well, they both had guns in their hands pointed straight at us.

Q.    And what happened when you encountered them?

A.    They turned us around and told us to go downstairs.  We went downstairs in the bar/TV area.  They immediately wrapped me in a blanket.

The shorter one and younger -- he was younger, I think, than the other one.  Appeared to be from what I could tell.  And he held a gun to my head and kept saying that he was going to blow my brains out, he was going to shoot me if I didn't shut up, and just went on and on screaming at the top of his lungs he was going to kill me.

Q.    Was he asking you for anything at this point in time?

A.    Yeah.  They were asking for money and jewelry.  They wanted to know where the money was.

Q.    And can you estimate how long that this went on that you were wrapped in a blanket with a gun put to you and being told that you were --

A.    Well, it felt like it was hours.  But afterwards, we found out the whole thing was probably 10 or 15 minutes before the police got there.

Q.    So what happened -- did the individual -- the shorter individual who was threatening to kill you, did he tell you anything about where he was from or what he wanted or who he was associated with?

A.    He just kept saying at one point that they were part of the Black Panthers and that we were going to pay for what we

79

did to them.

Q.   Now, did you know at this point when you were wrapped in the blanket what was happening with your partner?

A.   I had no idea.  Because as soon as I was wrapped in the blanket, I couldn't see and John was gone with the other guy. He had taken John -- the other guy had taken John upstairs.

Q.   So at some point, did something happen that caused you to be unwrapped or taken or moved somewhere?

A.   When they got -- when they -- the tall one brought John back downstairs, they started unwrapping me and told me they were going to take me upstairs to make sure that they had everything that John had shown them and that there was nothing else that they could get in the house.

Q.   At this point in time, did you -- were you able to see John?

A.   I could not see John until they started unwrapping me. And as they were standing me up, the one was shoving John to the ground and the blood was dripping from his head.  And I didn't know what had happened or what they had done to him at that point.

Q.   So did the taller robber take you upstairs?

A.   Yes, he did.

Q.   What happened during that process?

A.   He took me upstairs and basically said I want to make sure that we have everything and that there is nothing else here.

They wanted money.  They wanted jewelry.  They didn't want anything but money or jewelry.

And so the only money that amounted to anything that I knew we had was some silver dollars that my mother had left me. We had several silver dollars in a bank bag.  And when we went up there into the bedroom, the drawer was open, they were gone. And I said, well, you have everything.  That is all that I know of that we have.  And I had a ring.  They took my ring.

And that was -- at that point, he said, okay, we're going to go back downstairs, we're going to go to the ATM next.

Q.    Now, did you understand why you were going to the ATM?

A.    Yeah.  Because they wanted money.

Q.    And were they specifically discussing taking you to the ATM?

A.    They were going to take us both to the ATM.  They were going to take us one at a time to the ATM.

Q.    Do you remember which of the robbers was discussing or talking about the ATM with you?

A.    Both of them were talking about it.

Q.    Now, were you ever taken to the ATM by the armed robbers?

A.    No.  Because the minute that we looked in the drawer and I told him there is nothing else here, he said, okay, we're going to go to the ATM now.  We turned around.  He pointed me and said start walking downstairs.

As we got to the doorway -- excuse me -- the lights were

shining through the -- from the street into the windows.  And he said to me, is that the police?  And I said yes, it is.  And he hightailed it out of there screaming at the guy downstairs, we've got to go, the police are here.

Q.   And what did you do at that point?

A.   I ran out the front door because I knew the police was there.  I had no clue where John was, if they had done anything to him.  I just knew I was right at the front door and they were going out the back.  I went out the front.

Q.   And did you -- was it, in fact, the police outside --

A.   Yes, it was.

Q.   -- on the driveway?

I'm going to show you what has already been admitted as Government's Exhibit 31.

     MS. MORRIS:  Ms. Toussaint, thank you.

Q.   **(BY MS. MORRIS)**  If you could just take a look at the screen.  Do you recognize the person in this photograph?

A.   I do.

Q.   And who is that?

A.   John Porter.

Q.   And is that how John looked that night?

A.   It is.

They hit him over the head with the fire poker.

     MS. MORRIS:  Thank you, sir.  That is all the questions I have for you.

82

CROSS-EXAMINATION

BY MR. JONES:

Q.   Good morning, Mr. Terry.  My name is Derek Jones.  I'm the defense attorney in this case.  I have a few questions for you, sir.

A.   Okay.

Q.   Now, when you were -- when the people broke in and you were being taken to a place, you said there was one person who was talking about that they were Black Panthers and you were going to pay for what they did?

A.   Correct.

Q.   Was that one or both of them?

A.   It was the shorter one.

Q.   And did they mention any other -- did they say that they were from Chicago -- Black Panthers from Chicago, if you recall?

A.   I don't recall where they said they were from.

Q.   Did they mention any other, shall we say, racially charged incidents that had occurred around that time, for example, like Trayvon Martin?

A.   I don't recall.

Q.   Okay.  And the items that were taken -- there was a platinum ring, and that was your ring, sir?

A.   Correct.

Q.   Have you ever seen that ring since?

83

**A.**    No.

**Q.**    It wasn't returned to you by the police?  To the best of your knowledge, the police don't have it in evidence to be used in the case?

**A.**    If they do, I'm not aware of it.

**Q.**    And then there was -- what? -- $500 in currency?  About that?  Or was it more or less?

**A.**    You mean counting the silver dollars?

**Q.**    No, not counting the silver dollars.

**A.**    I think it is about right.  I didn't have any.  So whatever John had would have been what -- yeah.

**Q.**    And Mr. --

**A.**    They stole cash.

**Q.**    Your partner, he testified earlier.  And so we -- but he would be the one who knew about the amount of money that was --

**A.**    The amount of money.  Because I had no cash on me that night.  So if there was cash, it was his.  The only thing I had was the silver dollars from my mom and my ring.

**Q.**    And your ring that was taken?

**A.**    Correct.

**Q.**    And the silver dollars were -- was it 10 or 15 of them or so?

**A.**    I honestly had never counted them.  There was a bag. There could have been 20 or 30.  I never really counted.  My mom had passed away not too long before that.  And it was

just -- she had left them for me.  And I had them in a bank bag upstairs.  They were very old.

Q.    Would it be a fair statement that the value of the dollars would exceed the face amount?  I mean, a silver dollar is one dollar.  But --

A.    By far.

Q.    By far.  So they were valuable silver dollars that were taken?

A.    Yes.

Q.    Now, the police came quickly but yet were unable to catch the perpetrators on the scene?

A.    Correct.

Q.    Okay.  Do you -- did they ask you if you had video cameras around the house that might have -- security cameras outside that might have seen anything?

A.    I believe they did ask that question.

Q.    Did it appear that they did a thorough job in terms of, you know, looking for any sort of physical evidence that could -- found on the scene that somehow could be linked later to a perpetrator?

A.    They were there for several hours after it -- after the crime.  And it seemed to me that they were doing a very good job.

Q.    Do you know whether or not they made inquiries in the neighborhood as to, you know, was there -- did, you know,

neighbor, Mr. Smith, have a video camera that might have saw something?

A.    I do not know that.

Q.    And did they ask -- they talked to you about the description of the people; correct?

A.    Yes, they did.

Q.    Okay.  Did you ever tell the detectives that the smaller man had a small hump in his back?

A.    If I did, I don't recall saying that.

MR. JONES:  Your Honor, if I could just briefly approach the witness to see if I can refresh his memory.

THE COURT:  Yes.

MR. JONES:  Excuse me while I get my mask on.  I'm trying to be conscious about this social distance.

Q.    (BY MR. JONES)  Let me show you this.  It is a document that I got from the Government.

THE COURT:  Speak up.

MR. JONES:  I'm sorry.

THE COURT:  That's all right.  Just speak up when you have the mask on.

Q.    (BY MR. JONES)  Mr. Terry, this is one of the police reports that was provided for me or police statement.  In regards to whether or not the person had a hump or not, just review it, let me know if it refreshes your memory, and we'll go from there.

And this is specifically what I'm asking about.

A.   Actually, it does refresh my memory.  I had forgotten that until you read it.  But I do remember that.

Q.   And the small hump was where on the man's back?

A.   I would say --

THE COURT:  Again, you have got to either speak up or take off the mask.

MR. JONES:  I'm sorry.  I'm just so not --

THE COURT:  I understand.

MR. JONES:  -- used to working in a mask, Judge.

THE COURT:  I understand.

So just ask the question again so the jury can hear it.

A.   I think I understood the question.

Q.   (BY MR. JONES)  I think I might have interrupted you. Where in the back was the small hump?

A.   I'm not sure I can point.  But right in here somewhere.

THE COURT:  Can you turn around a little bit so that the jury can see you?

THE WITNESS:  Right in here.

Q.   (BY MR. JONES)  Sort of about midway in your back.  So the smaller gentleman had a hump on his lower part of his back?

A.   Not the lower part.  It was more the upper.

Q.   The mid part?

A.   Yes.

Q.   Mid part of his back.  I'm sorry.  Okay.

MR. JONES:  Judge, if I could just go through my notes.  I'm winding down here.

**(There was a brief pause in the proceedings.)**

MR. JONES:  Excuse me, Mr. Terry.  I'll be finished in a moment.

Q.   **(BY MR. JONES)**  Now, there was actually a K-9 tracking dog that was brought in at some point?

A.   I believe so.

Q.   Okay.  And they recovered a dropped 20-dollar bill?

A.   There was a 20-dollar bill.  It was laying in our rose garden.

MR. JONES:  Thank you, sir.  No further questions, Your Honor.

MS. MORRIS:  Nothing further for Mr. Terry.

THE COURT:  Thank you.  You are going to be excused. Please don't discuss your testimony with any other witnesses or anyone else involved in the case until the conclusion of the trial.

And thank you very much.  I think that -- I see Mr. Porter here.  And obviously the two of you can talk in privacy.  He has been present.  So that is something different.

THE WITNESS:  All right.

THE COURT:  Who is the Government's next witness?

MR. BUCHANAN:  Mark Mansfield, Your Honor.

THE COURT:  I'm sorry?

MR. BUCHANAN:  The United States calls Mr. Mark Mansfield.

COURTROOM DEPUTY CLERK:  If you would, please raise your right hand.

**(Witness sworn)**

COURTROOM DEPUTY CLERK:  Please have a seat.  Loudly and clearly state your name, and please spell your last name for the record.

THE WITNESS:  Mark Mansfield, M-A-N-S-F-I-E-L-D.

MR. BUCHANAN:  May I, Your Honor?

THE COURT:  Yes, you may.

Whereupon,

MARK MANSFIELD,

after having been first duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. BUCHANAN:

Q.   Mr. Mansfield, back in June of 2015, where did you live?

A.   105 Blackland Road.

Q.   Is that here in Atlanta?

A.   Yes.

Q.   Sir, if you can pull that -- you can pull yourself or you can pull that microphone closer to you and help us with hearing.

And specifically did you live at 105 Blackland in June of

2015?

A.    Yes.

Q.    And, Mr. Mansfield, who lived there with you at 105 Blackland in June of 2015?

A.    Toni Moceri.

Q.    And were you and Ms. Moceri home on the evening of June 21st, 2015?

A.    Yes.

Q.    And do you remember anything particular that happened that day?

A.    Well, that is the night of the robbery.

Q.    Please tell the jury what happened during that robbery.

A.    Well, I had just gotten home from a wedding reception and was sitting in my garage, as I do -- did quite often back then, smoking a cigar with my garage door open.  And a few minutes after I got out there, two people walked around the corner and put a gun to each side of my head.  Immediately asked -- I had an expensive watch on my wrist.  And I had, I think it was, $500 cash in my pocket.  They immediately asked for that.  And, you know, kept the gun to your head, poking the gun in the back of your head.  Asked if anyone was in the house.

        I said no.  And one of them went into the house and found Toni asleep.  And the other one stayed out with a gun to my head.

Q.    Let me show you what I have marked as Government's

Exhibit 23.

MR. JONES:  Go ahead, Mr. Buchanan.

Q.   **(BY MR. BUCHANAN)**  Mr. Mansfield, take a look at Government's Exhibit 23 and tell me if you recognize that item.

A.   Yeah.  That was my -- that is my smoking chair and obviously my cigars sitting there.

Q.   Does that fairly and correctly show how it looked right when the robbery happened?

A.   Yeah.

MR. BUCHANAN:  Your Honor, we move for the admission of Government's Exhibit 23 into evidence.

MR. JONES:  No objections, Your Honor.

THE COURT:  It is admitted.

Q.   **(BY MR. BUCHANAN)**  So, Mr. Mansfield, after one of the robbers went inside and the other one stayed with you -- is that what you said?

A.   Yes.

Q.   And eventually did you go back into the residence?

A.   I did.

Q.   And tell the jury how that happened.

A.   They -- during the time that I was still out there by myself, I heard Toni back there crying and all that.  And, you know, the timelines I can't be exact.  But it seemed like it was around 30 minutes when they came back out to get me.

They brought me back into the bedroom and told me to lay

down on the floor.  And then they put a blanket over me where I could not see anyone.

Q.    And when they brought you back in, did you see the robbers still with the guns?

A.    No.  I did not see them after they initially came around the corner when I was in the garage.  They were always behind me or had something over my head, poking the gun in your head.  And if I tried to reason with them, they would immediately say, if you say another word, I'm going to blow your Fing head off.

Q.    And did they ask for any -- I think you testified a second ago they took your watch; is that correct?

A.    Correct.

Q.    Did they ask or demand any other items?

A.    Well, I gave them my wallet.  And, you know, they took the cash out of it and I think threw the wallet over across the garage.  I can't remember exactly.

But they did not ask me specifically for anything after they got my watch and my cash.  They did ask if there was a safe in the house.  Yeah.

Q.    And do you recall whether or not they -- did they ask you or take you to any other parts of your house other than where you were placed on the floor?

A.    No.

Q.    Mr. Mansfield, I'm going to back up with what I have marked as Government's Exhibit 39.

MR. BUCHANAN:  Your Honor, Government's Exhibit 39 is a firearm.  It has been checked by the Marshal Service.  It has been rendered safe with a zip tie.

THE COURT:  All right.  Thank you.

Q.   (BY MR. BUCHANAN)  Mr. Mansfield, take a look at Government's Exhibit 39 and let me know if you recognize that item.

A.   That is very familiar.  I mean, that appears to be my gun that was by my bed.

MR. BUCHANAN:  Your Honor, we move for the admission of Government's Exhibit 39 into evidence.

MR. JONES:  No objections, Your Honor.

Q.   (BY MR. BUCHANAN)  So you recall --

THE COURT:  It is admitted.

Q.   (BY MR. BUCHANAN)  -- Mr. Mansfield, prior to the robbery purchasing this Taurus firearm?

A.   Yes.

Q.   And do you recall whether or not it was stolen during this robbery?

A.   Yes, it definitely was.

Q.   And then after it was recovered, did you confirm that firearm with the police?

A.   Yes.  The serial number.

MR. BUCHANAN:  Nothing else for this witness, Your Honor.

THE COURT:  Thank you.

MR. BUCHANAN:  May I show the jury this firearm?

THE COURT:  Yes.

CROSS-EXAMINATION

BY MR. JONES:

Q.    Good afternoon, sir.

A.    How are you?

Q.    I'm well.  Thank you.

Just a few questions.  The holdup men took cash out of your wallet.  And I believe you said it was how much -- how much cash was in your wallet approximately?

A.    Approximately $500.

Q.    But no credit cards were taken?

A.    No.

Q.    And they also -- there was also a number of items taken from your residence?  Clothes, handbags, shoes, that sort of thing?

A.    Correct.  That was -- I mean, Toni's personal belongings.

Q.    And what sort of items were taken?

A.    Jewelry, her watch, lots of expensive handbags, purses.  I think a speaker -- you know, a bluetooth speaker was taken.

And she can tell you better on her personal belongings. But that was basically --

Q.    I assume the lady will be testifying, and I'll defer to her on these specifics.

94

But to be -- to be concise about it, a large number of expensive items were taken from the home?

