The following is the PDF of an official transcript. Official transcripts may only be filed in CM/ECF by the Official Court Reporter and will be restricted in CM/ECF for a period of 90 days. You may cite to a portion of the attached transcript by the docket entry number, referencing page and line number, only after the Court Reporter has filed the official transcript; however, you are prohibited from attaching a full or partial transcript to any document filed with the Court.

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA,       :
                                :
vs.                             :   DOCKET NUMBER
                                :   1:15-CR-284-AT-1
MARIO DEANDRE JACKSON,          :
                                :   ATLANTA, GEORGIA
            DEFENDANT.          :   AUGUST 4, 2022


**TRANSCRIPT OF SENTENCING PROCEEDINGS**

**BEFORE THE HONORABLE AMY TOTENBERG**

**UNITED STATES DISTRICT SENIOR JUDGE**


APPEARANCES OF COUNSEL:

**FOR THE GOVERNMENT:**

RYAN K. BUCHANAN
JESSICA C. MORRIS
UNITED STATES ATTORNEY'S OFFICE

**FOR THE DEFENDANT:**

JEFFREY L. ERTEL
NATASHA PERDEW SILAS
FEDERAL DEFENDER PROGRAM, INC.


*MECHANICAL STENOGRAPHY OF PROCEEDINGS AND COMPUTER-AIDED TRANSCRIPT PRODUCED BY:*

*OFFICIAL COURT REPORTER:*      *SHANNON R. WELCH, RMR, CRR*
                                *2394 UNITED STATES COURTHOUSE*
                                *75 TED TURNER DRIVE, SOUTHWEST*
                                *ATLANTA, GEORGIA  30303*
                                *(404) 215-1383*

**P R O C E E D I N G S**

**(Atlanta, Fulton County, Georgia; August 4, 2022.)**

THE COURT:  Good morning.  Have a seat.

Counsel, are you ready, or do you need some more time with Mr. Jackson?

MR. ERTEL:  We're ready.

THE COURT:  Good morning, Mr. Jackson.  Good morning, Counsel.

We are here for the sentencing in United States of America v. Mario Deandre Jackson, Case Number 1:15-CR-284-1.

And, Counsel, would you go ahead and announce yourselves.

MR. BUCHANAN:  Good morning, Your Honor.  Ryan Buchanan and Jessica Morris for the United States.  We are joined at counsel table by FBI Special Agent Tim Burke.

MR. ERTEL:  Morning, Your Honor.  Jeffrey Ertel and Natasha Silas for Mr. Jackson.  Mr. Jackson is seated at counsel table with us.

THE COURT:  Very good.

THE DEFENDANT:  Morning, Judge Totenberg.

THE COURT:  Good morning.

Good to see you, Ms. Silas.  This is a special appearance, and I appreciate your being here and your -- and on behalf of counsel who is trying a case in Oklahoma also.  Good to see you.

MS. SILAS: Yes.

THE COURT: And, Mr. Buchanan, I appreciate your appearance. I know you have many larger, other broader responsibilities these days. And congratulations for it finally happening.

MR. BUCHANAN: Thank you, Your Honor.

THE COURT: And I want to welcome everyone who is in the courtroom. Thank you for your attendance.

So, Mr. Jackson, did you have an opportunity to review the presentence report and discuss the sentencing process with your counsel?

THE DEFENDANT: Yes. Yes, Your Honor.

THE COURT: And have you had a sufficient opportunity to -- do you need any more time to talk with your counsel before we begin today?

THE DEFENDANT: No, ma'am. No, ma'am.

THE COURT: Very good. I have the presentence report in front of me, and I also have Mr. Ertel's sentencing memorandum on behalf of Mr. Jackson.

And while at some juncture it addresses the question of credit for time served in the pen under the extraordinary circumstances that were existing at the pen, I'm not going to address that at this point.

There were no objections identified as to the actual findings in the presentence report; is that correct?

MR. BUCHANAN:  Yes, Your Honor.

MR. ERTEL:  Yes, Your Honor.

THE COURT:  Okay.  So according to -- then I'm going to adopt the presentence report.  I know that there are some issues regarding some of the items in here that relate to another defendant.  But I'm not going to address those at this juncture.

But -- so for purposes of Mr. Jackson's case, I'm adopting the presentence report.  And according to the report, the criminal history category is VI and the custody guideline -- the custody guideline range would be -- under Counts 2, 5, 7, 10, and 12 would be 360 months to life and the -- under -- and there are 84 consecutive months under Count 3, 6, and 13 that would have to be imposed consecutive to that under the guidelines and federal law.

And the total custody guideline range under -- if applied -- if the guidelines are applied would be 612 months to life, with a guideline -- fine guideline if imposed of 40,000 to $400,000 if Mr. Jackson actually had the capacity to pay that.

Under Counts 2, 5, 7, 10, and 12, that would be a term of supervised release of two to three years; under Counts 3, 6, and 13 that would be five years to life under the guidelines.

Anyone dispute that those are the guidelines

applicable?

MR. BUCHANAN:  The United States does not, Your Honor.

MR. ERTEL:  I'm sorry.  Your Honor, can you --

THE COURT:  Do you dispute that those are the guideline calculations that are applicable here?

MR. ERTEL:  No, Your Honor.

THE COURT:  Now, in order to move this matter forward and resolve this case in a way that was reasonable and also impose appropriate punishment that also protected many from a great deal of trauma associated with the trial, the Government and the defendant agreed to a binding plea agreement of 25 years.  And we had a plea hearing in which some of the individuals here at least were present.  And I accepted that binding plea agreement at that hearing.

Are there -- I want to know whether, first of all, on behalf of the Government do you wish to address the Court or -- and also do any -- because there are victims here, do you want to give any of them an opportunity to address the Court?

MR. BUCHANAN:  Your Honor, I would like to give a few of the victims the opportunity to address the Court.

Now we call Victim TM as identified in the superseding indictment.

VICTIM TM:  Thank you, Your Honor.

Seven years ago, Mario Jackson and your thug friends,

I was a victim of your armed robbery, home invasion, attempted murder, your sexual assault, which changed my life forever and all of the victims.