A.    Yes.  Very expensive.  Hundreds of thousands of dollars.

Q.    And your watch -- and excuse me for asking, sir.  But your watch was a Rolex, and what was the approximate value?

A.    Probably 20,000.

Q.    And have you gotten -- have you gotten any of that stuff back?

A.    No.

Q.    To the best of your knowledge, it was -- it hasn't been found?  It hasn't been recovered?  And it is not like, for example, in police evidence pending the outcome of this case?

A.    No.  I have not gotten any of it back.  I know at one point there was pictures of the watches that appeared to be from a pawn shop.  But we have not heard anything one way or the other after that.

Q.    Okay.  And the handgun in question, that was recovered?

A.    My understanding is it was recovered when they made the arrest.

Q.    And you identified -- it was brought to you?

A.    Yes.

Q.    And approximately when was that?

A.    Today is the first day I have seen it.

Q.    But when you confirmed the serial number of the -- what I'm assuming happened is the police contacted you, told you we

had this firearm, and asked if you could provide a serial number?

**A.**    Yes.

**Q.**    And which you did?

**A.**    Yes.

**Q.**    Okay.  And approximately when did you have that interchange with the police?

**A.**    Oh, it was way back early -- early after the robbery. Well, excuse me.  Early after they had made the arrest.

**Q.**    All right.

**A.**    In between the robbery and --

**Q.**    Yes, sir.

        MR. JONES:  Thank you, sir, for your time.  No further questions, Judge.

        THE WITNESS:  Thank you.

        THE COURT:  Any other questions?

        MR. BUCHANAN:  No further questions, Your Honor.

        THE COURT:  Thank you very much.  Please don't discuss your testimony with anyone else until the proceeding is concluded.

        THE WITNESS:  Okay.  Thank you.

        THE COURT:  Thank you very much.

        Who is your next witness?

        MR. BUCHANAN:  Your Honor, our next witness is Ms. Toni Moceri.

96

COURTROOM DEPUTY CLERK:  Please raise your right hand.

**(Witness sworn)**

COURTROOM DEPUTY CLERK:  Thank you.  Please have a seat.  If you would, please state your name and spell your last name for the record.

THE WITNESS:  Toni Moceri, M-O-C-E-R-I.

MR. BUCHANAN:  May I, Your Honor?

THE COURT:  Yes.  Go ahead.

Whereupon,

TONI MOCERI,

after having been first duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. BUCHANAN:

Q.   Good afternoon, Ms. Moceri.

A.   Hi.

Q.   In 2015, where did you live?

A.   105 Blackland --

Q.   105 Blackland?

A.   -- Road.

Q.   In Atlanta?

A.   Uh-huh (affirmative).

Q.   I'm sorry.  You have to say yes or no for the court reporter.

A.   Oh, I'm sorry.  105 Blackland Road, Atlanta.

Q.    Thank you.  And who lived with you at 105 Blackland?

A.    Mark Mansfield.

Q.    And I assume you lived there with Mr. Mansfield in June of 2015?

A.    Yes.

Q.    And were y'all home on the evening of June 21st, 2015?

A.    Yes.

Q.    And please tell the jury what happened on that evening.

A.    So we just came home from a wedding at Cherokee Country Club.  And I had taken an Uber, and he stayed at the country club.  And I had to -- I forgot my keys.  So we had -- I had to call and say I need an emergency.  And they came home.

      And I went to bed.  And he went out and smoked a cigar.  He said I will --

Q.    You mean -- he, you mean Mr. Mansfield?

A.    Mr. Mansfield, yeah, went out and smoked a cigar.  I said I'm going to bed.

Q.    Let me show you something, Ms. Moceri.  If I can show you Government's Exhibit 23.

      Does that look familiar?

A.    Yes.

Q.    And what is that, Ms. Moceri?  You can --

A.    Okay.  A chair that was in the garage that we had just put in the garage and cigars and his glasses.

Q.    Is that where Mr. Mansfield would have sat outside and

smoked a cigar?

**A.**   Yes.

**Q.**   And, Ms. Moceri, what happened after you went to bed?

**A.**   I went to bed.  I guess maybe 30 minutes and I woke up with someone hitting me and ripping my clothes off and telling me that this was for real and all of the vulgar words you can imagine and ripped my clothes off, beat me up, and dragged me with a gun behind my head.  Said where is your jewelry.  We want cash and jewelry.  I will blow your head off.  I will Fing blow your head off.

And he dragged me into the -- dragged me out of my bed and went into the -- I said the jewelry is on the counter.  He like dumped -- he like saw the jewelry that I had wore.  It was very sentimental jewelry from my grandmother.  And the jewelry that I had, he dumped it, was looking for a bag.  And my father's suitcase was -- my father that I was going to visit the next morning, I had a suitcase.  He goes, oh, no, you might never see your father.  So I was like don't rip the present up.  He was like -- well, he was behind me.  And so he goes I'm opening this thing and he puts my jewelry there.

And then he dragged me into the closet and took all of the purses that I owned and said where is your other jewelry box.  And he dumped my jewelry box and said this is going with me and dragged me around the house to see what else he could get upstairs, downstairs.  And I think it was about 45 minutes.

Q.   Ms. Moceri, did you -- were you able to tell whether or not there was one person or two people who came into your house?

A.   I think there were two.

Q.   And were you able to tell whether or not the people had firearms?

A.   Yes.

Q.   Yes, they did, or yes --

A.   Yes, they had firearms.  One was behind my head.  And I forgot that I gave -- while he is dragging me out of my bed, I knew that there was a gun by Mark Mansfield's side of the bed. And I took the gun and said, you might as well just kill me with this gun.

Q.   Okay.  I'm going to show you what I have marked as Government's Exhibit 24.

Ms. Moceri, what is in Government's Exhibit 24?

A.   My closet.

Q.   Is that how your closet looked when this robbery occurred?

A.   No.  I'm OCD closet.  My closet was very neat and normal.

Q.   Is this how it looked after the robbery?

A.   Yes.  Yes.

MR. BUCHANAN:  Your Honor, we move for the admission of Government's Exhibit 24 into evidence.

MR. JONES:  No objections, Judge.

THE COURT:  24 is admitted.

Q.    (BY MR. BUCHANAN)  You mentioned that you were put in one of the closets.

Is this the closet you were put in?

A.    Yes.

Q.    And, Ms. Moceri, while this happened, I believe you mentioned that one of the robbers hit you?

A.    Yes.

Q.    Did either of them touch you in any other way?

A.    He hit me in the face, yes, and then he put his fingers up in my body.

Q.    Just to be correct, he put his fingers in your vagina?

A.    Yes.

MR. BUCHANAN:  Nothing else, Your Honor.

CROSS-EXAMINATION

BY MR. JONES:

Q.    Excuse me for keeping you waiting, ma'am.  I'm Derek Jones.  I'm an attorney in Atlanta, and I have a few questions for you, please.

Now, this occurred on June 21st?

A.    Yes.

Q.    Was it in the early evening hours or late evening hours?

A.    I took Uber around 11:30 at night, and that is when I know it was about 11:30.

Q.    So when you took the Uber -- and I believe you were at an engagement before you took the Uber.

Was that Saturday night?

A.    Saturday night a wedding.  And -- yes.

Q.    Okay.  And then you took the Uber home.  And then it was after you got home in the early morning hours of the 21st that this invasion occurred; is that correct?

A.    Yes.

MR. JONES:  So if I can approach, Ms. Moceri.

Q.    **(BY MR. JONES)**  So just showing you a calendar, which is Defendant's Exhibit Number 2, the 20th would be a Saturday when you were at the function and then the actual incident occurred in the early morning hours of Sunday, which was the 21st?

A.    Yes.

Q.    Okay.  Thank you.

Now, there was a picture shown of your closet that the Government introduced in which it was not in your normal orderly fashion but depicts that your closet was ransacked?

A.    Yes.

Q.    Okay.  Can you tell me what was taken and what those items were worth?

A.    Around 40 purses.  And all of my jewelry from the jewelry box was probably over half a million dollars.

Q.    So there was 40 purses, and those were high-end designer purses?

A.    Uh-huh (affirmative).  Yes.

Q.    And how many different items of jewelry?

102

**A.**    I don't have a count.  But I know that they took everything in the -- everything that I owned.  So I think it was probably hundreds.

**Q.**    And, again, those -- the value of those was 100 -- approximately 100 individually -- individual pieces.  And the value --

**A.**    It was more than 100 pieces.

**Q.**    More than 100.  Okay.

        And they were of substantial value?

**A.**    Yes.

**Q.**    And were other items taken?  Shoes?

**A.**    Shoes.  Yes, some shoes.  They took all the suitcases and put it in there.  So I guess everything that could fit in several suitcases.

**Q.**    And, again, I'm not -- I'm not trying to pin you down to a specific number.  But approximately how many pairs of shoes?

**A.**    20.

**Q.**    And, again, these are high -- these are designer expensive shoes?

**A.**    Yes.

**Q.**    And I believe was there a watch taken as well?

**A.**    Yes.

**Q.**    Part of the jewelry?

**A.**    Part of the jewelry.

**Q.**    Now -- and the total value of your loss of these personal

103

items that you have accumulated over the years was in the hundreds of thousands of dollars?

A.    Yes.

Q.    Now, excuse me for -- I have a few more questions, and they are rather indelicate.  So my apologies.

But you were the victim of a sexual assault in which a man's finger actually penetrated you; correct?

A.    Yes.

Q.    Were you taken to the hospital for any sort of sexual assault examination?  They call it the rape kit.  Or any sort of --

A.    No.

Q.    -- examination?

A.    No.

MR. JONES:  I have no further questions, ma'am. Thank you for your patience.

THE WITNESS:  Thank you.

MR. BUCHANAN:  No more questions, Your Honor.

THE COURT:  All right.  You may be excused.  Please don't discuss this with anyone else until the case is concluded other than the individuals who have already been excused who are back here.  All right?

THE WITNESS:  Okay.

THE COURT:  Thank you very much.

THE WITNESS:  Thank you.  Thank you very much.

THE COURT:  This looks like a good time to break. We'll see you at 1:30.  Thank you very much.

MR. JONES:  1:30, Judge?

THE COURT:  Well, it is almost -- 1:35.  I'm looking at this.  I hate to keep them waiting for us when we are always slow.

So all right.  Thank you.

**(The jury exited the courtroom at 12:32 P.M.)**

THE COURT:  But I want to talk to counsel just to see what is happening next.

Who is your next witness?

MR. BUCHANAN:  Your Honor, our next witness is Ricky Stanley.

THE COURT:  And how many witnesses do you have after that approximately?

MR. BUCHANAN:  Three.

THE COURT:  Do you expect to close today or not?

MR. BUCHANAN:  I imagine we'll go into tomorrow.  I told Mr. Martin I expected early Wednesday.  And I think that is still correct.

THE COURT:  Okay.  Good.  Is there anything else that we need to address at this time?

MR. JONES:  Judge, briefly.  I had originally planned -- the Government's estimate of the case was Wednesday -- I think Wednesday, Wednesday afternoon.  I had

originally had my people coming in Wednesday.

I'm doing my level best to get them to come in today so we can proceed tomorrow. I don't want to hold this court up. And I think they are on their way. And I'm working on it, Judge.

THE COURT: Okay. All right. Well, give us an update at the end of the day. Thank you very much.

All right. We'll see you -- I think I've sorted out everything else that there were disputes about. So we should be able to just begin.

MS. MORRIS: Your Honor, I did send the Court and Mr. Jones the underlying police report for the Ricky Stanley -- the Ricky Stanley revocation.

THE COURT: Right. And I think that -- I think I have outlined what he can cover and what he should not touch.

MR. JONES: Just for refreshing, the two exhibits that I wanted to use, I'm using them or I'm not?

THE COURT: You are allowed to use them.

MS. MORRIS: And then is the Court going to give a brief limiting instruction that those are just mere allegations?

THE COURT: Well, I will say that they are allegations, yes. And -- but, you know, the reality is that obviously the -- they are more than that to the extent that the magistrate judge accepted them. I am happy to say that there

has been no final proceedings on these charges in state court.

MS. MORRIS:  I guess my only answer to that is that, you know, the burden is really on the defendant in that posture for release.  So the default is the defendant is detained.

So I mean, the magistrate judge -- so I mean, that is kind of the wrinkle there with regard to Judge Vineyard's findings or the order of detention.

But I understand the Court's rulings.

THE COURT:  Yes?

MR. JONES:  Judge, if I could just get a hard copy of the -- I appreciate the Government sending me the report.  But I just have a cell phone.  And if they could print one out for me, I would appreciate that.

MS. MORRIS:  I'll certainly print it out.  But it is my understanding that the cross-examination isn't -- won't go beyond what is already included in the documents that you have already identified.

THE COURT:  We can copy what we have here.

MR. BUCHANAN:  Well, I'm happy to go back down and --

THE COURT:  Thank you.  All right.  I think they are more than mere allegations.  But I will work on trying to get the right balance between this.

I mean, the judge obviously found that there was credible testimony and information submitted at the hearing.  But it is not the penultimate criminal proceeding where the

Government bears the burden of proof.

MS. MORRIS:  Thank you, Your Honor.

THE COURT:  Thank you.  We'll see you in about an hour.

COURTROOM SECURITY OFFICER:  The Court stands in recess for an hour.

**(A lunch break was taken.)**

THE COURT:  Are we all set?  Nothing we need to deal with before Mr. Stanley arrives?

MR. BUCHANAN:  I don't believe so, Your Honor.

MR. JONES:  No, Your Honor.

**(There was a brief pause in the proceedings.)**

THE COURT:  Ready for the jury to come back in?

MR. BUCHANAN:  Yes, Your Honor.

MR. JONES:  Yes, Your Honor.

**(The jury entered the courtroom at 2:02 P.M.)**

THE COURT:  Thank you very much.  Have a seat.

Is this your next witness?

MS. MORRIS:  It is, Your Honor.  The Government calls Ricky Lamar Stanley.

COURTROOM DEPUTY CLERK:  If you would, please stand and raise your right hand.

**(Witness sworn)**

COURTROOM DEPUTY CLERK:  Please have a seat.  Please state your name and spell your last name for the record.

108

THE WITNESS:  Ricky Lamar Stanley, S-T-A-N-L-E-Y.

Whereupon,

RICKY LAMAR STANLEY,

after having been first duly sworn, testified as follows:

DIRECT EXAMINATION

BY MS. MORRIS:

Q.   Good afternoon, Mr. Stanley.

A.   Yes, ma'am.  Good afternoon.

Q.   Are you currently in the custody of the United States Marshals or federal custody?

A.   Yes, ma'am.

Q.   And is that because you are -- you've been detained in connection with a supervised release matter?

A.   Yes, ma'am.

Q.   I want to go back a little bit and have you explain to the jury why are you on federal supervised release.

What case did you -- were you convicted of that put you on federal supervised release?

A.   Possession with intent to distribute cocaine.

Q.   And when did you plead guilty in that case?

A.   2002.

Q.   Around 2002?

A.   Yes, ma'am.

Q.   And did you serve a sentence in the Bureau of Prisons' custody after that?

109

A.    Yes, ma'am.

Q.    And how long approximately were you in BOP custody?

A.    18 years and something.

Q.    18 years.  And when did you get out of prison?

A.    2020 March.  I think it was March.

Q.    March 2020.  Did you do a period of time in a halfway house?

A.    No, ma'am.

Q.    Straight out into the community --

A.    Released.

Q.    -- in March 2020?

       All right.  Now, after getting out, were you on what is called supervised release as a part of your federal sentence in that case?

A.    Yes, ma'am.

Q.    And is supervised release similar to probation or parole?

A.    Yes, ma'am, it is.

Q.    And it means you -- insofar as you have a supervising probation officer on supervised release?

A.    Yes, ma'am.

Q.    Okay.  So I'm going to fast forward a little bit from March 2020 when you got out.

       At some point, were you rearrested either by the state authorities or by federal authorities?

A.    Yes, ma'am.

110

Q.   And when did that happen?

A.   March 2021.

Q.   March 2021.  And were you arrested because of a local --
on local charges in Covington?

A.   Yes, ma'am.

Q.   And were you alleged to have discharged a firearm in the
direction of a police officer and the victim of an alleged
domestic assault?