That evening of Father's Day, you cased our case and terrorized us like terrorists. My former boyfriend was smoking a cigar in our garage, and it was a stormy raining evening, and we returned from a wedding. And you and your thug friends, including all of -- all of the people that you had in our house that day while you were masked, terrorized us, beat us up. You had a gun to my head, dragged me out of -- whoever dragged me out of my bed had another gun that I gave them.

You -- you or whoever dragged me with all of your power and then threw me against the bed and held my arms down. Whoever that was. And only you and your friends and thugs know. Mostly terrorists that you are.

Whatever happened in our house nobody should ever have to experience. We were law-abiding tax citizens and you chose to victimize us. Thugs you are of this horrendous crime. You played a key role with Mark and I in our home. It should be a death sentence to terrorize somebody in their house.

You took all of my personal belongings, all of my jewelry from my grandmother. You and your thugs had guns to my head. Who I don't know. And you asked me, do I have guns, do have I jewelry, anything of value while you cased -- one of you cased our house, pounding at Mark's head -- because he is not

here to speak, pounding his head with a gun.  I don't know why you took -- you took a plea deal because you should see life in prison.

I had this written out for you.  But I am -- I'm not going to let you victimize me of everything.  Everything that I personally owned and everything my grandmother gave me and the relationship that ended was because of you.

The seven years has been torture.  When you can't go to sleep at night -- every single night, it is in my head.  If I go to sleep, I might get you sexual -- whoever it was sexually assaulting me or putting a gun to my head.  That is no way to live.

I had a stroke in 2017.  I think it was from the stress of -- because the next day when I saw you in court -- and I did see you in court when AT&T was the expert witness.  It was you that I blame for my stroke.

I don't want to go through all the counts and everything I actually wanted to say because I really want the family behind me to say what I feel too.  I know it was almost 90 minutes in our house.  I know the crime you convicted -- or were convicted of.  But it doesn't -- you are just with no emotion and stoic.  And you should be sorry.

I don't want to talk about who Brandon Redmond is or Varner.  I don't have anything to say.  But I know that you 100 percent were the person that made me have a stroke the next

day after I saw you.

So, Your Honor, I don't have anything else to say.

THE COURT:  Thank you.

VICTIM TM:  I just hope that you -- since I'm the first to speak that you actually take this into consideration because I believe that nobody should go through what we all went through.  Thank you.

THE COURT:  Thank you.

MR. BUCHANAN:  Your Honor, we would ask the victim identified as MC in the second superseding indictment to come forward.

VICTIM MC:  Your Honor, it is going to take me just a second to get it together here.

THE COURT:  Take your time.

VICTIM MC:  It just brings up a lot of emotion to be here, and it takes a second.

Mario, the night you broke into our house scared us half to death.  We were coming off of a hard year of cancer treatments for John and followed by the sudden death of his mother, which left us pretty ragged out, to say the least.

We were sitting in our office that night trying to catch up on bills and her estate stuff and paperwork and all.  And you came in with a gun drawn at our faces.

And the next hour and a half was a horrible time of taking all my jewelry and other items of ours.  Every piece of

that jewelry, Mario, was something that John had worked hard to give me over special occasions.  One piece, like Toni had mentioned, was a piece I inherited from my grandmother.  I was named for her.  It was really the only thing I had to remember her by.  And I remember when you took it I just felt like I was going to fall over.  It was the only thing I had left of her.  I remember feeling so sad when you took that ring.

You were not satisfied with the amount of cash we had in the house, so you wanted us to go to the bank to get out as much cash as we could.  We were terrorized that night, and our kids were terrorized when they found out what had happened in our house.

We were highly unsettled for the next six months until the arrest came through.  It was hard to think about someone wanting to do that to us when we had not done anything to you.  It was hard to think of a fellow American wanting to do that to me.  I would not do that to you.  My faith in the Lord helped me through the nightmare.

The next morning was Sunday.  So even though we hadn't had a lot of sleep -- there were crime processing units there and all until pretty late in the night.  It took a long time for our kids to settle down.  It took a long time for all of us to settle down.

So we got a few hours of sleep.  And we went to church the next morning.  We went to Passion City Church.  And

I think it was there that I started to get it together.  Thank God for that place.

My brother, who is a trained minister, came over to our house the next day or two after.  And he went around to each of the spots that were very tough, the memories.  And he spoke scripture over every place:  The window where you came in, the place where we stood in the basement, in the bathroom where you shoved us when you thought our son was coming home.  My brother spoke scripture over those places, places where we thought we were going to die.

And I remember at one point thinking my family will have to raise my kids.  That was the thing that went through my head.  My family will have to finish raising my kids.  The toughest memories.

But I want to segue from that night because you remember it, I remember it.  Everyone in here remembers the night of horror that they went through.  I want to tell you that I became a Christian when I was 24.  God chased me down when I needed help.  He surrounded me with Christian friends, a good church, and the knowledge that I needed him because I did need him.

I had lost my father when I was 12 to alcoholism.  And it left me feeling so empty and alone and just like there was a hole in my heart.  And God spoke to me one day and told me that he was my heavenly father.  And I will never ever

forget that.  It changed my life.  That is the day I came to know the Lord.

The knowledge that he told me that he was my heavenly father meant a lot to me because I had lost my father early. All of that loneliness, all of that emptiness left that day.  I was a smoker, and I had been trying to quit smoking.  I couldn't do it.  For some weird reason that day on after, I never smoked another cigarette.  The addiction just left me.

As I started my new life, I had so much to learn. Reading the Bible, prayer, and church became new disciplines in my life.  One command that God gives Christians in scripture many times is to forgive those who hurt you.  And it is tough. That is a tough thing to learn, and it is a tough thing to walk out.

But he asks us to do it because while we are lost in sin he came to earth to die for our sins and forgive us.  And so he asks us to do the same.  And so that is what I endeavor to do, to forgive you.  Luke 6:27, Jesus says, love your enemies, do good to those who hate you, bless those who curse you, pray for those who mistreat you.

I started this several years after I came to faith. I had a family member I had to forgive, and it was hard.  Also I was carjacked in 1998 while I was six months' pregnant with my youngest son.  And so I prayed for that man.

The Lord has taught me this lesson many times now.