A.   Yes.

Q.   You were accused of those things?

A.   Accused of those things, yes, ma'am.

Q.   And were you alleged -- was it alleged that the victim had
visible injuries and identified you as the person who had hit
her?

A.   Yes, ma'am.

Q.   Now, as a result of this local arrest, did your federal
probation officer take some actions to bring you back into
federal custody?

A.   Yes, ma'am, she did.

Q.   Now -- and I'm going to show you what has been marked as
Government's Exhibit 57.

     Do you recognize this document, Mr. Stanley?

A.   Yes, ma'am, I do.

Q.   And does this appear to be a document signed by Magistrate
Judge Vineyard in connection with your arrest back in March of

this year in federal court or your detention in federal court for these pending local charges?

A.   Yes, ma'am.

MS. MORRIS:  Okay.  I move to admit Government's Exhibit 57.

MR. JONES:  No objections, Your Honor.

THE COURT:  Admitted.

Q.   (BY MS. MORRIS)  I'm going to put this on the screen.

MS. MORRIS:  Mr. Martin, I'm not sure if we can see it.

Q.   (BY MS. MORRIS)  Mr. Stanley, the form is in front of you, and it is also on the screen next to you.

A.   Yes, ma'am.

Q.   So in addition to those allegations, which I have just read, this document which is labeled written statement -- written statement of reasons for detention, it states that you also -- or the defendant, which is you I believe, Mr. Stanley; is that correct?

A.   Yes, ma'am.

Q.   -- has several serious mental health issues and has reported suffering from hallucinations.  The supervising officer believes defendant is at risk of harming himself.

And do you understand -- who do you understand the supervising officer to be?

A.   Yes, ma'am.

112

Q.    Who is the supervisor officer?  Do you know?

A.    I think it was Gary.

Q.    Now, I want to talk to you a little bit about these other statements here.  The document alleges that you have serious mental health issues and you have reported suffering from hallucinations.

Have you had in recent years mental health issues?

A.    Yes, ma'am, I have.

Q.    And have you sought treatment -- or let me go back to March of 2020 when you got out of prison.

Did you seek as a part of your conditions of supervised release treatment for your mental health issues?

A.    Yes, ma'am, I did.

Q.    And were you put on any medicines or medications to help you with your issues?

A.    Yes, ma'am.

Q.    Did you take those for a period of time?

A.    Yes.  And I stopped.

Q.    Stopped taking those?

A.    Yes.

Q.    Around when did you stop taking those, if you can remember?

A.    Probably about a week or two before this incident.

Q.    When you say before this incident, you are referring to the incident when you were arrested on local charges in

Covington?

A.   Yes, ma'am.

Q.   So when you were re-incarcerated, locked up again in federal custody, just to be clear, was that in March 2021?

A.   Yes, ma'am.

Q.   Now, after being locked up again, did you again begin -- did you begin receiving some medications for your mental health issues?

A.   Yes, ma'am.

Q.   And to be clear, did those issues previously include hallucinations?

A.   Yes, ma'am.

Q.   And can you give the jury an example of what type -- were they things you saw or things you heard?

A.   Things I see and hear.

Q.   And what would be an example of something that troubles you?

A.   Stuff that happened in prison.  Things that happened in prison.

Q.   So you were troubled by things that happened in prison?

A.   Yes, ma'am.

Q.   Do you know if you ever had a diagnosis that you were receiving treatment for?

A.   PTSD.

Q.   PTSD.  And approximately when did you receive -- did you

114

begin receiving medication again once you were locked up this time in March 2021?

A.    Probably two days after I was locked up.

THE COURT:  I'm sorry?

THE WITNESS:  Two days after I was locked up.

Q.    **(BY MS. MORRIS)**  And what kind of medicines did you take -- have you been taking, if you know?

A.    Rimrole (phonetic) is one of them.  I don't know the other one.

Q.    And are the medicines that you are given -- are they -- do they help you with the issues you were having with instability and hallucinations?

A.    Yes, ma'am, they did.

Q.    How are you feeling now?

A.    I feel wonderful.

Q.    You are feeling wonderful?

A.    Yes, ma'am.

Q.    Okay.  So, now, when you were locked up in March 2021, this year, and in federal custody, where were you originally incarcerated?

A.    Robert A. Deyton detention facility.

Q.    And are there other federal pretrial inmates at Robert A. Deyton detention facility?

A.    Yes, ma'am, there is.

Q.    Now, did you move around to different units within that

115

facility?

A.   Yes, ma'am, I did.

Q.   So tell the jury where you moved.

A.   I moved from A5 to C1.

Q.   From A5 to C1.  And when did you move from A5 to C1?

A.   I want to say around May or June.

Q.   Around May or June.  And once you made that move from A5 unit to C1 unit at the Robert A. Deyton detention facility, did you come into contact with another inmate by the name of Brandon Redmond?

A.   Yes, ma'am, I did.

Q.   Do you know the individual you met in jail or in custody known as Brandon Redmond -- do you see him in the courtroom here today?

A.   Yes, ma'am, I do.

Q.   Can you please describe what he is wearing and where he is seated?

A.   He is seated to the left with a blue mask on with the burgundy outfit.

        MS. MORRIS:  So, Your Honor, would you please instruct the witness to remove his mask so that the witness can further -- excuse me -- the defendant to remove his mask.

        MR. JONES:  Mr. Redmond, would you just take the mask off so he can see you.

        THE WITNESS:  Yes, ma'am.  That is Brandon Redmond.

MS. MORRIS: Your Honor, may the record reflect that the witness has identified the defendant, Brandon Redmond.

Q. (BY MS. MORRIS) So when you were -- knew Brandon Redmond at the detention center, did he have a nickname?

A. Memphis.

Q. Memphis. Do you know why his nickname was Memphis?

A. Because that is where he is from.

Q. Now, give the jury an idea, please -- explain to the jury when you are on the C1 unit what kind of freedoms you are allowed to walk around.

A. All kind of freedoms to walk around mostly all day long, interact with other inmates, go to the rec yard with them and all.

Q. So the other inmates within C1, you spend time with them during the day, go to the rec yard?

A. Yes, ma'am.

Q. Watch TV?

A. Yes, ma'am.

Q. And you have the ability to have private conversations with inmates during that time?

A. Yes, ma'am.

Q. Now, approximately how long were you in the C1 unit, if you can recall, with Brandon Redmond or Memphis?

A. Maybe between about a week or three. One to three weeks.

Q. One to three weeks.

During that time, did Brandon Redmond engage with you or talk to you about why he was in jail?

A. Yes, ma'am.

Q. And did you ask him -- did you elicit or did you ask him questions, or did he come to you with information?

A. He come to me first.

Q. Did he say why he was coming to you?

A. Because I had been locked up 18 years and he said I know a little bit about the law.

Q. He told you that he thought you knew a little bit about the law?

A. Somebody had told him that.

Q. Somebody told him --

A. Yes.

Q. -- that you knew about the law because you had been locked up for 18 years?

A. Yes.

Q. And what did -- what did Brandon Redmond tell you?

A. He was asking me about his case. He asked me could they -- could they find DNA off of a hand -- over your hand -- could they get DNA off of your hand.

Q. Did he explain to you why he was worried if they could get DNA off his hand?

A. Later he did.

Q. What did he tell you later about why he was asking you

that?

**A.** Because he had fondled with a woman that he had tied up in a house that they had went and robbed in a home invasion.

**Q.** So he told you that he had fondled a woman that he had -- that he had tied up and robbed during a home invasion? Is that what he had said?

**A.** Yes, ma'am.

**Q.** And what did you understand him to mean when he said he fondled a woman?

**A.** Basically put his hand on her some kind of way.

**Q.** He put his hand on her?

**A.** Which he later told me he stuck his hand under her panties and pulled them to the side.

**Q.** He told you that he stuck his hand under her panties and pulled them to the side?

**A.** Yes.

**Q.** Did he tell you anything about what that -- anything else about that woman who he said was -- he tied up during a home invasion?

**A.** He just told me they got jewelry and stuff out of the house, Rolex watches and stuff.

**Q.** Did he tell you anything else about that woman, about how old she was, or what she looked like?

**A.** Around about 60 -- 60 or older. I don't know.

**Q.** When he was mentioning the victim of this incident, did he

say what her race was?

A.    White.

Q.    Now, when he asked you this question if they could get DNA from his finger sticking under this lady's panties, did you give him any advice?

A.    No.  I didn't know, which I don't know.

Q.    Did -- now, you mentioned at one point that he told you some of these things later.

      Did this information come in more than one conversation --

A.    Yes, ma'am, it did.

Q.    -- with the defendant?

      Did he say anything to you when he was talking about his --

          MR. JONES:  Your Honor, I'm going to object.  Counsel has been leading.  I have been giving her some leeway, given the witness.  But I would ask -- I would object to leading, Your Honor.

          THE COURT:  Sustained.  You can ask her did he say -- ask him did he say anything else.

Q.    (BY MS. MORRIS)  Did Brandon tell you anything else?

A.    Yes.  They got jewelry out the house and how he got caught because his cousin went to the pawn shop and sold it.

Q.    He told you that his cousin -- was it his cousin?

A.    Cousin or co-defendant went to the pawn shop and sold the jewelry.  That is how they got caught.  And one other one got

pulled over on 75 or 85 with two guns and two screwdrivers and a tote bag.

Q.   So he told you that a cousin got caught because he pawned some things; is that right?

A.   Yes, ma'am.

Q.   And that also someone got pulled over on 75 with two guns and screwdrivers?  Is that what you said?

A.   In a tote bag -- in a backpack.

Q.   Now, did Brandon Redmond ever show you any documents or discovery from his case?

A.   No, ma'am.

Q.   And you mentioned a cousin or a co-defendant.

THE COURT:  I'm sorry.  Just wait for a second.

What is going on with the door?

Go ahead.

Q.   **(BY MS. MORRIS)**  You mentioned a cousin or a co-defendant. In these conversations, did he tell you who else was involved in this home invasion activity?

A.   It was five of them in all.

Q.   Do you remember any of the names?

A.   Anthony, Mario, Dayzia (phonetic), Brazil or Brazila (phonetic), and Redmond.

Q.   And did you ever meet in custody any of these other people that he described to you?

A.   No, ma'am.

Q.   Now, you are -- you already explained to the jury you are in federal custody because of your supervised release; is that right?

A.   Yes, ma'am.

Q.   Okay.  Now I'm going to show you what has been marked as Government's Exhibit 32.

Do you recognize this document, sir?

A.   Yes, ma'am, I do.

Q.   Okay.  And is this the cooperation agreement you entered into with the United States?

A.   Yes, ma'am, it is.

Q.   Okay.  And is this the document that was signed by you and your attorney and the prosecutors on July 27, 2021?

A.   Yes, ma'am, it is.

MS. MORRIS:  I move to admit Government's Exhibit --

Q.   (BY MS. MORRIS)  What is the number on that exhibit, sir?

A.   32.

MS. MORRIS:  -- 32.  The Government moves to admit Government's Exhibit 32.

MR. JONES:  No objections, Judge.

THE COURT:  It is admitted.

Q.   (BY MS. MORRIS)  Now I'm going to publish the first page of that exhibit.  I'm reading from the first page of Government's Exhibit 32, Mr. Stanley.

It says that the defendant agrees to cooperate truthfully

and completely with the Government, including being debriefed and providing truthful testimony at any proceeding resulting from or relating to the defendant's cooperation.

Is it your understanding that testifying truthfully today is one of the requirements of your cooperation agreement?

A.   Yes, ma'am.

Q.   Is it your understanding that your supervised release could be revoked due to your underlying state charges?

A.   Yes, ma'am.

Q.   And is it your understanding that you may have to go -- you could be sent back to prison for up to five years if that happens?

A.   Yes, ma'am.

Q.   Now I'm turning now to Page 4 of your cooperation agreement.  It states the Government agrees to make the extent of the defendant's cooperation known to the sentencing court. It goes on to describe that the Government agrees that if we determine that your cooperation qualifies as substantial assistance then we will file a motion to the Court that could enable you to receive credit for your cooperation.

THE COURT:  I'm sorry.  Is there somebody who just knocked on the door?

**(There was a brief pause in the proceedings.)**

Q.   **(BY MS. MORRIS)**  Now, this page, Page 4 of the exhibit, also says that you -- the defendant understands that if the

123

Government decides to file a motion pursuant to this paragraph -- in other words, if we decide to file a motion asking the court to give you credit for your cooperation, we may recommend any specific sentence and the final decision as to what credit, if any, the defendant should receive for the cooperation will be determined by the court.

Is that your understanding of what will happen here?

A.    Yes, ma'am.

Q.    Now, so is it accurate to say that you -- you hope by -- that the Government will find that you testified truthfully?

MR. JONES:  Objection.  Leading, Your Honor.

Q.    **(BY MS. MORRIS)**  What, Mr. Stanley, do you hope to happen as a result of your cooperation here today?

A.    I hope that something would happen for me in my favor.

Q.    Now, earlier when I was asking you questions, I was talking about you being arrested and a supervised release warrant.

Did you turn yourself in on the supervised release warrant, or were you brought over here in custody?

A.    I turned myself in.

Q.    And did someone tell you to turn yourself in?

MR. JONES:  Your Honor, I didn't think we were going to go into the specifics of the offense in the other county. But I think the Government --

MS. MORRIS:  My question is in relation to the

124

federal supervised release warrant.

THE COURT:  Do you mean did he turn himself in here?

MS. MORRIS:  He turned himself in here.  My questioning made it appear that he was brought in custody.  But, in fact, he turned himself in would have been the testimony.

So I just wanted to clarify that since, in fact, I think it is the case.  That is my only other question.

THE COURT:  Well, would you confirm that one way or the other.  I think the problem is you answered -- you made a leading question, and then it was not clear what you were asking.

MS. MORRIS:  Certainly.

Q.   **(BY MS. MORRIS)**  So you are in federal custody now; is that right?

A.   Yes, ma'am.

Q.   Okay.  Were you brought to the federal courthouse in custody, or did you turn yourself in?

A.   I turned myself in here.

MS. MORRIS:  That concludes -- hold on.  That concludes our questions on direct.  Thank you.

CROSS-EXAMINATION

BY MR. JONES:

Q.   Mr. Stanley, my name is Derek Jones.  I'm an attorney in Atlanta.  Good afternoon.

125

**A.**    Good afternoon, sir.

**Q.**    You have served a long time in prison in your life, have you not?

**A.**    Yes, sir, I have.

**Q.**    And isn't it your feeling that you would rather die than go back to prison?

**A.**    No, sir.

**Q.**    You never told anybody that?

**A.**    Well, I maybe -- maybe spoke that to my probation officer, but I'm not recalling it.

**Q.**    How about your psychiatrist or psychologist who did an evaluation on you?  Didn't you tell her that you would rather die than go back to prison?

**A.**    I don't recall, sir.

**Q.**    Okay.  But you have told somebody that you would rather die than go back to prison?

**A.**    When I first got locked up, I think I might have told my probation officer that.

**Q.**    You might have told your probation officer.  Okay.  Might you have told somebody else that?

**A.**    Not that I can remember.

**Q.**    That you can remember.

Prison was hard on you, was it not?

**A.**    Well, you know, prison is basically what we make of it.

**Q.**    And also what people make of you when you are in prison?

126

A.    Yes, sir.

Q.    And you were sexually assaulted in prison, were you not?

A.    Well, sir, yes, sir.

Q.    And that caused you a great deal of trauma and distress?

A.    Yes, sir.

Q.    And the idea of going back to prison terrifies you, doesn't it?

A.    Well, at the time, it did.

Q.    It does now too, doesn't it?

A.    Now as I sat down and thought about it, you know, I haven't done anything to be going back to prison.  Not that I know of.  But I understand what I'm charged with.

Q.    Okay.  And right now you are in the Robert A. Deyton facility down at Lovejoy?

          MS. MORRIS:  Objection.  The current location of this witness is really not relevant.

          MR. JONES:  Oh, okay.  Excuse me.

Q.    **(BY MR. JONES)**  Well, you were in the Robert A. Deyton detention facility down in Lovejoy from March to June or July of this year; correct?