12

And so I started praying for you right after that incident happened, Mario, every day. Every day for a long time I prayed for you every single day. And I believe that I have forgiven you with God's help. And in 2 Peter 39 it says the Lord is not slow to keep his promise as some understand slowness. He is patient with you not wanting anyone to perish but everyone to come to repentance. Everybody in this courtroom. Everybody.

John 3:15, everyone who believes in him may have eternal life, for God so loved the world that he gave his only son that whoever believes in him shall not perish but will have eternal life, for God did not send his son into the world to condemn the world but to save the world. Where God wants to bring life, light, salvation, redemption, direction, and protection and so much more, the enemy lies to us. He is the father of lies. He wants to trick us into hate, into bad ways of living, into stealing, into killing or wanting to kill someone. He wants to ruin us. He wants to burden us. He wants to steal -- steal, kill, and destroy everything that is good and God-given in this life. He is the father of lies.

So I'm asking you today, Mario, to choose life. I'm asking you to turn and I'm asking you to choose life because God is reaching out for you the way he reached out for me. And I hope you will. I have prayed that you will, and I hope that you will.

And I think that is all I've got. But, anyway, thank

you, Your Honor.

THE COURT:  Thank you so very much.

MR. BUCHANAN:  Your Honor, the victim identified as JC in the second superseding indictment.

VICTIM JC:  Thank you, Judge.

Mario, you have done a lot of evil things.  I hope that justice will be served today.  I want him to serve the full 25 years.  I know there's probably ways to reduce that.  I don't think it is appropriate.

Through prayer and processing your heinous act towards us with my wife, I have replaced the anger and the hatred that I felt toward you with forgiveness.  Forgiveness is hard.  It is hard.

The first time I saw him in this -- saw you in this courtroom, I wanted to jump the aisle and beat the snot out of you.

THE DEFENDANT:  Pardon me?

VICTIM JC:  I wanted to beat you up the first time I saw you several years ago after being in our house and treating my wife that way.  But I've forgiven you.  I encourage you to seek God, to repent, and ask him for forgiveness.

Proverbs says the path of the righteous is like the first gleam of dawn, shining ever brighter until the full day of light -- full light of day.  But the way of the wicked is like deep darkness.

14

I don't want deep darkness for you, Mario.  I hope that you choose life.  And I hope that he serves the full sentence as we expect.

THE COURT:  Thank you very much.

MR. BUCHANAN:  Your Honor, the victim identified in the superseding indictment as SM.

VICTIM SM:  Thank you, Your Honor.  Nice to see you again, Judge.

THE COURT:  Thank you.

VICTIM SM:  We have got to stop doing this -- meeting like this.

Mario, there's -- I can go through kind of the steps of what you did to me.  And hearing the other victims talk about forgiveness, I can even work towards forgiving you.  But for my three children that you screwed with that evening when you came in my home and pushed my what was a 13-year-old to the ground, pistol whipped him down after he went to grab on to his mom, showed him the bullets in the gun, and then went ahead and took my other son out of his bed and went ahead and grabbed him and pulled him into the group where we are -- who I asked the next day how did you get to where I am and he said they came and got me, and I said what did you think was happening.  He said I thought they were stealing me.  This is a nine-year-old, ten-year-old boy who has to think that someone can come in their room when they are sleeping and think that they are

stealing him.

Think about that.  My nearly ten-year-old son -- please pay attention to me because this -- I'll wait.  My ten-year-old son had the opportunity to think he was being stolen from his home.

So when we talk about forgiveness, I struggle forgiving you.  And what one of the other victims said that there's justice to be served -- I know there is shucking and jiving.  We're going to talk about all these mitigating factors.

The mitigating factors that I can't overcome is you came into my home, you held me at gunpoint to my head, you abducted me, you took me to an ATM machine in the back seat of my car with a gun, proceeding to call back to the house where my wife was being held with my children with a gun to their heads saying if I did anything my wife would die that night -- my wife would die that night while she is sitting there and then proceeding to tell me that you're going to take the girl -- that you are going to take my daughter and the next day I'll give you $15,000 and you'll give her back to me and I have to convince you not to take my daughter, who is nine.  Nine-year-old girl -- you are going to tell me that you're going to take her out of my home.  And you are good with that.

During this whole process, you continued to use the term, I was just doing my job.  The last time we were all here

together you wanted to be very clear to everybody, Number 1, that when a ring was found at a pawn shop that you didn't do pawn shops, you were better than that, you had ways to distribute your stuff.  So clearly this isn't just a, hey, we did this once.  They got a pattern.  They have a path to go ahead and broker goods.

And then after that, you proceeded to tell the courtroom, I just want to be on record that I was just doing my job.  What kind of fucking job is that?  That you terrorize all of these people in this courtroom?  That you change lives because you were just doing your job?

I do a job too.  I get up every day.  I put my pants on.  I earn an honest living.  And I work my butt off for my children, my family, and everybody I'm with.

But you, on the other hand, have a different view of what doing your job is and show no remorse for it.  We went through seven years of you proceeding to tell us that you were unfit to stand trial, that you had all sorts of issues.

Yet the clarity when we get to this point is amazing.  The clarity that we have now is that you were just doing your job.  I struggle with that.

And I know other victims have talked about forgiveness.  But you messed with my children.  You messed with my wife.  You messed with my family because you were just doing your job.  I still have children that when they go in dark

rooms at night don't want to turn off the light because they are afraid they will see you.  Yeah.  No shit.  They will see you.

Don't look surprised.  When you hold a gun to a nine-year-old girl's head or a ten-year-old boy's head or a 13-year-old boy's head, there are consequences, there are impacts.  And you caused these things to my children.

And everybody is sitting in this room has to understand everybody processes trauma and grief very, very differently.  And when you talk about my children and my wife, it is just plain wrong.

The things you did when you were just doing your job and you held gunpoints -- or a gun to my children when you were just doing your job and you put my wife in a closet, when you were just doing your job when you took me out of the house at gunpoint and took me to an ATM machine to get you money, when you were just doing your job when you threatened to take my daughter, when you were just doing your job when you went ahead and proceeded to tell me to get in the closet with my family and count to 100 and after 25 you opened up the door and told me it is a good thing I didn't come out because you would have shot me -- when you were just doing your job.