A.    Yes, sir.

Q.    And that is a pretrial detention facility; correct?

A.    Yes, sir.

Q.    And that is much different than a USP, United States penitentiary?

**A.** Yes, sir.

**Q.** The United States penitentiaries are horrible places, are they not?

**A.** Yes, sir.

**Q.** And you would rather die than go back there?

**A.** No, sir.

**Q.** Okay. Now, you got into some trouble in 2002 in federal court, and you had had some serious legal criminal problems before you got in that trouble in 2002 in federal court; correct?

**A.** Correct, sir.

MR. JONES: Okay. Your Honor, I was going to introduce Defendant's Exhibit Number 10, which is the -- actually, Judge, I'm going to admit Defendant's Exhibit Number 10.

THE COURT: Okay.

MS. MORRIS: That's admitted, Your Honor.

MR. JONES: No. Their -- their exhibit is admitted, Your Honor. This is my exhibit, which I wanted to exhibit and have wanted to exhibit for quite a while.

THE COURT: All right. Go ahead.

MS. MORRIS: Just for the record, Your Honor, it is identical. I just put my sticker on his exhibit.

THE COURT: I don't know whether it is or not. He wants to admit it.

128

MS. MORRIS:  He is welcome to compare it.  I just don't want to create confusion with our exhibits.

MR. JONES:  No.  I believe it is the same exhibit, Your Honor.  And counsel just stated that what she did was put her exhibit sticker over my exhibit sticker.  So now we have two in the record.

THE COURT:  All right.  That is fine.  It is not unusual.

Q.  **(BY MR. JONES)**  Now, when you had that problem in Covington -- that criminal problem in Covington, the Government, the U.S. Attorney's Office, actually filed a motion to detain you, that means keep you locked up, pending resolution of the case, i.e., they wanted -- the Government wanted you locked up until the judge decided what to do with you; is that correct?

A.  Yes, sir.

Q.  And you have been detained as we can see in Defendant's 10?

A.  Yes, sir.

Q.  Okay.  But there was an actual motion that the Government filed back on March 4th to detain you; correct?

A.  Yes, sir.

MR. JONES:  Okay.  Your Honor, I would move to introduce Defendant's Number 9.

MS. MORRIS:  Your Honor, I'll renew my objection to

that exhibit.

THE COURT:  All right.  I'm going to admit it and note your objections.

Q.    (BY MR. JONES)  And I'm not --

THE COURT:  But I'm admitting it for a limited purpose, and I'll explain after --

MR. JONES:  Right.  Exactly.  Exactly.

THE COURT:  -- after you have proceeded.

MR. JONES:  Pursuant to the Court's instructions, I'm not going to go through it bit by bit.

Q.    (BY MR. JONES)  But this is why the Government wanted you detained until they could -- until a judge could decide what to do with you about the five-year supervised release; correct?

A.    Yes, sir.

Q.    Okay.  So -- and if the judge would revoke five years' supervised release, all of it, you would go back to prison for five years; correct?

A.    Yes, sir.

Q.    Not a detention facility -- pretrial detention facility but a prison; correct?

A.    Yes, sir.

Q.    And you've had some horrible experiences in prison?

A.    Back then I did.

Q.    I beg your pardon?

A.    Back then I did.

130

Q.   Okay.  Now, you are also aware that because of these -- I believe you were asked that you were -- your local arrest for -- I think the Government asked.  You said there was a local arrest for shooting at a police officer -- for alleged shooting at a police officer and a local arrest for an alleged battery where somebody was injured; correct?

A.   Correct.

Q.   Okay.  Was there also an alleged charge that you were a convicted felon in possession of a firearm?

A.   Yes, sir.

Q.   Okay.  Now, that is not -- and the word local was used.  But that is not like a city ordinance violation or a municipal court violation?  That is a state criminal charge where you go to state and superior court; correct?

A.   Yes, sir.

Q.   Okay.  And you also know that those state charges can come to federal court -- be made a federal court charge and then you're looking at even more trouble; correct?

A.   Yes, sir.

Q.   And I'm not going to go into the time involved.  But you're looking -- in addition to the five years' supervised release problem, you're looking at more problems potentially as well; correct?

A.   Well, not that I know of because I haven't done anything.

Q.   And the prisons are full of people who haven't done

anything?

MS. MORRIS:  Objection, Your Honor.  Calls for speculation.

Q.   (BY MR. JONES)  Have you been in prison with people saying, hey, I'm serving this ten-year bit, but I didn't do anything?

A.   Yes, sir, I have.

Q.   Is that correct?

A.   Yes, sir.

Q.   Okay.  Now -- so have you cooperated before?

A.   Yes, sir, I have.

Q.   Oh.  Did you testify in a state criminal trial?

A.   Yes, sir.

Q.   A murder case?

A.   Yes, sir.

Q.   And did you cooperate in your -- in that problem you had back in 2002 in this building?

A.   No, sir.

Q.   Well, did you try to cooperate but it didn't work out because they didn't believe you?

A.   No, sir.

THE COURT:  Why don't you go a little further away from the jury if you are talking.

Q.   (BY MR. JONES)  Mr. Stanley, did you not have a potential cooperation agreement in 2002 with the Government?

132

A.   Not that I can recall, sir.

MR. JONES:  Well, maybe I can -- if I can approach the witness, Judge, I can refresh his memory or attempt to refresh his memory by showing him a document.

Q.   **(BY MR. JONES)**  Mr. Stanley, if you would read that and see if that refreshes -- see if that -- sorry.  I'm mumbling with a mask on.

Would you see if that refreshes your memory about that cooperation.  Oh, and let me show you --

THE COURT:  Do you want to identify what he is reviewing or not?

MR. JONES:  Beg your pardon?

THE COURT:  Do you want to identify what he is reviewing?

MR. JONES:  If I may.

THE COURT:  Well, let's see if it refreshes his recollection.

Q.   **(BY MR. JONES)**  Mr. Stanley, this is the front page of it.

A.   It has been so long ago that I didn't remember.

Q.   Well, after -- so after reading that document, that does not refresh your memory?

A.   Yes, but I did not cooperate with the Government.

Q.   But you had an agreement -- you had an agreement to cooperate with them, did you not?  A 5K1 as it is called.

A.   I don't recall having a 5K1, but I see the agreement, but

133

I didn't testify.  I did not testify.

Q.   Well, cooperation doesn't necessarily entail testifying, does it?  It also entails giving information; correct?

A.   Correct.

Q.   I mean, you served a lot of time in prison.  So, you know, Mr. Redmond came to you as an expert, so you know these things; right?

A.   But I don't know all about the law, but I know some things.

Q.   Now, you suffer -- and excuse me for asking these questions, Mr. Stanley.  I'm not trying to embarrass you.

A.   No problem.

Q.   I have got some questions I need to ask you.
     You suffer from schizophrenia, don't you?

A.   Yes, sir.

Q.   And you suffer from schizophrenia -- you are -- what? -- about 50 years -- 50 years old now, sir?

A.   48.  I am 48.

Q.   48.  Okay.  And you have suffered from schizophrenia for a long time?

A.   Yes, sir.

Q.   And it is a horrible debilitating disease, is it not?

A.   It is when I am off of my medicine.

Q.   It has caused you a world of trouble?

A.   Yes, when I'm off my medicine.

Q.   Right.   And sometimes you don't like taking the medications, so you don't take it; correct?

A.   Well, I have been taking it regular now since I have been locked up.

Q.   I understand that.   But when you got out of prison after serving -- what was it -- 18 years --

A.   Yes, sir.

Q.   -- in March of last year and -- correct?

A.   Yes, sir.

Q.   And one of your -- one of the things you were supposed to do was take your medication?

A.   Yes, sir.

Q.   And you didn't take it?

A.   No, sir, I did not.

Q.   And when you didn't take your medication, your mind started playing tricks on you?

A.   Yes, sir.

         MS. MORRIS:   Objection, Your Honor.   The defendant -- that is not a medical phrase about -- the defendant can explain how his mind works.   But he doesn't need to use those kind of pejorative terms to describe his mental health condition.

         MR. JONES:   Judge, I don't think -- I don't think I am -- I am well familiar with schizophrenia, and I am not trying to insult this man.   I'm cross-examining him the way that I feel is appropriate.   And --

THE COURT: All right. Just be careful. Proceed.

Q. **(BY MR. JONES)** Mr. Stanley, again, I'm not trying to embarrass you.

But your mind -- your mind sees things and tells you things that aren't there and aren't true when you are suffering from a schizophrenic episode?

A. Like I say, once -- if I'm off my medicine, yes, sir. But once I'm taking my medicine, I'm fine.

Q. Well -- but who knows if you were taking your medication when you had these conversations with Mr. Redmond?

A. Well, I had to take it because whenever the nurse comes to bring the pills we have to take it at the door and the officer stands there and watches us take it.

Q. Are you familiar with people being in jail that sometimes they don't want to take the medication and they can put it in their mouth and spit it out later; correct?

A. But they have you open your mouth and look in your mouth.

Q. Okay. Now, is the reason you don't take the medication sometimes because you don't like the way it makes you feel?

A. Well, when I take it, it makes me feel pretty good.

Q. But then --

MS. MORRIS: Objection, Your Honor. It is asked and answered. He asked him if he liked how it made him feel, and he answered the question. He is harassing this witness, who has very honorably explained --

THE COURT:  I'm --

MS. MORRIS:  -- his mental health condition.

THE COURT:  All right.  I'm going to sustain the objection.  But don't start making commentary like that.  All right?

Thank you.

Q.   **(BY MR. JONES)**  Now, you got there in March.  And at some point, you say you took medication and your mind got clearer.

Did you then start to think about, hey, what do I need to do to get out of this mess that I'm in?  Did you have thoughts like that?

A.   No, sir, I did not.

Q.   Okay.  Now, were you Mr. Redmond's cellmate?

A.   No, sir, I was not.

Q.   Did you ask to move to his dorm?

A.   No, sir, I did not.

Q.   Okay.  Did you have an opportunity to read his paperwork -- his discovery?

A.   No, sir, I did not.

Q.   Okay.  Now, you -- by discovery -- you know what I mean by discovery; correct?

A.   Yes, sir.

Q.   That is what -- in these cases, the Government is supposed to give the defense certain information, reports, that sort of thing?

137

**A.** No, sir, I did not read it.

**Q.** Okay. But you understand the concept of discovery; correct?

**A.** Yes, sir.

**Q.** Okay. And the defendant can have his discovery in his cell; and if he is not careful, somebody can read it; correct?

**A.** If it is in their cell if you allow them to go in the cell.

**Q.** Do you know -- did you read any of Mr. Redmond's discovery?

**A.** No, sir, I did not.

**Q.** Did you go on a tablet in the cell and do any sort of research on this case?

**A.** No, sir, I did not.

**Q.** Now, did you ever hear the phrase when you were in prison something that goes to the effect of catching a ride on a case?

**A.** Yes, I have heard that before.

**Q.** Catching a ride on a case in prison parlance means -- in prison speak means that there is a defendant who is going to trial and people jump on the case to try to testify against him; correct?

**A.** Yes, sir.

**Q.** And isn't that what you are doing in this case?

**A.** No, sir. I'm just telling you the truth of what happened.

**Q.** I understand. And people talk in jail about cases --

138

other people's cases, that sort of thing; correct?

A.    Yes, sir.

Q.    Okay.  Did you figure out from people that Mr. Redmond was going to go to trial in August of this year?

A.    No, sir.  He told me he was going to trial.

Q.    Okay.  So he told you he was going to trial.  Was that sort of common knowledge in the cellblock?  Was that common knowledge in the cellblock?

A.    I hadn't been over there that long.

Q.    But people are able to, I think you said on direct examination, walk freely around and talk and interact with each other?

A.    Yes, sir.

Q.    So you didn't -- you didn't learn from that?  You learned from Mr. Redmond that he was going to trial?

A.    Yes, sir.

Q.    Okay.  Now, Mr. Stanley, you said he came to you -- I mean, is it possible that you hallucinated some of this stuff?

A.    No, sir.

Q.    Now, do some people go around and talk about their cases?  By that I mean, you have got some people in jail that they don't say anything about their case and you have got other people in jail who are always talking about this is what they have got, the Government has this, the Government has that; right?

**A.**   That is true, sir.

**Q.**   Right.  Okay.  Well, is that what happened in this case?  Did Mr. Redmond -- was he just going around mouthing off to people about his case and the potential evidence and that sort of thing?

**A.**   I would not know that about others, but I know he came to me.

**Q.**   Okay.  Well, you don't know that.  Well, if he came to you for advice, could it be rather than as you say he admitted to you that he did this he discussed it with you and didn't admit?

**A.**   He admitted it.

**Q.**   And then you, knowing what he had talked about, decided that you were going to catch a ride on the case and spare yourself some time in federal prison?

**A.**   No, I did not, sir.  He told me directly.

**Q.**   Okay.  Now, you haven't gone to court -- you have been to court on this.  But you haven't -- the judge hasn't decided yet what to do with you on your supervised release; correct?

**A.**   Correct, sir.

**Q.**   And the last time you went to court was -- what? -- in early July?

**A.**   Yes, sir.

**Q.**   Okay.  And you go back to court on August -- sometime in August; correct?

**A.**   Yes, sir.

140

MR. JONES:  Your Honor, I would like to introduce what is Defendant's 11, Your Honor, a minute sheet from district court showing the proceedings of that day and the reset date.

THE COURT:  All right.

MS. MORRIS:  No objection.

THE COURT:  It is admitted.

Q.   (BY MR. JONES)  So we are now in August, aren't we, Mr. Stanley?

A.   Yes, sir, we is.

Q.   So you are hopeful, are you not, when you go back that this cooperation -- your truthful cooperation will be made known to the judge and things will work out for you and you might go home?

A.   Hopefully.

Q.   You are hoping?

A.   I'm hoping.

MR. JONES:  Judge, if I could have a moment here.

**(There was a brief pause in the proceedings.)**

Q.   (BY MR. JONES)  Mr. Stanley, I want to go back to that question about not wanting to go back to prison.

And I ask you again:  Did you not tell a psychologist who did an evaluation of you in May of this year that you would rather die than go back to prison?

A.   I said I don't recall.  But maybe I have.

141

MR. JONES:  Well, may I approach the witness to show him a document, Your Honor.

MS. MORRIS:  Your Honor, I'm not sure if this would be an appropriate document to show the defendant.

MR. JONES:  I'm trying to refresh his recollection, Judge.

MS. MORRIS:  Perhaps we should approach briefly.

THE COURT:  Okay.  I think it would be easier just simply given the difficulties of approaching the bar just to excuse the jury for a few minutes.  And then we'll just talk -- and if the defendant then could be escorted to the room for a moment.  Let's just take a few minutes.

**(The jury exited the courtroom at 2:52 P.M.)**

THE COURT:  Could we just have Mr. Stanley escorted just for a minute so he can be in the holding cell so we can talk privately.  Thank you.  Thank you.

Thank you, Mr. Stanley.

MS. MORRIS:  (Inaudible).

MR. JONES:  No.  I understand.  I appreciate your passion because I have been there too.

THE DEFENDANT:  I said that to you, Ricky?

**(Witness exited the courtroom.)**

THE COURT:  Okay.  We don't have to -- I think the whole point was so that we wouldn't be so squeezed.

MR. JONES:  Judge, I quite understood at the -- the

Government filed a motion that we dealt with at the pretrial conference.  I quite understand what they are saying.

However, there is a way to handle these situations by either laying a prior inconsistent statement, which I have done in this case, or using a document to refresh the witness' recollection.

And that is what I've done repeatedly throughout this trial.  And the rules allow it.  And that is what I was trying to do with Mr. Stanley was refresh his recollection.

MS. MORRIS:  I'm not sure the Court knows what the document is.

MR. JONES:  Oh.

THE COURT:  It is a psychiatric evaluation I gather.

MS. MORRIS:  Yes.

THE COURT:  So tell me what the -- I mean, we're not going to introduce the psychiatric evaluation.

MS. MORRIS:  I think it is --

MR. JONES:  No, ma'am.

MS. MORRIS:  -- awkward to even show him his own psychiatric evaluation.

THE COURT:  Why is that?

MS. MORRIS:  I'm not sure he has ever seen it.