I will tell you you are very good at your job because I've heard you have done it many times obviously with the victims there.  So you were very good at what you did in a

really, really bad way.

I can't tell you how proud I am of my children that they have been working towards overcoming the trauma and grief that they faced.  I have two that couldn't come today because they didn't want to see your face because they were afraid that they would see your face over and over again.

THE DEFENDANT:  Who came today?  Scott?

VICTIM SM:  You don't get to ask me questions.  You get to listen.

My heart has been broken.  I couldn't go back to my home because my family saw that home as the devil's home.  You were just doing your job though.  I understand that.  You clearly had no issues of competency.  This was all well-thought-out because you were just doing your job.

So, again, you're going to shuck and jive.  And your counsel is going to come up and say, let me tell you what I have gone through.  You are not the victim.  I am.

THE DEFENDANT:  I have been a victim.

VICTIM SM:  They are.  You are going to come up with 100 reasons why you shouldn't serve your sentence.  And I call bullshit on that.  Because we have been harmed in a really, really bad, emotional, horrible, angry way.

And I don't wish you ill will.  But I think you know when you do your deed and you are doing your job you get the compensation for it.  In this case, your compensation is

measured in years, not dollars.

And I'm just so disappointed that our paths crossed. I'm so disappointed that you walked in my back door that night uninvited. I'm so disappointed that you went ahead and threatened us. I'm so disappointed you told me to get $15,000 out of the ATM machine at the bank the next morning and that you were going to come back. I'm just disappointed in you.

But I'm proud of my family, and I'm proud of my children, and I'm proud of my wife, and I'm proud of my friends that have been with me to help me through this period of time. And I'm very proud of those folks because they have been there with me.

But, again, I get back to you, Mario. You need to do your time. You don't need to do less. In fact, I think 25 is a gift to you. Because it should be more for what you did and the frequency you did it and the thoughtfulness with which you did it. Because, Your Honor, he was just doing his job.

Now it is time for us to do our job. Because after seven years -- seven -- every delay that we could possibly do from the defense has been done. We had to go through multiple iterations of trying to prove we were competent to even be here. Yet he was competent enough, Your Honor, to tell you he was just doing his job.

I implore upon you, Your Honor, to do your job now. Thank you.

THE COURT:  Thank you very much.

MR. BUCHANAN:  I believe that is all from the victims, Your Honor.

THE COURT:  Thank you.  Do you have anything else you want to say with respect to the sentencing?

MR. BUCHANAN:  Your Honor, I can't say it any differently than the victims have put it.

The Court is aware we've negotiated a plea to 25 years, 300 months.  We believe that this agreement reflects the items that the Court contemplates in Section 3553(a).  Clearly, this is a very serious offense.  It was something that was violent, traumatic to a number of folks.

Mr. Jackson has an extensive criminal history.  And so we believe that this sentence is necessary to promote respect for the law and to deter Mr. Jackson from future offenses.

Your Honor, it is the end of a long road.  And we ask the Court to consider the information that has been proffered by the victims in this case.  And we ask the Court to enter the sentence requested by both parties.  And that is a sentence of 300 months.

THE COURT:  Thank you.

Mr. Ertel?

MR. ERTEL:  Judge, it is an agreed-upon plea to 300 months.  My sentencing memo -- I'm not going to rehash stuff

that is in there.  We think that the Court is aware -- well, first of all, I need to be clear that there is a 21-year mandatory minimum that I did not put in the sentencing memorandum.  So no matter what, there are three 924(c)s that stack consecutive.  So the lowest possible sentence under law is 21 years.  And I apologize for not putting that in the sentencing memo.

Judge, I think in the news recently there has been a lot of attention played to the conditions at the United States penitentiary.  There is Congressional inquiry into the conditions there.  And that is something that I think the Court can consider.

I think I would be remiss to say that these were not very, very serious offenses.  There was potential for grave injury, shall we say.  There have been injuries suffered.  But I mean, there's no doubt that when people enter somebody's home with guns, things can go bad.  And I think in one sense we're lucky that we're not in a different type of trial.

But Mr. Jackson is probably -- I have been doing this a long time.  And he probably is one of the most -- has experienced some of the most horrific events.  And I'm not going to detail them here.  They are in the sentencing memo.  I think the Court should consider that.

And I have confidence that the Court will enter a sentence that is reasonable and appropriate given the facts of

22

the case and the character and history of the defendant and what he has gone through.

Like I said, he has been at the United States penitentiary for seven years.  And the conditions are deplorable.  We've been through this dozens of times on this and other cases.  Hopefully something will come of it.

But I ask -- I know that the Court has the discretion.  I know the Court is aware of the discretion -- its discretion.  I know the Court is aware of what sentences it can impose.

And I ask the Court to impose a reasonable sentence.

THE COURT:  Does Mr. Jackson wish to -- did you want to say something?

MR. BUCHANAN:  Just one quick thing.  I don't quibble with Mr. Ertel about the conditions at USP Atlanta.  But Mr. Jackson has been at several facilities.  He's been at Devens in Massachusetts.  He was housed in Miami for a bit.  I don't think he's at USP Atlanta currently.  And a large part of that is due to his own behavior.

So while we don't argue about the conditions there, he has not been there the entire time of his --

MR. ERTEL:  I think that is accurate.  I agree with that.  There have been, you know, maybe a year, year and a half that he might have been at other facilities.

THE COURT:  Okay.  Thank you.

MR. ERTEL:  Do you want Mr. Jackson to stand?

THE COURT:  I think he can sit.  He can speak from there.  I think we'll get a clear --

THE DEFENDANT:  All right.  Good morning, Judge Totenberg.

THE COURT:  Good morning.

THE DEFENDANT:  I just want to say top of the morning -- top of the morning to everybody in the courtroom.  I just want to say November 2020 President Joe Biden stated -- he stated a speech and he stated this --

THE COURT:  Can we just get the microphone a little closer?  I know that the individuals here would like to hear as well.

THE DEFENDANT:  I said top of the morning.  I said November the 7th, 2020, President Joe Biden had a speech.  At the end of that speech, he stated as he was over at his grandparents' house he stated to all America people -- he stated as he was leaving his grandparents' house his grandfather stated to him, Joe, keep the faith.  As he turned around, went forward to the door, his grandmother stopped him and told him -- and stated to him, Joseph, just don't keep the faith, just spread the faith.