I will say the question was did you tell -- have you said that you would rather die than go back to prison.  He said I may have told my probation officer that.  So he has already

kind of acknowledged that he -- that those words may have come out of his mouth when he -- recently.  So that is the goal, I believe.

MR. JONES:  May have told his probation officer. When he was first whatever -- when he wasn't in his right mind and later on he told this professional some months after he was supposedly on medication that he still felt that way.  And that is what I was trying to get from Mr. Stanley.

THE COURT:  So what are you saying would be impermissible about -- Ms. Morris, about allowing Mr. Stanley to review that portion of the notes of the psychiatric evaluation?

I don't understand why his psychiatric evaluation would be -- he would be barred from seeing or at least that portion of it.

MS. MORRIS:  I just think it is awkward to show someone their own psychiatric evaluation of a medical doctor talking about their own -- their own -- an assessment of their own mental health as a document for refreshing their recollection of something that happened.

Mr. Jones, what page specifically and what paragraph are you referring to?

MR. JONES:  Page 4, third paragraph from the bottom.

MS. MORRIS:  The paragraph states, in 2017 and 2018 while in prison, Mr. Stanley was sexually assaulted twice by

144

inmates.  He said that is why I don't want to go to prison.
Mr. Stanley added, I would rather die than go to prison.

Well, you have already elicited -- the defense has already elicited the fact that he was sexually assaulted in prison.  So that has already come out.

And he said that he recalls saying to his probation officer he may have -- he may have recalled saying to his probation officer I would rather die than go to prison.  So at this point, I mean --

THE COURT:  I think he said I may have told him that.  I mean, I think all that counsel is trying to do is have him confirm that this was something again in May -- in a more recent time frame, May, that this was on his mind at that time.

And do you want to just propose the question again that you would ask him?

MR. JONES:  My question is:  Did you not tell your psychiatrist in May of this year that you would rather die than -- your psychologist that did an evaluation that you would rather die than go back to prison?  I believe --

THE COURT:  After he has looked at it?  And I think you have to say, did you have a consultation with a psychologist?

MR. JONES:  And --

THE COURT:  And in looking at this, does it refresh your recollection that you told her --

145

MR. JONES:  If he says, oh, this document doesn't -- you know, if the information -- I'll show him the front page of the document.  If he doesn't -- if after that he says it doesn't refresh my memory, then --

THE COURT:  That's that?

MR. JONES:  -- that's that.

MS. MORRIS:  That is fine, Your Honor.  I withdraw my objection.

THE COURT:  Okay.

MR. JONES:  Before the jury comes back, Judge, if I may take a brief break.  I didn't know if we were going to take our afternoon break or what.

THE COURT:  Yes.  That is fine.  Everyone can go to the bathroom, and we will continue.  Okay.

**(A brief break was taken at 2:59 P.M.)**

THE COURT:  You can bring the jury back.  You have introduced all the exhibits that you need to that you have referenced?

MR. JONES:  I beg your pardon?

THE COURT:  Have you introduced all the exhibits that you need to?

MR. JONES:  I think I had three for this gentleman.  9, 10, and 11, I believe.

COURTROOM DEPUTY CLERK:  I've got them right here, 9, 10, and 11.

THE COURT:  And I admitted them?

COURTROOM DEPUTY CLERK:  Yes.

MR. JONES:  Yes, ma'am.

THE COURT:  All right.  Very good.

MR. JONES:  Judge, before the jury comes in -- I'm sorry -- there is one thing.  And I understand this is a public courtroom.  And I understand the rights of the victims to be here.

But with this COVID, normally the jury is all in this box.  But we've got this one lone juror here and the folks are -- you know, the victims who have just testified are --

THE COURT:  Could the victims sit over there instead?

MR. JONES:  Just one row back.

THE COURT:  Or go one row back or split up, whichever you want.

MR. JONES:  Thank you, Judge.

THE COURT:  Either way.  I mean, you can stay on that level row if you go over here, or you can just go back one.

MR. BUCHANAN:  I'm just wondering:  Was there a comment from the juror about that?

MR. JONES:  No.  No, not at all.

THE COURT:  No.  But it is close.

MR. JONES:  It is something that I saw, and I felt I just -- with this COVID, you know, normally the jurors are in the box right there.  They are not outside.  And, you know, it

UNITED STATES DISTRICT COURT
OFFICIAL CERTIFIED TRANSCRIPT

is just --

**(The jury entered the courtroom at 3:13 P.M.)**

THE COURT:  Thank you.  Go ahead.

MR. JONES:  Yes, Your Honor.

Q.    **(BY MR. JONES)**  Mr. Stanley, I just want to show you this document and see if you could review it and whether or not it refreshes your memory about what you said about not wanting to go to prison.  That is the front page.  Okay?

A.    Yes, sir.

Q.    And this is -- this is the line right here.  You are free to look at more of it if that --

THE COURT:  What is the date of the conversation reflected?

MR. JONES:  I believe it is May 10, Your Honor.

THE COURT:  All right.

A.    Yes, sir.  That refreshes my memory.

Q.    **(BY MR. JONES)**  Okay.  So, Mr. Stanley, back on May 10 of this year, did you tell Dr. Flores that you would rather die than go to prison?

A.    I was referring to when I first got locked up and I told my probation officer.

Q.    Okay.  Now, you were -- Mr. Redmond told you things about the case you testified.  But there was nobody else around, correct, when he told you about it?

A.    Me and him.

**Q.**   You and him.  Did he tell you how long he had been in jail awaiting this trial?

**A.**   He told me he had been locked up about five or six years.

**Q.**   Okay.  Did he tell you that all that time he was in Deyton awaiting trial?

**A.**   Well, I didn't ask him that.  I assumed he was.

MR. JONES:  Okay.  Fair enough.

Thank you.  I have no further questions at this time, Your Honor.

THE COURT:  I just want to instruct the jury that counsel has introduced two exhibits.  I think they are Defendant's 9 and 10.  9 -- the parties have referenced them. 9 is the Government's motion for detention for Mr. Stanley. And I just want to instruct you that those are -- those were the -- it is the motion of the Government at that time that was filed March the 4th, 2021, for the detention and the basis upon which the Government was moving as reflected in the conversation we've had already so far.  There has not been any state judicial proceeding yet on the underlying charges.  But this was the basis upon which the Government moved for detention.

And then the magistrate judge in our court in Exhibit 10 indicated his conclusions and why he had detained -- approved the detention.  Again, these are -- the standard here for the detention is not one that is sort of like -- as if we

were in the court -- the state court or this court for these purposes right now where the jury is trying or a judge is trying to determine whether there is proof beyond a reasonable doubt of somebody's guilt.

Instead, it relates to whether there was sufficient evidence to support the detention given the charges at issue and the evidence before that -- the magistrate judge.

So I wanted to be sure that you understood that. And even though this evidence is relevant and provided to you because it is relevant, I want to make sure that you understand it in its context and don't conclude that this is the penultimate finding on those -- the charge that this gentleman is facing or may be facing in the future.

Is there any other examination of this witness?

MS. MORRIS: No additional questions from the Government.

THE COURT: Thank you. Thank you, Mr. Stanley.

May he be excused?

MS. MORRIS: He may be.

The Government calls as its next witness Dan Worrell.

COURTROOM DEPUTY CLERK: Please raise your right hand.

**(Witness sworn)**

COURTROOM DEPUTY CLERK: Thank you. Please have a seat. If you would grab one of these little plastic bags right

150

there and place it over the microphone.  Then you can remove your mask.

Then if you would, state your name and please spell your last name for the record.

THE WITNESS:  Daniel Worrell, W-O-R-R-E-L-L.

Whereupon,

DANIEL WORRELL,

after having been first duly sworn, testified as follows:

DIRECT EXAMINATION

BY MS. MORRIS:

Q.    Good afternoon, sir.

A.    Good afternoon.

Q.    Sir, where are you currently employed?

A.    I'm an investigator with the district attorney's office in Cherokee County.

Q.    And how long have you been there at the district attorney's office?

A.    Roughly seven months.

Q.    And prior to that, where were you employed?

A.    Investigator with the Atlanta Police Department.

Q.    And were you an investigator with the Atlanta Police Department back in 2015?

A.    Yes.

Q.    I want to take you back to 2015.  When you were an investigator there, did you become involved in the

investigation of a series of home invasion robberies happening in Atlanta and the greater metro Atlanta area?

**A.**    I did.

**Q.**    Who -- can you explain to the jury please how you were working that investigation?  Alone or with others?

**A.**    It was with others.  It was a team.  I was assigned to a unit called the violent repeat offender unit.  It consisted of myself, another investigator, an officer, and a sergeant.  We all were working in conjunction together.

**Q.**    And did that team work also with federal law enforcement partners?

**A.**    Yes.

**Q.**    And were some members of your team actually task force officers?

**A.**    They were.

**Q.**    And was it a particular federal agency?

**A.**    The FBI.

**Q.**    Now, with this investigation involving home invasion robberies, let's go back specifically to early July 2015.

         What was the status of the investigation at that time?

**A.**    We had identified a phone number of interest.  There was a home invasion in May of 2015, May 25th to be exact.  During that home invasion or after that home invasion, the victim was contacted by telephone by a number they did not know.  The number had an area code that was not in Atlanta.  I believe it

152

was Memphis, Tennessee.  And we had that lead.

We had that phone number.  We worked on that particular number.  We identified the user had migrated to a new number in early June -- early June of 2015.  We had received toll records for both of those numbers, the one number that contacted the victim and then as well as the new number.

Through analyzing the toll records and the contacts of those numbers, I was able to identify a potential user of that -- of those numbers.  His name was Mario Jackson.  This was actually July 9th of 2015.

Simultaneously while I was identifying him, we were going up on a geo location ping of the cell phone that used a particular -- that number.

Q.    Let me ask you to pause there just to orient the jury.

You mentioned that there had been a robbery on May 25th, 2015, and that some phone evidence was developed because one of -- one of the victims was actually called after the robbery; is that correct?

A.    That's correct.

Q.    Now, based on your involvement with the case from the beginning, is it your understanding that that -- that Leon Scott actually was involved in that robbery and pled guilty to participating in that robbery?

A.    Yes.

Q.    Okay.  So you just mentioned that you were -- there were

two phone numbers that you associated with Mario Jackson and one migrated to the other; is that correct?

A.    Correct.

MS. MORRIS:   I'm going to ask Ms. Toussaint to publish Government's Exhibit 13.

Q.    **(BY MS. MORRIS)**   Take a look, if you will, Investigator Worrell, at the screen to your right.

Do you recognize the person depicted in this picture?

A.    Yes.

Q.    Who do you recognize it as?

A.    Mario Jackson.

Q.    And are you familiar at all with that -- with the name below it?

A.    Yeah.   His alias, Memphis Dre.

Q.    And this exhibit depicts two different mobile phone numbers.

Are you familiar with these numbers?

A.    I am.

Q.    And how are you familiar with them?

A.    Those -- both of those numbers are attributed to Mr. Jackson.   I believe the 602-1788 was the number that called the victim of the May 25th home invasion.   And the 500-9328 was the number I think early June that went active.

Q.    Okay.   So you were just describing identifying these numbers and then on July 9th actually getting some -- a court

154

order or some process from the court regarding a number.

Can we resume there in reference to the numbers here on the screen?

A.   Yes.  So the (901) 500-9328 number -- there was a court order to allow for a geo location ping of the device that utilized that phone number in order to locate the user of that device.

Q.   Now let me stop you.  You referenced developing some evidence after a May 25th robbery.  Now you are talking about events on July 9th.

Explain to the jury if any additional events had happened in the intervening month, in the month of June, that kind of gave urgency to the investigation.

A.   Yes.  So there were multiple home invasions in the Atlanta and metro Atlanta area throughout June.  I believe there were three.  They seemed to be occurring regularly.  So it did motivate us to act quickly on attempting to apprehend the perpetrators of these crimes.

Q.   All right.  So with that context, on July 9, did you obtain -- actually obtain the court order that you sought for this number (901) 500-9328?

A.   It was.  I didn't personally do the court order.  But yes, it was that number.

Q.   And did that investigative step yield any results for you and the rest of the team?

**A.**   Yes.   So once we had Mr. Jackson identified, we sent out a photo to other police officers in the area.   They were going to the area where the phone was pinging.   One officer was able to identify an individual that matched the description of Mr. Jackson.

We conducted surveillance to follow Mr. Jackson, and eventually we were able to have Georgia State Patrol conduct a traffic stop on the vehicle that he was in.

**Q.**   And when you say conduct a traffic stop, was there an independent basis for the deputies' traffic stop of that vehicle?

**A.**   Yes.   It was a seat belt violation.

**Q.**   And what happened at that traffic stop?

**A.**   The vehicle was occupied by three individuals.   One Mario Jackson was in the passenger's seat.   The driver was Anthony Richardson.   And there was a small child in the back.   I believe it was Anthony Richardson's sister's child, I believe. It was a relative of Anthony Richardson.

**Q.**   I'm going to ask you to pause there and take a look at a couple of exhibits.

MS. MORRIS:  Mr. Jones, 33, 34, and 35.

MR. JONES:  Yes.  Thank you.

**Q.   (BY MS. MORRIS)**   Before I show you those exhibits, you said that you obtained a court order for or your team obtained a court order for a ping for one of these telephone numbers.

In vary basic terms, what is the purpose of that and how did that assist your investigation?

**A.** Yeah. So a ping is just a regular location -- well, to locate the device, carriers will ping the phone to find an approximate location. It usually has a -- within meters it can locate a device based on cell tower information and other things in the phone itself.

So when you ping a phone, it is typically every five to ten minutes. And you will find -- you will have a GPS coordinate, a lat and a long of the location of the device.

**Q.** Is it fair to say that that technique works sometimes better than others?

**A.** Yes.

**Q.** In this case, did it work effectively?

**A.** It did.

**Q.** Now I'm going to show you Exhibits 34 -- 33, 34, and 35.

Do you recognize these photographs?

**A.** I do.

**Q.** What do they depict?

**A.** They are screenshots of the dash cam from the trooper's patrol car of the traffic stop.

**Q.** Were you actually present at that traffic stop?

**A.** I was.

**Q.** Are these true and accurate depictions of the scene at the traffic stop on July 9?

**A.**    Yes.

MS. MORRIS:  I move to admit 33, 34, and 35.

MR. JONES:  No objections, Your Honor.

THE COURT:  They are admitted.

MS. MORRIS:  So, Ms. Toussaint, if you will publish Government's Exhibit 33, please.

**Q.**    **(BY MS. MORRIS)**  So, Investigator Worrell, looking at this screen here, if you could describe to the jury who the individuals are depicted in this screenshot.

**A.**    On the far left is Mario Jackson.  He is the taller black male in a white T-shirt, dark pants.  Next to him is Anthony Richardson with a ponytail and the white shirt.  I am on the far right.  And to my right is Investigator Bleifeld.

**Q.**    And right above the time stamp where it says 47:32, there appears to be a leg near Mr. Richardson's waist.

Who does that belong to?

**A.**    That is the young child that was in the vehicle.

**Q.**    And is the vehicle that Mr. Richardson was driving at the time -- is it visible in this photograph?

**A.**    Yes.  It is the Altima.

**Q.**    Now, so what is happening here at the beginning or at this point in the stop, if you recall?

**A.**    We were merely just having conversation while the troopers conducted their traffic stop.

MS. MORRIS:  Ms. Toussaint, if we could switch to

Government's Exhibit 34 now.

Q. (BY MS. MORRIS) What does this image depict?

A. This is when the trooper to the right of the vehicle discovers a backpack on the passenger side floorboard.

Q. Okay. And where is Mr. Jackson in this picture?

A. He is to the right of the picture talking with Investigator Bleifeld.

Q. Wearing a white shirt?

A. Wearing a white shirt and dark pants. It looks like he has got a small suitcase.

Q. So are you aware where that -- was that small suitcase on the sidewalk, or was that small suitcase with Mr. Jackson?

A. It was with Mr. Jackson. I believe it was pulled from the vehicle.

Q. Did he appear to be traveling?

A. Yes.

Q. And you mentioned that a backpack was located by the trooper; is that right?

A. That is right.

MS. MORRIS: I'm going to ask you to switch now to Government's Exhibit 35, Ms. Toussaint.