And I just want to say that I do believe that President Joe Biden -- he going to spread faith into the whole United States citizens.  I just want to say that first.

Okay.  Second, I want to say, Judge Totenberg, I had a rough life growing up.  My grandmother passed away at age 11.  So I didn't have noplace to go.  This is the truth.  I grew up in poverty.  I don't want nobody to feel sorry for me or nothing like that.

But at 12 years old, 13 years old, I was going back and forth in juvenile for stealing, breaking in houses, breaking in cars.  I did a lot of illegal activity at the age of 12.

And I just wanted to state this right here -- to the lady right here that says she has been sexually assaulted.  I have been sexually assaulted in my life before.  I won't ever sexually assault you.  So I hope you do sleep well at night because I don't believe in that at all.

And I had a rough life, Your Honor.  So I was back and forth juvenile in and out.  I went to many places for suicide when I was young.  I was thinking about killing myself because the life -- I was young.  I was living.  So I went to psych wards many times in my life.  My medical record, my juvenile record will prove it.

So I really been incarcerated all my life.  So at the age of 18, 19, I went to the penitentiary.  And I was around a number of people that really taught me to do more crime.  I hate to say this.  But I see drugs smuggled into the prison system and all type of things.  And I was like wow.

So really I just want to say I have been around crime all my life. And I have been a victim all my life. I ain't ever had a father or a mother. My mama mentally ill. My mother, she is mentally ill. Sometimes I can't even understand her at all. So I was getting like an SSI check while I was young. I really didn't get to see the money because the person that was getting the check didn't ever took care of me at all.

So if I would have had a father figure or a mother in my life, maybe my life would be different. But I ain't ever had no father or no mother at all.

I understand the prosecutor, Ryan Buchanan, saying he got a criminal history, but you got to look how my life started. If I would have had somebody to teach me right and wrong, I probably wouldn't be here today. I had to get in the streets and do crime. I didn't have nobody.

I was staying with my auntie when my grandma passed away. And she loved her kids more than me. So it was like -- it was crazy.

So also I just want to say to the victim -- the second victim, I feel your pain, what you said that you a Christian lady. I remember when I was in your house and your closet you stated to me I want to pray for you. And I said, ma'am, thank you, but I'm not going to pray right now. I remember that.

And I just want to say to you, the second victim,

stand up -- the woman that I got you and your husband in your office -- I remember that night.  And I just want to say to you I feel your pain and I apologize and I appreciate that night while I was in your closet you stated to me I'm going to pray for you, let's pray right now.  So I did felt that angel in you 100 percent.

And also I want to say to all the victims:  I hope you do accept this plea like I accept this plea and forgive me. I have been a victim all my life 100 percent.  I got stabbed in prison, you know, for not -- for -- for not doing other things for other inmates.

So I just wanted to say that, hey, just forgive me. You know, that is all I can just say in the courtroom.  Just please forgive me, you know.  That is all.

And one more thing, Your Honor.  I had a rough life. And like Ryan Buchanan just stated, I went to Devens, Massachusetts.  And I went to FCI.  I stayed at FCI Miami for like two months.  I went to Devens, Massachusetts, and stayed for like about four months.  And when I went to Devens, Massachusetts, and they were like -- they told me, like, what is going on with you?  What is going on?  What -- can we help you?

I said Atlanta took me off my medication for 18 months, left me cold turkey.  And I asked them why they took me off.  They looked in the computer, and they stated that we

don't know what is going on with Atlanta.  We're going to put you back on your meds.

I actually got a real mental health problem.  Juvenile tried to help me when I was young.  But it is like twice I went to see a lady and talk to her in my life.  And my auntie took me twice.  And I talked to the lady and stuff like that.  And juvenile helped me get medication and stuff like that.  I took them.  Even though in my report, one of my co-defendants stated to Ryan Buchanan that he always have a lot of medication with him.  Yes, I take my medication on the streets.

So I just want to say that I have been struggling all my life.  And as to the victim though, I have been a victim all my life, once again.  And I feel your pain.  Because I am a victim.

And I got to say this on record:  To the lady just stating first that she said she don't really just know who sexually assault her.  Believe me, I'm a man of my word.  I am honest.  If I would have did that, I would have tell you.  It wasn't me, Mario Jackson, at all.  Because I feel that pain.  I feel your pain on it.  It wasn't me.  Believe me, I would tell you, yes, it was me.  But it wasn't me at all.  I don't touch no woman at all.

So, Your Honor, I just want to say -- have the Court have mercy on me.  And I'm asking for mental health treatment

in the BOP.  I'm asking you please put that in your judgment and commitment because I need it.  I actually need counseling.  I actually need help.

And I feel their pain when they say they have nightmares because I do all the time.  If I would have had a father figure or a mother, I probably wouldn't even be in this courtroom right now.  I probably would have been a lawyer or anything.

But I was around criminal activity when I was young in the hood that I stayed in.  And that is all I see, drug selling, guys bringing things back to drug dealers and selling them, and making money.  That is all I seen.

I didn't see no positive telling me to do this and do that.  So I just want to tell all the victims you just can't say that, hey, I wish death from you.  You have got to see where it start at first.  I ain't never had nobody in my life to help me out while I was young.

My auntie told the courts in juvenile court that she don't want me, I don't belong to her.  My mom cannot raise me because she got a mental illness problem.  She take medicine like I do.

So I'm around a number of gangsters and robbers and kidnappers and stuff like that and misleading me.  That is all I know.  But I'm going be honest with you -- to the courts.

I'm glad that I got incarcerated in federal court

because it taught me a lot.  It taught me a lot.  I'm around people -- individuals incarcerated from all around the world and tell me different kind of stories that I ain't never really just been, African people, Caucasian people.  And they telling me different stories and stuff like that.  So I'm glad that I'm in federal custody.  I wish I didn't went to the state.

The feds teach you a lot.  It teach you about politicians.  It teach you a lot when you are around certain inmates.  And I'm just like a sponge.  I'm trying to soak up knowledge.  And I soak up knowledge from Jeff.  And I'm glad that Natasha here.  She gave me knowledge when I first got incarcerated because I was blind to this federal stuff.  I was blind.  But now I know.