Q. (BY MS. MORRIS) What is happening in this picture?

A. I am taking a photo of the backpack as well as some of the contents.

Q. And just to be clear, do you show up at every traffic stop

159

that the Georgia State Patrol does?

A.    No.

Q.    So why were you here at this traffic stop?

A.    We believed that Mr. Jackson, well, was in the vehicle and had evidence of the crimes of the home invasion.

Q.    So why were you taking photographs of this backpack that was found in the back of the vehicle?  Do you recall?

A.    Yes.  Within the backpack were two firearms.

Q.    And is it customary when firearms are recovered on a scene like this at a traffic stop or any other location or search warrant that you photograph those firearms?

A.    Typically, yes.

Q.    I'm going to show you now a few more exhibits, 36 and 37.

      Do you recognize these two photographs, sir?

A.    I do.

Q.    And what do you recognize them as?

A.    These are the firearms that were found inside the backpack.

Q.    And these are the pictures that you actually took; is that correct?

A.    Correct.

          MS. MORRIS:  I move to admit Government's Exhibit 36 and 37.

          MR. JONES:  No objections, Judge.

          THE COURT:  All right.  They are admitted.

160

Q.   (BY MS. MORRIS)  I'm going to show you another physical exhibit this time, sir -- a series of physical exhibits.

I'm going to ask you to look through them one by one -- one by one and tell me if you recognize them.

MR. JONES:  Your Honor, could I just see the backpack?

MS. MORRIS:  Certainly.  Yes.

Q.   (BY MS. MORRIS)  So I'm showing you Government's Exhibit 43 and a series of smaller objects within it, which I'll ask you to read out.  And then we'll go through them one by one.

A.   Government's Exhibit 40, Taurus revolver ammunition. Government's Exhibit 42 is the ammunition from the .45 handgun with a magazine.  Government's Exhibit 44 is a holster -- Black Hawk holster.  Government's Exhibit 45 is a large flathead screwdriver.  Government's Exhibit 46 is another large flathead screwdriver.  Government's Exhibit 47 is a can of black pepper and a little hand towel.

Q.   I don't believe that one is marked.

A.   All right.

Q.   I'll ask you to also -- what is the exhibit number on that -- the larger item that contains those items?

A.   43, which is the gray and black backpack.

Q.   If you could also take a look at the two items contained in the boxes to your left.

UNITED STATES DISTRICT COURT
OFFICIAL CERTIFIED TRANSCRIPT

161

**A.**    Government's Exhibit 39 is the Taurus Judge revolver.

**Q.**    Is this the Taurus -- the ammunition you mentioned, 40, does correspond to Exhibit 39?

**A.**    It does.

And Government's Exhibit 41 is a .45 caliber handgun, which would correspond with the ammunition.

**Q.**    So do you recognize the backpack, Exhibit 43, and the contents 40, 42, 45, 46, and 47?

**A.**    I do except 47.  I don't recall the black pepper can.  But yes.

**Q.**    Would it have been customary for you to take a picture or otherwise notate a can of black pepper in a backpack seized at a scene?

**A.**    No.

**Q.**    Now, does it appear based on the presentation of the backpack or any evidence tags or markings that the backpack and its contents have been maintained in the normal course of preservation of evidence through the Atlanta Police Department?

**A.**    It appears so, yes.

**Q.**    Is there a tag from the Atlanta Police Department on the backpack?

**A.**    There is.

MS. MORRIS:  The Government moves to admit Exhibits 40, 42, 43, 44, 45, 46, and 47.

MR. JONES:  No objections, Your Honor.

162

THE COURT:  Okay.  They are admitted.

Q.   **(BY MS. MORRIS)**  Now, is the backpack the one you photographed at the scene, Investigator Worrell?

A.   Yes.

Q.   I'll ask you some specific questions about the firearms. You indicated that it is customary to photograph firearms that are found at the scene.

The Taurus Judge, Exhibit 39, did it have any particular significance in the context of your home invasion robbery investigation?

A.   Yes.

Q.   And what was that?

A.   It was the firearm that was taken during a home invasion on June 20th, 2015, on Blackland Drive.

Q.   And were you able to determine if the other firearm was stolen at some other point in time?

A.   Yes.  It was stolen from Memphis, Tennessee, if I recall, from a similar home-invasion-type crime.

Q.   All right.  Now, following this traffic stop, did you have any further encounters with Anthony Richardson, the driver of the car?

A.   Yes.

Q.   Okay.  How did that meeting with Mr. Richardson get set up?

A.   Investigator Bleifeld got Mr. Richardson's contact

163

information.  We -- Investigator Bleifeld reached out to Mr. Richardson on July 15 to schedule an interview.  Myself, Investigator Bleifeld, and Officer Youngs then went to pick up Mr. Richardson and bring him back to public safety headquarters at Atlanta PD.

Q.    Do you know how he reached out to him and scheduled that interview?

A.    By phone.

Q.    And do you know the phone number that he called to schedule that interview?

A.    Yes.  I believe it started with 704.  I don't recall the rest.

Q.    And at some point, did you actually review records from Metro PCS for that particular phone number?

A.    Yes.

Q.    For the 704 phone number?

A.    Yes.

Q.    And would the subscriber record for that number actually help refresh your recollection as to the number?

A.    Yes.

Q.    Please take a look at this and let me know if it refreshes your recollection as to the 704 number.

A.    Yes.  (704) 490-9610.  Yes.

Q.    (704) 490-9610; is that correct?

A.    That's correct.

164

Q.   All right.  I'm going to take that exhibit -- that document back from you.

So after the meeting was set up with Mr. Richardson, did you participate in a meeting with him?

A.   Yes.

Q.   Okay.  I'm going to show you two more exhibits marked as Government's Exhibit 48 and 49.  Please take a look and tell me if you recognize these.

A.   Lost one.

Yes.  These are photos of Mr. Richardson's phone, one making a telephone call, the other a contact in the phone.

MS. MORRIS:  Okay.  I'm going to move to admit now Government's Exhibits 48 and 49.

MR. JONES:  No objections.

THE COURT:  Okay.  Admitted.

MS. MORRIS:  Ms. Toussaint, if you could publish 48, please.

Is it possible to turn it?  It is all right if it is not.

MS. TOUSSAINT:  No.  Sorry.

Q.   (BY MS. MORRIS)  So what does Government's Exhibit 48 depict, Investigator Worrell?

A.   This is a telephone call to a contact that appears to be Brandon Lame Ass.

Q.   Who is holding the phone and the red lollipop?

UNITED STATES DISTRICT COURT
OFFICIAL CERTIFIED TRANSCRIPT

165

**A.** Anthony Richardson.

**Q.** If you could switch to Government's Exhibit 49 now.

**A.** Uh-huh (affirmative).

**Q.** What does this depict?

**A.** It is a contact for Brandon Lame Ass.

MS. MORRIS:  Ms. Toussaint, if you could blow up the number.

**Q.** **(BY MS. MORRIS)**  What does that indicate the number is on this exhibit, sir?

**A.** (901) 292-3291.

**Q.** And you mentioned previously that a phone number -- that Anthony Richardson was placing an outgoing call to this number 901 -- this contact saved under the name Brandon with what appears to be a nickname.

What happened when Anthony Richardson placed that outgoing call?

**A.** It said the number was no longer in service.

**Q.** And who did you learn that that phone number was associated with?

**A.** Brandon Redmond.

**Q.** And I'm going to ask you to look briefly at Government's Exhibit 14, which has already been admitted, Ms. Toussaint.

How does this number for the contact Shawty Love compare to the number that Anthony Richardson had saved in his phone?

**A.** It is the same.

Q.    The same number.  So when Anthony Richardson tried to call the defendant Brandon Redmond's phone number on July 15, it was disconnected; is that correct?

A.    Right.  The automated response was this number is no longer in service.

Q.    How many days was that after Anthony Richardson and Mario Jackson were arrested or were pulled over in that traffic stop with Georgia State Patrol?

A.    Six.

Q.    What happened with Mario Jackson's phone at that traffic stop?

A.    It was taken into custody as evidence.

Q.    Now, in addition to participating in this interview, did you spend time as part of this investigation reviewing phone records related to various -- to the various suspects involved in this case?

A.    Yes.

Q.    I'm going to show you what has been premarked as Government's Exhibit 50 and 51 and ask you if you recognize them.

      So I'm showing you Government's Exhibits 50 and 51.  What are these?

A.    Exhibit 50 are the two mobile records for (704) 490-9610.

          MR. JONES:  Judge, if I could just have a moment to talk to counsel.

**(A discussion ensued off the record.)**

**Q.    (BY MS. MORRIS)**  So you were mentioning that the 704 number records is on one of the discs; is that correct?

**A.**    Yes.  Exhibit 50, (704) 490-9610.  T-Mobile records.

**Q.**    Those are the T-Mobile records corresponding with Anthony Richardson's phone number; is that correct?

**A.**    That's correct.

MS. MORRIS:  The Government moves to admit those records from the cell phone provider.

MR. JONES:  No objections, Judge.

THE COURT:  Could I see them?  They are not in your exhibit notebook.

MS. MORRIS:  50.

THE COURT:  They are not here.

MS. MORRIS:  It is a disc, Your Honor.

THE COURT:  It is just a disc.  All right.

But what is the form of them?  I would like to know what I'm admitting.

MS. MORRIS:  Certainly.

THE COURT:  Are they just a disc with the billing records, or are they -- do they have sound on them?  What are they?

MS. MORRIS:  So the disc contains --

**Q.    (BY MS. MORRIS)**  Can you describe briefly the contents of the disc that you reviewed?

168

**A.**    Yes.  It is an Excel spreadsheet that has toll records.  So incoming/outgoing voice calls.  But it is all formatted in an Excel spreadsheet.

THE COURT:  Is this from the -- is that what you-all have done, or is it from the company?

THE WITNESS:  It is from T-Mobile.

THE COURT:  So T-Mobile produced it in that form to you?

THE WITNESS:  That's correct.

**Q.    (BY MS. MORRIS)**  Does it also include, Investigator Worrell, a copy of the subscriber record in a PDF or a Word document form?

**A.**    Yes.

THE COURT:  All right.  It is admitted.

**Q.    (BY MS. MORRIS)**  With regard to Government Exhibit 51, what does that contain, Investigator Worrell?

**A.**    These are the Sprint records for (901) 292-3291.  It is Exhibit 51.

MS. MORRIS:  Your Honor, for the record, I'm going to mark --

**Q.    (BY MS. MORRIS)**  To clarify for the Court's inquiry on the other exhibit, what two documents are on this disc?

**A.**    The Excel spreadsheet with the actual records.  And there should be some -- the subscriber information, which is a Word document.

169

MS. MORRIS:  And, Your Honor, I will go ahead and mark the Word document as 51A so that we can all refer to it because the defense has a copy as well.

**Q.   (BY MS. MORRIS)**  Do you recognize what I've just marked as 51A?

**A.**   Yes.  These are the subscriber records for the telephone number (901) 292-3291.

**Q.**   And is this document actually on the disc labeled Exhibit 50 -- the .rtf of -- the document ending in .rtf?

**A.**   Exhibit 51 I believe.

**Q.**   Excuse me.  51.

MS. MORRIS:  Okay.  I'll move to admit 51A as well, Your Honor.

MR. JONES:  No objections, Judge.

THE COURT:  They are admitted.

**Q.   (BY MS. MORRIS)**  So while we're on Exhibit 51A, Investigator Worrell, you mentioned that these are subscriber records for a particular number.

Please, if you will, restate the number that these are records for.

**A.**   (901) 292-3291.

**Q.**   Okay.  And I'll refer to this as 3291 are the last four for convenience sake.

Who is the subscriber of this particular -- to this phone number?

UNITED STATES DISTRICT COURT
OFFICIAL CERTIFIED TRANSCRIPT

170

A.    Brandon Redmond.

Q.    I'm publishing via the overhead projector Page 2 of 51A.

What -- according to this record listing Brandon Redmond as the subscriber, what was the billing address effective -- what was the effective date of this account?

A.    9/15 of 2014.

Q.    What address does Mr. Redmond list as his billing address?

A.    5700 Fenway Drive, Memphis, Tennessee, 38141.

Q.    And does this subscriber and billing record give you any indication of when the account was terminated?

A.    Yes.  7/13/2015 it shows a canceled status.

Q.    And how many days was that after Mario Jackson and Anthony Richardson's arrest?

A.    Four.

Q.    And when was that in relation to Anthony Richardson's attempted call to Brandon Redmond?

A.    This was two days prior to that interview.

Q.    So we discussed the fact that there is a -- there is a -- there are toll records -- an Excel spreadsheet on this Government's Exhibit 51 disc; is that correct?

A.    Correct.

Q.    And in basic terms, what does this spreadsheet contain?

A.    It will have a date and time of call it made or received or a text is made or received.  It will show the calling number.  It will show the called number.  It can show the cell

site which the call utilized to complete the transaction.

It will show the duration.  It can show, depending on the carrier, other -- other things.  But mainly it consists of called party, calling party, and then the date and a time and duration.

Q.   So like a call log and a text log?

A.   Exactly.

Q.   The calls to and from and the times and dates?

A.   Correct.

Q.   And just to clarify, what was the date that Mario Jackson and Anthony Richardson were stopped?

A.   July 9th.

Q.   July 9th, 2015?

A.   Correct.

Q.   And Mr. Redmond's phone was deactivated or canceled on July 13, 2015; is that right?

A.   Right.

Q.   So have you reviewed this Excel spreadsheet with Brandon Redmond's phone records, the to/from call log and text log?

A.   Yes.

Q.   Okay.  Now, you've indicated already your familiarity with two phone numbers that Mario Jackson used during the course of your investigation.

Are you familiar with him using any additional phone numbers?

172

**A.**   Mr. Jackson?  Yes.  There were a third, an additional that was prior -- I'm sorry.

**Q.**   Do you recall the Memphis -- the area code?

**A.**   It was 901.

**Q.**   I'm showing you what has been admitted already as Government's Exhibit 34 -- 54.  Excuse me.

Do you recognize this phone number?

**A.**   Yes.

**Q.**   And what do you recognize it as?

**A.**   That is one of the numbers attributed to Mario Jackson.

**Q.**   So is that the third number or is that one of the three numbers?  Excuse me.

**A.**   Yes.

**Q.**   One of the three numbers.

Now, are you also familiar with the phone number that was utilized by Leon Scott and Basil Varner?

**A.**   Yes.  I don't have them in my memory, but I would recognize them.

**Q.**   Would you recognize them if I said them to you?

**A.**   Yes.

**Q.**   (901) 801-9832, is that --

**A.**   Leon Scott.

**Q.**   -- Leon Scott's?

And do you know (256) 200-7532 as Basil Varner's number?

**A.**   Yes.

173

**Q.**    Now, explain to the jury when you looked prior to testifying today at Brandon Redmond's cell phone records what kind of -- what kind of analysis you conducted.

**A.**    Simply locating known phone numbers within those records and finding when there was activity around particular incidents.

**Q.**    Okay.  And were you looking to see whether Brandon Redmond was in touch with Mario Jackson's various numbers?

        MR. JONES:  I'm going to object to the question as leading, and it calls for a conclusion.  It says that Brandon Redmond was in touch as opposed to a phone that is attributed to Brandon Redmond.

        MS. MORRIS:  I apologize, Your Honor.  I'll make that connection.

**Q.**    **(BY MS. MORRIS)**  So when I refer to this phone number 3291 -- Brandon Redmond's phone number, I'm referring to 3291.  The cell phone records subscribed to by Brandon Redmond but the records associated with 3291.

        MS. MORRIS:  So if I could have one moment, Your Honor.

**Q.**    **(BY MS. MORRIS)**  So I'm showing you now -- I'm sorry.  I should show you first.

        Do you recognize this Government's Exhibit 55?

**A.**    Yes.

**Q.**    Okay.  And what do you recognize it as?

**A.** An attribution table showing numbers, who they are attributed to and the communication with the 3291 phone number.

**Q.** Okay. And does this reflect your analysis of the phone numbers with the different known numbers -- 3291 with the known numbers?