And I just want to say to Natasha I'm glad she here. I call her Natasha a/k/a Queen.  Jeff, thank you for everything you did for me 100 percent.  Thank you.

But I just want to say I'm not mad at Ryan Buchanan or the agents that incarcerate me.  They were just doing their job 100 percent.  So I can't get mad at the prosecutor.  That is his career.

But I just want to say to the Court I really need mental health treatment.  Please, please put that.  I need it. I need it bad.

And I'm asking -- and also, Judge Totenberg, I'm asking the courts for credit.  The reason why?  I'm not just

asking because the pen. I'm asking for my childhood. I got my whole records in here.

Also USP Atlanta, how they treat inmates is kind of crazy. We have the right to come out, law library time. We have the right to go work out. My vitamin D is so low from the sun that they gave me 50,000 milligrams of vitamin D for being locked down so much.

So it is kind of hard -- hard over there. And you've got people fighting for their lives. How can they even fight for their lives if they don't even come out? And, Amy Judge Totenberg, you gave me a court order in 2018 to be out for law library time. And they don't even honor that.

And also yes, Your Honor, I caught many write-ups over there. The reason why I caught many write-ups is because they took me off my medication. I'm going crazy. I'm cold turkey in the cell. I'm insane without my medicine.

Medicine do help me. And I hate to say this, but it is true. When you are around -- when an inmate is around -- well, inmate in a facility and the normal Blacks that run a facility -- it is going to basically be ran wrong. But when you are around a lot of Caucasian people running the facility, they give you things what you are supposed to have, they help you out, they talk to you, they give you the medication and stuff like that.

So that is why Atlanta is ran wrong because it is a

lot of Black people that is not doing their job.  So I just want to leave it there about that facility.  And I just want to say and leave the Court with this:  Everybody in the courtroom, we are all people.  We have two sides:  A good side, a bad side; a past, a future.  We must all embrace both and somehow love me, Mario Jackson.

Amen.

THE COURT:  Thank you, Mr. Jackson.

Is there anything else that the --

MR. ERTEL:  No.  Thank you.

THE COURT:  -- that you are requesting?  Is there something in particular with regard to the mental health?  Are you requesting a specific designation that you think would be helpful?

MR. ERTEL:  Yes, Judge.  If it is appropriate with the BOP, I think a mental health facility, you know, Butner, Devens.

THE COURT:  There is a tidal wave of pain in this room, enough to sweep the globe again and again and again.  And, sadly, the Court can't cure that pain.  But I have heard the pain.  And I want you to know that.  And I have heard the trauma, the shock, the enduring nightmares of you and your loved ones and all that you have had -- the journeys that you have had to take to grapple with it and grapple with all that your loved ones have gone through.

And that is not to in any way, Mr. Jackson, deny that you have -- you went through a horrific childhood yourself of abuse and deprivation and mental illness.  I think all of that was considered when the Government came to an agreement with your counsel, with you for a 25-year sentence.

I can understand why some of you would like the defendant to have -- be incarcerated for life because it is -- and others feel -- have -- are able to cope with it in a different way.  But I think that the parties did their best and counsel in particular did their best to try to come to an agreement that would also preserve your sanity and impose punishment and protect you and your families for years to come.

This was a grievous set of house invasions, home invasions, psychic invasions.  And, Mr. Jackson, since you yourself were -- as a child were a victim of such assaults in some ways, it is true that you can understand how it terrorizes you for a lifetime.

But it is also different.  These people were living with their families.  And out of nowhere, like a bolt of lightning full of hell arrives on their doorstep.  And they are terrorized.  And there are things that you said and the way you handled it and the way you were very manipulative at that time -- and it is not to say that you weren't mentally ill either.  But it terrorized them and their children, if they had children, and their spouses that day and for years to come.  It

33

is a nightmare.

You know, there are -- so I'm not going to deviate from the 25 years that the parties agreed on.  And there was good reason.  And it was in its own way trying to bring closure.  No more -- no appeals that would have made you feel like it was going on and on and on and what was going to happen or some error that I might make in a trial and it was going to go on and on and we would have to have another trial.  Not that I think that would happen.  But that is just the way of the world.

And no doubt, Mr. Jackson, I will do everything in my power, which is not necessarily such great power, to make -- to -- in the strongest of terms try to get the BOP to get you the treatment that you need and an American citizen deserves still.

What happened at the penitentiary is totally unacceptable -- the depths to which it has fell.  And just so that people here understand, that individuals incarcerated were basically not let out of their cell.  They had no time out of their cell for days and days and weeks and weeks on end and had -- were given clothes -- one and two outfits for 30 days with no -- no sanitary conditions, no hot meals, nothing.  And medication wasn't provided.

None of that though deals in my mind -- I mean, even though I am somebody who has recognized this and strenuously

spoken out about it, it doesn't mitigate the fact that the -- the fact that the 25 years here is still the needed sentence to protect the public and to afford you whatever medical assistance that you need but -- and to be an appropriate deterrent for the future. And that is -- those are the critical sentencing factors.

It is not greater than what is necessary. You committed these crimes when you were 28. You are 35 now. And I dearly hope that you will get yourself into shape that you have some portion of your life. And I recognize that you, in fact, even yourself understand that you are a very smart man still -- extremely smart. And no one wants to live in a prison.

But you, in fact, have already obviously recognized that there are opportunities for your own education there. I'm not sugarcoating it in any way. But you did terrible damage to these people and their families that is enduring.

One of the things that I wanted to note was what a remarkable group of people that you-all are who have come today and said your piece in such different and human and meaningful ways. It says a lot about the extraordinary range in which people experience these traumas and also the way you cope with it and the friends you have assembled to protect you, to support you, the power of your anger, the power of your forgiveness, and the total humanity that you have manifested at

the same time.

I want to thank you for your courage in being here and surviving.  I want you to know that I recognize you.  I recognize the pain you have experienced and the terror and your incredible determination to reconstruct your lives, to love your families, to move onward.

And that is what you have to do.  And you don't need a judge to tell you that.  You might need a minister.  You might need your best friend, your mother, the memory of your mother, the mother that Mr. Jackson never had.