**A.** Yes.

MS. MORRIS: Permission to -- or I move to admit Government's Exhibit 55.

MR. JONES: No objections, Judge.

THE COURT: All right. 55 is admitted.

**Q.** **(BY MS. MORRIS)** I'll publish Government's Exhibit 55 now to facilitate your testimony, Investigator.

You mentioned in the beginning when you started to discuss Mario Jackson's number or numbers associated with him that his phone -- he migrated -- he appeared to have migrated from one number to the next.

When you looked at the 3291 records, did you see any communications or connections between the 3291 number subscribed to by Brandon Redmond and Mario Jackson's various numbers?

**A.** Yes.

**Q.** Can you explain to the jury, please, what you observed in that and those communications?

**A.** Yes. So the records for 3291 encompassed a time period, I believe, from middle of March 2015 until middle of July. I did

a find and replace for -- or did a find in the Excel spreadsheet to locate the known numbers attributed to these individuals and was able to determine a time span that the numbers were communicating with each other.

Q.   So if you could explain to the jury row by row what each of these -- what each of these entries signifies.

A.   So the first row is telephone number (901) 907-3921, which was attributed to Mario Jackson, communicated with the 3291 phone number from March 18 to May 12 based on a search of the records.

The second row, (901) 602-1788, also attributed to Mario Jackson, communicated with the 3291 number from May 22nd, 2015, to May 26, 2015.

Q.   Let me stop you there.  Was there any -- anything noteworthy with respect to the home invasion investigation that happened in that time frame of May 22nd to May 26, 2015?

A.   Yes.  The early morning of May 26, approximately 1:00, 1:30 A.M., the 3291 number had contact with the phone number belonging to Mario Jackson.

Q.   And when was that communication in relation to any robberies that may have been under investigation at that time?

A.   It was right after.  I believe the home invasion that occurred on May 25th was late evening.  So this was a couple of hours after that.

Q.   And what does the next row indicate?

176

**A.**   The third row is telephone number (901) 500-9328, another number attributed to Mario Jackson.  It communicated with the 3291 number from May 31st to July 9.

**Q.**   So July 9 was the date that Mario Jackson was arrested and his phone was seized; is that correct?

**A.**   Correct.

**Q.**   So according to your analysis, the 3291 number communicated with Mario Jackson up until the day his phone was seized?

**A.**   Correct.

**Q.**   And based on your familiarity with the investigation, does that time period, 5/31 to 7/9, encompass additional robbery activity?

You already told us about the 5/25 connection.

**A.**   It does.

**Q.**   And does that time period encompass the June 2015 robberies?

**A.**   Yes.

**Q.**   Okay.  What about the next row, the fourth row?  What does that row reflect from your analysis?

**A.**   Telephone number (901) 801-9832 belonging to Leon Scott communicated with the 3291 number from April 23rd, 2015, to July 2nd, 2015.

**Q.**   And do those communications span the time frame of the robbery activity that the defendant, Brandon Redmond, has been

177

charged with?

A.    Yes.

Q.    And were there any particular communications between Leon Scott and the 3291 number that were noteworthy in relation to the times of the robbery investigation?

A.    Yes.  There were similar communications on the early morning of May 26 with Leon Scott, if I recall, 1:00, 1:30 A.M.

Q.    Following the May 25th robbery that Leon Scott has pled guilty to?

A.    Correct.

Q.    Now, what about the next line?

A.    (256) 200-7532, which is a phone number belonging to Basil Varner, communicated with the 3291 number from June 16, 2015, to July 13, 2015.

Q.    And did this -- did these communications span at least some of the robbery activity in June of 20 -- 2015?

A.    Yes.

Q.    And do the records reflect that Ms. Varner and the 3291 number actually communicated the day -- the last day that the 3291 number was in service?

A.    Yes.  July 13.

Q.    And what about the final number -- the final row, rather?

A.    (704) 490-9610, which we attributed to Anthony Richardson, communicated with the 3291 number from April 4, 2015, to July 13, 2015.

178

Q.   And, again, same question as the Basil Varner communications:  Does this indicate to you that Mr. Richardson and the 3291 number were in communication up until the day that the 3291 number was deactivated?

A.   Yes.

Q.   And that was just a few days after Jackson and Richardson were arrested?

A.   Correct.

Q.   Were there any communications -- noteworthy communications on June 20th, 2015, the date of the -- the robbery incident on Blackland Drive in northwest Atlanta -- Blackland Road?

A.   Yes.  There was communication with numbers associated with Mr. Richardson, Ms. Varner, Mr. Scott, and Mr. Jackson, all four of them, throughout the day.

Q.   Now, in looking at the 3291 records, were you able to determine whether there was any activity on June 12th, 2015?

A.   There was not any activity.

Q.   And what about June 17th, 2015?

A.   There wasn't -- I believe there might have been one or two texts, but that was it for that day.

Q.   Now, the address of 1822 Chartwell Trace, Stone Mountain, 25 Annie Cook Way in Roswell, 105 Blackland Road in Atlanta -- are all of those locations in the Northern District of Georgia?

A.   They are.

Q.   Okay.

MS. MORRIS:  That's all I have on direct examination for Investigator Worrell, Your Honor.

THE COURT:  All right.

MR. JONES:  Judge, just give me a moment.  There is a lot of ground covered here.

THE COURT:  Yes.  Do you need five minutes to sort of pull yourself together?

MR. JONES:  That would be great.

THE COURT:  Okay.  Why doesn't everyone take a break.  Stand up and go to the bathroom.  We'll call you back and let counsel get himself together.

MR. JONES:  If I could take a short comfort break, Judge.

**(The jury exited the courtroom at 4:10 P.M.)**

THE COURT:  People are welcome to stay, leave.  Not leave the building.

**(A brief break was taken at 4:10 P.M.)**

THE COURT:  Have a seat.  Just one second.  I just would appreciate you getting clarification about what we mean by communications.  We can spend a lot more time than I would like to if we don't get any clarification about what does it mean to have -- that there were communications between --

MS. MORRIS:  Okay.  Do you want me to clean that up on direct?

THE COURT:  I guess so.

180

MR. JONES:  Well, Judge --

THE COURT:  You are happy to do it?

MR. JONES:  I'm happy to cross now.

THE COURT:  Okay.  Fine.  Go ahead.  Just get it done.

MS. MORRIS:  Or I can ask him.

THE COURT:  He can ask.  This is not a loaded question.  I just want to -- don't want to end up having the whole thing end up taking more time because we ultimately get confused what the word communications mean.

MS. MORRIS:  And I suppose also one could speculate, not knowing the way we do obviously, about, oh, well, do you have the content of those communications or -- that can certainly be --

MR. JONES:  Well, maybe I can clear it up, Judge.

MS. MORRIS:  Yeah.  I mean, we take for granted some of those basic facts.  But yeah, I might have gone too quickly over those things.  I understand.

MR. JONES:  Judge --

THE COURT:  If you don't get it, she will be allowed to clean it up.

MS. MORRIS:  Sure.  I understand what you are saying now.

THE COURT:  All right.  All right.  We can bring the jury back.

181

**(The jury entered the courtroom at 4:25 P.M.)**

MR. JONES: Shall I proceed, Judge?

THE COURT: Yes.

CROSS-EXAMINATION

BY MR. JONES:

Q. Mr. Worrell, am I saying your name right?

A. Worrell.

Q. My name is Derek Jones. I'm an attorney in Atlanta, and that is my client over there, Mr. Brandon Redmond.

A. Hello.

Q. Now, you have got this chart here where you talk about communications.

Now, by communications, you mean that the records per your opinion show that these phones communicated; correct?

A. Yes. There was an entry in the records that showed another one of those cell phone numbers in there, whether it was a text or whether it was a voice call. Yes, there was interaction between those two numbers.

Q. But you don't actually have like -- this is not like this was a wiretap situation where there were recorded phone calls and you can attempt to identify the voices? This is just communication between devices?

A. That's correct. Yes.

Q. Okay. Now, you -- 51 is -- I believe you said there were two phones for Mr. Redmond?

182

**A.**    I was only aware of one.

**Q.**    Okay.  Well, then I misunderstood you.

Okay.  This one -- putting Government's 51 on this device here, it says Sprint records for 29 -- United States vs. Brandon Redmond, Sprint records for this particular number 292-3291?

**A.**    Correct.

**Q.**    Okay.  And that is the phone that you said -- well, I'll get to that.  So bear with me, Mr. Worrell.  It has been a long day.  And if I stumble a bit, I will work through it.

**A.**    I understand.

**Q.**    Now, there is also a -- Number 50 was United States vs. Brandon Redmond, T-Mobile records for -- and that is the number up there; correct?

**A.**    Correct.

**Q.**    But that is -- you are not contending that this was a phone that was registered to Brandon Redmond; correct?

**A.**    No.  That was --

**Q.**    That was actually Mr. Richardson's phone?

**A.**    Correct.

**Q.**    So do you have any other phone records in the name of Brandon Redmond?

**A.**    No.

**Q.**    Okay.  Now -- and the call records to the -- well, let me -- I think it is easier if I use this.

183

You have attempted to go through and summarize -- in Government's Number 55, you have attempted to go through and summarize the period of time that the Brandon -- phone registered to Brandon Redmond communicated with other phones?

A.    Correct.

Q.    Okay.  And this was the basis of your analysis, and that was the period of time that these phones were connected.

Okay.  Now, this looks rather simple in terms of -- well, it doesn't show you how many calls were made by what we're going -- I'll call the Brandon -- phone registered to Brandon Redmond.

But that doesn't indicate the volume of calls, does it?

A.    It does not.

Q.    Now, I have printed out --

MR. JONES:  If I may approach, Your Honor.

Q.    (BY MR. JONES)  And I believe you touched on this in your direct examination.  But there are a large number of calls over several months.

And what I'm showing you now is basically Page Number 295 to 390; is that correct?  This is a hard copy of the document that you have looked at on a spreadsheet?

A.    Yes.

Q.    Okay.  So you, being somewhat younger than me, Mr. Worrell -- you are sort of a computer guy and this is a paper document?

184

**A.**   Yes.

**Q.**   Okay.  There we go.

Now, I believe you testified -- and what I showed you basically goes from May 31st, 2015, through July 13 of 2015; is that correct?

**A.**   I didn't look at the end.  I don't know if that is --

**Q.**   Well, sure.  Let me put my mask back on.

Okay.  If you would just take a look at it, it basically goes through May 31st through July 13th.

**A.**   Yes.

**Q.**   Now, in looking at this, there is -- and I believe the Government touched on it in their -- in their direct examination.

But there is -- from June 10th through June -- June 10th through, let's see, June 18th, there is much less calls than during the other days; correct?

**A.**   Yes.

**Q.**   And we believe we know from now that two of these home invasions occurred on June 17th and June 12th?

**A.**   Yes.

**Q.**   But there is very few calls during that time.  As a matter of fact, there is only two on June 17th; correct?

**A.**   Right.  I believe those were texts.

**Q.**   I beg your pardon?

**A.**   Yes.

185

**Q.**    Okay.  Or text communications we'll call them.

**A.**    Yeah.  I believe it was texts.  Yes, I think you are right, two on the 17th.

**Q.**    But nothing on June 12th?

**A.**    Right.

**Q.**    And that is the date of one of the holdups; correct?

**A.**    Yes.

**Q.**    Okay.  Now, did you look at -- did you ever look for the number (901) 318-7222?

**A.**    That number does not ring a bell.  So I would say no.

**Q.**    Okay.  So your recollection is that when you went through these call records (901) 318-7222 was not in there?

**A.**    I do not know.

**Q.**    But it doesn't ring a bell to you now?

**A.**    No, it does not.

MR. JONES:  Okay.  Do you mind if I put this in evidence?

MS. MORRIS:  No objection.

MR. JONES:  I don't have a sticker, and I didn't think I was going to be using it.  And I don't know what number I'm up to, quite frankly.

COURTROOM DEPUTY CLERK:  12.

MR. JONES:  12.  Let me make sure I don't have another 12 there.

Thank you, Mr. Martin.

UNITED STATES DISTRICT COURT
OFFICIAL CERTIFIED TRANSCRIPT

COURTROOM DEPUTY CLERK:  Your list only goes up to 11.

MR. JONES:  All right.  Good.  Okay.  I'll move to introduce Defendant's Exhibit Number 12, Your Honor.

THE COURT:  Any objections?

MS. MORRIS:  No objection.

THE COURT:  It is admitted.

Q.   **(BY MR. JONES)**  Now, Mr. Worrell, I don't know whether or not you are aware that the defense may present a defense of alibi in this case.

Are you aware that that is a possibility?

A.   I'm not aware.  I don't know.

Q.   And do you know that in an alibi defense you have to give the phone numbers of your potential witnesses?

A.   Okay.

Q.   Do you know Ms. Lavonzella Redmond of Memphis, Tennessee?

A.   I do not.

Q.   Okay.

A.   I don't recall her.

Q.   Would it surprise you to know that Ms. Redmond's number is (901) 318-7222?

A.   It doesn't surprise me.  I take your word for it.

Q.   Okay.  Well, let me show you my notice of alibi and the date that I gave this to the Government.

The first page -- tell me if you see that -- do you see

that number?

A.   Yes.

Q.   Okay.  And what is the date that I served that notice of alibi on the Government?  It will be on the next page.

A.   13th day of November, 2018.

Q.   So that is about getting two years, eight months ago -- roughly two years, eight months ago?  Well -- okay. November 2018, and we're now August 2021.  Okay.

     When you examined phone records of defendant's, would you expect to see during a time from May 2015 to July 2015 that they might call their mother?

A.   If they have a good relationship, sure.

     MR. JONES:  Okay.  Now, I'm going to try my best not to confuse this stuff, Judge, by mixing up mine with theirs.

Q.   **(BY MR. JONES)**  Now, you say that the phone calls stopped on -- the phone was cut off from service on July 13, I believe it was, 2015, and that is about the last call that is reflected on that list; correct?

A.   Yes.

Q.   Okay.  Now, the record here shows in terms of this is the -- this is Government's 51A -- let me put it this way. This is 51A.  And this is the Sprint -- Sprint information that you talked about earlier; correct?

A.   Correct.

Q.   And that is the one that has -- and that is the phone

associated with Brandon Redmond, 3291; correct?

**A.**   Yes.

**Q.**   And that gives Mr. Redmond's address on Fenway Drive?

**A.**   Yes.

**Q.**   In Memphis, Tennessee; correct?

**A.**   Yes.

**Q.**   And so the calls stopped on July 13.  But you know where Mr. Redmond was arrested.

Do you remember Mr. Redmond was arrested -- wasn't it like November 5th or 6th of 2015?

**A.**   I don't know the specific date, but I believe it was November.

**Q.**   November.  And he was arrested, was he not, at 5700 Fenway Drive, Memphis, Tennessee?  Was he not?

**A.**   I do not know.

**Q.**   Okay.  But he wasn't arrested in California in a hotel somewhere paying cash; correct?

MR. JONES:  I strike that, Your Honor.  That is argumentative.  I strike that.  I strike that question.

THE COURT:  Okay.

**Q.**   **(BY MR. JONES)**  Now, there came a time when after you identified Mr. Mario Jackson on July 9 and then there was a traffic stop?

**A.**   Yes.

**Q.**   Okay.  And then you've got photos of the traffic stop.

189

Are they in front of you?

A.   No.  You took them.

Q.   I took them.  I was afraid of that.

Okay.  But you stopped him for seat belt, and there were three people in the car:  A small child, Mr. Richardson, and Mr. Jackson?

A.   Yes.

Q.   And there was a couple of firearms in the car and other materials.

Now, you said it was customary to take photographs of firearms during a traffic stop.

But let me ask you this:  If it is John Q. Citizen in Georgia where you have a right to carry law and the person has a -- is stopped for speeding and there is a firearm in the vehicle, a state trooper is not going to take a picture of that firearm unless there is a reason otherwise to take it; correct?