So it is not my place, but I will say this or I'll share this with you.  My father, who was a quite remarkable man, who came to this country two or three years before -- two years and was able to before the holocaust went into full blast talked to me at some point about how -- how different people survived the war and concentration camps and his sister and my beloved cousin survived in hiding for years.

But we were talking about really some of the people from coming out of the concentration camps who he knew in Poland and said, you know, what is so remarkable is -- he told me was, you know, some people never get over it, just can't get over it, and it just is a shadow their entire life.  And understandably.  And others because of their psychic -- the way they are and their body chemistry, their whole life chemistry are able to move on.  It is still in them.  It is terrorizing.

But it is -- but they live.  They thrive.  They give to others.  And he was in particular talking about this woman he knew well, also, you know, some extended cousin who was a doctor and who managed to take care of everyone while in the concentration camp and then not give up and continue to do so and move on and take care of people again and again and again and again.  And I think it is the greatest cure in life to take care of others, to be able to offer that, and to love others.

And as scarred as you may feel, I think we're all better off if we can move on with our love and our care and our commitment because it is restorative.  As angry as you are, as infuriated, as traumatic, this -- your greatest salvation is still to figure out how to move on to the next chapters of your lives and that is -- and your children.

And I know you-all have been doing that.  But continue in all of the ways that you might need to do it.  But continue, continue, continue.  Because I can't do more in here, other than to recognize what has occurred and to impose the punishment that the parties agreed on, which I thought was reasonable.  Because I'm telling you:  It would have gone on and on in other hurtful ways for you.

You will be protected.  And that is also what you can tell your children.  They are protected.  And I certainly am going to provide hope that the hearings that were held make a difference.  But that, Mr. Jackson, you are not going to be in

37

a pretrial facility.  And there will be opportunities -- not only will I recommend it on paper, I will call up the Bureau of Prisons designation unit.  And whatever authority I have, I will try to make sure that you get the type of --

THE DEFENDANT:  I'm going to be honest with you, Your Honor.  Excuse me.  If I don't get the help that I should get, I'm going to get out and do the same thing.

THE COURT:  I understand.

THE DEFENDANT:  It will probably be more worse.  I'm being honest with you because I actually need help.

THE COURT:  I know you do.

THE DEFENDANT:  Like -- I just want to say something like -- I stated to all the victims that I'm not going to hurt you, I just want things valuable out the house.

THE COURT:  I know you do.

THE DEFENDANT:  I don't know what might happen if I don't get help when I get out.  I'm asking for help.

THE COURT:  I understand that.

But for all of those reasons -- and I have, I think, in the process considered all of the sentencing factors under 3553(a) -- I find that the appropriate sentence in this case is 35 -- is 25 years.  And I have identified the justification for it.

So pursuant to the Sentencing Reform Act of 1984, it is the judgment of the Court that the defendant, Mario Deandre

38

Jackson, is committed to the custody of the Bureau of Prisons to be imprisoned for a total term of 300 months, which consists of 48 months as to each of Counts 2, 5, 7, 10, and 12 to be served concurrently to each other and 84 months as to Count -- each Counts 3, 6, and 13 to be served consecutively to each other and consecutively to Counts 2, 5, 7, 10, and 12.

The defendant shall pay a special assessment of $800, which shall be due immediately.  I find that the defendant does not have the funds to pay a fine and the cost of incarceration. And therefore that is waived.

Is there any property to be forfeited?

MR. BUCHANAN:  Your Honor, we've got a consent proposed order.

THE COURT:  All right.  The property will be forfeited consistent with a forfeiture order to be presented. The final restitution amount is pending with the amounts to be determined jointly and severally with those other co-defendants.  But several of the co-defendants have died.

And we have identified the victims as JC and MC, MM and TM, SM and family, JP and JT, NW and SW.

Counsel, was it your thought that any of the terms of this should be just set forth later or not?

MR. BUCHANAN:  Is Your Honor talking about the restitution?

THE COURT:  That's right.

MR. BUCHANAN:  Yes, Your Honor.

THE COURT:  All right.  I'm going to defer any other discussion of restitution until that time.

The Court strongly recommends that Mr. Jackson be designated to a facility where he can be provided with intensive mental health services and support and that he receive individualized counseling on an ongoing basis for at least three years and that he receive further counseling services throughout his incarceration period.

Upon release from imprisonment, you'll be placed on supervised release for a term of five years, which consists of three years as to Counts 2, 5, 7, 10, and 12, and five years as to each of Counts 3, 6, and 13.

Is the Government requesting that any of this time be done sequentially or not?

MR. BUCHANAN:  I'm not certain I heard you.

THE COURT:  Are you requesting any of the time to be done -- the supervised release time to be done sequentially, or do you have a specific request as to the -- as to the length of time of supervision?

MR. BUCHANAN:  We would like for it to run as long as possible, Your Honor.  So sequentially.

MR. ERTEL:  Judge, I think by law it has got to be concurrent.  I think you can impose a set of concurrent -- and once it is revoked, they might be able to.  But my

understanding is that it has to be concurrent.

THE COURT: All right. I'm going to run it concurrently. But as to Counts 2, 5, 7 -- I'm sorry. Under Counts 3, 6, and 13, I have discretion to go above the five years. And I will under the circumstances here. And I will provide for a ten-year period of supervision. If Mr. Jackson is in full compliance after five years, he could move for modification of that.

**(A discussion ensued off the record between the defendant and defense counsel.)**

THE COURT: I'm just pausing here. Because if you disagree with this and you think I'm not legally authorized to do this, I would rather hear it now than later.

MR. ERTEL: Judge, Mr. Jackson points out -- and I think rightfully so -- that the plea agreement says that it is up to five years of supervision in the plea agreement that was signed. That is on Page -- it is on Page 3 of the plea agreement -- 3 and 4.

THE COURT: Okay. He is right.

All right. Then I'm going to go back to five years. But let me just explain to you so -- just that if you do violate the supervised release in that five-year period, I'm authorized under the law to extend it.

So while we would have a hearing and we would go through all of that, I'm hopeful that will not happen. But

41

that is the way the supervised release works.

While you're on supervised release, the following mandatory conditions will apply.  You will not commit another federal, state, or local crime.  You must not unlawfully possess a controlled substance.  You must refrain from any unlawful use of a controlled substance, and you must submit to one drug test within 15 days of release from imprisonment and at least two periodic tests thereafter.  You must cooperate in the collection of your DNA as directed by the probation officer.  And you must make restitution in accordance with the terms to be determined once we -- the other defendants are sentenced.

As part of your supervision, you must comply with the standard and mandatory conditions adopted by this Court and the additional -- these additional special conditions.  Any criminal fines or penalties still outstanding you must pay while you are incarcerated within five years.  I am not dealing here with the payment of any -- again of any restitution due.

**(A discussion ensued off the record between the defendant and defense counsel.)**

THE COURT:  Is there anything I need to pause for?

MR. ERTEL:  No.

THE COURT:  You must make a full and complete disclosure of your finances and submit to an audit of your financial documents to the extent you have any at the request

of the probation officer or the United States Attorney's Office. And that really goes to the question of -- at the issues of handling any payment of restitution as much as anything else. And if there is restitution ordered and there is the ability to pay the restitution, you must not incur new credit charges or open additional lines of credit without approval of the probation office.

While you are on supervised release, you must submit your person, property, home, residence, vehicles, papers, cell phones, and other storage devices or vehicles to search by the United States Probation Office if there is reasonable suspicion that you have violated the law or violated the terms of supervised release. And you must cooperate in that. And if there is any unlawful materials or contraband found, you must agree to confiscation of such.

The probation officer is authorized to determine whether substance abuse testing is appropriate. It is a long time before you will be released. So I think that that is premature to be determining that. The probation officer is also authorized to determine whether -- based on your record in prison whether you need any alcohol or substance abuse treatment program.

You are required -- and this is mandatory -- to continue to receive mental health services on an intensive basis upon release and to continue to take your medications

that are prescribed.  The probation officer is not authorized to modify the mental health counseling requirement.

You must not use or possess any unlawful substance, and you must take all mental health medication prescribed by your treating provider.

And your request was for designation to either Butner or --

MR. ERTEL:  Butner or Devens.  Butner, North Carolina.  Devens, Massachusetts.

THE COURT:  And I will make that recommendation.

Mr. Jackson, you waived a substantial range of your appeal rights.  To the extent you retained any, you would have to exercise your right to appeal and file a notice of appeal within 14 days of the date of this judgment.  You would -- so you will need to talk with your counsel about that.

If they are not willing or able to represent you and you desire to appeal, you could ask for me to appoint another attorney for you at no cost to you, you could retain your own attorney at your own cost, or you could write a letter to the Clerk of the Court indicating your desire to appeal.  The important thing is there is only 14 days to appeal from the date of the judgment.

THE DEFENDANT:  Excuse me, ma'am.  Judge Totenberg, what you just stated?

THE COURT:  I said:  If you desire to appeal, there

is only 14 days to appeal.

THE DEFENDANT:  Okay.

THE COURT:  You waived a substantial range of your appeal rights.  And so I don't think it is likely appealable.  But that is for you to decide with your counsel.

So that is the -- and what I said was:  If your counsel is not willing or able to represent you, you would -- could ask me to appoint somebody else to represent you, another counsel, or you could hire your own lawyer at your own expense, or you could write to the Clerk of the Court.  But there is a 14-day limit.

Mr. Jackson, I hope you get the help you need.  I don't just hope.  I mean, I fervently wish that that will happen and the system will work right and that you get that and you are not put into a facility not capable of handling those needs and that you get the medication on an ongoing basis.

And you are an enormously intelligent individual.  The question is can you get the help that you can turn around some portion of your life despite the real trauma that clearly marked your early life, marked your entire life.

And children are deeply affected by trauma and by what happens in their lives.  And you suffered a lot of the wounds of that.  But right now there's still -- and so I deeply hope for that.

These people are trying though with all their heart

45

and the best they have to protect their children and themselves as well from -- and to end the trauma.  And I really genuinely hope that you are able to emerge from this nightmare and move on.

I don't really have anything else to say at this juncture.  So unless there is something that counsel want to say, I'm going to adjourn.

MR. BUCHANAN:  Not on behalf of the United States, Your Honor.

MR. ERTEL:  Judge, there is only one thing.  We had previously filed a motion for return of property.  And the property specifically we're talking about is the luggage -- obviously not the gun -- the guns that were seized -- but the property that was seized at the arrest.  There's the luggage.  And I believe there is also like $700.  And, of course, this will all go to Mr. Jackson's family.

Mr. Jackson got his Social Security check for that $700.  That is not -- you know, if all of that stuff -- there is a cell phone and luggage, I believe, along with I think it is 700-some dollars that was on his person.

THE COURT:  Do you know how you want to address that?

MR. BUCHANAN:  Your Honor, to the extent that those pieces of -- those items are evidence in matters still pending, we'll hold on to them.  And at the conclusion of the case, I'll get with Mr. Ertel and Ms. Silas about returning them.

THE COURT:  All right.

THE DEFENDANT:  Excuse me, Your Honor.  May I say something?

THE COURT:  I don't think so at this juncture.  I think if there's something you want to say, tell Mr. Ertel at this point.

THE DEFENDANT:  I understand.

THE COURT:  Anything else, Counsel?

MR. BUCHANAN:  No, Your Honor.

THE COURT:  Anything else, Mr. Ertel?

MR. ERTEL:  Nothing else, Your Honor.

THE COURT:  Thank you very much.

MR. ERTEL:  Thank you, Your Honor.

THE COURT:  We're adjourned.

COURTROOM SECURITY OFFICER:  All rise.

**(The proceedings were thereby concluded at 12:17 PM.)**

C E R T I F I C A T E


UNITED STATES OF AMERICA

NORTHERN DISTRICT OF GEORGIA


   I, SHANNON R. WELCH, RMR, CRR, Official Court Reporter of the United States District Court, for the Northern District of Georgia, Atlanta Division, do hereby certify that the foregoing 46 pages constitute a true transcript of proceedings had before the said Court, held in the City of Atlanta, Georgia, in the matter therein stated.

   In testimony whereof, I hereunto set my hand on this, the 24th day of August, 2022.




                         _____
                         SHANNON R. WELCH, RMR, CRR
                         OFFICIAL COURT REPORTER
                         UNITED STATES DISTRICT COURT