A.   That is correct.

Q.   Okay.  So but this was a reason otherwise, given what you were developing from Mr. Jackson?

A.   Yes.

Q.   Now, I believe you said one of the weapons was stolen in this case -- stolen from one of the victims in this case?

A.   Yes.  The Taurus Judge.

Q.   Yeah.  Who did that -- who did that -- what holdup was that connected to?

190

**A.**    The home invasion on 105 Blackland, as I recall.

**Q.**    So that was the June 19th one?

**A.**    The 20th.

**Q.**    June 20th.  Yes.  June 20th.

Okay.  And you found the firearm.  And was it you who contacted the gentleman who it belonged to?

**A.**    No.  That was likely Investigator Bleifeld.

**Q.**    Okay.  But it was determined that by the serial number that the male victim in that case -- that was determined that the firearm was, in fact, his?  He was able to provide the serial number to you, and you confirmed that, okay, this firearm that was found in the possession of Mr. Jackson came from that victim in the third holdup that we're talking about in this case regarding Mr. Redmond?

**A.**    Yes.

**Q.**    Okay.  Just to be -- I think it is clear.  But to state the obvious, when the firearm was recovered, Mr. Redmond wasn't in the car?

**A.**    No, he was not.

**Q.**    And the firearm wasn't recovered from Mr. Redmond?  It was recovered from Mr. Jackson in the vehicle that he and Mr. Richardson were in?

**A.**    Yes.

**Q.**    Now, in the backpack, there was a number of items that has been -- you have laid out in front of you.  And -- I'm sorry,

191

folks.  Let me just grab these.

Now, you seized these -- seized these and actually tagged these, correct, which is Government's Exhibit 45 and Government's Exhibit 46?

A.   They were seized, yeah.

Q.   And was one of the reasons that you seized them was that you thought that this is something that a home invader might find handy in terms of breaking into somebody's house?

A.   I believe the entirety of the contents of the backpack were all taken into evidence.  I didn't make the decision on those specific items --

Q.   Well, there is also 42, which is the clip from an automatic --

A.   -- magazine, yes.

Q.   Right.  Okay.  And then basically what you do with this is you take it, put the -- put the bullets in there, and then you put it in the automatic?  That is how it works?

A.   Uh-huh (affirmative).  Well, semiautomatic.

Q.   Semiautomatic.  Okay.  Then there is also this Publix pepper spray, which is Government's 47.

I'm assuming from the absence of black powder on these that none of these items were fingerprinted; is that correct?

A.   I do not know.

Q.   Well, generally when items are fingerprinted, they often -- even awhile later, if they have been stored in

evidence, they will have that black print powder on them; correct?

A.   It is possible.

Q.   Sure.  Okay.  And would not all of those surfaces have the possibility of having latent prints on them?

A.   It is possible.

Q.   By latent prints, I mean prints that could be recovered and then compared to a suspect or a person later on.

A.   Again, it is possible.

Q.   Well, it is done commonly in the law enforcement business, is it not?

A.   Yes.

Q.   To try to find fingerprints, particularly when, as you know in this investigation, there was an absence of physical evidence in the case?

A.   I'm sorry?

Q.   There was an absence of physical evidence in this case in terms of -- well, in terms of Mr. Redmond?

A.   I don't recall what evidence was collected.

Q.   Well, you haven't connected Mr. Redmond to the scene -- any of these scenes by his fingerprints, his DNA, or anything like that?  Fiber evidence?  Blood?  Anything like that?

A.   Not to my knowledge.

Q.   Okay.

          MR. JONES:  Judge, I'm winding down, if I could have

a moment, please.

THE COURT:  Sure.

**(There was a brief pause in the proceedings.)**

MR. JONES:  You were correct, sir.  I did have the photos.  I did have the documents.

Judge, I don't believe I have anything else of this gentleman.  Thank you.

THE COURT:  All right.  Any redirect?

MS. MORRIS:  Just very briefly.

REDIRECT EXAMINATION

BY MS. MORRIS:

Q.   On cross-examination, Investigator Worrell, Mr. Jones alluded to the fact that Mr. Redmond was arrested in November 2015.  And I realize you didn't know the details of that.

But does that sound about the right time?

A.   Yes.

Q.   Referring to Government's Exhibit 51A, if you still have it -- no, you don't.

When did the Atlanta Police Department receive the requested records from Sprint regarding the 3291 number associated with Brandon Redmond?

A.   September 17, 2015.

Q.   And is it -- was the investigation regarding Brandon Redmond's role still ongoing when those records were requested

194

and received?

**A.**   Yes.

**Q.**   Okay.

          MS. MORRIS:  Nothing further, Your Honor.

          MR. JONES:  No recross, Your Honor.

          THE COURT:  All right.  May this witness be excused?

          MR. JONES:  No objections.

          THE WITNESS:  Thank you.

          THE COURT:  Excuse me.  Does the Government excuse the witness?

          MS. MORRIS:  Yes, Your Honor.

          THE COURT:  Please don't discuss the testimony with anyone else until this matter is concluded -- this trial.

          THE WITNESS:  Yes, ma'am.  Thank you.

          THE COURT:  Do you have a very short witness, or do you want to conclude on this today?

          MR. BUCHANAN:  We have a short witness, Your Honor.  The United States calls Taurus Nolen.

          COURTROOM DEPUTY CLERK:  Please raise your right hand.

                    **(Witness sworn)**

          COURTROOM DEPUTY CLERK:  Thank you.  Please have a seat.  If you would, there are some plastic bags over there somewhere.  There you go.  Thank you very much.  If you would, take one of those and place it over the microphone.

UNITED STATES DISTRICT COURT
OFFICIAL CERTIFIED TRANSCRIPT

And then if you would state your name, and please spell your last name for the record.

THE WITNESS:  My name is Taurus Nolen, N-O-L-E-N.

MR. BUCHANAN:  May I, Your Honor?

THE COURT:  Yes.

Whereupon,

LIEUTENANT TAURUS NOLEN,

after having been first duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. BUCHANAN:

Q.    Is it Lieutenant Nolen?

A.    Yes, sir.

Q.    Sir, how are you employed?

A.    I'm employed with the Memphis Police Department.

Q.    How long have you been employed with the Memphis Police Department?

A.    22 years.

Q.    And what types of cases do you work on?

A.    Now?

Q.    Yes, now.

A.    Now I'm a supervisor over PSN, which is Project Safe Neighborhoods.

Q.    And prior to your work with PSN, what did you do?

A.    I worked for Safe Streets for eight years, which is a Federal Bureau of Investigation task force.

**(There was a brief pause in the proceedings.)**

Q.   **(BY MR. BUCHANAN)**   And were you working on this Safe Streets task force with the FBI back in 2015?

A.   Yes.

Q.   And as a part of your work with the Safe Streets task force, do you communicate and work with agents and other places outside of Memphis?

A.   Yes.

Q.   And as a part of that work with agents outside of Memphis, did you become involved in the investigation involving Mr. Brandon Redmond?

A.   I did.

Q.   And ultimately were you a part of the team that executed an arrest warrant for Mr. Redmond?

A.   That's correct.

Q.   And do you recall where that arrest warrant was executed?

A.   Yes.

Q.   And where was that?

A.   4700 Fenway, I believe it was.

Q.   That address on Fenway Drive, that is in Memphis?

A.   That's correct.

Q.   And did you and your colleagues go there on or about November 6th, 2015?

A.   That's correct.

Q.   And when you went there to that residence, did you

encounter Mr. Redmond?

**A.**    Yes.

**Q.**    And, sir, was it 4700 or 5700?

**A.**    5700.

**Q.**    5700 Fenway is where you went in November 6th, 2015?

**A.**    That's correct.

**Q.**    And was Mr. Redmond at that residence on that day?

**A.**    Yes.

**Q.**    And was Mr. Redmond arrested and taken into custody on that date?

**A.**    Yes.

**Q.**    And do you see the individual whom you and your colleagues arrested on that date in Memphis, Tennessee?

**A.**    Yes.

**Q.**    Please identify him by an article of clothing that he is wearing.

**A.**    He is the gentleman in the crimson shirt.

        MR. BUCHANAN:  I would like the record to reflect that the witness has identified the defendant as the person he arrested in Memphis.

        Nothing else, Your Honor.

        THE COURT:  All right.

                        CROSS-EXAMINATION

BY MR. JONES:

**Q.**    Good afternoon, Lieutenant Nolen.

198

**A.**   Good afternoon, sir.

**Q.**   My name is Derek Jones.  I'm an attorney in Atlanta.  I represent Brandon Redmond.  Just a few brief questions.

I'm going to show you the document here.  The address there that has the checkmark, is that where you arrested Brandon Redmond?

**A.**   Yes, sir.

MR. JONES:  Okay.  No further questions.

THE COURT:  May this witness be excused?

MR. BUCHANAN:  Yes, Your Honor.

THE COURT:  Thank you.

Anyone else short like that?

MR. BUCHANAN:  No, Your Honor.

THE COURT:  Do you know approximately how many more witnesses you have?

MR. BUCHANAN:  Between one and three, Your Honor.

THE COURT:  Okay.  Then we'll talk about that a little more just in terms of the schedule.

Ladies and gentlemen, why don't you just retire to the jury room for just a few minutes.  I want to make sure what time I need you to report based on what they say to me.  I think it would be most helpful.

Thank you very much for your attention.  And, remember, don't discuss the testimony or evidence with anyone, including each other.

UNITED STATES DISTRICT COURT
OFFICIAL CERTIFIED TRANSCRIPT

**(The jury exited the courtroom at 4:58 P.M.)**

THE COURT:  So one to three.  What are you thinking about on time?  It is three versus one.

MR. BUCHANAN:  I believe that even if we call the three, I believe we will still be done, as we instructed Mr. Martin, by lunch tomorrow.

THE COURT:  Okay.  So are your witnesses -- do you think your witnesses are going to be with you by then, Mr. Jones?

MR. JONES:  Yes.  I'm hopeful that they will be here, and I believe they will be here, Judge.  I have not had any communications directly during the -- during the trial today.  But I believe that they will be here.

If there is any problem, I will let the Court know.  But I'm expecting them.

THE COURT:  Well, all I'm -- and how long do you think your witnesses will take?

MR. JONES:  An hour on direct total.

THE COURT:  Okay.  Well, my thought is, as much as we like to race here, I don't want to sort of end up having this jury waiting for people.  And if you haven't seen your folks, maybe we should begin a little later in the morning so we're not holding them around.

And I could -- given what you are saying, it seems like if we started at 10:30 we would still be able to finish

your case by 1:00 and they would get lunch, and we would get a break.

MR. JONES:  Let me see if I can reach out now, Judge. I would like --

THE COURT:  But if they are not going to get here until 2:30 --

MR. JONES:  No.  I'm expecting that they are in Atlanta or will be in Atlanta today so we can go forward tomorrow.

**(There was a brief pause in the proceedings.)**

MR. JONES:  Judge, I don't know if I will get a communication back.  I just emailed one of my witnesses.

But, Judge, my expectation is that my folks are in Atlanta now or on the way.  I've been working on accommodations and all that to add a night for the accommodations.  I think I have accomplished that.  I have to communicate that to them.

The Court, of course, runs the court.  But my suggestion is that we just go forward tomorrow morning at 9:30. And, you know, I'll have a Rule 29 motion that probably won't take too long and then --

THE COURT:  I'm going to begin at 10:00 because I have had the jury waiting for us every morning and every afternoon.  So I feel kind of sensitive about that at this juncture.  So I would rather just take -- I mean, just start at 10:00 and then be a -- and hopefully really be in at 10:00.

I don't see any issues that are going to blow up in our face.  You will do your motion.  I want to get you-all the charges.  And, you know, if we can do a charge conference and -- you know, are you thinking you are going to want to roll into -- into closing arguments on Wednesday or on -- knowing all of this?  Or do you want to sort of clean up and get yourselves ready and then have closing argument Thursday morning?

MR. BUCHANAN:  The Government would prefer to clean up and close Thursday morning, Your Honor.

MR. JONES:  That will work for me, Judge.

THE COURT:  Well, I think we'll have plenty of time then if we start at 10:00 in the morning, even if that is now 10:30 in the morning as it turns out.  But just simply then we're going to be at least not just having them sit -- having to deal with traffic for no purpose.

MR. JONES:  Judge, if I do -- if I do find that there is some sort of problem, you know, if a car broke down or whatever, I'll report anything that I have to Mr. Martin as soon as I know if there are complications.

THE COURT:  Then maybe Mr. Martin can just -- we have one juror who has never told you his telephone number; is that right?

COURTROOM DEPUTY CLERK:  I believe I got them all.

THE COURT:  So please do.  Because if he has to -- if

we have a problem because of people coming out of town, he needs to communicate -- we will tell them he is going -- that they should be looking at their telephones in the event there is any -- that there are people coming from out of town.

MR. JONES:  Thank you, Judge.

THE COURT:  All right.

MR. BUCHANAN:  Last bit of information, Your Honor: A few moments ago Ms. Ivory -- Victoria Brunner Ivory relayed to us that Mr. Redmond made some comment to her client as he was leaving the courtroom.  We noticed it yesterday, a little dialogue between Mr. Redmond and Mr. Scott, as he was leaving the stand.

I don't believe -- there may be one other cooperating witness that has to testify tomorrow.  But we would like the Court to admonish Mr. Redmond about communicating with our witnesses as they come and go.

THE COURT:  I think I've tried to relay that -- a concern about this via -- but I know that this -- as I have told you before, Mr. Redmond, I recognize this is a stressful time and you know all of these people.

But you don't want something also to happen in your communication with one of these defendants, as short as it may be, that ends up hurting you that you haven't thought about.

So I really want to strongly state to you it is not acceptable.  And I say that for the purpose of the justice

system but also not acceptable for purposes of -- you know, for you taking care of yourself and not -- and protecting yourself from -- and you may be completely ignorant of this in the system.

And yes, you know, you heard Mr. Jackson make all sorts of idle comments during his plea. But we were trying to get that over with and just move forward.

But you have a great interest, frankly, in seeing that this trial goes smoothly, that no one is watching you say something to one of the defendants that is adversely considered against you, even though you have no idea that that might be so.

It is like watching a movie. Just these little things happen, and you don't know what the -- how somebody else will interpret it. And so, you know, in fact, right now I'm glad that you've been able to show your genuine face at points at least.

And I would -- but, you know, it is very hard for people to keep a straight face when things are upsetting. And that is the only thing I can say positive about masks. But be very careful because it is not acceptable.

And I won't -- and when anyone else comes through here, you just have to be completely mum. Don't say anything at all.

Do you understand that?

204

THE DEFENDANT:  Yes, ma'am.

THE COURT:  Yeah.  You complied with what I asked you about the feet and the moving around, and I appreciate that. And just impose that degree of self-control here as to that too.  All right?

THE DEFENDANT:  Yes, ma'am.

THE COURT:  All right.  Anything else we need to address?

MR. JONES:  Just, Judge, if the Marshals -- if I could have a moment with Mr. Redmond alone before he is brought down.

THE COURT:  Sure.  Where are they?

THE MARSHAL:  That is fine, Your Honor.

THE COURT:  All right.  If we can get you out anything tonight, we will.  Otherwise we will definitely -- we'll just give you a longer break to look at them.  They are not that complicated.

MR. JONES:  So, Judge, the Court is just going to let the jurors know -- is the Court going to bring the jurors back to instruct them or --

THE COURT:  No.  Mr. Martin will talk with them.

MR. JONES:  Great.  No objections to that, Judge.

THE COURT:  What?

MR. JONES:  No objection to Mr. Martin communicating with the jurors about a 10:00 day tomorrow.

THE COURT:  No.  All right.  Very good. Everyone, be well.  Get some rest if you can.

**(The proceedings were thereby adjourned at 5:08 P.M.)**

C E R T I F I C A T E


UNITED STATES OF AMERICA

NORTHERN DISTRICT OF GEORGIA


     I, SHANNON R. WELCH, RMR, CRR, Official Court Reporter of the United States District Court, for the Northern District of Georgia, Atlanta Division, do hereby certify that the foregoing 205 pages constitute a true transcript of proceedings had before the said Court, held in the City of Atlanta, Georgia, in the matter therein stated.

     In testimony whereof, I hereunto set my hand on this, the 23rd day of September, 2021.


_____
SHANNON R. WELCH, RMR, CRR
OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT